UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

    ARDITH LINDSEY,

                        Plaintiff,                          COMPLAINT

        - against -

    CITIGROUP GLOBAL MARKETS, INC.,

                        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

        Plaintiff Ardith Lindsey ("plaintiff" or "Lindsey"), by her attorneys Vladeck, Raskin

& Clark, P.C., complains of defendant Citigroup Global Markets, Inc. ("Citi," "the Bank," or

"defendant") as follows:[1]

### NATURE OF CLAIMS

        1.      Lindsey, an experienced and successful investment professional, faced

horrifying sexual harassment, gender discrimination, and sexual assault during her tenure at the

firm. After 15 years at the Bank working in the Global Equities Markets division during which

Lindsey ascended the ranks, including most recently earning a promotion to Managing Director

("MD"), the prolonged, pervasive, and outrageous mistreatment that Citi forced Lindsey to endure

has derailed her career – and her life.

        2.      Contrary to the Bank's carefully cultivated public image, many senior male

executives have created, and the Bank has knowingly tolerated, an environment that has been

---

[1] Lindsey has filed a charge with the United States Equal Opportunity Employment Commission
(the "EEOC") alleging gender discrimination, including hostile work environment, under Title VII
of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"). When Lindsey
receives the notice of her right to sue from the EEOC, she will seek to amend the Complaint to
add claims for gender discrimination under Title VII. The facts set forth herein support those
claims as well, and therefore there will be no prejudice to defendant by this procedure.

openly and notoriously hostile to women, including Lindsey.  Within the Bank's Equities division, Citi has permitted, and, in some instances, has encouraged a locker room environment on its trading floor in which men have treated women as sexual objects and denigrated their accomplishments.  For example, male employees, including executives within the Equities area, ranked and rated the appearance of female employees; openly discussed with each other which female employees they wanted to have sex with; frequently commented on women's bodies; mocked the Bank's sexual harassment trainings and women's initiatives; excluded women from professional opportunities afforded to men; and pressured Lindsey to attend strip clubs and other events where male managers used women solely for entertainment.  In many instances, Citi did nothing to stop the egregious legal violations despite Lindsey and other women making complaints.

3.      In this environment, numerous male executives in the Equities division regularly flouted the anti-discrimination and harassment laws without consequences. Lindsey was repeatedly subjected to extreme sexual harassment, including quid pro quo harassment and a hostile work environment.  Lindsey did not pursue legal claims earlier because, as Citi executives had warned her, she feared for her job and experienced severe trauma due to the abuse.

4.      As set forth below, in 2022 the sexual harassment made it impossible for Lindsey to do her job.  Whatever the risks to her career and her safety, Lindsey had no choice but to confront the employer which had ignored the mistreatment for so long. Moreover, although Citi maintains a purportedly mandatory employment dispute arbitration policy that has prevented public exposure of long-standing discriminatory practices, federal legislation effective March 2022 now permits Lindsey and other survivors of sexual harassment to vindicate their rights in court proceedings.

5.      The trauma Lindsey endured as a Citi employee began in 2007, just weeks after she started as a junior employee at the Bank. A senior Equities executive, Rich Evans ("Evans"), sexually assaulted her. Even though Lindsey reported the incident, the Bank took no action.

6.      Most recently, former Citi Managing Director Mani Singh ("Singh") (whose legal name is Manvinder Bhathal), who was, until November 2022, one of Citi's senior-most global executives in Equities and one of Lindsey's supervisors, subjected her to unrelenting abuse and unlawful conduct.  Singh, using his position of authority and threats to harm Lindsey and her family, coerced Lindsey to have a relationship with him for years.  After Lindsey ended the toxic relationship with Singh in October 2022, Singh subjected Lindsey to an onslaught of shocking abuse via hundreds of text messages and incessant phone calls. Singh's deranged messages included, but are not limited to:

- threatening to kill Lindsey, including texting her, "And I am going to set you on fire" and "[H]ug [your children] tight" because your "world will be over [tomorrow]";

- making malicious comments about her family, including her children, such as "Gon[n]a fuck your life and kids with it too"; "Kids no kids I don't give a fuck [I] plan to burn it all down"; "Your kids['] life will be ruined from here on in"; and "Your children will have no future with [a] Slut like you";

- threatening to reduce Lindsey's compensation and to sabotage her career, including messaging her, "Taking you down in comp[ensation]. Hard. Like a bitch you are"; and "Obv[iously] I plan to use . . . [m]y power. Obv[iously] comp[ensation] is just st[a]rt of where I take it all out."

- attacking her reputation, including texting her, "And I plan to fuck your life. And I may drop something on social media and tag the community. Not clear to me yet on my path. But disloyalty will not go unpunished."

- falsely accusing her of having sex with Citi clients, including stating, "Focus on fuckin[g] more accounts"; and

- making demeaning and sexualized comments about her appearance and body, including texting, "I been asking on floor. You barely top 10 and [t]hat[']s for a trading floor." "Not one person name[d] you hot [on] whole floor. Can't even get a rank on a floor."

During that time, Singh also called Lindsey repeatedly, including in one instance calling her approximately 30 times in a single day.

7.      Lindsey reported Singh's erratic and frightening conduct to Citi management and Human Resources. Shortly thereafter, Lindsey, fearful for her life and her job, disclosed some of Singh's abusive and repugnant text messages to the Bank and described his egregious harassment, which Citi's investigator characterized as "criminal." Unfortunately, even though Citi was aware of Singh's extreme misconduct, the Bank attempted to silence Lindsey's claims and failed to acknowledge the gravity of what Singh had done. Not only did Citi allow Singh to resign, but it praised him when he left the Bank. In reading from a prepared statement on a call to over 150 employees in Equities, Tim Gately ("Gately"), the Head of Sales for the Americas who reported directly to Citi's Global Head of Equities, emphasized that Singh's resignation was voluntary and commended him.  Gately said, among other things, "We're all very sorry to see him go and certainly grateful to the contributions he has made over the years. But it was his decision, and we wish him well."  Gately made those comments, and Citi permitted him to do so, knowing that Singh had threatened to kill Lindsey and harm her family; that Singh had made grotesque and violent sexual comments about Lindsey; and that Singh had used his power and status at the Bank and his control over Lindsey's job to instill fear and terrorize her.

8.      In addition, on information and belief, Citi took no steps to ensure that Singh would not abuse another woman in the industry or that his vile and vicious attacks would not continue with Lindsey after his resignation. On information and belief, Citi did not report Singh's conduct to the Financial Industry Regulatory Agency ("FINRA") or indicate on Singh's U5 Form

that he had engaged in gross misconduct, including his depraved threats to physically harm Lindsey, and his outrageous sexual harassment.  Nor did Citi take any steps to ensure the physical safety of Lindsey.  Citi failed to do so even though Lindsey had provided Citi with undeniable proof of not only violations of the anti-harassment and discrimination laws, flagrant violations of FINRA rules, and industry standards, but also likely criminal misconduct.

9.      Lindsey is currently on an approved leave of absence from Citi as she tries to recover from the trauma she suffered.  As a result of Lindsey having endured years of shocking abuse and harassment while working for Citi, her doctors diagnosed her with Post Traumatic Stress Disorder, Major Depressive Disorder, Generalized Anxiety Disorder, and Major Neurocognitive Disorder and deemed her unable to work.

10.     Based on the conduct described in more detail below, Lindsey brings this action to remedy unlawful gender discrimination and sexual harassment, including quid pro quo harassment and a hostile work environment, in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. (the "NYSHRL"); and the Administrative Code of the City of New York § 8-101 et seq. (the "NYCHRL").

11.     Lindsey also brings this action to remedy Citi's violations of the NYSHRL and New York common law in connection with Evans's sexual assault.  Evans's sexual assault of Lindsey constitutes unlawful sexual offenses as defined in Article 130 of the New York Penal Law.  These claims are therefore timely under the Adult Survivors Act, N.Y. C.P.L.R. § 214-j.

<u>PARTIES</u>

12.     Lindsey has worked for Citi in its New York City, New York office for almost 16 years.  She resides in New Jersey.

13.     Citi is a multinational investment bank and financial services company. It is headquartered in New York City, New York and incorporated in the State of Delaware.

JURISDICTION AND VENUE

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332. First, the parties have diversity of citizenship. Plaintiff is domiciled in New Jersey. Pursuant to 28 U.S.C. § 1348, Citi is incorporated in the State of Delaware and maintains its principal place of business in the State of New York. Second, the amount in controversy exceeds $75,000.

15.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because defendant's offices are located in New York, New York; plaintiff worked in New York, New York; and the majority of the events giving rise to the plaintiff's claims occurred in New York, New York.

16.     Pursuant to Section 8-502(c) of the NYCHRL, plaintiff will serve a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

17.     Although Citi maintains a compulsory arbitration agreement for employment disputes, under The Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("EFAA"), that agreement is not enforceable in this matter. See EFAA, 2021, Pub. L. No. 117-90, 136 Stat 26 (2022).

FACTUAL ALLEGATIONS

Lindsey Joins Citi's Global Equities Markets Division

18.     Lindsey is an experienced investment professional who has dedicated virtually her entire career to Citi.

19.     After graduating college, in or around April 2007, Lindsey joined a financial services company.  In or around August 2007, Citi acquired the company where Lindsey was working.

20.     Following the acquisition, beginning in or around October 2007, Lindsey became a Citi employee.  Throughout her tenure, Lindsey has worked within the North America Markets Equities Division, which sits within Citi's Global Markets business.    According to the Bank's website, "Citi Equities provides investors with a broad range of equity and equity-linked products and services."[2]   Citi boasts that it has "trading desks in over 30 countries and market access in over 70 countries."[3]

21.     In the Equities division, the Bank has multiple sales trading and trading desks. In simplest terms, the High Touch Sales Trading desk handles client orders with a sales trader who monitors the market, confers with the client on instructions, and subsequently executes the client orders which requires a greater degree of human intervention than the Electronic Desk. The Electronic Sales Trading desk handles client directed trades using Citi's computer algorithmic strategies that determine what and when to trade and execute the orders based on various inputs.  The Program Trading desk also uses computer-generated algorithms, but trades baskets of different stocks in large volumes that are part of a coordinated trading strategy.  As set forth below, Lindsey was initially the most junior team member of the Electronic Sales Trading desk and later became Americas Head of Electronic Sales Trading.

22.     The Equities division also provides Execution Advisory Services.  In that area, equity execution consultants work with clients to advise on optimal execution strategy, algorithmic strategy customization, trade cost analysis, market microstructure, as well as generating trading research content. Lindsey assumed responsibility for this team in 2021, in addition to her role as Americas Head of Electronic Sales Trading.

---

[2] https://www.citi.com/mss/solutions/equities/

[3] https://www.citi.com/mss/solutions/equities/

## Leadership in Equities

23.     Since approximately August 2020, Fater Belbachir ("Belbachir") has been the Global Head of Equities; Belbachir reports to Global Head of Markets Andy Morton.  Gately, the Equities Head of Sales for the Americas, reports directly to Belbachir.  At the time Singh left Citi in late 2022, he reported to Gately.

24.     During Lindsey's tenure at Citi, on information and belief, Singh ascended the ranks faster than any other employee within Equities.  After working for several years at JPMorgan in London, Singh joined Citi in or around 2006.  In or around 2011, Singh moved to Citi's New York office as a Director in the Equities area.  In or around 2014, Singh became Head of Americas Execution Sales in addition to his prior responsibilities; Execution Sales or Platform Sales as its also known, is the team responsible for partnering with existing sales teams to market new products, identify new execution opportunities, and cross sell the entire execution platform to new and existing clients. Singh was promoted to Managing Director in 2015.

25.     Throughout the remainder of his tenure at Citi, Singh received additional promotions and roles of increasing responsibility. For example, in or around 2017, Singh's job expanded to include Global Head of Platform Sales whereby he reported to the North America Markets ("NAM") Head of Equities and Global Head of Sales and worked with regional management to determine which clients to focus on based on business opportunities.  At this time, he was also given additional responsibility for being named the Global Sales lead on all Platinum Client relationships, which are the firm's most important clients.

26.     Again, in April 2020, Citi appointed Singh as North America Markets ("NAM") Head of Cash Equity Execution Services. His role later expanded to include Futures as well.  Singh continued to maintain his role as the Global Cash lead for Equities Execution for

Global Platinum clients.  In his role as head of Cash and Futures Execution, he oversaw several areas within the Equities and Futures division, including High Touch Sales Trading; Program Trading Sales Trading; Electronic Sales Trading; Electronic Product; Platform Sales; and Execution Advisory Services.

27.     By the time he left Citi, Singh effectively had become the Bank's most senior client-facing executive in Sales within the Equity division globally.  Singh had approximately 100 employees reporting directly and indirectly to him.

28.     During Lindsey's employment, Citi used a matrix management structure under which many employees reported to more than one manager. Most recently, Lindsey's direct manager was Americas Head of Electronic Trading, and Lindsey indirectly reported to Singh as her matrix manager.

29.     As one of the most senior executives in Equities globally, Singh was responsible for ensuring that the division's conduct, culture, governance, and controls were aligned with Citi's core values and regulatory commitments.  Despite this purported responsibility, as set forth below, Singh repeatedly and brazenly violated Citi policies, FINRA rules, and the employment laws.  During his tenure, Singh suffered minimal consequences for his shocking and abusive behavior because, on information and belief, he is a man who earned significant revenue for the Bank.

<u>Lindsey's Success at Citi</u>

30.     After Lindsey joined Citi in or around October 2007, the Bank quickly identified her as a star performer, assigning her to handle some of the Bank's most significant Equities accounts and manage high-priority relationships even as a junior employee.

31.     Consistent with her excellent performance, Lindsey has received regular promotions throughout her career, including to Vice President ("VP") and, in 2016, to Director.

32.     More recently, in early 2019, Lindsey unofficially took on responsibility for overseeing the Electronic Equity Sales Trading desk. In that role, Lindsey oversaw a team of eight investment professionals in addition to continuing to manage her own client accounts.  In or around February 2020, Citi formally promoted Lindsey to head of that desk.

33.     In 2021, Lindsey also took over responsibility for overseeing the Execution Advisory Services team and oversaw five additional investment professionals as a part of that role.

34.     Also in 2021, Citi promoted Lindsey to Managing Director. During the promotion process for the Managing Director role, Citi made clear to Lindsey that it was considering her as a future leader of the Cash Execution division (which is a larger group that includes the Electronic Sales Trading Desk). Among other things, during that process, Citi management discussed positioning Lindsey as a potential future head of two additional desks within Cash Execution: the Program Trading and High Touch desks.

35.     As her upward trajectory at Citi demonstrates, Lindsey's performance throughout her career has been excellent. Lindsey has consistently received strong performance reviews, merit-based bonuses, and salary increases.  In addition, Lindsey was well regarded by her peers.  Citi maintains a talent deck listing its highest performing employees.  Managers have told Lindsey that her name was included in that deck.  They also advised her that she was named in Citi's succession planning for future business leadership positions.

36.     Lindsey's coworkers regularly cited her in peer reviews for her impressive work ethic, her ability to work cooperatively with other teams, her performance in covering accounts and ability to drive revenue, her professionalism, and her significant efforts to represent

the Bank and its clients well. In recognition of Lindsey's commitment to the Bank and her clients and her upstanding character, a wide range of employees from junior analysts to senior executives referred to her as "10 and 2," which analogizes her accomplishments to proper driving protocol and safety.

37.     In 2020, Citi management formally recognized Lindsey as a female leader in the Markets business of the Bank, which includes Equities. Citi management selected Lindsey as one of the three heads of the Citi Women's Network "Recruit, Inspire, Support and Engage" or "RISE."   The organization was founded by Deirdre Dunn ("Dunn"), an accomplished, widely respected senior female executive.  RISE, which includes over 100 Citi employees, is the largest and one of the most important diversity groups in Citi's Markets business.  As a result, the tri-head position is highly coveted role for female Directors. Lindsey was the longest-serving tri-head in the organization's history and, during her tenure, she worked diligently to advance gender equity at Citi.  During her time as tri-head, Lindsey held that role in addition to leading her teams within the Equity division.

<u>Citi's Pervasive Culture of Sexual Harassment and Gender Discrimination</u>

38.     The Bank has made considerable attempts to portray itself publicly as an institution that values diversity and inclusion, including gender equity.  For example, in 2022, Citi "introduced new diversity goals for gender, race and sexual orientation in its workforce for 2025," including aiming "to boost global representation of women in assistant vice president to managing director levels."[4]  Also, Citi boasts that it was "the first bank to disclose [its] adjusted pay results and the following year [it] became one of the first companies to disclose [its] unadjusted or 'raw'

---

[4]      https://www.reuters.com/business/sustainable-business/citigroup-sets-new-diversity-goals-workforce-by-2025-2022-09-20/

pay gaps for both women and US minorities" theoretically to "hold [itself] accountable for the progress [it] want[s] to make in being a diverse and inclusive company."

39.     Contrary to the Bank's carefully cultivated public image, however, many male executives created, and the Bank knowingly tolerated, an environment that has been openly and notoriously hostile to women.  Citi, especially in the Equities division, has been a workplace where sexual harassment and gender discrimination are rampant and egregious.   There is a locker room environment on Citi's Equities trading floor in which numerous men have treated women as sexual objects and denigrated their accomplishments.

A.     <u>Women as Sexual Objects</u>

40.     For years during Lindsey's employment (and as reflected in Singh's text messages about Lindsey's "rank" on the trading floor), male employees, including executives within Equities, ranked and rated the appearance of female employees. Executives openly discussed with each other which female employees they wanted to have sex with. For example, in or around 2017, a Desk Head used a book of Citi first year analysts' headshots to rank the "hotness" of female analysts.  Singh and other male managers, including Belbachir, the Global Head of Equities, bonded by discussing their past and prospective sexual conquests.

41.     There are other examples of men on the trading floor treating women as sexual objects.  For instance, several of the male traders on the trading desk encouraged the most junior male trader to talk about his romantic interactions with women. On one occasion, in or around 2016 or 2017, some of the more senior male traders encouraged that junior trader to show while on the desk at work, the underwear of a woman he had recently had sex with. Although Citi fired the junior employee, the Bank took no action against the senior employees who supported

and encouraged the behavior and ultimately were responsible for fostering the culture the junior employee was following.

42.     In addition, in multiple instances, Lindsey observed that various male employees tried to isolate those they believed had spoken out against the discriminatory culture. For example, several of the traders lashed out against a female Managing Director who they believed had reported the incident described above involving the junior trader.

43.     Throughout his tenure at Citi, Singh treated women as objects he could collect. Singh made an effort to bring onto his team women he deemed attractive, including targeting Lindsey, and often jokingly referred to the group as "Mani's Angels" to other male leaders.

44.     Lindsey is aware of multiple instances where male employees targeted women for sexual harassment.  For example, male employees subjected a former female Managing Director, Jackie Moran ("Moran"), who is a lesbian, to egregious sexual harassment, including homophobic remarks, over a 10-year period. On one occasion, Moran's manager, a male Managing Director, apparently believing that such conduct was acceptable, commented to Moran in front of the entire Electronic Trading team that he would "crawl under her desk" and "turn" her straight. Male members on the desk, including managers, openly joked about her sexuality.  Even though the environment was toxic and offensive, on information and belief, women like Moran reasonably understood that if they complained, the Bank would retaliate against them because senior managers were involved in making and condoning these harassing comments. Male managers also criticized Moran without basis and the Bank ultimately laid her off.   On information and belief, there was no performance-related reason for Citi to fire her.

45.     Singh also told Lindsey that Belbachir, the Global Head of Equities, engaged in sexually harassing conduct.  For example, on information and belief, Belbachir subjected the most senior female executive in Equities to unwanted flirting.  In addition, on information and belief, Belbachir was "handsy" with that senior woman at a Bank outing in Fall 2022.

46.     There are also numerous examples of senior male executives involved in sexual relationships with their direct reports or more junior women. In many of those instances, for no apparent reason the women, and not the men, left the Bank.

47.     Also, numerous male members of management commented on the age and physical appearance of female employees. For example, male managers regularly mocked an older female employee hired as Global Head of Electronic Marketing, including referring to her as "Dan's Mom." They questioned why the firm would have hired her and joked that Citi must have done so because she was another employee's mother.  In contrast, male employees had expressed positive feelings towards this employee's predecessor, a younger woman who they repeatedly said was attractive.

B.     Women as Entertainment

48.     On multiple occasions, male executives have pressured Lindsey to attend strip clubs and other events where male managers used women solely for entertainment.

49.     Over the past several years, Lindsey's Citi colleagues, although fully aware that she had never been to a strip club, have asked her multiple times to go to a strip club in Miami to entertain clients. On the first occasion, in or around 2018, Lindsey was at a dinner with a group of Citi colleagues and a client.  A Citi colleague suggested that the group go to a club called "Eleven," which the colleague referred to as a "dance club." When Lindsey arrived, she was

shocked to learn that Eleven was, in fact, a strip club. When Lindsey made clear during that event

that she was uncomfortable, a male Managing Director and male Director scolded her for making

the experience "awkward" and "ruining" it.

50.     In or around 2019, a group of Citi colleagues asked Lindsey to go to Eleven

while she was in Miami for a Citi-hosted conference. Lindsey objected, but her colleagues were

persistent.  As the only objector, Lindsey eventually acquiesced.  She felt that she had no choice

but to endure another demeaning and unprofessional situation.

51.     When the group arrived, a senior Citi business head in Equities whom

Lindsey indirectly reported to, was also at the strip club. Lindsey told this executive that she felt

demeaned and objectified, that she did not want to be there, and that she had been pressured into

going to the club. After this discussion, Lindsey promptly left the strip club. This executive avoided

Lindsey from that point forward even though Lindsey indirectly reported to him. Lindsey also

subsequently disclosed these events to another senior manager. On information and belief, Citi did

not take any action in response to the misconduct that Lindsey had reported.

52.     In yet another incident, in or around 2020, Lindsey was at dinner with a

group of colleagues, including Singh, and a Citi client. During the dinner, Lindsey's colleagues

repeatedly made humiliating comments about Lindsey's appearance and pressured everyone,

including Lindsey and the client, to go to Eleven with them after the dinner.

53.     This time Lindsey was not the only voice of dissent.  Even though the client

also expressed hesitation about going to the strip club, the Citi employees, including Singh, went

to Eleven and encouraged Lindsey and the client to attend. When dinner ended, Lindsey and the

client returned to the conference for drinks. During that time, the client told Lindsey he was

horrified by the Citi male executives' behavior towards Lindsey and stated, in sum and substance,

"If you ever need a witness, I'll be your witness."  Lindsey again reported this incident to management and, once again, on information and belief, Citi failed to act.

54.     Management and Human Resources knew not only that Singh went to strip clubs while working for Citi, but also that he used his corporate credit card at those clubs.    In response to Singh's misuse of his Bank credit card for that purpose, the only discipline Citi imposed was to give Singh a warning.   Yet, after the Bank gave Singh a slap on the wrist, he continued to take clients and other employees to strip clubs as part of work events.

55.     Singh also repeatedly told Lindsey that he and other male executives used the back rooms of strip clubs.  On information and belief, Singh meant that they used the back rooms for sex and drugs.

56.     Between approximately 2018 and 2020, Citi also required Lindsey to participate in multiple purported business dinners, which the Bank paid for, with male colleagues and clients.   Lindsey was the only professional woman at these events.   In addition, male executives, including Managing Directors and Directors, invited women – who were not Citi clients, employees, or spouses and had no reason to be there – to serve as entertainment for the men at the dinners.  Disgusted by the blatantly sexist conduct, Lindsey believed she had no choice but to remain silent and endure this demeaning and offensive work environment.

57.     Throughout Lindsey's employment, various male senior Sales Traders in Equities invited junior women they ranked on the floor as attractive to client dinners.  The men did so even though those women did not cover, and had no relationship with, the accounts whose representatives attended the dinners.

C.     Sexualized Comments About Women's Clothing and Appearance

58.     Throughout Lindsey's career, male managers have subjected Lindsey and other female employees to degrading and sexualized comments about their appearance.

59.     Male senior leaders at the Bank openly discussed Lindsey's body. For example, at a business dinner in 2018, a Managing Director and a Director made comments about Lindsey's breasts. On numerous occasions, Singh told Lindsey that Managing Directors and Directors at the Bank discussed her breasts when she was not present. Moreover, male employees compared Lindsey's body to those of other Citi women, including referring to a female junior analyst who resembled Lindsey as "Ardith 2.0."

60.     Lindsey's former supervisor and a Managing Director frequently made demeaning comments about Lindsey's work and appearance. For example, in or around 2017, before a presentation, Lindsey's former supervisor told Lindsey that she was assigned the "boring" part and that her job was to "wear a cute outfit" to keep the attendees interested. Even though Lindsey reported this comment to senior management, on information and belief, the Bank took no action.

61.     During the time that Lindsey reported to him, Singh also commented about Lindsey's body and appearance, including in front of her clients. Among other things, Singh and other supervisors commented on Lindsey's arm muscles and touched them in front of her peers. In or around 2021, Singh openly referred to Lindsey as "Lara Croft Tomb Raider" based on her physique when she first returned to the office after the Covid pandemic began.

62.     Singh also frequently commented on the appearance of other women. For example, in or around 2022, Singh commented to several colleagues about the breasts of a highly talented female employee who had just had a baby.  Singh made these remarks loudly in front of

numerous Citi employees.  Singh had previously made sexual comments about this same employee after doing a workout class with her and seeing her in spandex.

63.     In other ways, Singh often objectified women at work.  He told Lindsey that women employees had romantic interests in him and suggested that certain women had changed their appearances to suit his purported tastes.

D.     Belittling Women and Their Accomplishments

64.     Many male executives regularly denigrated the competence and successes of women employees, including Lindsey.

65.     For example, male executives repeatedly insulted and diminished women who managed to assume significant responsibility at Citi. In or around 2022, Singh told Lindsey that male managers mocked in sexist ways the most senior female executive in Equities, a well-respected professional, a role model for junior women, and Singh's peer.  Singh told Lindsey that they referred to this executive as "emotional," "immature," and "needy."  Singh also told Lindsey that these men often excluded this female manager from senior executive outings. Similarly, male managers, including Singh, mocked the former Chief Operating Officer of Global Electronic Equities, a woman, including calling her "dumb" and undermining her competence and credibility without justification.

66.     Managing Directors, including Lindsey's direct managers, regularly suggested that Lindsey had secured client relationships, which she had cultivated through years of hard work, because those clients were sexually attracted to her. Citi managers made similar jokes about other women, including implying that the only basis for the positive relationship between a female Citi employee and a male client was sex.

67.     In or around 2018, a male Managing Director and Lindsey's supervisor openly mocked to other male executives, a well-respected female Relationship Manager for a mistake she made in an email.  This Managing Director referred to the woman's "stupidity," and then to insult Lindsey, even though Lindsey was not involved in the email interaction, yelled down the desk that the purportedly stupid female Relationship Manager had, in essence, "taught [Lindsey] everything she knows."  Lindsey did report the insulting and gender-biased behavior to senior management.  Even though this Managing Director frequently denigrated Lindsey without basis and made no similar belittling comments about male employees, the Bank, on information and belief, took no action in response to her complaints.

E.     Jokes About Sexual Harassment Training,
        Women's Initiatives, and Maternity Leave

68.     Reflecting the bias against women that was pervasive at Citi during Lindsey's tenure, male executives regularly made jokes about the Bank's sexual harassment training and women's initiatives and belittled women for taking maternity leave.

69.     For example, as Lindsey prepared for her maternity leave in or around 2013, a coworker denigrated her leave, telling Lindsey to "enjoy [her] 13-week vacation."

70.     Senior men, including Singh, openly mocked the Bank's sexual harassment training. Among other things, in or around 2022, Singh joked to a group of colleagues on the trading desk, in sum and substance, that if you "ask a woman out three times, it's fine but if you ask her out a fourth time, it's harassment." Singh then loudly asked Lindsey to go on a date with him.  Singh's comments about the training confirmed that many male managers did not take seriously Citi's policies purportedly designed to ensure a workplace free of gender discrimination and harassment.

71.     Citi asked Singh to moderate a panel discussion that two of the firm's most accomplished senior women led. During the discussion, Singh asked about what the women panelist did in their free time. Singh was dismissive and insulting in response to the earnest and in-depth answers that the women panelists gave. Singh remarked, in sum and substance, "I'm surprised; I was expecting something along the lines of 'Netflix and Chill,'" which is slang terminology for watching a movie and engaging in sexual activity. On information and belief, this comment was Singh's way of mocking the RISE Women's Initiative and belittling these accomplished female professionals.

F.     Excluding Women and Maintaining a
        "Boys' Club" Environment

72.     As part of the ongoing gender discrimination, Citi leadership maintained a "boys' club" environment that gave better opportunities to men.  Management excluded women from events that provided professional development, networking, and bonding.

73.     Belbachir, the Global Head of Equities (the division in which Lindsey worked), did not introduce himself to or engage with women in the group and, instead, focused his efforts on developing relationships with male executives who were part of his leadership team. For example, when Belbachir met with the North America Markets Equities management team, despite his having run the division for two years, he stated that Lindsey was one of two individuals in the room he did not know.  Given Lindsey's position at the firm, his not knowing her was highly unusual. Lindsey was one of a few women promoted to Managing Director during Belbachir's tenure as Global Head of Equities and, as previously highlighted, she was also a long-tenured RISE leader.

74.     Singh and other managers frequently planned all-male outings and trips to spend time together with each other and male employees.

75.     During a conference Lindsey attended in Miami, a male colleague insisted to Lindsey that she could not join the attendees for a planned afternoon outing. Singh attempted to vouch for Lindsey, saying, in sum and substance, "Don't worry; she's cool." While the male colleague ultimately withdrew his objection to Lindsey's attending the event, Lindsey refused because he had insulted her and made clear that she was not welcome at what was intended as an exclusively male outing.

76.     On another occasion, Singh demanded that Lindsey exclude a female Derivatives Director from a business trip.  This talented woman was one of six women within Equities that Citi had selected to participate in the Bank's then-new Advocacy Program in which it assigned mentors to its highest-achieving junior female employees. Singh insisted that the woman should not attend the trip because she was not "fun."   In addition, Citi discharged that employee even though she had a reputation as a high performer.  Thereafter, a male executive, well known by both management and female employees on his team and management for mistreatment of women, told her clients that she left the Bank because she preferred to stay home to be a "mommy."

77.     As another example, during a Derivatives conference that Citi hosted, several of Lindsey's clients called Lindsey (who had not been invited) to express their surprise at the absence of female attendees. Realizing that it had a problem, Citi management during the conference requested that Lindsey travel the following morning to attend the event.

<u>Male Executives Sexually Assault and Harass Lindsey</u>

78.     As described above, countless male executives in Equities regularly flouted the anti-discrimination and harassment laws without consequences.  In many instances, Lindsey

and other women complained about the locker room environment where men treated women as sexual objects.  Yet senior managers and Human Resources failed to take action.

79.     Citi's failure to act enabled men, especially powerful executives, to engage in outrageous and unlawful sexual harassment.  In this environment, Lindsey was sexually assaulted, harassed, and abused.

<u>A Senior Citi Executive Sexually Assaults Lindsey</u>

80.     Just weeks after Lindsey began at Citi in 2007, Evans, Citi's then-Global and Europe, Middle East, and Africa ("EMEA") Head of Program Trading and Electronic Execution and a senior manager at the Bank, sexually assaulted her.

81.     In or around December 2007, Lindsey attended the Bank's holiday party. Evans, who was then three levels above Lindsey, was the most senior executive at the party and Lindsey was the most junior woman at the event. As Lindsey later learned, Evans was well known for his volatile and hard-partying behavior that often involved women.

82.     During the event, he pressured Lindsey to stay out late and drink excessively, including by threatening to fire her if she went home.  Evans's threat was especially troubling as it came at the time of a much-anticipated and widely known Reduction-in-Force or layoff.  Given Evans's seniority and that Lindsey had virtually just started with Citi, Lindsey had no reason to doubt that he would carry through with his threats.

83.     Following the holiday party, Lindsey's colleagues and more senior executives left her alone with Evans. He demanded that Lindsey continue to stay out with him. Evans and Lindsey went to several bars before he insisted on walking Lindsey home. When the two arrived at her apartment building, the executive demanded to use her restroom and, as there

was no bathroom in the lobby of Lindsey's building, Lindsey felt that she had no choice but to allow him into her apartment to use the restroom.

84.     Lindsey and Evans subsequently talked in her living room while sitting in separate chairs; eventually Lindsey fell asleep. Lindsey woke up to find the executive was on top of her and kissing her. Lindsey was shocked and disgusted but, out of fear, felt that she had no choice but to allow him to kiss her because of his authority over her job and previous threats that evening to fire her. Lindsey was able to prevent his further sexual advances until he passed out. Lindsey promptly took a shower and got ready to go to the office while he was asleep. Once ready for work, Lindsey woke up Evans and requested that he leave her apartment.

85.     Even then, Evans, the Global and EMEA Head of Program Trading and Electronic Execution, continued his sexual advances that morning, including in the elevator when he pretended to tie his shoe and ran his hand up Lindsey's leg and up her skirt.  Upon exiting the elevator, the executive insisted on dropping Lindsey off at work in a cab and asked Lindsey to go to dinner with him that evening. Lindsey deflected these advances and went to work.

86.     Evans was supposed to present to the division that day and never turned up at the office. The following day, he rescheduled the meeting for the division and ogled Lindsey throughout it. Lindsey averted her eyes and avoided him to the best of her ability thereafter.

87.     Lindsey subsequently reported the incident to her manager. On information and belief, Citi did nothing in response to Evans's sexual assault.

<u>Singh's Pervasive and Egregious Sexual Harassment Against Lindsey</u>

88.     Singh, who was one of Citi's most senior executives in Equities and one of Lindsey's supervisors, subjected her to unrelenting abuse and unlawful conduct for many years. Using his position of authority and threats to harm Lindsey and her family, Singh coerced her into

starting a relationship with him, and when she tried to end things, pressured her to prolong it. Throughout their relationship and after Lindsey finally ended it, Singh subjected Lindsey to shocking abuse, threats, and retaliation.

      A.    <u>Singh Wielded Significant Power Over Lindsey's Career</u>

      89.    Even though Lindsey did not report to Singh when their relationship began, he was, at all times, senior to Lindsey. At the time he left Citi, as set forth above, Singh was one of the most senior executives within the Global Equities division and Lindsey indirectly reported to him.

      B.    <u>Singh's Abusive Conduct</u>

      90.    Singh, always in a more senior position than Lindsey, had persistently targeted her for sexual advances. Initially, under the guise of friendship, Singh established trust with Lindsey, but later revealed to her, in sum and substance, "I had my eye on you from the moment I first met you and knew I had to have you."

      91.    Singh's tactics later changed to "love bombing," which involved him using over-the-top displays of attention and affection. Eventually, following Singh's incessant pursuit, Lindsey was worn down and they began a sexual relationship.

      92.    Over time, Lindsey's relationship with Singh became more toxic and abusive. For much of their relationship, Singh was manipulative and controlling, including using his power over Lindsey at work to intimidate and coerce her.

      93.    Singh's abusive behavior was often related to his incessant demand for Lindsey to engage in sexual acts. When Lindsey rejected Singh's sexual advances, he regularly shamed her and instructed her that it was his expectation that she should perform sex whenever he wanted her to do so. If his sexual demands were not met, Singh punished Lindsey at work. On

such occasions, Singh humiliated Lindsey in front of her boss and the individuals who reported to her.

94. Singh's behavior towards Lindsey escalated during the COVID pandemic. During that time, Singh frequently and excessively consumed alcohol and/or drugs and his behavior towards Lindsey became increasingly volatile and frightening.

95. For example, Singh used physical force despite Lindsey's protests. Singh's conduct was so erratic and threatening that Lindsey feared for her physical safety.

96. Singh also used verbal abuse to terrorize Lindsey. On one occasion, when Singh was away on vacation, he loudly berated Lindsey over the phone. Singh's screaming was so loud that his host's neighbors called the police. According to Singh, the police subsequently took him in for questioning over concerns of domestic violence.

97. On another occasion, Singh and Lindsey were in Miami for work. During an Uber ride, Singh's unhinged yelling at Lindsey caused the driver to pull over the car and to demand that Singh exit the vehicle because of his abuse towards Lindsey.

98. Following many instances of cruelty, Lindsey apologized to deescalate the situation. Lindsey feared that if she did not placate Singh, Singh would retaliate against her.

C. Lindsey Did Not End Her Relationship Sooner
Because of Singh's Threats to Harm Her and Her Career

99. Lindsey wanted to end the relationship with Singh many times. Lindsey did not do so because she was terrified that Singh would physically harm her and destroy her career as he repeatedly threatened to do.

100. In a variety of ways, Singh repeatedly and explicitly reminded Lindsey of his power over her career and his ability to undermine and ruin her.

101.    When Singh was unhappy with Lindsey, he punished her at work.    For example, in the months leading up to their breakup, Singh frequently made attempts to exclude Lindsey from work activities and diminish her contributions to the team. He deliberately attempted to isolate Lindsey and undermine her authority.

102.    Also, Singh on multiple occasions expressly threatened Lindsey that if she left him, he would kill her, sabotage her career, and ruin her reputation.  Singh often made such threats when he felt Lindsey was creating any distance between her and him.  Among other things, Singh regularly told Lindsey, in sum and substance, "I made you; don't ever forget it"; "I will kill you if you ever leave me"; "No other man can ever be with you"; "You are nothing without me"; and "You were a nerdy girl in the corner that nobody noticed and now everybody notices you; you are my creation. I made you, don't ever forget it." Singh also threatened Lindsey on multiple occasions that if she ever left him, he would hurt himself, including by purposefully overdosing when taking drugs.

103.    As described in more detail below, when Lindsey ended the relationship, Singh made several threats to her job via text message, including, among many others:

- "Obv[iously] I plan to use . . . [m]y power. Obv[iously] comp is just st[a]rt of where I take it all out."

- "Told [another Citi Director] and whole team when you [were] out I decide comp. To neuter you."

- "I ruined you at work this week . . . . [People] need to know [that] you [do] not have my support."

104.    In addition to punishing Lindsey at work and making explicit threats, Singh regularly emphasized to Lindsey that he was adept at masterminding negative outcomes without personally executing them.

105.     For example, when he talked to Lindsey during their relationship, Singh often called himself Frank Underwood, the nefarious fictional character from the television show "House of Cards." That character used his power to harm or even kill anyone who got in his way.

106.     To demonstrate the depth and breadth of his powerful network at the Bank, Singh regularly conducted telephone calls with senior executives on speaker phone in Lindsey's presence.

107.     On multiple occasions, Singh stressed to Lindsey that he had successfully used his relationships at the Bank to force the removal of employees who he believed had crossed him or posed a threat to his power. In that way, Singh boasted about his driving decisions about which employees to include on Reduction-in-Force (or layoff) lists. These threats were particularly intimidating to Lindsey as employees on these lists often had unusually short tenures and appeared to have been let go without explanation. For example, Singh emphasized to Lindsey that he was responsible for forcing the departures of the following employees because he wanted them gone:

- A high-profile Managing Director who was Head of Platform Sales for the EMEA region departed in 2022 after fewer than two years at the Bank.

- The Managing Director, Global Head of Cash Equities E-Trading who was also only in his role for fewer than two years before departing in 2022.

- The Managing Director, Americas Head of Equity Electronic Execution who was also in his position for fewer than two years and departed in 2020.

108.     Singh told Lindsey that he punished other employees that he believed had betrayed him. For example, in or around 2022, Singh told Lindsey that he would "block [the] promotion" of a talented female employee on the sector specialist desk whom Singh did not see as his ally. Singh referred to that employee as "entitled." She is no longer at the firm. There was another talented and accomplished female employee on Platform Sales whom Singh targeted after that employee disagreed with him about her year-end compensation. Singh remarked to Lindsey,

in sum and substance, that this employee "was ungrateful and dead to [him] now; [he] would no longer help her." Singh made clear to Lindsey that he would do nothing for her and became overly demanding, condescending, and dismissive of her efforts even though he had previously expressed appreciation for her hard work. Singh's unmistakable message to Lindsey was that employees who crossed him, especially women, would face negative consequences.

109.    Singh made clear to Lindsey that he wielded significant authority and influence at the Bank in other ways. For example, as described below, he blatantly violated Bank policy without consequences. He also publicly made insulting and offensive comments about Lindsey, which reflected his gender bias and were designed to humiliate her, but he suffered no repercussions for his conduct. On one occasion, Singh remarked loudly to Lindsey in front of others, in sum and substance, that he had "read Citi's policy [and] heard that if you ask a woman out three times it's fine, but if you ask her out a fourth time, it's harassment." He then demanded, in front of others, "Hey [Lindsey], do you want to go out with me?" Even though Lindsey pleaded with Singh not to treat her this way, he refused and repeatedly embarrassed her before her peers and managers.

110.    By isolating Lindsey at the Bank, by blocking her from advancement opportunities, and by making her think he had the power to impede Lindsey's career success, Singh also silenced Lindsey from complaining about his gross misconduct and coerced her into remaining in a relationship with him.

111.    For example, Singh shut off any possibility that Lindsey would be able to complain to Gately, who was then Citi's Head of Equities for the Americas. Citi had selected Lindsey to participate in its Advocacy program, described above, because the Bank had identified

her as one of the highest-achieving junior female employees.  As part of the program, the Bank assigned Gately to Lindsey as a mentor.

112.    Because Gately was Lindsey's mentor, Lindsey and Gately had long maintained a close professional relationship. Singh, who reported to Gately, berated Lindsey for speaking with Gately.  Singh told Lindsey that he did not like her relationship with Gately. Because of Singh's threats and influence at the Bank, Lindsey felt that she had no choice but eventually to distance herself from Gately to avoid Singh's hostility as Singh was particularly obsessive about her dealings with Gately.

113.    Also, Singh pitted women against each other at work to remind Lindsey of the power he had at the firm and over her career. This destructive conduct was most evident when Citi did not promote Lindsey to Managing Director the first time she was considered.  When Lindsey did not receive the promotion, many Citi employees, including peers and Managing Directors, told her that they could not understand what had happened.  Those colleagues said they assumed they missed her name during the Managing Director announcement because they believed she had earned that promotion.  But Citi did elevate another woman that Singh sponsored even though Singh had previously made demeaning and unfounded comments about her, including that the candidate would never be made Managing Director.  Singh, who had played a role in the promotion process, made Lindsey believe that he had orchestrated the decision not to elevate her and to select the other woman as a way to punish Lindsey.

114.    Throughout their relationship, Singh made comments that Lindsey should "be less ambitious," "quit her job," and give up the career she had worked so hard for. He often told her that his career was more important than her job and she should "take a backseat" and "support him."  Moreover, Singh gloated, in sum and substance, that "any candidate he sponsored

was a lock for promotion" and made sure Lindsey knew she was the only candidate he had ever sponsored who did not make Managing Director.   When Lindsey was up for Managing Director the following year and ultimately received the promotion, her direct supervisor – not Singh – sponsored her through the promotion process.

115.    Showing Lindsey that the rules did not apply to him, Singh went so far as to target his boss, Gately.  Singh was not shy about telling Lindsey and others that he wanted Gately's job and was laying the groundwork to have Gately removed from the position. As a show of his force, Singh inaccurately commented to clients and employees, including Lindsey, on multiple occasions that Gately was "just an empty suit" and that he was not doing his job. These comments were without any basis.

D.    Citi Was Aware of Singh's Volatility and Erratic Behavior But Took No Action

116.    Singh's erratic behavior and brazen violations of Bank policy, including his abuse of drugs and alcohol and mistreatment of women, were well-known throughout the Bank. Yet Citi took virtually no steps to rein in his conduct because, on information and belief, he helped the Bank earn huge sums of money and because, in some instances, other senior managers engaged in similar misconduct.

117.    Singh openly engaged in unstable behavior, including, but not limited to,

- Singh on several occasions showed up hours late to work after nights when he abused alcohol and/or drugs;

- on multiple occasions, Singh missed flights and meetings due to his alcohol and drug use;

- at both internal Bank events and client events, Singh drank more than others and became visibly intoxicated or blackout drunk;

- Singh vaped openly in Citi offices and on the trading floor, even though it was against the Bank's policies;

- Singh entertained clients and colleagues multiple nights each week and even bragged that his corporate card expenditures that totaled six figures, were among the highest for any employees within the Global Equity division; and

- while Singh prided himself on being the "life of the party," Lindsey on multiple occasions heard Citi employees express concern about his drinking, noting that it was "unhinged" and "out of control" and that Singh was "out of his mind."

118.    Senior management knew about Singh's erratic conduct.  Throughout Lindsey's employment, including through 2022, Singh on multiple occasions hosted "team night" outside of the office where he often became visibly intoxicated, including in front of junior and analyst level employees. Senior Bank managers were aware of Singh's behavior. Indeed, sometimes they attended these events, and, on information and belief, took no action.

119.    Not only did members of senior management turn a blind eye to Singh's blatant violations of Bank policy, but, in some instances, they participated in the misconduct. Between 2014 and 2022, on information and belief, Singh often excessively drank alcohol and used drugs with high-level Citi managers, including with his own bosses. Among other things, Singh told Lindsey that he had used cocaine with senior managers while in the office. Singh had explained to Lindsey, in sum and substance, that "going to strip clubs and doing drugs," including in particular cocaine, with male executives, "bonded you and deepened your relationship."  This misconduct only further perpetuated the male locker room environment.

120.    Citi was aware of gender discrimination complaints against Singh and, on information and belief, did nothing to address the serious problems.  For example, in or around 2018, a talented female Vice President at Citi escalated to her manager that Singh had been unprofessional and verbally aggressive towards her after a business outing involving heavy drinking. On information and belief, that manager and Singh "handled" the complaint by persuading the Vice President not to report Singh's gender bias to Human Resources. That

employee subsequently left the Bank. Singh later told Lindsey he had forced that woman's husband (a former Director on Citi's High Touch Trading desk) to leave the Bank in or around 2019.

121.    Also, in 2021, a top-rated junior analyst filed a complaint with Human Resources that Singh had her pick up his dry cleaning and asked her to do other menial tasks outside her work responsibilities. She promptly left the firm after raising the complaint while, on information and belief, Citi did nothing to discipline Singh.

122.    Even though some of Singh's inappropriate conduct was open and notorious, the Bank allowed it to continue. On information and belief, due to the substantial profits he produced for the firm, Citi disregarded his egregious violations and took no action against Singh nor made any attempt to regulate his conduct.

123.    Indeed, despite Singh's demonstrated hostility to women, including to women's initiatives; his erratic behavior; and women's complaints against him described above, Belbachir and Human Resources chose Singh as an Equities representative for one of the limited Managing Director sponsorship roles to the women's diversity group, RISE. Singh's appointment made clear that in the Equities division, Citi's public relations campaign purportedly in support of gender equality and inclusion was nothing more than lip service and platitudes.

### Singh's Onslaught of Shocking Abuse Against Lindsey

124.    In Fall 2022, Lindsey tried to distance herself further from Singh. In response, Singh's tirades and abuse became increasingly more frequent, malicious, and unbearable. Towards the end of October 2022, Lindsey finally summoned the courage to end once and for all the volatile and toxic relationship with Singh. Unfortunately, his reaction was exactly as she had feared.

125.    Between November 6 and November 10, 2022, Singh subjected Lindsey to an onslaught of shocking abuse via hundreds of harassing texts messages; called Lindsey incessantly (including in the middle of the night and, at one point, calling 30 times in one day); and left her several bullying voicemail messages.

126.    Singh's messages ranged from threatening to kill Lindsey; making malicious comments about her family, including her children; threatening Lindsey's career, compensation, and reputation; falsely accusing her of having sex with Citi clients; and making demeaning and sexualized comments about her appearance and body.

127.    The effect of Singh's behavior on Lindsey was devastating. During this time in November 2022, Lindsey was not able to eat or sleep and was traumatized and debilitated by fear.

A.    Threats to Lindsey's Safety

128.    Singh sent several text messages threatening to harm Lindsey.  For example, Singh sent the following messages:

- "And I am going to set you on fire."

- "You got no idea on my rage. Thought it was bad before it's off the scales."

- "A world of pain coming. You will rue the day you crossed me."

- "I am no longer silent. You are fuckin[g] dead."

- "You should never have crossed me. Now we walk the plank to death together."

- "[A]nd I plan to fuck your life."

- "[D]isloyalty will not go unpunished."

B.     Alarming Comments about Lindsey's Family

129.    Examples of Singh's disturbing and intimidating comments about Lindsey's children include:

- "Kids no kids I don't give a fuck [I] plan to burn it all down."

- "Your kids['] life will be ruined from here on in."

- "Gon[n]a fuck your life and kids with it too."

- "I fuckin[g] hate you. God help you. And your family."

- "Your children will have no future with [a] Slut like you."

- "Focus on [your children] and your family. Test me once and I will blow it up."

- "Fuck you. And fuck your whole fucking community and family."

- "If it comes out kids ruined in [their school district] and you are ruined your family name."

- "Kids are fucked."

- "Hug [your children] tight u world be over [tomorrow] . . . Shit mom."

C.     Repugnant Comments about Lindsey's Body and Appearance
       Reflecting Deeply Ingrained Views of Women as Sexual Objects

130.    Singh's text messages included numerous denigrating and offensive comments about Lindsey's body and physical appearance, made repeated references to sex, and demeaned her professional success.  Singh's text messages made clear that he felt entitled to make such comments because objectifying women was a common feature of Citi's trading floor culture.

- "Not one person name[d] you hot [on] whole floor. Can't even get a rank on a floor."

- "So many hotter on floor . . . and you rank below."

- "E[very]one will most likely high five me but prob think I could have done better."

- "Telling boys about our sex life."

34

- "You don't get to run off into sunset w[ith] some white dick in your [] ass. No fucking Way. Its game time."

- "All u got is tits and big head."

- "[Y]our ass is awful. Ur torso not fit your body. Your face and head [are] too . . . big."

- "U so [average]. Massive head and hands and tits. Rest is wack."

- "I fuckin[g] hate you. And will show you and your fake appearance zero mercy."

- "Same pasty white ugly fuck face."

- "Can't believe I was going to settle on your sub par ass. Past prime. No thanks."

D.   <u>Sexist and Threatening Comments</u>

131.   Singh's messages included repugnant and aggressive comments that reflected his contempt for women.  For example, Singh wrote:

- "Fuck you. Cunt."

- "Fuck your self"

- "Ok cunt. Let's go."

- "Tested me bitch."

- "I plan to fuck e[very]thing that walk if I have not been at it already."

E.   <u>Threats to Lindsey's Career and Compensation</u>

132.   Singh made numerous threats about the terms and conditions of Lindsey's employment, including, but not limited to:

- "Taking you down in comp. Hard. Like a bitch you are."

- "Obv[iously] I plan to use . . . [m]y power. Obv[iously] comp is just st[a]rt of where I take it all out."

- "Told [another Citi Director] and whole team when you out I decide comp. To neuter you."

- "[L]eave Citi. Maybe I will save your reputation."

- "Good luck getting job w Dan or any other firm. The only person who will hire you will think they a chance."

F.   False Accusations about Lindsey's Performance and Conduct at Work

133.   In the text messages, Singh repeatedly falsely attacked Lindsey's job performance and made false accusations about her relationships with clients. For example, Singh sent the following text messages:

- "Focus on fucking the next Acct to get US dollars."

- "Your personal perf[ormance] at work is avg [average] at best so focus on fucking your clients or whatever you do so we win. You disgusting fucking person."

- "Focus on your accounts and trading with your flirting or whatever you do . . . . Not swan off on sexc[apades] with clients. Don't try women card. I know women."

- "Focus on fuckin[g] more accounts."

- "You are alone you dumb selfish overpromoted fuck."

- "U not[h]ing [without] me and kicking u back to curb where u belong."

G.   Threats to Lindsey's Professional Reputation

134.   Singh's text messages made explicit threats that he would harm Lindsey's reputation. For example:

- "I swear w[ith] my very being I plan [t]o [t]orch you and your reputation."

- "And I plan to fuck your life. And I may drop something on social media and tag the community. Not clear to me yet on my path. But disloyalty will not go unpunished."

- "I ruined you at work this week . . .  [people] need to know [that] you [do] not have my support."

- "Fucking ruined my fucking life. I will ruin yours like no other . . .  This will be the talk of the industry for years."

- "Let me insult you on the work thread."

- "Oh try to block me and I will start sending emails on work."

- "Telling boys about our sex life. All sales trading."

- "I been asking on floor. You barely top 10 and [t]hat[']s for a trading floor."

- "Next up is telling boys we banged. Left me no choice. Won[']t be complimentary."

- "Your whole team thinks you're a joke too. I ruined you at work this week."

H.    Contacting Lindsey's Colleagues

135.    After Lindsey ended the relationship, Singh also made good on his threats to damage Lindsey's reputation with her colleagues.

136.    For example, Singh told Lindsey's direct supervisor that Lindsey was out of the office, that Lindsey was not responding to Singh, that Lindsey was not working out in her role at the Bank, and that he was escalating his supposed concerns to Human Resources.

137.    Singh also threatened Lindsey that he would contact other former and current colleagues to malign her further.

I.    Citi Celebrates Singh Despite Knowing About His Outrageous Harassment

138.    Lindsey tried to ignore Singh's incessant and abusive messages.  However, Singh escalated his outrageous sexual harassment.  At least 30 times, Lindsey pleaded with him to leave her alone.  He refused to stop until, as described in more detail below, Lindsey summoned the courage to make clear to senior management and Human Resources what was evident all along, Singh's egregious harassment.

139.    Singh's abusive and threatening text messages were devastating to Lindsey who feared for her safety and her job.  Having no other choice because Singh refused to stop, on or about November 10, 2022, Lindsey complained about Singh's disgusting conduct and abuse to Citi.  She sent a written complaint to Singh's manager Gately; Dunn, Citi's Co-Head of Global

Rates, one of the Board members of the RISE organization, and Lindsey's senior-most female mentor; and to HR Advisor Shari Funk ("Funk"). Lindsey also informed her direct supervisor as she wanted him to be aware of Singh's violent threats and abuse and what she had experienced.[5]

140.    In Lindsey's November 10 complaint, Lindsey wrote, among other things, "I am very sorry to write you like this but I am scared and traumatized." She explained that Singh had "been calling [her] incessantly and sending [her] 100s of texts with threatening and incoherent messages." She wrote that she had "asked him to stop but the harassment and abuse is continuing." She also submitted screenshots of several of Singh's messages as attachments to the complaint.

141.    On November 14, 2022, Lindsey was in crisis and crying uncontrollably. Despite Lindsey's condition, Citi insisted that Lindsey meet with investigators for the Bank for over an hour regarding her complaint about Singh's sexual harassment.  Even though multiple investigators conducted the interview and even though Lindsey was distraught, Citi rejected Lindsey's requests to have her counsel present and subsequently for them to review any summary of her interview.

142.    Despite her traumatized state, Lindsey was cooperative throughout the interview.  During the interview with the Citi investigators, Lindsey discussed at length her relationship with Singh and his abusive and harassing behavior towards her. Citi's investigator told Lindsey, in sum and substance, that she believed Singh's behavior was "criminal" and that "in circumstances like this it is commonplace for perpetrators to contact their victims."

143.    Following the interview, on or about November 21, 2022 (prior to Singh's resignation), Lindsey via counsel submitted to Citi over 30 additional screenshots of Singh's

---

[5] Lindsey made clear in her message that she did not blame her direct supervisor.  She wrote that "[her direct supervisor] is an amazing manager" and "please don't infer anything" against him.

abusive messages. As a result, Citi had substantial documentation corroborating Singh's egregious misconduct before the Bank allowed him to resign and celebrated him on his way out.

144.     Faced with overwhelming evidence of Singh's misconduct, Citi apparently determined that it had no choice but to distance itself from Singh. Rather than fire Singh, however, Citi took steps to protect Singh and his reputation, including allowing him to resign. Even though Citi was fully aware of Singh's heinous conduct towards Lindsey, and consistent with the Bank's history of permitting discrimination and harassment and silencing victims, it went out of its way to praise Singh on his way out.

145.     On November 22, 2022, Gately announced to Citi staff in a clearly a scripted statement that Singh had "resigned." Gately stated, in sum and substance:

> Unfortunately, I would like to announce Mani Singh has decided to resign from the firm for personal and family reasons. We're all very sorry to see him go and certainly grateful to the contributions he has made over the years.  But it was his decision, and we wish him well . . . While there is never a good time, guys, to lose strong leadership on our teams, we are certainly excited for the team we have in place . . . I want to thank Mani for his many years of contribution . . .  I know it's disappointing . . . to lose someone like Mani who has been such an impact on the franchise. . . .

146.     In addition, on information and belief, Citi took no steps to ensure that Singh's shocking and abusive conduct would not happen again. On information and belief, Citi did not report to FINRA, which "plays a critical role in ensuring the integrity of America's financial system,"[6] that Singh had engaged in gross misconduct and sexual harassment.

147.     When Singh resigned, Citi was obligated to file with FINRA Form U5 to terminate his association with the Bank.  On Form U5, Citi was required to provide the reason why Singh was no longer working for the Bank.  The Form U5 also obligated Citi to answer whether

---

[6] https://www.finra.org/about/what-we-do

the employment of the individual ended when he or she was "under internal review for . . . violating industry standards" and whether the "individual [was] permitted to resign . . . after allegations were made that accused the individual of . . . violating . . . industry standards of conduct."  That form is then available to Singh's prospective employers.

148.    Citi had undeniable proof that Singh's conduct violated FINRA rules and industry standards of conduct.  FINRA rules specifically prohibit harassment, including Rule 5240 which states, "No member or person associated with a member shall . . . engage, directly, or indirectly, in any conduct that threatens, harasses, coerces, intimidates or otherwise attempts improperly to influence another member, a person associated with a member, or any other person."  Also, according to FINRA's website, FINRA "categorically rejects racism and discrimination of any kind. In carrying out our mission of investor protection and market integrity, [FINRA is] committed to pursuing racial justice and equity within [its] organization, the financial services industry and the communities we serve."[7]

149.    Citi could have, and should have, disclosed Singh's egregious harassment against Lindsey on his Form U5, but, on information and belief, did not do so.  As a result of Citi's willful disregard of its obligations, Singh was free to sexually harass other women and continue his mistreatment against Lindsey.

### Citi Has Seriously Damaged Lindsey

150.    The pervasive gender discrimination and sexual assaults and harassment that Lindsey experienced at Citi for more than a decade; Singh's abuse and Citi's toleration of that abuse and praise for him; and Citi's years-long failure to act, have all traumatized Lindsey.

---

[7] https://www.finra.org/about/responsible-citizenship/racial-justice

151.    The shocking mistreatment that Lindsey suffered is omnipresent in her thoughts and now causes her to struggle with sleep, nightmares, and paranoia.  She startles easily; has difficulty focusing; and is unable to follow through on basic tasks that she previously was able to accomplish with ease.

152.    To try to manage the effects of the abuse she endured as a Citi employee for 15 years, Lindsey since November 2022 has sought treatment and evaluation from a variety of medical professionals, including a psychotherapist, a psychiatrist, and a neuropsychologist. Lindsey has been diagnosed, for the first time in her life, with Post Traumatic Stress Disorder, Major Depressive Disorder, Generalized Anxiety Disorder, and Major Neurocognitive Disorder.

153.    Lindsey, as a condition of her employment at the firm that Citi acquired in 2007, was required to undergo an extensive psychological examination. At the time, her test results indicated a superior Intelligence Quotient ("IQ") in the 95th percentile and noted an absence of any psychological ailments or disorders. As a result of the abuse she experienced at Citi, Lindsey has suffered significant negative neurological effects, including a 24-point drop in IQ and an alarming decline in her memory, executive function, and attention span.

154.    According to Lindsey's doctors and therapist, Lindsey is incapable of returning to work and requires intensive treatment to manage her symptoms. Lindsey has been on an approved medical leave from Citi since late 2022.

FIRST CAUSE OF ACTION
Discrimination Under the NYSHRL

155.    Plaintiff repeats and realleges paragraphs 1 through 154 of this Complaint as if fully set forth herein.

156.    By the acts and practices described above, defendant subjected plaintiff to unlawful sex discrimination and sexual harassment, including quid pro quo harassment and a hostile work environment, in violation of the NYSHRL.

157.    In addition to all of the acts and practices described above, plaintiff's claim under the NYSHRL includes, but is not limited to, the gender discrimination and hostile work environment based on, and caused by, Evans's sexual assault of Lindsey in 2007.  At the time Evans sexually assaulted Lindsey, Lindsey was over 18 years old.  For those claims related to Evans's assault of Lindsey, plaintiff alleges intentional and negligent acts and/or omissions causing physical, psychological, and other injury suffered as a result of conduct that would constitute sexual offenses as defined in Article 130 of the New York Penal Law.  Lindsey's claim based on Evans's assault is therefore timely under the Adult Survivors Act, N.Y. C.P.L.R. § 214-j.

158.    Defendant acted with malice and/or reckless indifference to plaintiff's rights protected under state law.

159.    As a result of defendant's unlawful acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury and other compensable damages.

SECOND CAUSE OF ACTION
Discrimination Under the NYCHRL

160.    Plaintiff repeats and realleges paragraphs 1 through 159 of this Complaint as if fully set forth herein.

161.    By the acts and practices described above, defendant subjected plaintiff to unlawful sex discrimination and sexual harassment, including quid pro quo harassment and a hostile work environment, in violation of the NYCHRL.

162.     Defendant discriminated against plaintiff with willful or wanton negligence, or recklessness, and/or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

163.     As a result of defendant's unlawful acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury and other compensable damages.

<u>THIRD CAUSE OF ACTION</u>
Negligent Hiring, Negligent Retention, and/or Negligent Supervision

164.     Plaintiff repeats and realleges paragraphs 1 through 163 of this Complaint as if fully set forth herein.

165.     Evans committed battery against Lindsey when he forcibly sexually assaulted her, including kissing and groping her without her consent.

166.     Evans's actions constitute sexual offenses as defined in Article 130 of the New York Penal Law, including, but not limited to, forcible touching in violation of New York Penal Law § 130.52.

167.     At the time Evans assaulted Lindsey, Evans was a Citi executive.

168.     Before Evans assaulted Lindsey, Citi was aware, or should have been aware, of Evans's propensity for misconduct towards women.  As a result of Citi's negligent hiring of Evans, negligent retention of him, and/or negligent supervision of him, Lindsey suffered serious injuries.

169.     At the time Evans sexually assaulted Lindsey, Lindsey was over 18 years old.  Lindsey's claim for negligent hiring, negligent retention, and/or negligent supervision is therefore timely under the Adult Survivors Act, N.Y. C.P.L.R. § 214-j.

PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

a)      Declaring that the acts and practices complained of herein violate the NYSHRL, the NYCHRL, and the New York common law;

b)      Enjoining and permanently restraining these violations of the NYSHRL, the NYCHRL, and the New York common law;

c)      Directing defendant to take affirmative action as is necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff;

d)      Directing defendant to place plaintiff in the position she would have occupied but for defendant's discriminatory treatment, and making her whole for all the earnings and benefits she would have received but for defendant's discriminatory treatment, including, but not limited to, wages, bonuses, and other lost benefits;

e)      Directing defendant to pay plaintiff compensatory damages, including damages for loss of earning potential, emotional distress, humiliation, and pain and suffering;

f)      Directing defendant to pay an additional amount as punitive damages for its willful and/or reckless disregard of plaintiff's rights;

g)      Awarding plaintiff reasonable attorneys' fees and costs;

h)      Awarding plaintiff such interest as is allowed by law;

i)      Granting plaintiff a tax enhancement award to offset adverse tax consequences associated with a lump sum award of damages; and

j)      Granting such other and further relief as the Court deems necessary and proper.

DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
       November 20, 2023

VLADECK, RASKIN, & CLARK, P.C.

By:

Jeremiah Iadevaia
Emily Bass
Debra L. Raskin
Attorneys for Plaintiff
111 Broadway, Suite 1505
New York, New York 10006
(212) 403-7300