UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ARDITH LINDSEY,

                Plaintiff,                          <u>AMENDED COMPLAINT</u>

     - against -                           No. 1:23-cv-10166 (ALC)

CITIGROUP GLOBAL MARKETS, INC.,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiff Ardith Lindsey ("plaintiff" or "Lindsey"), by her attorneys Vladeck, Raskin & Clark, P.C., complains of defendant Citigroup Global Markets, Inc. ("Citi," "the Bank," or "defendant") as follows:

<u>NATURE OF CLAIMS</u>

1.      Lindsey, an experienced and successful investment professional, faced horrifying sexual harassment, gender discrimination, and sexual assault during her tenure at the firm. After more than 16 years at the Bank working in the Global Equities Markets division during which Lindsey ascended the ranks, including most recently earning a promotion to Managing Director ("MD"), the prolonged, pervasive, and outrageous mistreatment that Citi forced Lindsey to endure has derailed her career – and her life.

2.      Contrary to the Bank's carefully cultivated public image, many senior male executives have created, and the Bank has knowingly tolerated, an environment that has been openly and notoriously hostile to women, including Lindsey.  Far from being limited to a few bad actors, the sexual harassment and gender discrimination have persisted for Lindsey and many other women at Citi for years.  Human Resources and the highest levels of management

have been aware of the unlawful conduct.  Yet Citi, as an institution, has let the problems fester and repeatedly protected, and covered up for, the male executives who discriminated against and harassed those women.  After Lindsey filed this lawsuit, the New York Times and Bloomberg have published articles describing the unlawful conduct on a large scale, including stating numerous women have spoken to the reporters about the bias, harassment, and retaliation.[1]

3.     Within the Bank's Equities division, the department where Lindsey has worked for over 16 years, the unlawful conduct has been rampant.  Citi has permitted, and, in some instances, has encouraged a locker room environment on its trading floor in which men have treated women as sexual objects and denigrated their accomplishments.  For example, male employees, including executives within the Equities area, ranked and rated the appearance of female employees; openly discussed with each other which female employees they wanted to have sex with; frequently commented on women's bodies; mocked the Bank's sexual harassment trainings and women's initiatives; excluded women from professional opportunities afforded to men; and pressured Lindsey to attend strip clubs and other events where male managers used women solely for entertainment.  In many instances, Citi did nothing to stop the egregious legal violations despite Lindsey and other women making complaints.

4.     In this environment, numerous male executives in the Equities division regularly flouted the anti-discrimination and harassment laws without consequences. Lindsey

---

[1] See Flitter, Emily, New York Times, "Citi Is Sued Over Sex Abuse. Before 2022, It Would Have Been a Secret," (Nov. 29, 2023), available at https://www.nytimes.com/2023/11/29/business/citi-sex-harassment-lawsuit.html (citing the accounts of ten former Citi employees who "described a hostile work environment for female employees at Citi"); Smith, Paige and Abelson, Max, Bloomberg, "Harassment and Drugs Plagued a Citigroup Division for Years," (March 23, 2024), available at https://www.bloomberg.com/news/articles/2024-03-23/citigroup-inside-the-bank-unit-plagued-by-harassment-and-drugs?embedded-checkout=true (describing based on interviews of 22 former employees, rampant harassment and discrimination against women).

was repeatedly subjected to extreme sexual harassment, including quid pro quo harassment and a hostile work environment.  Lindsey did not pursue legal claims earlier because, as Citi executives had warned her, she feared for her job and experienced severe trauma due to the abuse.

5.      As set forth below, in 2022 the sexual harassment made it impossible for Lindsey to do her job.  Whatever the risks to her career and her safety, Lindsey had no choice but to confront the employer which had ignored the mistreatment for so long. Moreover, although Citi maintains a purportedly mandatory employment dispute arbitration policy that has prevented public exposure of long-standing discriminatory practices, federal legislation effective March 2022 now permits Lindsey and other survivors of sexual harassment to vindicate their rights in court proceedings.

6.      The trauma Lindsey endured as a Citi employee began in 2007, just weeks after she started as a junior employee at the Bank. A senior Equities executive, Rich Evans ("Evans"), sexually assaulted her. Lindsey reported the incident to her male supervisor, Managing Director Dan Keegan ("Keegan"), who held numerous senior roles during his tenure, including Co-Head of Global Equities and Chairman, Chief Executive Officer ("CEO") and President of Citigroup Global Markets Inc. and Head of North America Markets and Securities Services.   Despite Lindsey's reporting the incident, a sexual assault by a senior male executive who continued working for Citi, the Bank took absolutely no action.

7.      Most recently, former Citi Managing Director Mani Singh ("Singh") (whose legal name is Manvinder Bhathal), who was, until November 2022, one of Citi's senior-most global executives in Equities and one of Lindsey's supervisors, subjected her to unrelenting abuse and unlawful conduct.  Singh, using his position of authority and threats to harm Lindsey

and her family, coerced Lindsey to have a relationship with him for years. After Lindsey ended the toxic relationship with Singh in October 2022, Singh subjected Lindsey to an onslaught of shocking abuse via hundreds of text messages and incessant phone calls. Singh's deranged messages included, but are not limited to:

- threatening to kill Lindsey, including texting her, "And I am going to set you on fire" and "[H]ug [your children] tight" because your "world will be over [tomorrow]";

- making malicious comments about her family, including her children, such as "Gon[n]a fuck your life and kids with it too"; "Kids no kids I don't give a fuck [I] plan to burn it all down"; "Your kids['] life will be ruined from here on in"; and "Your children will have no future with [a] Slut like you";

- threatening to reduce Lindsey's compensation and to sabotage her career, including messaging her, "Taking you down in comp[ensation]. Hard. Like a bitch you are"; and "Obv[iously] I plan to use . . . [m]y power. Obv[iously] comp[ensation] is just st[a]rt of where I take it all out."

- attacking her reputation, including texting her, "And I plan to fuck your life. And I may drop something on social media and tag the community. Not clear to me yet on my path. But disloyalty will not go unpunished."

- falsely accusing her of having sex with Citi clients, including stating, "Focus on fuckin[g] more accounts"; and

- making demeaning and sexualized comments about her appearance and body, including texting, "I been asking on floor. You barely top 10 and [t]hat[']s for a trading floor." "Not one person name[d] you hot [on] whole floor. Can't even get a rank on a floor."

During that time, Singh also called Lindsey repeatedly, including in one instance calling her approximately 30 times in a single day.

8.    Lindsey reported Singh's erratic and frightening conduct to Citi management and Human Resources. Shortly thereafter, Lindsey, fearful for her life and her job, disclosed some of Singh's abusive and repugnant text messages to the Bank and described his egregious harassment, which Citi's investigator, a former District Attorney, characterized as "criminal." Unfortunately, even though Citi was aware of Singh's extreme misconduct, the Bank

attempted to silence Lindsey's claims and failed to acknowledge the gravity of what Singh had done. Not only did Citi allow Singh to resign, but it praised him when he left the Bank. In reading from a prepared statement on a call to over 150 employees in Equities, Tim Gately ("Gately"), the former Head of Sales for the Americas who reported directly to Citi's Global Head of Equities, emphasized that Singh's resignation was voluntary and commended him. Gately said, among other things, "We're all very sorry to see him go and certainly grateful to the contributions he has made over the years. But it was his decision, and we wish him well." Gately made those comments and, Citi's Human Resources and top management, including, on information and belief, Fater Belbachir ("Belbachir"), Global Head of Equities, greenlighted this announcement. They did so knowing that Singh had threatened to kill Lindsey and harm her family; that Singh had made grotesque and violent sexual comments about Lindsey; and that Singh had used his power and status at the Bank and his control over Lindsey's job to instill fear and terrorize her.

9.      In addition, on information and belief, Citi took no steps to ensure that Singh would not abuse another woman in the industry or that his vile and vicious attacks would not continue with Lindsey after his resignation. On information and belief, Citi did not report Singh's conduct to the Financial Industry Regulatory Agency ("FINRA") or indicate on Singh's U5 Form that he had engaged in gross misconduct, including his depraved threats to physically harm Lindsey, and his outrageous sexual harassment. Nor did Citi take any steps to ensure the physical safety of Lindsey. Citi failed to do so even though Lindsey had provided Citi with undeniable proof of not only violations of the anti-harassment and discrimination laws, flagrant violations of FINRA rules, and industry standards, but also likely criminal misconduct. Moreover, in May 2023, Keegan, who left Citi by that time but on information and belief had

continued to do business with the Bank through his own company, tried to encourage Lindsey to keep the matter confidential.  He suggested that she arbitrate her claims and made threats that her career would be over if she filed a lawsuit.  Keegan did so knowing that Lindsey worked incredibly hard to build her career.

10.    Not only did Citi not protect Lindsey and other women at the Bank, but it also retaliated against them for making protected complaints.  For example, Lindsey's direct supervisor whom she never witnessed behaving in an inappropriate manner, told Lindsey in November 2022 that her end of year performance rating for 2022 year was a "1, 1" which was the highest rating an employee could achieve at Citi.  Lindsey consistently received a 1 rating for both her performance and leadership over the course of her career. But when Lindsey's supervisor delivered the formal performance communication for 2022, Citi inexplicably downgraded Lindsey's rating to a "2, 2." On information and belief, Citi executives above her supervisor had made the decision to decrease Lindsey's rating following her protected complaints in November 2022.

11.    Lindsey is currently on an approved leave of absence from Citi as she tries to recover from the trauma she suffered.  As a result of Lindsey having endured years of shocking abuse and harassment while working for Citi, her doctors diagnosed her with Post Traumatic Stress Disorder, Major Depressive Disorder, Generalized Anxiety Disorder, and Major Neurocognitive Disorder and deemed her unable to work.

12.    Based on the conduct described in more detail below, Lindsey brings this action to remedy unlawful gender discrimination and sexual harassment, including quid pro quo harassment and a hostile work environment, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); the New York State Human Rights

Law, N.Y. Exec. Law § 296 et seq. (the "NYSHRL"); and the Administrative Code of the City of New York § 8-101 et seq. (the "NYCHRL").

13.    Lindsey also brings this action to remedy unlawful retaliation in violation of the NYSHRL and the NYCHRL.

14.    Lindsey also brings this action to remedy Citi's violation of the NYSHRL in connection with Evan's sexual assault.  Evans's sexual assault of Lindsey constitutes unlawful sexual offenses as defined in Article 130 of the New York Penal Law.  This claim is therefore timely under the Adult Survivors Act, N.Y. C.P.L.R. § 214-j.

15.    In addition, Lindsey brings this action to remedy Citi's violation of the New York City Victims of Gender-Motivated Violence Protection Law, Administrative Code of the City of New York §10-1101 et seq. ("GMVPL").

<u>PARTIES</u>

16.    Lindsey has worked for Citi in its New York City, New York office for over 16 years.  She resides in New Jersey.

17.    Citi is a multinational investment bank and financial services company. It is headquartered in New York City, New York and incorporated in the State of Delaware.

<u>JURISDICTION AND VENUE</u>

18.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because plaintiff's Title VII claims arise under federal law.

19.    This Court also has supplemental jurisdiction over plaintiff's Executive Law, City Law, and GMVPL claims pursuant to 28 U.S.C. § 1367 because these claims relate closely to the Title VII claims, having arisen from a common nucleus of operative facts, such that the Executive Law, City Law, and GMVPL claims form part of the same case or controversy.

20.    This Court also has jurisdiction pursuant to 28 U.S.C. § 1332. First, the parties have diversity of citizenship. Plaintiff is domiciled in New Jersey. Pursuant to 28 U.S.C. § 1348, Citi is incorporated in the State of Delaware and maintains its principal place of business in the State of New York. Second, the amount in controversy exceeds $75,000.

21.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because defendant's offices are located in New York, New York; plaintiff worked in New York, New York; and the majority of the events giving rise to the plaintiff's claims occurred in New York, New York.

22.    Pursuant to Section 8-502(c) of the NYCHRL, plaintiff will serve a copy of the Amended Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

23.    Although Citi maintains a compulsory arbitration agreement for employment disputes, under The Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("EFAA"), that agreement is not enforceable in this matter. See 9 U.S.C. §§401-02.

<u>FACTUAL ALLEGATIONS</u>

<u>Lindsey Joins Citi's Global Equities Markets Division</u>

24.    Lindsey is an experienced investment professional who has dedicated virtually her entire career to Citi.

25.    After graduating college, in or around April 2007, Lindsey joined a financial services company where she reported to Keegan.  In or around August 2007, Citi acquired the company where Lindsey and Keegan were working.

26.    Following the acquisition, beginning in or around October 2007, Lindsey became a Citi employee.  Throughout her tenure, Lindsey has worked within the North America Markets Equities Division, which sits within Citi's Global Markets business.  According to the

Bank's website, "Citi Equities provides investors with a broad range of equity and equity-linked products and services."[2]   Citi boasts that it has "trading desks in over 30 countries and market access in over 70 countries."[3]

27.     In the Equities division, the Bank has multiple sales trading and trading desks. In simplest terms, the High Touch Sales Trading desk handles client orders with a sales trader who monitors the market, confers with the client on instructions, and subsequently executes the client orders which requires a greater degree of human intervention than the Electronic Desk. The Electronic Sales Trading desk handles client directed trades using Citi's computer algorithmic strategies that determine what and when to trade and execute the orders based on various inputs.  The Program Trading desk also uses computer-generated algorithms, but trades baskets of different stocks in large volumes that are part of a coordinated trading strategy.  As set forth below, Lindsey was initially the most junior team member of the Electronic Sales Trading desk and later became Americas Head of Electronic Sales Trading.

28.     The Equities division also provides Execution Advisory Services.  In that area, equity execution consultants work with clients to advise on optimal execution strategy, algorithmic strategy customization, trade cost analysis, market microstructure, as well as generating trading research content. Lindsey assumed responsibility for this team in 2021, in addition to her role as Americas Head of Electronic Sales Trading.

<u>Leadership in Equities</u>

29.     For approximately 15 years, Managing Director Keegan held senior roles within Equities.  Among other positions, Keegan was Co-Head of Global Equities and a member

---

[2] https://www.citi.com/mss/solutions/equities/

[3] https://www.citi.com/mss/solutions/equities/

of Citi's Pension Investment Committee. His final role at Citi was Chairman, CEO and President of Citigroup Global Markets, Inc. and Head of North America Markets and Securities Services. In addition to his business responsibilities, Keegan "led the executive management office in maintaining a culture of responsible ethics and finance."[4]

30.     During his tenure, Keegan worked with the Bank's highest level executives, including Jane Fraser ("Fraser"), Citi's CEO; Tyler Dickson, Global Co-Head of Banking, Capital Markets and Advisory Services and a member of Citi's Institutional Clients Group Management Committee, the Global Markets Management Committee and Global Banking and Coverage Leadership Committees; John Chirico, Head of Investment Banking in North America; and Jim O'Donnell, Head of Global Wealth Management, previously Global Head of Investor Sales and Relationship Management at Citi Markets and Securities Services. On information and belief, Keegan and Fraser had worked closely together on planning related to the COVID-19 pandemic.  Keegan also included Suni Harford, former Regional Head of Markets for North Americas at Citi, and Kevin Russell, former Global Head of Equity Trading at Citi as some of his closest Citi colleagues. Keegan was also close to Singh, and repeatedly told Lindsey (even after seeing some of Singh's abusive text messages) he "would always love Singh." Indeed, multiple women have stated to Lindsey, in sum and substance, "Everyone knew that [Singh] was [Keegan's] guy."

31.     Since approximately August 2020, Belbachir has been the Global Head of Equities; Belbachir reports to Global Head of Markets Andy Morton ("Morton").  Gately, the former Equities Head of Sales for the Americas, reported directly to Belbachir.  At the time Singh left Citi in late 2022, he reported to Gately.

---

[4] www.18somerset.io/daniel-keegan

32.     During Lindsey's tenure at Citi, on information and belief, Singh ascended the ranks faster than any other employee within Equities.  After working for several years at JPMorgan in London, Singh joined Citi in or around 2006.  In or around 2011, Singh moved to Citi's New York office as a Director in the Equities area.  In or around 2014, Singh became Head of Americas Execution Sales in addition to his prior responsibilities; Execution Sales or Platform Sales as its also known, is the team responsible for partnering with existing sales teams to market new products, identify new execution opportunities, and cross sell the entire execution platform to new and existing clients. Singh was promoted to Managing Director in 2015.

33.     Throughout the remainder of his tenure at Citi, Singh received additional promotions and roles of increasing responsibility. For example, in or around 2017, Singh's job expanded to include Global Head of Platform Sales whereby he reported to the North America Markets ("NAM") Head of Equities (which was Gately at the time) and Global Head of Sales (which was Antonin Jullier ("Jullier") at the time) and worked with regional management to determine which clients to focus on based on business opportunities.  At this time, he was also given additional responsibility for being named the Global Sales lead on all Platinum Client relationships, which are the firm's most important clients.

34.     Again, in April 2020, Citi appointed Singh as North America Markets Head of Cash Equity Execution Services. His role later expanded to include Futures as well. Singh continued to maintain his role as the Global Cash lead for Equities Execution for Global Platinum clients.  In his role as head of Cash and Futures Execution, he oversaw several areas within the Equities and Futures division, including High Touch Sales Trading; Program Trading Sales Trading; Electronic Sales Trading; Electronic Product; Platform Sales; and Execution Advisory Services.

35.     Singh, who on information and belief, had the fastest ascension of any employee in the Equities division, received multiple promotions and positions of increasing responsibility even though Citi was aware that, during his employment, he on countless occasions violated Citi rules and, in some instances, the laws. By the time he left Citi, Singh effectively had become the Bank's most senior client-facing executive in Sales within the Equity division globally.  Singh had approximately 100 employees reporting directly and indirectly to him.

36.     During Lindsey's employment, Citi used a matrix management structure under which many employees reported to more than one manager. Most recently, Lindsey's direct manager was Americas Head of Electronic Trading, and Lindsey indirectly reported to Singh as her matrix manager.

37.     As one of the most senior executives in Equities globally, Singh was responsible for ensuring that the division's conduct, culture, governance, and controls were aligned with Citi's core values and regulatory commitments.   Despite this purported responsibility, as set forth below, Singh repeatedly and brazenly violated Citi policies, FINRA rules, and the employment laws.  During his tenure, Singh suffered minimal consequences for his shocking and abusive behavior because, on information and belief, he is a man who earned significant revenue for the Bank.

<u>Lindsey's Success at Citi</u>

38.     After Lindsey joined Citi in or around October 2007, the Bank quickly identified her as a star performer, assigning her to handle some of the Bank's most significant Equities accounts and manage high-priority relationships even as a junior employee.

39.    Consistent with her excellent performance, Lindsey has received regular promotions throughout her career, including to Vice President ("VP") and, in 2016, to Director.

40.    More recently, in early 2019, Lindsey unofficially took on responsibility for overseeing the Electronic Equity Sales Trading desk. In that role, Lindsey oversaw a team of eight investment professionals in addition to continuing to manage her own client accounts.  In or around February 2020, Citi formally promoted Lindsey to head of that desk.

41.    In 2021, Lindsey also took over responsibility for overseeing the Execution Advisory Services team and oversaw five additional investment professionals as a part of that role.

42.    Also in 2021, Citi promoted Lindsey to Managing Director. During the promotion process for the Managing Director role, Citi made clear to Lindsey that it was considering her as a future leader of the Cash Execution division (which is a larger group that includes the Electronic Sales Trading Desk). Among other things, during that process, Citi management discussed positioning Lindsey as a potential future head of two additional desks within Cash Execution: the Program Trading and High Touch desks.

43.    As her upward trajectory at Citi demonstrates, Lindsey's performance throughout her career has been excellent. Lindsey has consistently received strong performance reviews, merit-based bonuses, and salary increases.  In addition, Lindsey was well regarded by her peers.  Citi maintains a talent deck listing its highest performing employees.  Managers have told Lindsey that her name was included in that deck.  They also advised her that she was named in Citi's succession planning for future business leadership positions.

44.    Lindsey's coworkers regularly cited her in peer reviews for her impressive work ethic, her ability to work cooperatively with other teams, her performance in covering

accounts and ability to drive revenue, her professionalism, and her significant efforts to represent the Bank and its clients well. In recognition of Lindsey's commitment to the Bank and her clients and her upstanding character, a wide range of employees from junior analysts to senior executives referred to her as "10 and 2," which analogizes her accomplishments to proper driving protocol and safety.

45.    In 2020, Citi management formally recognized Lindsey as a female leader in the Markets business of the Bank, which includes Equities. Citi management selected Lindsey as one of the three heads of the Citi Women's Network "Recruit, Inspire, Support and Engage" or "RISE." The organization was founded by Deirdre Dunn ("Dunn"), an accomplished, widely respected senior female executive. RISE, which includes over 100 Citi employees, is the largest and one of the most important diversity groups in Citi's Markets business. As a result, the tri-head position is highly coveted role for female Directors. Lindsey was the longest-serving tri-head in the organization's history and, during her tenure, she worked diligently to advance gender equity at Citi. During her time as tri-head, Lindsey held that role in addition to leading her teams within the Equity division.

Citi's Pervasive Culture of Sexual Harassment and Gender Discrimination

46.    The Bank has made considerable attempts to portray itself publicly as an institution that values diversity and inclusion, including gender equity. For example, in 2022, Citi "introduced new diversity goals for gender, race and sexual orientation in its workforce for 2025," including aiming "to boost global representation of women in assistant vice president to managing director levels."[5] Also, Citi boasts that it was "the first bank to disclose [its] adjusted

---

[5]    https://www.reuters.com/business/sustainable-business/citigroup-sets-new-diversity-goals-workforce-by-2025-2022-09-20/

pay results and the following year [it] became one of the first companies to disclose [its] unadjusted or 'raw' pay gaps for both women and US minorities" theoretically to "hold [itself] accountable for the progress [it] want[s] to make in being a diverse and inclusive company."

47.     Contrary to the Bank's carefully cultivated public image, however, many male executives created, and the Bank knowingly tolerated, an environment that has been openly and notoriously hostile to women.  Citi, especially in the Equities division, has been a workplace where sexual harassment and gender discrimination are rampant and egregious.    There is a locker room environment on Citi's Equities trading floor in which numerous men have treated women as sexual objects and denigrated their accomplishments.

A.     Women as Sexual Objects

48.     For years during Lindsey's employment (and as reflected in Singh's text messages about Lindsey's "rank" on the trading floor), male employees, including executives within Equities, ranked and rated the appearance of female employees. Executives openly discussed with each other which female employees they wanted to have sex with. For example, in or around 2017, on information and belief, a male Desk Head, Gene Song used a book of Citi first year analysts' headshots to rank the "hotness" of female analysts.  Employees reported this sexist incident and another similar one to Citi's Human Resources ("HR") and a Managing Director; on information and belief, Citi took no action.

49.     Singh and other senior male managers, including Belbachir and other members of the Equities Global Executive Committee, bonded by discussing their past and prospective sexual conquests and objectification of women.  For example, the male employees at Citi frequently stated that they targeted female employees for sexual conquest.  Among others,

Keegan often made jokes referencing women using the phrase "take her down," slang for having sex.

50.    In addition, Singh told Lindsey that he and Gately watched a woman in the neighboring apartment building get dressed from Gately's office; Singh talked glowingly about a male Managing Director, David Haldane, Global Head of Derivatives Trading who picked up his future wife at her bachelorette party by flaunting his explicit sexual prowess to encourage her to call off her wedding; Singh bragged about a male Managing Director who regularly engaged in threesomes; Singh discussed another male Managing Director on the sales trading desk who shared "war stories" about sexualizing women and drug use at a prior firm; and Singh told Lindsey that another male Managing Director, a senior Executive, had a propensity for spending time in the back rooms of strip clubs where he, on information and belief, had sex with the female staff.

51.    There are other examples of men on the trading floor treating women as sexual objects. For instance, several of the male traders on the trading desk encouraged the most junior male trader to talk about his romantic interactions with women. On one occasion, in or around 2016 or 2017, some of the more senior male traders, including the male Managing Director and Head of the Trading Desk who played a key role in the repeated offensive and biased conduct, encouraged that junior trader to show while on the desk at work, the underwear of a woman he had recently had sex with. Although Citi fired the junior employee, the Bank took no action against the senior employees who supported and encouraged the behavior and ultimately were responsible for fostering the culture the junior employee was following.

52.    In addition, in multiple instances, Lindsey observed that various male employees tried to isolate those they believed had spoken out against the discriminatory culture.

For example, several of the traders and sales traders lashed out against a female Managing Director who they believed had reported the incident described above involving the junior trader. Following this incident, this female Managing Director, who still works for the Bank, has been the target of ongoing retaliatory behavior as Lindsey and numerous other former colleagues have observed.  On information and belief, this female employee's manager and other management have done nothing to intervene.

53.    Throughout his tenure at Citi, Singh treated women as objects he could collect. Singh made an effort to bring onto his team women he deemed attractive, including targeting Lindsey, and often jokingly referred to the group as "Mani's Angels" to other male leaders.

54.    Lindsey is aware of multiple instances where male employees targeted women for sexual harassment.  For example, male employees subjected a former female Managing Director, Jackie Moran ("Moran"), who is a lesbian, to egregious sexual harassment, including homophobic remarks, over a 10-year period. On one occasion, Moran's manager, a male Managing Director, apparently believing that such conduct was acceptable, commented to Moran in front of the Electronic Trading team that he would "crawl under her desk" and "turn" her straight. Male members on the desk, including manager Keegan, openly joked about her sexuality.

55.    On another occasion, Moran invited Keegan to help represent Citi at an LGBTQ event. When Keegan returned from the event and for many years thereafter, he made jokes and exaggerated references to that event, including introducing Moran to clients as "the woman I go to gay bars with"; repeatedly joking that others thought he is gay because he attended the event; and telling others that when he was at a drag show, he was standing with

"cock and balls" in his face.  Keegan also repeatedly referred in a professional setting to her sexuality, which offended Moran and made her uncomfortable.

56.    Even though the environment was toxic and offensive, on information and belief, women like Moran reasonably understood that if they complained, the Bank would retaliate against them because senior managers were involved in making and condoning these harassing comments. Male managers also criticized Moran without basis and the Bank ultimately laid her off.   On information and belief, there was no performance-related reason for Citi to fire her.

57.    Singh also told Lindsey that Belbachir, the Global Head of Equities, engaged in sexually harassing conduct.  For example, on information and belief, Belbachir subjected Salima Habib ("Habib"), the now most senior female executive in Equities, to unwanted flirting.  In addition, on information and belief, Belbachir was "handsy" with Habib at a Bank outing in Fall 2022.

58.    On information and belief, Jullier, a male Managing Director, sexually assaulted a junior woman at a work conference.  The woman described Jullier as a "predator" who sexually attacked her, manipulated her, and repeatedly communicated with her thereafter to ensure she remained silent. Jullier called her at work and said, "We are still ok, right?" This woman, like many others, understood that Citi HR functioned to protect the Bank and such executives, not the women. Thereafter, she was moved to a new office in a new position, and was given few resources and little opportunity to do her job. On information and belief, Jullier wanted to ensure that she was out of his way and that he was able to continue his ascension within the organization. Ultimately, that woman left the firm.  Jullier bragged to Singh about this sexual encounter.

59.    On information and belief, a female analyst attended a concert with Citi executives, including two individuals who were both Managing Directors and desk heads; traders; and sales traders. She was the only woman in attendance. During the event, a team member of the Cash Equity Trading Desk pulled his pants down in front of the female analyst and proceeded to grab her buttocks. The two male Managing Directors and desk heads, which included the male employee's supervisor, who had witnessed the gross misconduct said they would handle the situation. On information and belief, however, the male Managing Directors failed to take any action. A year later, the male trader who had engaged in harassment became a client of the firm. The female analyst's supervisor who had witnessed the event attempted to assign the junior woman as new coverage for that account. That analyst subsequently left the firm.

60.    There are also numerous examples of senior male executives involved in sexual relationships with their direct reports or more junior women.  Even though Citi has policies in place to supposedly prohibit those relationships, which cannot be consensual given the power that the senior men have over the women, the Bank allowed them to happen.   In many of those instances, for no apparent reason the women in those relationships, and not the men, left the Bank. For example:

- On information and belief, until approximately 2022, it was widely known among Citi employees, including management, that the Global Head of Commodities, a group within Markets, had a romantic and sexual relationship with his subordinate.  The Bank, however, turned a blind eye.

- According to Singh, senior executives, including Belbachir, ignored the much discussed romantic relationship between Stephen Roti ("Roti"), who is now Managing Director at

Citi and Global Head of its Strategic Equity Solutions Business, and the female then Head In-Business Risk for Equities, a support area that was responsible for overseeing the risk function in Roti's business. This woman managed all in-business risk activity across Global Equities, including Prime Brokerage, Delta 1, Equity Derivatives, Strategic Equity Solutions, Futures and OTC clearing and FX Prime Brokerage.

- In recent years, numerous traders and sales traders have had relationships with female analysts, an entry-level position. These women subsequently moved teams or left Citi.

- On information and belief, the male former Head of Americas Equities Trading was romantically involved with multiple women subordinates and a Human Resources representative. Even though many at Citi were aware of this purportedly off-limits relationship, the Bank responded by promoting the male executive yet again. The women employees are no longer at the Bank.

- According to Singh and others, a married male Director on the Sector Specialist desk was romantically involved with a female analyst. Ultimately, the Bank relocated the woman to another state. Although Citi knew of this purportedly impermissible relationship, after this male Director's departure, the Bank recently tried to rehire him into a more high-profile seat.

61. Also, numerous male members of management commented on the age and physical appearance of female employees. For example, male managers regularly mocked an older female employee hired as Global Head of Electronic Marketing, including referring to her as "Dan's Mom" (a reference to Dan Keegan). They questioned why the firm would have hired her and joked that Citi must have done so because she was another employee's mother. In contrast, male employees had expressed positive feelings towards this employee's predecessor, a younger woman who they repeatedly said was attractive.

B.    <u>Women as Entertainment</u>

62.    On multiple occasions, male executives have pressured Lindsey to attend strip clubs and other events where male managers used women solely for entertainment.

63.    Over the past several years, Lindsey's Citi colleagues, although fully aware that she had never been to a strip club, have asked her multiple times to go to a strip club in Miami to entertain clients. On the first occasion, in or around 2018, Lindsey was at a dinner with a group of Citi colleagues and a client.  A Citi colleague suggested that the group go to a club called "Eleven," which the colleague referred to as a "dance club." When Lindsey arrived, she was shocked to learn that Eleven was, in fact, a strip club. When Lindsey made clear during that event that she was uncomfortable, a male Managing Director and male Director scolded her for making the experience "awkward" and "ruining" it.

64.    In or around 2019, a group of Citi colleagues and a client asked Lindsey to go to Eleven while she was in Miami for a Citi-hosted Derivatives conference. Lindsey objected, but her colleagues were persistent.  As the only objector, Lindsey eventually acquiesced.  She felt that she had no choice but to endure another demeaning and unprofessional situation.

65.    When the group arrived, a senior Citi business head in Equities whom Lindsey indirectly reported to, was also at the strip club. Lindsey told this executive that she felt demeaned and objectified, that she did not want to be there, and that she had been pressured into going to the club. After this discussion, Lindsey promptly left the strip club. This executive avoided Lindsey from that point forward even though Lindsey indirectly reported to him. Lindsey also subsequently disclosed these events to the then Co-Head of Global Equities Keegan.  On information and belief, Citi did not take any action in response to the misconduct that Lindsey had reported.

66.     In yet another incident, in or around 2020, Lindsey was at dinner with a group of colleagues, including Singh, and a Citi client. During the dinner, Lindsey's colleagues repeatedly made humiliating comments about Lindsey's appearance and pressured everyone, including Lindsey and the client, to go to Eleven with them after the dinner.

67.     This time Lindsey was not the only voice of dissent.  Even though the client also expressed hesitation about going to the strip club, the Citi employees, including Singh, went to Eleven and encouraged Lindsey and the client to attend. When dinner ended, Lindsey and the client returned to the conference for drinks. During that time, the client told Lindsey he was horrified by the Citi male executives' behavior towards Lindsey and stated, in sum and substance, "If you ever need a witness, I'll be your witness."  Lindsey again reported this incident to management and, once again, on information and belief, Citi failed to act.

68.     Management and Human Resources knew not only that Singh went to strip clubs while working for Citi, but also that he used his corporate credit card at those clubs. In response to Singh's misuse of his Bank credit card for that purpose, the only discipline Citi imposed was to give Singh a warning.   Yet, after the Bank gave Singh a slap on the wrist, he continued to take clients and other employees to strip clubs as part of work events.

69.     Singh also repeatedly told Lindsey that he and other senior male executives used the back rooms of strip clubs.  On information and belief, Singh meant that they used the back rooms for sex and drugs.

70.     Between approximately 2018 and 2020, Citi also required Lindsey to participate in multiple purported business dinners, which, on information and belief, the Bank paid for, with male colleagues and clients.  Lindsey was the only professional woman at these events.   In addition, male executives, including Managing Directors and Directors, invited

women – who were not Citi clients, employees, or spouses and had no reason to be there – to serve as entertainment for the men at the dinners. At one of these dinners, one of the women attending was a masseuse and Gately, met by off-color humor from the men present, arranged for her to provide a massage in his room the next day. Disgusted by the blatantly sexist conduct, Lindsey believed she had no choice but to remain silent and endure this demeaning and offensive work environment.

71.    In or around 2018,  Citi hosted a Derivatives Conference in Miami during which the then-CEO Mike Corbat spoke. The Bank also invited Lindsey because she covered many of these Equities clients.  On the first evening of the conference, the male then-Co-Heads of Global Equities at Citi, including Keegan, who both appeared to be drinking more than anyone else, kept the bar open after hours.  On multiple occasions, Lindsey tried to leave the event, but Keegan insisted that she stay because, on information and belief, his Co-Head found Lindsey attractive. Lindsey overheard one of the Co-Heads of Equity say to Keegan about Lindsey, "She is exactly my type."

72.    Throughout Lindsey's employment, various male senior Sales Traders, covering Hedge Fund clients in Equities invited to client dinners junior women they ranked on the floor as attractive.  The men did so even though those women did not cover, and had no relationship with, the accounts whose representatives attended the dinners.  In many instances these sales traders would then broadly distribute call reports to management about the dinner and attendees.  It is hard to believe management was unaware of what was happening.  On information and belief, many of those women have left Citi and have described their time at the Bank as some of the worst years of their lives and attributed their departures to the sexual harassment and the discriminatory culture.

C.    Sexualized Comments About Women's Clothing and Appearance

73.    Throughout Lindsey's career, male managers have subjected Lindsey and other female employees to degrading and sexualized comments about their appearance.

74.    Soon after Lindsey joined Citi in 2007, Keegan told Lindsey that another male Managing Director had asked him, in sum and substance, "How can you concentrate sitting next to Lindsey all day?"   Similarly, years later Singh informed Lindsey of another male Managing Director Executive who had told Singh he was going to try and hook-up with Lindsey. Both of these men are past or present desk and or business heads.

75.    Male senior leaders at the Bank openly discussed Lindsey's body. For example, at a business dinner in 2018, a Managing Director and a Director made comments about Lindsey's breasts. On numerous occasions, Singh told Lindsey that Managing Directors and Directors at the Bank discussed her breasts when she was not present. Moreover, male employees compared Lindsey's body to those of other Citi women, including referring to a female junior analyst who resembled Lindsey as "Ardith 2.0."   Keegan, then the Co-Head of Global Equities, made Lindsey particularly uncomfortable when he openly discussed in the office the body of the woman that men referred to as Ardith 2.0. Keegan began to make the objectifying and offensive comments after seeing Ardith 2.0 in a swimsuit while on a vacation when he ran into her.

76.    Lindsey's former supervisor, Greg Sutton ("Sutton"), a male Managing Director, frequently made demeaning comments about Lindsey's work and appearance. For example, in or around 2017, before a presentation, Sutton told Lindsey that she was assigned the "boring" part and that her job was to "wear a cute outfit" to keep the attendees interested. Even

though Lindsey reported this comment to senior management, on information and belief, the Bank took no action.

77.    Sutton assigned Lindsey other tasks that he did not consider important, including the responsibility of preparing a Citi University Knowledge Block for Electronic Markets that Sutton deemed administrative work.  The Citi group responsible for publishing the videos, Citi Velocity, specified that the purpose of the knowledge block was for Citi business leaders to post videos to help educate other Citi employees about the different business areas.

78.    Even though Lindsey took the Knowledge Block assignment seriously and worked diligently to make the video, male employees, including executives, used the project to further objectify and sexualize Lindsey. When Citi Velocity released the video on its site, at the encouragement of Singh, the desk made bets on how many male employees would watch the video of Lindsey.  The site provided statistics on who watched the video, how many times they watched it, and how long they watched it. The desk deemed the executive who watched the video twenty-two times as Lindsey's "stalker" and also made jokes about the Citi Co-Head of Equities, Keegan, watching the video approximately nine times.

79.    During the time that Lindsey reported to him, Singh also commented about Lindsey's body and appearance, including in front of her clients. Among other things, on numerous occasions, Sutton, Singh, and Singh's boss Antonin Jullier, Global Head of Sales and Client Executives for Equity, Prime Finance and Futures, commented on Lindsey's arm muscles and touched them in front of her peers. In or around 2021, Singh openly referred to Lindsey as "Lara Croft Tomb Raider" based on her physique when she first returned to the office after the Covid pandemic began.

80.    Singh also frequently commented on the appearance of other women. For example, in or around 2022, Singh commented to several colleagues about the breasts of a highly talented female employee who had just had a baby.  Singh made these remarks loudly in front of numerous Citi employees.  Singh had previously made sexual comments about this same employee after doing a workout class with her and seeing her in spandex.

81.    In other ways, Singh often objectified women at work.  He told Lindsey that women employees, including his peer Habib, had romantic interests in him and suggested that certain women had changed their appearances to suit his purported tastes.

82.    Singh and other men at Citi were also inappropriately critical of women's bodies. For example, Singh made derogatory comments about a woman who was wearing Spanx and who he referred to as "horseface." Also, when Lindsey was pregnant in 2014, Singh distributed pictures he found online of a person with very large ankles and drew a demeaning comparison to Lindsey's ankles when she was nine months pregnant.

83.    On information and belief, a junior woman in Equities had multiple concerns about a male mentor.  He repeatedly asked her about her personal life, including attempting to discuss her relationship status.  He also told her what to wear, including suggesting that she was tall and skinny and should show her figure off to "bait men." That woman reported her concerns to Managing Director Habib. Habib was dismissive of that woman's complaints because the junior woman and the man were purportedly "friends." Habib then suggested that the woman could report the problem to HR, the man's boss could talk to him, or, as Habib clearly was encouraging, the young woman could handle the situation herself. When the woman told Habib she was very upset and getting stomach ulcers as a result of the repeated harassment, Habib suggested that the woman meditate to cope with the mistreatment.

84.    On information and belief, the same young woman complained to Habib that two men she worked with were using the Bank's Analyst Facebook page, which included resumes and photos of analysts, to select the "hottest" analyst for their desk. Habib said that she could do something only if this young woman provided the names of those coworkers; otherwise Habib said that she could not help. This young woman faced a particularly difficult choice because one of the individuals engaged in the misconduct was her manager.  The young woman was left feeling that Habib did not want to intervene. Plainly Habib could have corrected the problem without further embarrassing the woman or endangering her job; Habib chose not to address the entire team and put a stop to the humiliating practice. Habib repeatedly failed to act, including when there was explicit evidence of women being sexualized and harassed.

D.    Belittling Women and Their Accomplishments

85.    Many male executives regularly denigrated the competence and successes of women employees, including Lindsey.

86.    For example, male executives repeatedly insulted and diminished women who managed to assume significant responsibility at Citi. In or around 2022, Singh told Lindsey that male managers mocked Habib, who was Singh's peer, in sexist ways.  Singh told Lindsey that they referred to Habib as "emotional," "immature," and "needy."  Singh also told Lindsey that these men often excluded Habib from senior executive outings. Similarly, using disparaging language, male managers, including Singh, mocked the former Chief Operating Officer of Global Electronic Equities, a woman who was outspoken and escalated to upper management concerns about inappropriate behavior and questionable conduct, and undermined her competence and credibility without justification.

87. Managing Directors, including Lindsey's direct managers, regularly suggested that Lindsey had secured client relationships, which she had cultivated through years of hard work, because those clients were sexually attracted to her. Citi managers made similar jokes about other women, including implying that the only basis for the positive relationship between a female Citi employee and a male client was sex.

88. In or around 2018, Sutton, a male Managing Director and Lindsey's supervisor, openly mocked to other male executives, a well-respected female Relationship Manager about an email she sent. Sutton referred to the woman's "stupidity," and then to insult Lindsey, even though Lindsey was not involved in the email interaction, yelled down the desk that the purportedly stupid female Relationship Manager had, in essence, "taught [Lindsey] everything she knows." Lindsey did report the insulting and gender-biased behavior to senior management, including Keegan and Gately. Even though Sutton frequently denigrated Lindsey without basis and made no similar belittling comments about male employees, the Bank, on information and belief, took no immediate action in response to her complaints.

89. Singh was also known for treating the female analysts on Platform Sales in a demeaning and unprofessional manner. He frequently threw his credit card at them to get him lunch; on multiple occasions, he suggested that the female group diet together; and he regularly asked these junior women personal sexually inappropriate questions. All of these women ultimately left the firm.

E.    Jokes About Sexual Harassment Training,
      Women's Initiatives, and Maternity Leave

90. Reflecting the bias against women that was pervasive at Citi during Lindsey's tenure, male executives regularly made jokes about the Bank's sexual harassment training and women's initiatives and belittled women for taking maternity leave.

91.    For example, as Lindsey prepared for her maternity leave in or around 2013, a coworker denigrated her leave, telling Lindsey to "enjoy [her] 13-week vacation."

92.    Senior men, including Singh, openly mocked the Bank's sexual harassment training. Among other things, in or around 2022, Singh joked to a group of colleagues on the trading desk, in sum and substance, that if you "ask a woman out three times, it's fine but if you ask her out a fourth time, it's harassment." Singh then loudly asked Lindsey to go on a date with him.  Singh's comments about the training confirmed that many male managers did not take seriously Citi's policies purportedly designed to ensure a workplace free of gender discrimination and harassment.

93.    Citi asked Singh to moderate a panel discussion that two of the firm's most accomplished senior women led. During the discussion, Singh asked about what the women panelists did in their free time. Singh was dismissive and insulting in response to the earnest and in-depth answers that the women panelists gave. Singh remarked, in sum and substance, "I'm surprised; I was expecting something along the lines of 'Netflix and Chill,'" which is slang terminology for watching a movie and engaging in sexual activity. On information and belief, this comment was Singh's way of mocking the RISE Women's Initiative and belittling these accomplished female professionals.

94.    Not surprisingly, female employees recognized that such purported efforts to remedy bias were meaningless. Numerous women have raised concerns about HR, including that department's failure to consistently offer exit interviews. In instances when exit interviews were conducted, investigations into complaints did not occur and no change resulted.

F.    Excluding Women and Maintaining a
      "Boys' Club" Environment

95.     As part of the ongoing gender discrimination, Citi leadership maintained a "boys' club" environment that gave better opportunities to men.  Management excluded women from events that provided professional development, networking, and bonding.

96.     Belbachir, the Global Head of Equities (the division in which Lindsey worked), did not introduce himself to or engage with women in the group and, instead, focused his efforts on developing relationships with male executives who were part of his leadership team. For example, when Belbachir met with the North America Markets Equities management team, despite his having run the division for two years, he stated that Lindsey was one of two individuals in the room he did not know.  Given Lindsey's position at the firm, his not knowing her was highly unusual. Lindsey was one of a few women promoted to Managing Director during Belbachir's tenure as Global Head of Equities and, as previously highlighted, she was also a long-tenured RISE leader.

97.     Male managers frequently planned all-male outings and trips to spend time together with each other and male employees.  Belbachir has been known to be close with a small group of male colleagues and to invite to them attend to all-male outings. That group included Singh and Roti, Global Head of Strategic Equity Solutions.  According to Singh, those outings often focused on picking up women, including Singh telling Belbachir, in sum and substance, that Belbachir's "only chance at beating Singh at picking up women was his business card."  As set forth above and below, both Singh and Roti had a long track-record of complaints of gender bias and harassment against them.

98.     Another male Managing Director, who is a close friend of Singh's and reports to Roti, is widely known for being regularly intoxicated at work. In one instance, he was so inebriated during the early afternoon that he attempted to urinate in front of Citi's office

building and subsequently climb into strangers' cars.  Before the incident further escalated, a junior employee interceded. The Bank has taken no action against this male Managing Director.

99.    During a conference Lindsey attended in Miami, a male colleague insisted to Lindsey that she could not join the attendees for a planned afternoon outing. Singh attempted to vouch for Lindsey, saying, in sum and substance, "Don't worry; she's cool." While the male colleague ultimately withdrew his objection to Lindsey's attending the event, Lindsey refused because he had insulted her and made clear that she was not welcome at what was intended as an exclusively male outing.

100.    On another occasion, Singh demanded that Lindsey exclude a female Derivatives Director from a business trip.  This talented woman was one of six women within Equities that Citi had selected to participate in the Bank's then-new Advocacy Program in which it assigned mentors to its highest-achieving junior female employees. Singh insisted that the woman should not attend the trip because she was not "fun."

101.    In addition, Citi discharged that employee even though she had a reputation as a high performer.  Thereafter, a male Managing Director and Co-Head of North America Equity Derivatives Sales and Head of Cross Asset Sales, Ross Goldstein ("Goldstein"), well-known by both management and female employees on his team for mistreatment of women, told her clients that the female Derivatives Director left the Bank because she preferred to stay home to be a "mommy."

102.    As another example, during a Derivatives conference that Citi hosted, several of Lindsey's clients called Lindsey (who had not been invited) to express their surprise at the absence of female attendees. Realizing that it had a problem, Citi management during the conference requested that Lindsey travel the following morning to attend the event.

<u>Male Executives Sexually Assault and Harass Lindsey</u>

103.    As described above, countless male executives in Equities regularly flouted the anti-discrimination and harassment laws without consequences.  In many instances, Lindsey and other women complained about the locker room environment where men treated women as sexual objects.  Yet senior managers and Human Resources failed to take action.

104.    Citi's failure to act enabled men, especially powerful executives, to engage in outrageous and unlawful sexual harassment.  In this environment, Lindsey was sexually assaulted, harassed, and abused.

<u>A Senior Citi Executive Sexually Assaults Lindsey</u>

105.    Just weeks after Lindsey began at Citi in 2007, Evans, Citi's then-Global and Europe, Middle East, and Africa ("EMEA") Head of Program Trading and Electronic Execution and a senior manager at the Bank, sexually assaulted her.

106.    In or around December 2007, Lindsey attended the Bank's holiday party. Evans, who was then three levels above Lindsey, was the most senior executive at the party and Lindsey was the most junior woman at the event. As Lindsey later learned, Evans was well known for his volatile and hard-partying behavior that often involved women.

107.    During the event, he pressured Lindsey to stay out late and drink excessively, including by threatening to fire her if she went home.  Evans's threat was especially troubling as it came at the time of a much-anticipated and widely known Reduction-in-Force or layoff.  Given Evans's seniority and that Lindsey had virtually just started with Citi, Lindsey had no reason to doubt that he would carry through with his threats.

108.    Following the holiday party, Lindsey's colleagues and more senior executives left her alone with Evans. He demanded that Lindsey continue to stay out with him.

Evans and Lindsey went to several bars before he insisted on walking Lindsey home. When the two arrived at her apartment building, the executive demanded to use her restroom and, as there was no bathroom in the lobby of Lindsey's building, Lindsey felt that she had no choice but to allow him into her apartment to use the restroom.

109.    Lindsey and Evans subsequently talked in her living room while sitting in separate chairs; eventually Lindsey fell asleep. Lindsey woke up to find the executive was on top of her and kissing her. Lindsey was shocked and disgusted but, out of fear, felt that she had no choice but to allow him to kiss her because of his authority over her job and previous threats that evening to fire her. Lindsey was able to prevent his further sexual advances until he passed out. Lindsey promptly took a shower and got ready to go to the office while he was asleep. Once ready for work, Lindsey woke up Evans and requested that he leave her apartment.

110.    Even then, Evans, the Global and EMEA Head of Program Trading and Electronic Execution, continued his sexual advances that morning, including in the elevator when he pretended to tie his shoe and ran his hand up Lindsey's leg and up her skirt.  Upon exiting the elevator, the executive insisted on dropping Lindsey off at work in a cab and asked Lindsey to go to dinner with him that evening. Lindsey deflected these advances and went to work.

111.    Evans was supposed to present to the division that day and never turned up at the office. The following day, he rescheduled the meeting for the division and ogled Lindsey throughout it. Lindsey averted her eyes and avoided him to the best of her ability thereafter.

112.    Lindsey subsequently reported the incident to her male manager Keegan. As set forth above, Keegan held numerous senior positions within Equities including Co-Head of

Global Equities and Chairman, CEO, and President of Citigroup Global Markets Inc and Head of North America Markets and Securities Services.  Keegan subsequently joked about Lindsey's interaction with Evans.

113.    On information and belief, Citi did nothing in response to Evans's sexual assault. At the age of 24 in her third month at Citi, Lindsey understood senior male executives are protected and women like her are silenced in the process.

<u>Singh's Pervasive and Egregious Sexual Harassment Against Lindsey</u>

114.    Singh, who was one of Citi's most senior executives in Equities and one of Lindsey's supervisors, subjected her to unrelenting abuse and unlawful conduct for many years. Using his position of authority and threats to harm Lindsey and her family, Singh coerced her into starting a relationship with him, and when she tried to end things, pressured her to prolong it.  Throughout their relationship and after Lindsey finally ended it, Singh subjected Lindsey to shocking abuse, threats, and retaliation.

A.    <u>Singh Wielded Significant Power Over Lindsey's Career</u>

115.    Even though Lindsey did not report to Singh when their relationship began, he was, at all times, senior to Lindsey.  At the time he left Citi, as set forth above, Singh was one of the most senior executives within the Global Equities division and Lindsey indirectly reported to him.

B.    <u>Singh's Abusive Conduct</u>

116.    Singh, always in a more senior position than Lindsey, had persistently targeted her for sexual advances.  Initially, under the guise of friendship, Singh established trust with Lindsey, but later revealed to her, in sum and substance, "I had my eye on you from the moment I first met you and knew I had to have you."

117.    Singh's tactics later changed to "love bombing," which involved him using over-the-top displays of attention and affection.  Eventually, following Singh's incessant pursuit, Lindsey was worn down and they began a sexual relationship.

118.    Over time, Lindsey's relationship with Singh became more toxic and abusive. For much of their relationship, Singh was manipulative and controlling, including using his power over Lindsey at work to intimidate and coerce her.

119.    Singh's abusive behavior was often related to his incessant demand for Lindsey to engage in sexual acts. When Lindsey rejected Singh's sexual advances, he regularly shamed her and instructed her that it was his expectation that she should perform sex whenever he wanted her to do so.  If his sexual demands were not met, Singh punished Lindsey at work. On such occasions, Singh humiliated Lindsey in front of her boss and the individuals who reported to her.

120.    Singh's behavior towards Lindsey escalated during the COVID pandemic. During that time, Singh frequently and excessively consumed alcohol and/or drugs and his behavior towards Lindsey became increasingly volatile and frightening.

121.    For example, Singh used physical force despite Lindsey's protests. Singh's conduct was so erratic and threatening that Lindsey feared for her physical safety.

122.    Singh also used verbal abuse to terrorize Lindsey. On one occasion, when Singh was away on vacation, he loudly berated Lindsey over the phone. Singh's screaming was so loud that his host's neighbors called the police. According to Singh, the police subsequently took him in for questioning over concerns of domestic violence.

123.    On another occasion, Singh and Lindsey were in Miami for work. During an Uber ride, Singh's unhinged yelling at Lindsey caused the driver to pull over the car and to demand that Singh exit the vehicle because of his abuse towards Lindsey.

124.    Following many instances of cruelty, Lindsey apologized to deescalate the situation. Lindsey feared that if she did not placate Singh, Singh would retaliate against her.

C.    Lindsey Did Not End Her Relationship Sooner
        Because of Singh's Threats to Harm Her and Her Career

125.    Lindsey wanted to end the relationship with Singh many times. Lindsey did not do so because she was terrified that Singh would physically harm her and destroy her career as he repeatedly threatened to do.

126.    In a variety of ways, Singh repeatedly and explicitly reminded Lindsey of his power over her career and his ability to undermine and ruin her.

127.    When Singh was unhappy with Lindsey, he punished her at work.  For example, in the months leading up to their breakup, Singh frequently made attempts to exclude Lindsey from work activities and diminish her contributions to the team. He deliberately attempted to isolate Lindsey and undermine her authority.

128.    Also, Singh on multiple occasions expressly threatened Lindsey that if she left him, he would kill her, sabotage her career, and ruin her reputation. Singh often made such threats when he felt Lindsey was creating any distance between her and him. Among other things, Singh regularly told Lindsey, in sum and substance, "I made you; don't ever forget it"; "I will kill you if you ever leave me"; "No other man can ever be with you"; "You are nothing without me"; and "You were a nerdy girl in the corner that nobody noticed and now everybody notices you; you are my creation. I made you, don't ever forget it." Singh also threatened

Lindsey on multiple occasions that if she ever left him, he would hurt himself, including by purposefully overdosing when taking drugs.

129.    As described in more detail below, when Lindsey ended the relationship, Singh made several threats to her job via text message, including, among many others:

- "Obv[iously] I plan to use . . . [m]y power. Obv[iously] comp is just st[a]rt of where I take it all out."

- "Told [another Citi Director] and whole team when you [were] out I decide comp. To neuter you."

- "I ruined you at work this week . . . . [People] need to know [that] you [do] not have my support."

130.    In addition to punishing Lindsey at work and making explicit threats, Singh regularly emphasized to Lindsey that he was adept at masterminding negative outcomes without personally executing them.

131.    For example, when he talked to Lindsey during their relationship, Singh often called himself Frank Underwood, the nefarious fictional character from the television show "House of Cards."  That character used his power to harm or even kill anyone who got in his way.

132.    To demonstrate the depth and breadth of his powerful network at the Bank, Singh regularly conducted telephone calls with senior executives on speaker phone in Lindsey's presence.

133.    As set forth above, Singh frequently reminded Lindsey that he had strong relationships with powerful male executives in Equities including as a result of their shared experiences involving sexualizing women.

134.    On multiple occasions, Singh stressed to Lindsey that he had successfully used his relationships at the Bank to force the removal of employees who he believed had

crossed him or posed a threat to his power.  In that way, Singh boasted about his driving decisions about which employees to include on Reduction-in-Force (or layoff) lists. These threats were particularly intimidating to Lindsey as employees on these lists often had unusually short tenures and appeared to have been let go without explanation.  For example, Singh emphasized to Lindsey that he was responsible for forcing the departures of the following employees because he wanted them gone:

- A high-profile Managing Director who was Head of Platform Sales for the EMEA region departed in 2022 after fewer than two years at the Bank.

- The Managing Director, Global Head of Cash Equities E-Trading who was also only in his role for fewer than two years before departing in 2022.

- The Managing Director, Americas Head of Equity Electronic Execution who was also in his position for fewer than two years and departed in 2020.

135.    Singh told Lindsey that he punished other employees that he believed had betrayed him.  For example, in or around 2022, Singh told Lindsey that he would "block [the] promotion" of a talented female employee on the sector specialist desk whom Singh did not see as his ally.  Singh referred to that employee as "entitled."  She is no longer at the firm. There was another talented and accomplished female employee on Platform Sales whom Singh targeted after that employee disagreed with him about her year-end compensation. Singh remarked to Lindsey, in sum and substance, that this employee "was ungrateful and dead to [him] now; [he] would no longer help her."  Singh made clear to Lindsey that he would do nothing for her and became overly demanding, condescending, and dismissive of her efforts even though he had previously expressed appreciation for her hard work.  Singh's unmistakable message to Lindsey was that employees who crossed him, especially women, would face negative consequences.

136.    Singh made clear to Lindsey that he wielded significant authority and influence at the Bank in other ways.  For example, as described below, he blatantly violated

Bank policy without consequences.  He also publicly made insulting and offensive comments about Lindsey, which reflected his gender bias and were designed to humiliate her, but he suffered no repercussions for his conduct.  On one occasion, Singh remarked loudly to Lindsey in front of others, in sum and substance, that he had "read Citi's policy [and] heard that if you ask a woman out three times it's fine, but if you ask her out a fourth time, it's harassment." He then demanded, in front of others, "Hey [Lindsey], do you want to go out with me?"  Even though Lindsey pleaded with Singh not to treat her this way, he refused and repeatedly embarrassed her before her peers and managers.

137.    By isolating Lindsey at the Bank, by blocking her from advancement opportunities, and by making her think he had the power to impede Lindsey's career success, Singh also silenced Lindsey from complaining about his gross misconduct and coerced her into remaining in a relationship with him.

138.    For example, Singh shut off any possibility that Lindsey would be able to complain to Gately, who was then Citi's Head of Equities for the Americas.  Citi had selected Lindsey to participate in its Advocacy program, described above, because the Bank had identified her as one of the six highest-achieving junior female employees.  Given the way Citi mistreats women, it is not surprising that only two of the six women in the original Advocacy program remain at Citi.

139.    As part of the Advocacy program, the Bank assigned Gately to Lindsey as a mentor.  Because Gately was Lindsey's mentor, Lindsey and Gately had long maintained a close professional relationship. Singh, who reported to Gately, berated Lindsey for speaking with Gately.  Singh told Lindsey that he did not like her relationship with Gately. Because of Singh's threats and influence at the Bank, Lindsey felt that she had no choice but eventually to distance

herself from Gately to avoid Singh's hostility as Singh was particularly obsessive about her dealings with Gately.

140.     Also, Singh pitted women against each other at work to remind Lindsey of the power he had at the firm and over her career. This destructive conduct was most evident when Citi did not promote Lindsey to Managing Director the first time she was considered. When Lindsey did not receive the promotion, many Citi employees, including peers and Managing Directors, told her that they could not understand what had happened.  Those colleagues said they assumed they missed her name during the Managing Director announcement because they believed she had earned that promotion.  But Citi did elevate another woman that Singh sponsored even though Singh had previously made demeaning and unfounded comments about her, including that the candidate would never be made Managing Director.  Singh, who had played a role in the promotion process, made Lindsey believe that he had orchestrated the decision not to elevate her and to select the other woman as a way to punish Lindsey.

141.     Throughout their relationship, Singh made comments that Lindsey should "be less ambitious," "quit her job," and give up the career she had worked so hard for. He often told her that his career was more important than her job and she should "take a backseat" and "support him."  Moreover, Singh gloated, in sum and substance, that "any candidate he sponsored was a lock for promotion" and made sure Lindsey knew she was the only candidate he had ever sponsored who did not make Managing Director.   When Lindsey was up for Managing Director the following year and ultimately received the promotion, her direct supervisor – not Singh – sponsored her through the promotion process.

142.     Showing Lindsey that the rules did not apply to him, Singh went so far as to target his boss, Gately.   Singh was not shy about telling Lindsey and others that he wanted

Gately's job and was laying the groundwork to have Gately removed from the position. As a show of his force, Singh inaccurately commented to clients and employees, including Lindsey, on multiple occasions that Gately was "just an empty suit" and that he was not doing his job. These comments were without any basis.

      D.    <u>Citi Was Aware of Singh's Volatility and Erratic Behavior But Took No Action</u>

     143.    Singh's erratic behavior and brazen violations of Bank policy, including his abuse of drugs and alcohol and mistreatment of women, were well-known throughout the Bank. Yet Citi took virtually no steps to rein in his conduct because, on information and belief, he helped the Bank earn huge sums of money and because, in some instances, other senior managers engaged in similar misconduct.

     144.    Singh openly engaged in unstable behavior, including, but not limited to,

- Singh on several occasions showed up hours late to work after nights when he abused alcohol and/or drugs;

- on multiple occasions, Singh missed flights and meetings due to his alcohol and drug use;

- at both internal Bank events and client events, Singh drank more than others and became visibly intoxicated or blackout drunk;

- Singh vaped openly in Citi offices and on the trading floor, even though it was against the Bank's policies;

- Singh entertained clients and colleagues multiple nights each week and even bragged that his corporate card expenditures that totaled six figures, were among the highest for any employees within the Global Equity division; and

- while Singh prided himself on being the "life of the party," Lindsey on multiple occasions heard Citi employees express concern about his drinking, noting that it was "unhinged" and "out of control" and that Singh was "out of his mind."

     145.    Senior management knew about Singh's erratic conduct. Throughout Lindsey's employment, including through 2022, Singh on multiple occasions hosted "team night" outside of the office where he often became visibly intoxicated, including in front of

junior and analyst level employees. Senior Bank managers were aware of Singh's behavior. Indeed, sometimes they attended these events, and, on information and belief, took no action.

146.    Not only did members of senior management turn a blind eye to Singh's blatant violations of Bank policy, but, in some instances, they participated in the misconduct. Between 2014 and 2022, on information and belief, Singh often excessively drank alcohol and used drugs with high-level Citi managers, including with his own bosses. Among other things, Singh told Lindsey that he had used cocaine with senior managers while in the office. Singh had explained to Lindsey, in sum and substance, that "going to strip clubs and doing drugs," including in particular cocaine, with male executives, "bonded you and deepened your relationship." In one instance in 2016 on the Sales Trading Desk, a team member suggested that his coworker, a Senior Director, wipe off the white residue between his nose and his lip. This misconduct, which also violated FINRA rules, only further perpetuated the male locker room environment and led to more opportunities for advancement to male employees.

147.    Citi was aware of gender discrimination complaints against Singh and, on information and belief, did nothing to address the serious problems. For example, in or around 2018, a talented female Vice President at Citi escalated to her manager that Singh had been unprofessional and verbally aggressive towards her after a business outing involving heavy drinking. On information and belief, that manager and Singh "handled" the complaint by persuading the Vice President not to report Singh's gender bias to Human Resources. Keegan, who was also aware of this incident, took no action, and therefore supported Singh's continued advancement and acquisition of power. That female employee subsequently left the Bank. Singh later told Lindsey he had forced that woman's husband (a former Director on Citi's High Touch Trading desk) to leave the Bank in or around 2019.

148.    Also, in 2021, a top-rated junior analyst filed a complaint with Human Resources that Singh had her pick up his dry cleaning and asked her to do other menial tasks outside her work responsibilities. She promptly left the firm after raising the complaint while, on information and belief, Citi did nothing to discipline Singh.

149.    Even though much of Singh's inappropriate conduct was open and notorious, the Bank allowed it to continue. On information and belief, due to the substantial profits he produced for the firm, Citi disregarded his egregious violations and took no action against Singh nor made any attempt to regulate his conduct.

150.    Indeed, despite Singh's demonstrated hostility to women, including to women's initiatives; his erratic behavior; and women's complaints against him described above, Belbachir and Shari Funk ("Funk") in Human Resources chose Singh as an Equities representative for one of the limited Managing Director sponsorship roles to the women's diversity group, RISE. Singh's appointment made clear that in the Equities division, Citi's public relations campaign purportedly in support of gender equality and inclusion was nothing more than lip service and platitudes.  It further demonstrated what Lindsey had learned at the age of 24 and witnessed in multiple instances thereafter, the firm protected senior male Managing Directors.  Citi, as an institution, created, supported and covered up Singh's toxic and inappropriate behavior towards women, making him exhibit A of this pattern.

<u>Singh's Onslaught of Shocking Abuse Against Lindsey</u>

151.    In Fall 2022, Lindsey tried to distance herself further from Singh. In response, Singh's tirades and abuse became increasingly more frequent, malicious, and unbearable. Towards the end of October 2022, Lindsey finally summoned the courage to end

once and for all the volatile and abusive dynamic with Singh, her supervisor. Unfortunately, his reaction was exactly as she had feared.

152.    Between November 6 and November 10, 2022, Singh subjected Lindsey to an onslaught of shocking abuse via hundreds of harassing texts messages; called Lindsey incessantly (including in the middle of the night and, at one point, calling 30 times in one day); and left her several bullying voicemail messages.

153.    Singh's messages ranged from threatening to kill Lindsey; making malicious comments about her family, including her children; threatening Lindsey's career, compensation, and reputation; falsely accusing her of having sex with Citi clients; and making demeaning and sexualized comments about her appearance and body.

154.    The effect of Singh's behavior on Lindsey was devastating. During this time in November 2022, Lindsey was not able to eat or sleep and was traumatized and debilitated by fear.

A.    <u>Threats to Lindsey's Safety</u>

155.    Singh sent several text messages threatening to harm Lindsey.    For example, Singh sent the following messages:

- "And I am going to set you on fire."

- "You got no idea on my rage. Thought it was bad before it's off the scales."

- "A world of pain coming. You will rue the day you crossed me."

- "I am no longer silent. You are fuckin[g] dead."

- "You should never have crossed me. Now we walk the plank to death together."

- "[A]nd I plan to fuck your life."

- "[D]isloyalty will not go unpunished."

B.    <u>Alarming Comments about Lindsey's Family</u>

156.    Examples of Singh's disturbing and intimidating comments about Lindsey's children include:

- "Kids no kids I don't give a fuck [I] plan to burn it all down."

- "Your kids['] life will be ruined from here on in."

- "Gon[n]a fuck your life and kids with it too."

- "I fuckin[g] hate you. God help you. And your family."

- "Your children will have no future with [a] Slut like you."

- "Focus on [your children] and your family. Test me once and I will blow it up."

- "Fuck you. And fuck your whole fucking community and family."

- "If it comes out kids ruined in [their school district] and you are ruined your family name."

- "Kids are fucked."

- "Hug [your children] tight u world be over [tomorrow] . . . Shit mom."

C.    Repugnant Comments about Lindsey's Body and Appearance
       <u>Reflecting Deeply Ingrained Views of Women as Sexual Objects</u>

157.    Singh's text messages included numerous denigrating and offensive comments about Lindsey's body and physical appearance, made repeated references to sex, and demeaned her professional success.  Singh's text messages made clear that he felt entitled to make such comments because objectifying women was a common feature of Citi's trading floor culture.

- "Not one person name[d] you hot [on] whole floor. Can't even get a rank on a floor."

- "So many hotter on floor . . . and you rank below."

- "E[very]one will most likely high five me but prob think I could have done better."

- "Telling boys about our sex life."

- "You don't get to run off into sunset w[ith] some white dick in your [] ass. No fucking Way. Its game time."

- "All u got is tits and big head."

- "[Y]our ass is awful. Ur torso not fit your body. Your face and head [are] too . . . big."

- "U so [average]. Massive head and hands and tits. Rest is wack."

- "I fuckin[g] hate you. And will show you and your fake appearance zero mercy."

- "Same pasty white ugly fuck face."

- "Can't believe I was going to settle on your sub par ass. Past prime. No thanks."

    D.    Sexist and Threatening Comments

    158.    Singh's messages included repugnant and aggressive comments that reflected his contempt for women.  For example, Singh wrote:

- "Fuck you. Cunt."

- "Fuck your self"

- "Ok cunt. Let's go."

- "Tested me bitch."

- "I plan to fuck e[very]thing that walk if I have not been at it already."

    E.    Threats to Lindsey's Career and Compensation

    159.    Singh made numerous threats about the terms and conditions of Lindsey's employment, including, but not limited to:

- "Taking you down in comp. Hard. Like a bitch you are."

- "Obv[iously] I plan to use . . . [m]y power. Obv[iously] comp is just st[a]rt of where I take it all out."

- "Told [another Citi Director] and whole team when you out I decide comp. To neuter you."

- "[L]eave Citi. Maybe I will save your reputation."

- "Good luck getting job w Dan or any other firm. The only person who will hire you will think they have a chance."

    F.    <u>False Accusations about Lindsey's Performance and Conduct at Work</u>

    160.    In the text messages, Singh repeatedly falsely attacked Lindsey's job performance and made false accusations about her relationships with clients.  For example, Singh sent the following text messages:

- "Focus on fucking the next Acct to get US dollars."

- "Your personal perf[ormance] at work is avg [average] at best so focus on fucking your clients or whatever you do so we win. You disgusting fucking person."

- "Focus on your accounts and trading with your flirting or whatever you do . . . . Not swan off on sexc[apades] with clients. Don't try women card. I know women."

- "Focus on fuckin[g] more accounts."

- "You are alone you dumb selfish overpromoted fuck."

- "U not[h]ing [without] me and kicking u back to curb where u belong."

    G.    <u>Threats to Lindsey's Professional Reputation</u>

    161.    Singh's text messages made explicit threats that he would harm Lindsey's reputation.  For example:

- "I swear w[ith] my very being I plan [t]o [t]orch you and your reputation."

- "And I plan to fuck your life. And I may drop something on social media and tag the community. Not clear to me yet on my path. But disloyalty will not go unpunished."

- "I ruined you at work this week . . .  [people] need to know [that] you [do] not have my support."

- "Fucking ruined my fucking life. I will ruin yours like no other . . . This will be the talk of the industry for years."

- "Let me insult you on the work thread."

- "Oh try to block me and I will start sending emails on work."

- "Telling boys about our sex life. All sales trading."

- "I been asking on floor. You barely top 10 and [t]hat[']s for a trading floor."

- "Next up is telling boys we banged. Left me no choice. Won[']t be complimentary."

- "Your whole team thinks you're a joke too. I ruined you at work this week."

H.    Contacting Lindsey's Colleagues

162.    After Lindsey ended the relationship, Singh also made good on his threats to damage Lindsey's reputation with her colleagues.

163.    For example, Singh told Lindsey's direct supervisor that Lindsey was out of the office, that Lindsey was not responding to Singh, that Lindsey was not working out in her role at the Bank, and that he was escalating his supposed concerns to Human Resources.

164.    Singh also threatened Lindsey that he would contact other former and current colleagues to malign her further.

I.    Citi Celebrates Singh Despite Knowing About His Outrageous Harassment

165.    Lindsey tried to ignore Singh's incessant and abusive messages. However, Singh escalated his outrageous sexual harassment. At least 30 times, Lindsey pleaded with him to leave her alone. He refused to stop until, as described in more detail below, Lindsey summoned the courage to make clear to senior management and Human Resources what was evident all along, Singh's egregious harassment. Lindsey knew that raising her complaint against the long protected male executive and breaking the "code of silence," would be the end of her career.

48

166.     Singh's abusive and threatening text messages were devastating to Lindsey who feared for her safety and her job.  Having no other choice because Singh refused to stop, on or about November 10, 2022, Lindsey complained about Singh's disgusting conduct and abuse to Citi.  She sent a written complaint to Singh's manager Gately; Dunn, Citi's Co-Head of Global Rates, one of the Board members of the RISE organization, and Lindsey's senior-most female mentor; and to HR Advisor Funk. Lindsey also informed her direct supervisor as she wanted him to be aware of Singh's violent threats and abuse and what she had experienced.[6]

167.     In Lindsey's November 10 complaint, Lindsey wrote, among other things, "I am very sorry to write you like this but I am scared and traumatized." She explained that Singh had "been calling [her] incessantly and sending [her] 100s of texts with threatening and incoherent messages." She wrote that she had "asked him to stop but the harassment and abuse is continuing." She also submitted screenshots of several of Singh's messages as attachments to the complaint.

168.     On November 14, 2022, Lindsey was in crisis, not sleeping, traumatized, and crying uncontrollably.  Despite Lindsey's condition, Citi insisted that Lindsey meet with investigators from its investigative unit called Citi Security and Investigative Services ("CSIS") regarding her complaint about Singh's sexual harassment.  The CSIS interrogations are intense, intimidating, and could be classified as hostile for anyone, much less someone who openly acknowledged she was in a traumatized state.

169.     Lindsey's interview with CSIS, which included questioning by a former District Attorney, lasted over an hour.  Even though multiple investigators conducted the

---

[6] Lindsey made clear in her message that she did not blame her direct supervisor.  She wrote that "[her direct supervisor] is an amazing manager" and "please don't infer anything" against him.

interview and even though Lindsey was distraught, Citi rejected Lindsey's requests to have her counsel present and subsequently for them to review any summary of her interview. As a current Citi employee, however, Lindsey had no choice but to participate in the interview or else she risked losing her job for being uncooperative.

170.    Despite her traumatized state, Lindsey was cooperative throughout the interview. During the interview with the Citi investigators, Lindsey discussed at length her relationship with Singh and his abusive and harassing behavior towards her. Citi's investigator told Lindsey, in sum and substance, that she believed Singh's behavior was "criminal" and that "in circumstances like this it is commonplace for perpetrators to contact their victims."

171.    Following the interview, on or about November 21, 2022 (prior to Singh's resignation), Lindsey via counsel submitted to Citi over 30 additional screenshots of Singh's abusive messages. As a result, Citi had substantial documentation corroborating Singh's egregious misconduct before the Bank allowed him to resign and celebrated him on his way out.

172.    Faced with overwhelming evidence of Singh's misconduct, Citi apparently determined that it had no choice but to distance itself from Singh. Rather than fire Singh, however, Citi took steps to protect Singh and his reputation, including allowing him to resign. Even though Citi was fully aware of Singh's heinous conduct towards Lindsey, and consistent with the Bank's history of permitting discrimination and harassment and silencing victims, it went out of its way to praise Singh on his way out.

173.    On November 22, 2022, Gately announced to Citi staff in a clearly a scripted statement that Singh had "resigned." Gately stated, in sum and substance:

> Unfortunately, I would like to announce Mani Singh has decided to
> resign from the firm for personal and family reasons. We're all
> very sorry to see him go and certainly grateful to the contributions
> he has made over the years. But it was his decision, and we wish

him well . . . While there is never a good time, guys, to lose strong leadership on our teams, we are certainly excited for the team we have in place . . . I want to thank Mani for his many years of contribution . . . I know it's disappointing . . . to lose someone like Mani who has been such an impact on the franchise. . . .

174.    On information and belief, Citi took no steps to ensure that Singh's shocking and abusive conduct would not happen again. On information and belief, Citi did not report to FINRA, which "plays a critical role in ensuring the integrity of America's financial system,"[7] that Singh had engaged in gross misconduct and sexual harassment.

175.    When Singh resigned, Citi was obligated to file with FINRA Form U5 to terminate his association with the Bank.  On Form U5, Citi was required to provide the reason why Singh was no longer working for the Bank.  The Form U5 also obligated Citi to answer whether the employment of the individual ended when he or she was "under internal review for . . . violating industry standards" and whether the "individual [was] permitted to resign . . . after allegations were made that accused the individual of . . . violating . . . industry standards of conduct."  That form is then available to Singh's prospective employers.

176.    Citi had undeniable proof that Singh's conduct violated FINRA rules and industry standards of conduct.  FINRA rules specifically prohibit harassment, including Rule 5240  which states, "No member or person associated with a member shall . . . engage, directly, or indirectly, in any conduct that threatens, harasses, coerces, intimidates or otherwise attempts improperly to influence another member, a person associated with a member, or any other person."  Also, according to FINRA's website, FINRA "categorically rejects racism and discrimination of any kind. In carrying out our mission of investor protection and market

---

[7] https://www.finra.org/about/what-we-do

integrity, [FINRA is] committed to pursuing racial justice and equity within [its] organization, the financial services industry and the communities we serve."[8]

177.    Citi could have, and should have, disclosed Singh's egregious harassment against Lindsey on his Form U5, but, on information and belief, did not do so.  As a result of Citi's willful disregard of its obligations, Singh was free to sexually harass other women and continue his mistreatment against Lindsey.

178.    Moreover, despite the overwhelming evidence of Singh's deplorable and criminal behavior, Singh continues to be embraced by a boys' club of current and former Citi male executives, many of whom sat at the senior-most levels on executive boards in Equities. For example:

- Gately, the very person Lindsey complained to about Singh, invited Singh to his engagement party months after Lindsey's filing became public and while Gately still worked for the Bank.

- Additionally, in around May 2023, before filing her lawsuit, Lindsey met with Keegan about Singh's grotesque sexual harassment, including his deplorable text messages. Even though Keegan had left Citi by that time, on information and belief, he continued to work with the Bank through his own company. Despite seeing some of the text messages, Keegan repeatedly told Lindsey he "would always love Singh."  Indeed, multiple women have stated to Lindsey, in sum and substance, "Everyone knew that [Singh] was [Keegan's] guy."

179.    As set forth above, Citi's privileged treatment of Singh, including elevating and protecting him, to the detriment of women, including Lindsey, is part of a much

---

[8] https://www.finra.org/about/responsible-citizenship/racial-justice

broader pattern at the Bank.  For years, Singh emotionally, sexually, and professionally abused Lindsey, including threatening her life, family, and career.  As a result, Lindsey has lived in fear of Singh every single day.  The Bank, as an institution, chose to overlook numerous red flags about Singh's conduct, and instead, promoted him and, at the same time, did not protect Lindsey and many other women. The senior most male executives she trusted, including Keegan and Gately, who occupied positions that gave them the ability to remedy the rampant discrimination, looked the other way and repeatedly failed to act.

Citi Purportedly Attempts to Clean Up Its Misconduct But the Unlawful Bias Persists

180.    Following the filing of the initial Complaint in this matter and the reaction to it, Citi took steps to show its purported commitment to a workplace free of discrimination and harassment.  But those efforts are nothing more than a slick public relations campaign designed to distract from the ongoing and pervasive problems at Citi.

181.    Lindsey raised her internal complaint in November 2022.  On information and belief, Citi's senior executives were aware of Lindsey's serious complaints.  Indeed, Keegan told Lindsey that CEO Fraser received a weekly list of pending litigations involving Citi, and thus she would have been well aware of Lindsey's complaints.

182.    Yet, it was not until nearly a year after Lindsey reported Singh's threatening text messages that Citi made any attempt to respond to her concerns. For example, within approximately one week of Lindsey initiating the lawsuit, Citi publicly leaked a memo from Morton, the Head of Markets, to Citi employees that encouraged them to speak up in the face of discrimination and harassment (the "Morton Memo").  Also, in February 2024, the firm distributed a survey to women in Markets asking about the workplace environment but, on information and belief, no results have been shared.  Moreover, after the commencement of the

lawsuit, on information and belief, Citi hired a law firm to examine prior complaints that women had made about mistreatment, including by employees who had left the Bank several years earlier. Citi's post-hoc flurry of activity apparently acknowledged the widespread failure to take action in the past.

183.    In addition to the Morton Memo, Citi further contends publicly that the Bank provides its employees with "avenues to raise concerns in confidence and, then when substantiated [Citi] will take appropriate action, up to and including termination of employment."[9]  As detailed above, however, this boast has not been the experience of countless women.  For example, even though Citi has asserted that it completed its investigation into Lindsey's complaints, the Bank allowed Singh to resign and celebrated him upon his departure after he engaged in what Citi's investigator, the former District Attorney, characterized as criminal misconduct, including threatening Lindsey's life and her family.  Falling woefully short of its public statements about a safe workspace, the Bank permitted Singh to leave without consequences for his actions.

184.    In another example, in or around 2019, a hardworking female analyst on the Program Trading desk observed what she deemed questionable business practices. On information and belief, she did exactly as the Morton Memo, the Bank's public statements, and its policies purportedly demand employees to do by anonymously raising a complaint using the hotline.  Despite Citi's assurances that her complaint, including her identity, would remain confidential, Sutton, then a supervisor and Managing Director; multiple male members of her desk; and other teams became aware of her escalation.  Citi marked her as a "problem" and she faced retaliation for speaking up.  Ultimately, that female analyst left the bank.

---

[9] Smith and Abelson, supra n. 1.

185.    Moreover, rather than address Citi's gross misconduct and institutional malfeasance and support its supposed mission to encourage employees to speak up, Citi continues to attack Lindsey and make clear that those who complain will be punished. For example, on information and belief, Conor Davis ("Davis"), Global Head of Sales for Markets, addressed Lindsey's lawsuit in front of senior women and numerous male senior executives. Davis, in his comments, was dismissive of Lindsey's complaints and tried to discredit her, including, in sum and substance, suggesting that Lindsey's claims were nothing more than a story about a man and a woman and that Lindsey was doing nothing but causing Citi trouble. Thus, Citi continues its pattern of treating women who have reported incidents of unlawful treatment as the problem while permitting the senior male executives to go unscathed.

186.    Indeed, the problems that Lindsey has identified in her lawsuit about gender bias, sexual harassment, a culture of fear about speaking up, and retaliation when employees do so continue to plague the Bank.  For example, despite numerous complaints by women against Roti, he continues to work in a senior role in Global Equities.  Also, on information and belief, Citi continues to cover up the behavior, including sexual harassment, sexual assault, and retaliation, by male Managing Directors in Equity Capital Markets.  On information and belief, Citi is also well-aware of complaints about senior male employees reporting to Fergal Walsh ("Walsh"), Global Head of E-Trading Risk Management's department, engaging in discriminatory conduct.  To Lindsey's knowledge, most of those men continue to work for the Bank.

187.    Not only are the problems ongoing, but, on information and belief, they extend far beyond Equities and Markets at Citi.   For example, in 2023, employees made and escalated complaints in writing with the subject: "Concerns: Racism, Bullying, Retaliation,

Harassments, Alienation and False Allegation." That detailed account reflected complaints by multiple employees within the Treasury Group responsible for implementing a government Consent Order. That complaint was initially sent to three Human Resources executives, including Sara Wechter ("Wechter"), Citi's Chief Human Resource Officer, and Citi CEO Fraser.

188.    Because, on information and belief, Citi took no action in response to that complaint, employees re-circulated it to a large group of executives, including Fraser; Citi's Chief Financial Officer Mark Mason; Wechter; Erika Irish Brown, Citi's Chief Diversity, Equity, and Inclusion Officer and Global Head of Talent; numerous individuals in HR; the Shareholder Relations group; and media outlets.

189.    In that detailed complaint, an employee referenced the Citi policy that employees are instructed to follow; that policy, similar to the Morton Memo, required "employees to speak up when they see something unethical."  That employee, however, cited to the danger of trying to get Citi to follow its policy, echoing the harm that came to Lindsey when she complained:

> [If the people who speak up are retaliated against then who would want to do so. This creates an environment of abuse. HR is supposed to be independent but have been covering up for some directors and up. Currently fifteen individuals have left this particular organization within a year of employment due to toxicity and bullying. It is a place where senior managers and directors are not held accountable.

To date, to Lindsey's knowledge, Citi has taken no action in response to the complaints.

190.    Brave women have tried repeatedly to shed light on this toxic discriminatory culture at Citi. But as Lindsey is well aware, management -- even at the highest levels -- turns a blind eye and silences these women despite Citi's policies to the contrary.

## Citi Retaliates Against Lindsey

191.    Not only did Citi not protect Lindsey and other women at the Bank, but it also retaliated against them for making protected complaints.  For example, Lindsey's immediate supervisor told Lindsey that her end of year performance rating for 2022 year was a "1" [for meeting goals and "1" for leadership, which were the highest ratings an employee could achieve at Citi.  Lindsey consistently received a "1, 1" rating for her performance over the course of her career.

192.    But when Lindsey's immediate supervisor delivered the formal compensation communication for 2022, in or around January 2023, Citi inexplicably downgraded Lindsey's rating to a "2, 2."  On information and belief, Citi executives above Lindsey's supervisor had made the decision to decrease Lindsey's rating following her protected complaints in November 2022.

## Citi Has Seriously Damaged Lindsey

193.    The pervasive gender discrimination and sexual assaults and harassment that Lindsey experienced at Citi for more than a decade; Singh's abuse and Citi's toleration of that abuse and praise for him; and Citi's years-long failure to act, have all traumatized Lindsey.

194.    The shocking mistreatment that Lindsey suffered is omnipresent in her thoughts and now causes her to struggle with sleep, nightmares, and paranoia.  She startles easily; has difficulty focusing; and is unable to follow through on basic tasks that she previously was able to accomplish with ease.

195.    To try to manage the effects of the abuse she endured as a Citi employee for 15 years, Lindsey since November 2022 has sought treatment and evaluation from a variety of medical professionals, including a psychotherapist, a psychiatrist, and a neuropsychologist.

Lindsey has been diagnosed, for the first time in her life, with Post Traumatic Stress Disorder, Major Depressive Disorder, Generalized Anxiety Disorder, and Major Neurocognitive Disorder. Lindsey has since learned of numerous other female former Citi employees who, on information and belief, struggle with mental health challenges related to the trauma associated with sexual harassment, gender discrimination and retaliation at the hands of Citi executives.

196.    Lindsey, as a condition of her employment at the firm that Citi acquired in 2007, was required to undergo an extensive psychological examination. At the time, her test results indicated a superior Intelligence Quotient ("IQ") in the 95th percentile and noted an absence of any psychological ailments or disorders. As a result of the abuse she experienced at Citi, Lindsey has suffered significant negative neurological effects, including a 24-point drop in IQ and an alarming decline in her memory, executive function, and attention span.

197.    According to Lindsey's doctors and therapist, Lindsey is incapable of returning to work and requires intensive treatment to manage her symptoms. Lindsey has been on an approved medical leave from Citi since late 2022.

<u>FIRST CAUSE OF ACTION</u>
Discrimination Under Title VII

198.    Plaintiff repeats and realleges paragraphs 1 through 197 of this Amended Complaint as if fully set forth herein.

199.    By the acts and practices described above, defendant subjected plaintiff to unlawful sex discrimination and sexual harassment in violation of Title VII.

200.    Defendant acted with malice and/or reckless disregard to plaintiff's rights protected under federal law.

201.    As a result of defendant's unlawful acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury, and other compensable damages.

## SECOND CAUSE OF ACTION
Discrimination Under the NYSHRL

202.    Plaintiff repeats and realleges paragraphs 1 through 201 of this Amended Complaint as if fully set forth herein.

203.    By the acts and practices described above, defendant subjected plaintiff to unlawful sex discrimination and sexual harassment, including quid pro quo harassment and a hostile work environment, in violation of the NYSHRL.

204.    In addition to all of the acts and practices described above, plaintiff's claim under the NYSHRL includes, but is not limited to, the gender discrimination and hostile work environment based on, and caused by, Evans's sexual assault of Lindsey in 2007.  At the time Evans sexually assaulted Lindsey, Lindsey was over 18 years old.  With response to those claims related to Evans's assault of Lindsey, plaintiff alleges Citi's intentional and discriminatory acts and/or omissions caused physical, psychological, and other injury suffered as a result of conduct that would constitute sexual offenses as defined in Article 130 of the New York Penal Law.  Lindsey's claim based on Evans's assault is therefore timely under the Adult Survivors Act, N.Y. C.P.L.R. § 214-j.

205.    Defendant acted with malice and/or reckless indifference to plaintiff's rights protected under state law.

206.     As a result of defendant's unlawful acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury and other compensable damages.

### THIRD CAUSE OF ACTION
### Retaliation Under the NYSHRL

207.     Plaintiff repeats and realleges paragraphs 1 through 206 of this Amended Complaint as if fully set forth herein.

208.     By the acts and practices described above, defendant subjected plaintiff to unlawful retaliation in violation of the NYSHRL.

209.     Defendant acted with malice and/or reckless indifference to plaintiff's rights protected under state law.

210.     As a result of defendant's unlawful acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury and other compensable damages.

### FOURTH CAUSE OF ACTION
### Discrimination Under the NYCHRL

211.     Plaintiff repeats and realleges paragraphs 1 through 210 of this Amended Complaint as if fully set forth herein.

212.     By the acts and practices described above, defendant subjected plaintiff to unlawful sex discrimination and sexual harassment, including quid pro quo harassment and a hostile work environment, in violation of the NYCHRL.

213.     Defendant discriminated against plaintiff with willful or wanton negligence, or recklessness, and/or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

214.    As a result of defendant's unlawful acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury and other compensable damages.

FIFTH CAUSE OF ACTION
Retaliation Under the NYCHRL

215.    Plaintiff repeats and realleges paragraphs 1 through 214 of this Amended Complaint as if fully set forth herein.

216.    By the acts and practices described above, defendant subjected plaintiff to unlawful retaliation in violation of the NYCHRL.

217.    Defendant retaliated against plaintiff with willful or wanton negligence, or recklessness, and/or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

218.    As a result of defendant's unlawful acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury and other compensable damages.

SIXTH CAUSE OF ACTION
GMVPL

219.    Plaintiff repeats and realleges paragraphs 1 through 218 of this Amended Complaint as if fully set forth herein.

220.    The above-described conduct of Evans constitutes a "crime of violence" as defined by the GMVPL because that conduct is a sexual offense under Article 130 of the New York Penal Law, including, but not limited to, forcible touching under § 130.52 and sexual abuse in the third degree under § 130.55. Evans's assault of Lindsey took place in New York City.

221.   Citi enabled Evans to commit a crime of violence motivated by gender against Lindsey.

222.   Pursuant to § 10-1105(a), this cause of action is timely because it was commenced within "two years and six months after September 1, 2022."

223.   As a direct and proximate result of the aforementioned crime of violence and gender-motivated violence, plaintiff has sustained and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

a)      Declaring that the acts and practices complained of herein violate Title VII, the NYSHRL, the NYCHRL, and the GMVPL;

b)      Enjoining and permanently restraining these violations of Title VII, the NYSHRL, the NYCHRL, and the GMVPL;

c)      Directing defendant to take affirmative action as is necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff;

d)      Directing defendant to place plaintiff in the position she would have occupied but for defendant's discriminatory and retaliatory treatment, and making her whole for all the earnings and benefits she would have received but for defendant's discriminatory treatment, including, but not limited to, wages, bonuses, and other lost benefits;

e)      Directing defendant to pay plaintiff compensatory damages, including damages for loss of earning potential, emotional distress, humiliation, and pain and suffering;

f)      Directing defendant to pay an additional amount as punitive damages for its willful and/or reckless disregard of plaintiff's rights;

g)      Awarding plaintiff reasonable attorneys' fees and costs;

h)      Awarding plaintiff such interest as is allowed by law;

i)      Granting plaintiff a tax enhancement award to offset adverse tax consequences associated with a lump sum award of damages; and

j)      Granting such other and further relief as the Court deems necessary and proper.

<u>DEMAND FOR A TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.


Dated: New York, New York
      April 22, 2024

VLADECK, RASKIN, & CLARK, P.C.

By: _____
    Jeremiah Iadevaia
    Emily Bass
    Debra L. Raskin
    Attorneys for Plaintiff
    111 Broadway, Suite 1505
    New York, New York 10006
    (212) 403-7300