UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ARDITH LINDSEY,

                                  Plaintiff,

                   - against -

CITIGROUP GLOBAL MARKETS INC.,

                                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Index No.: 1:23-cv-10166 (ALC)

---

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S PARTIAL MOTION TO DISMISS

---

VLADECK, RASKIN & CLARK, P.C.
Attorneys for Plaintiff
111 Broadway, Suite 1505
New York, New York 10006
(212) 403-7300

Of Counsel:
       Jeremiah Iadevaia
       Emily Bass
       Debra Raskin

TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................iii

FACTUAL BACKGROUND ............................................................................................... 2

     A.    Citi's Pervasive Culture of Sexual Harassment and Gender Discrimination.......... 2

     B.    The Evans Sexual Assault Is Part of the Hostile Environment.............................. 4

     C.    Singh's Prolonged and Devastating Abuse Is Part of the Hostile Environment ..... 6

     D.    Citi Has Seriously Damaged Lindsey .................................................................... 9

ARGUMENT ...................................................................................................................... 10

I.        APPLICABLE LEGAL STANDARDS................................................................ 10

II.      THE TITLE VII CLAIM BASED ON THE EVANS ATTACK
         SHOULD PROCEED ............................................................................................ 10

     A.    It is Premature to Determine Whether Lindsey's Claims Are Timely ................. 11

     B.    Lindsey Has Alleged a Continuing Violation ...................................................... 12

         1.    Nature and Frequency of the Conduct ........................................................ 12

         2.    Individuals Involved ................................................................................. 126

         3.    Absence of Remedial Action....................................................................... 17

     C.    It is Premature to Determine Whether the Continuing Violations
         Doctrine Applies ................................................................................................. 17

III.     PLAINTIFF PLAUSIBLY ALLEGES A CLAIM UNDER THE GMVPL................... 18

     A.    The Clear Expression of the City Council's Purpose Mandates Retroactivity..... 19

         1.    The Amendment Clarifies What the GMVPL Was Always Meant to Say. 129

         2.    Statements in the Legislative History Must Be Read as a Whole ............... 22

     B.    The Amendment is a Remedial Enactment Entitled to Retroactive Application.. 23

CONCLUSION.................................................................................................................... 26

<u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

<u>Adams v. Jenkins</u>,
    2005 WL 6584554 (N.Y. Cty. Apr. 22, 2005) .........................................................................21

<u>Anderson v. Nassau Cnty. Dep't of Corr.</u>,
    558 F. Supp. 2d 283 (E.D.N.Y. 2008) ...............................................................................11, 18

<u>Annunziata v. Int'l Bhd. of Elec. Workers Loc. Union # 363</u>,
    2018 WL 2416568 (S.D.N.Y. May 29, 2018) .......................................................................15

<u>Arazi v. Cohen Bros. Realty Corp.</u>,
    2022 WL 912940 (S.D.N.Y. Mar. 28, 2022) .........................................................................11

<u>Baldwin v. TMPL Lexington LLC</u>,
    2024 WL 3862150 (S.D.N.Y. Aug. 19, 2024) .......................................................................10

<u>Bandyopadhyay v. State Univ. of New York</u>,
    2021 WL 1209420 (E.D.N.Y. Mar. 30, 2021) .......................................................................10

<u>Banks v. Gen. Motors, LLC</u>,
    2020 WL 6827707 (W.D.N.Y. Nov. 20, 2020) ......................................................................15

<u>Becker v. Huss</u>,
    43 N.Y. 527 (N.Y. 1978) ...............................................................................................23, 24

<u>Bensky v. Indyke</u>,
    2024 WL 3676819 (S.D.N.Y. Aug. 5, 2024) .........................................................................22

<u>Best v. Bell</u>,
    2014 WL 1316773 (S.D.N.Y. Mar. 28, 2014) .......................................................................15

<u>Bowen-Hooks v. City of New York</u>,
    13 F. Supp. 3d 179 (E.D.N.Y. 2014) ....................................................................................15

<u>Brothers v. Florence</u>,
    95 N.Y.2d 290 (N.Y. 2000) ...........................................................................................19, 23

<u>Brown v. Fat Dough Incorp.</u>,
    2024 WL 1345360 (N.D.N.Y. Mar. 29, 2024) ......................................................................12

<u>Campo v. City of New York</u>,
    2022 WL 970730 (E.D.N.Y. Mar. 31, 2022) .........................................................................11

Carroll v. Trump,
    650 F. Supp. 3d 213 (S.D.N.Y. 2023)..........................................................................25

Castillo v. Altice USA, Inc.,
    2023 WL 8650270 (S.D.N.Y. Dec. 14, 2023) ..........................................................16

Collier v. Boymelgreen Devs.,
    2008 WL 835706 (E.D.N.Y. Mar. 28, 2008) ............................................................17

Crawford v. ExlService.com, LLC,
    2019 WL 6284228 (S.D.N.Y. Nov. 25, 2019)..........................................................13

Deprey v. FedEx Freight, Inc.,
    2020 WL 1702335 (D. Conn. Apr. 8, 2020) ............................................................10

Deravin v. Kerik,
    335 F.3d 195 (2d Cir. 2003)......................................................................................11

Doe v. Univ. of Connecticut,
    2013 WL 4504299 (D. Conn. Aug. 22, 2013) .........................................................13

Drees v. County of Suffolk,
    2007 WL 1875623 (E.D.N.Y. June 27, 2007) .........................................................11

Duell v. Condon,
    84 N.Y.2d 773 (N.Y. 1995) ......................................................................................24

E.E.O.C. v. Rotary Corp.,
    297 F. Supp. 2d 643 (N.D.N.Y. 2003).....................................................................15

Figueroa v. Johnson,
    109 F. Supp. 3d 532 (E.D.N.Y. 2015) .....................................................................12

Genovese v. Nationstar Mortgage LLC,
    223 A.D.3d 37 (1st Dept. 2023)................................................................................23

In Re Gleason (Michael Vee, Ltd.),
    96 N.Y. 117 (N.Y. 2001) ..............................................................................20, 22, 23

Gonzalez v. Hasty,
    802 F.3d 212 (2d Cir. 2015)......................................................................................15

Gottwald v. Sebert,
    2016 WL 1365969 (N.Y. Cty. Apr. 6, 2016)...........................................................21

Gottwald v. Sebert,
    40 N.Y. 3d 240 (N.Y. 2023) .............................................................................19, 23

Green v. N.Y.C. Transit Auth.,
	2020 WL 5632743 (S.D.N.Y. Sept. 21, 2020)........................................................................16

Herman v. City of New York,
	2023 WL 6386887 (S.D.N.Y. Sept. 29, 2023)........................................................................13

Hernandez v. Barrios-Paoli,
	93 N.Y.2d 781 (1999) ...........................................................................................................20

Irrera v. Humpherys,
	695 F. App'x 626 (2d Cir. 2017) ...........................................................................................14

Jacobus v. Colgate,
	217 N.Y. 235 (N.Y. 1916) .....................................................................................................24

King v. Aramark Servs. Inc.,
	96 F.4th 546 (2d Cir. 2024) .............................................................................................16, 17

Klymn v. Monroe Cnty. Sup. Ct.,
	641 F. Supp. 3d 6 (W.D.N.Y. 2022) .................................................................................12, 14

Krul v. Brennan,
	501 F. Supp. 3d 87 (N.D.N.Y. Nov. 17, 2020) .....................................................................10

Lagano v. Chrysler Corp.,
	957 F. Supp. 36 (E.D.N.Y. 1997) .........................................................................................23

Lane v. City of N.Y.,
	18 N.Y.S.3d 579 (N.Y. Sup. Ct. 2015) .................................................................................14

Little v. Nat'l Broad. Co.,
	210 F. Supp. 2d 330 (S.D.N.Y. 2002)...................................................................................17

Littlejohn v. City of New York,
	795 F.3d 297 (2d Cir. 2015)..................................................................................................10

Louis v. Niederhoffer,
	2023 WL 8777015 (S.D.N.Y. Dec. 19, 2023))......................................................................22

Mackoff v. Bluemke-Mackoff,
	222 A.D.3d 67 (2d Dept. 2023) .............................................................................................23

Majewski v. Broadalbin-Perth Cent. Sch. Dist.,
	91 N.Y.2d 577 (N.Y. 1998) ...................................................................................................19

McGee v. Int'l Life Ins. Co.,
	355 U.S. 220 (1957)...............................................................................................................24

McGullam v. Cedar Graphics, Inc.,
    609 F.3d 70 (2d Cir. 2010)............................................................................11, 12

Meritor Sav. Bank, FSB v. Vinson,
    477 U.S. 57 (1986)..............................................................................................12

Matter of Mia S.,
    212 A.D.3d 17 (2d Dept. 2022) ......................................................................23, 24

Moll v. Telesector Res. Grp., Inc.,
    760 F.3d 198 (2d Cir. 2014)................................................................................10

Morren v. New York Univ.,
    2022 WL 1666918 (S.D.N.Y. Apr. 29, 2022) ....................................................20

Morris v. NYS Dep't of Corr. & Cmty. Supervision,
    2024 WL 4252049 (N.D.N.Y. Sept. 20, 2024) ...................................................14

Morrison v. Shalach,
    67 Misc. 3d 451 (N.Y Sup. Westchester Cty. 2020)...........................................20

Morse v. Fidessa Corp.,
    165 A.D.3d 61 (1st Dept. 2018)..........................................................................21

Murillo-Roman v. Pension Boards - United Church of Christ,
    2024 WL 246018 (S.D.N.Y. Jan. 23, 2024) ...................................................11, 17

Nat'l R.R. Passenger Corp. v. Morgan,
    536 U.S. 101 (2002)........................................................................................11, 18

Nelson v. HSBC Bank USA,
    87 A.D.3d 995 (1st Dept. 2011)......................................................................23, 25

New York v. Pennsylvania Higher Educ. Assistance Agency,
    2022 WL 951048 (S.D.N.Y. Mar. 30, 2022) ..................................................19, 25

Newton v. LVMH Moet Hennessy Louis Vuitton Inc.,
    2024 WL 3925757 (S.D.N.Y. Aug. 23, 2024)......................................................13

In re NYP Holdings, Inc. v. New York City Police Dep't.,
    220 A.D.3d 487 (1st Dept. 2023)........................................................................23

In re OnBank & Tr. Co.,
    90 N.Y.2d 725 (1997)....................................................................................19, 25

Parrott v. Krasicky,
    2013 WL 3338570 (D. Conn. July 2, 2013) .......................................................15

People v. Arana,
  32 A.D.3d 305 (1st Dept. 2007)...............................................................21

People v. Dyshawn B.,
  196 A.D.3d 638 (2d Dept. 2021) .............................................................20

People v Forshey,
  75 A.D.3d 1100 (4th Dept. 2010)............................................................19

Posillico v. Southhold Town Zoning Bd. of Appeals,
  219 A.D.3d 885 (2d Dept. 2023) .............................................................23

Regina Metro. Co. v. New York State Div. of Housing & Comty. Renewal,
  35 N.Y.3d 332 (N.Y. 2020) ....................................................................25

Roberts v. Sage Corp.,
  2021 WL 3617670 (N.D.N.Y. Aug. 16, 2021) ........................................14

Roches-Bowman v. City of Mount Vernon,
  2022 WL 3648394 (S.D.N.Y. Aug. 24, 2022)..........................................14

Ruggerio v. Dynamic Elec. Sys. Inc.,
  2012 WL 3043102 (E.D.N.Y. July 25, 2012)...........................................14

Ruiz v. New Avon LLC,
  2019 WL 4601847 (S.D.N.Y. Sept. 22, 2019)...................................13, 15

Slattery v. Swiss Reinsurance Am. Corp.,
  248 F.3d 87 (2d Cir. 2001).........................................................................3

Sosa v. New York City Dep't of Educ.,
  368 F. Supp. 3d 489 (E.D.N.Y. 2019) .....................................................12

Speedmark Transp., Inc. v. Mui,
  778 F. Supp. 2d 439 (S.D.N.Y. 2011).......................................................18

Spiegel v. 226 Realty LLC,
  2024 WL 4486892 (1st Dept. Oct. 15, 2024)......................................20, 23

Sprint/United Mgmt. Co. v. Mendelsohn,
  552 U.S. 379 (2008)..................................................................................13

Stein v. Rockefeller Univ. Hospital,
  2024 LEXIS 1662, at *8 (N.Y. Cty. May 23, 2024)................................22

Stevens v. City of Oneonta,
  2020 WL 5909071 (N.D.N.Y. Oct. 6, 2020) ...........................................14

Tassy v. Buttigieg,
    51 F.4th 521 (2d Cir. 2022) .................................................................................14

United States v. Morrison,
    529 U.S. 598 (2000).............................................................................................21

Walker v. Accenture PLC,
    511 F. Supp. 3d 169 (D. Conn. 2020)..................................................................11

Woollcott v. Shubert,
    217 N.Y. 212 (N.Y. 2016) ...................................................................................21

In re World Trade Ctr. Lower Manhattan Disaster Site Litig.,
    30 N.Y.3d 377 (N.Y. 2017)..................................................................................25

Zakrewska v. The New School,
    14 N.Y.3d 469 (2010) ..........................................................................................24

**Statutes**

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. .................................. *passim*

Violence Against Women Act, 42 U.S.C. § 1398 .......................................................21

New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. ..............................1

New York Civil Rights Law §§ 70 et seq. .................................................................19

Administrative Code of the City of New York § 8-107 et seq. ....................................17

Administrative Code of the City of New York § 10-1101 et seq. ................................17

**Other Authorities**

Plain Language Summary of Int. No. 2372-B, November 30, 2021 ...........................20

Report of the Council of the City of New York Committee on Women and Gender
    Equality, December 9, 2021..............................................................................20

Plaintiff Ardith Lindsey ("Lindsey") respectfully submits this Memorandum of Law in Opposition to the Partial Motion to Dismiss the Amended Complaint of defendant Citigroup Global Markets Inc. ("Citi" or the "Bank") (Dkt. 20). Citi does not challenge, nor can it, most of Lindsey's claims about the unending and vile sexual harassment, gender discrimination, and assaults that she faced during her 16 years at the Bank.[1] Instead, Citi tries to chip away at some (but not all) of the claims to the extent they are based on the horrific sexual assault that Richard Evans ("Evans"), a senior Citi Global executive, inflicted on Lindsey and Citi's failure to act in response to her complaint.[2] Given that Citi has for many years covered up for, enabled, and empowered senior male executives who sexually harass women, it is predictable that the Bank again tries to avoid accountability for its actions.

Even though Citi is certainly familiar with the law governing motions to dismiss, the Bank improperly urges the Court to ignore numerous allegations in the Amended Complaint (the "AC") (Dkt. 12) and draw inferences in Citi's favor. Citi attacks each act alleged as part of the hostile environment, including the Evans sexual assault, as if it stood alone. Citi is wrong. The AC, which is 64 pages long and includes 223 paragraphs, describes in painstaking detail that the Evans sexual attack was part of a much broader culture of sexual harassment, abuse, and gender discrimination, which has gone unchecked within Citi's Global Equities Markets division ("Equities") for nearly two decades and which Citi's most senior executives have perpetrated and emboldened. (See, e.g., AC ¶¶ 2-4) Citi leadership's failure to act following Evans's assault sent a clear message to Lindsey

---

[1] Lindsey alleges that Citi's misconduct violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. (the "State Law"); the Administrative Code of the City of New York § 8-107 et seq. (the "City Law"); and the Gender Motivated Violence Protection Law, N.Y.C. Admin. Code §§10-1101 et seq. (the "GMVPL").

[2] See Citi Memorandum of Law in Support of Its Partial Motion to Dismiss the Amended Complaint (Dkt. 20) ("Def. Br.") 2. Even if Citi's partial motion were granted, which it should not be, far from "streamlin[ing]" this action (Def. Br. 2) the decision would not affect other claims involving the Evans attack, including the State Law and the City Law claims based on identical misconduct.

1

about the Bank's treatment of women, a message repeated multiple times during her tenure:  Citi protected senior male executives and women who want to continue their career have no choice but to remain silent.  (See, e.g., AC ¶¶ 2-4, 124)  Thus, Citi's motion to dismiss the Title VII claim based on the Evans assault should be denied.

The Court should also reject Citi's motion to dismiss the GMVPL claim. While Citi does not contest that Evans's brutal sexual assault and Citi's enabling the attack constitute misconduct that violate the current version of the GMVPL, Citi argues that dismissal is warranted because the amended version of the law, which was passed in 2022, should not apply retroactively.  Citi, however, disregards well-established statutory construction principles and the clear legislative history that the amendment was enacted to clarify the law. Citi's motion should be denied.

FACTUAL BACKGROUND

A.    Citi's Pervasive Culture of Sexual Harassment and Gender Discrimination

Lindsey and dozens of other women within Equities endured years of sexual harassment. (See, e.g., AC ¶¶ 2-4) The pervasive problems, which multiple news outlets corroborated (AC ¶ 2 n.1), included men repeatedly making degrading and sexual comments about women employees concerning their bodies, clothing, and other aspects of their appearance (AC ¶¶ 73-84); treating them as sex objects (AC ¶¶ 48-61); using them as entertainment (AC ¶¶ 62-72); belittling them and their accomplishments (AC ¶¶ 85-89); disparaging sexual harassment training, women's initiatives and maternity leaves (AC ¶¶ 90-94); and excluding women from professional opportunities and taking other steps to maintain a boys' club environment. (AC ¶¶ 95-102)

Citi disregards dozens of allegations that senior management and Human Resources ("HR") uniformly failed to address the widespread misconduct within Equities; silenced numerous women by actively discouraging them from pursuing their complaints; and engaged in other tactics

2

designed to avoid accountability.  (See, e.g., AC ¶¶ 2-4, 190)[3] The most senior executives within Equities, including Dan Keegan ("Keegan") (who was at times the Co-Head of Global Equities and Chairman as well as the Chief Executive Officer and President of Citi Global Markets Inc.); Tim Gately ("Gately") (former Head of Equities for the Americas); and Salima Habib ("Habib"), Head of Sales for the Americas), repeatedly protected men who brazenly violated the law.  The AC identifies numerous instances when those executives and others witnessed sexual harassment and abuse or received complaints about such misconduct, but failed to act and, in some cases, retaliated against the women who dared to protest their unlawful treatment.[4]

The AC also alleges that many women were scared to speak up because male senior managers, including Keegan; Fater Belbachir ("Belbachir") (the current Global Head of Equities); Stephen Roti ("Roti") (Global Head of Strategic Equity Solutions Business); Mani Singh ("Singh"") (one of Citi's senior-most global executives in Equities); and Antonin Jullier (former Global Head of Sales), frequently participated in the misconduct.  (AC ¶¶ 4, 56, 57, 58, 71, 97) Furthermore, many women raised concerns about HR, including that HR functioned to protect the Bank, the male executives and their unlawful behavior; that when HR was aware of problems, it turned a blind eye by failing to conduct interviews or follow up on investigations of any

---

[3] See Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 92 (2d Cir. 2001) ("When a major company executive speaks, 'everybody listens' in the corporate hierarchy, and when an executive's comments prove to be disadvantageous to a company's subsequent litigation posture, it cannot compartmentalize this executive as if he had nothing more to do with company policy than the janitor or watchman.").

[4] See, e.g., AC ¶¶ 65, 76, 88 (no action taken in response to Lindsey's complaints to senior managers about: men pressuring her to attend strip clubs; her supervisor telling her that her job during a meeting was to wear a cute outfit; and her supervisor referring to another woman's stupidity and then insulting Lindsey by saying she had taught this woman everything she knew); id. ¶¶ 51, 52 (failing to discipline senior employees who encouraged a junior trader, while on the trading desk, to show the underwear of a woman he had recently had sex with and retaliating against the female Managing Director ("MD") who reported the incident); id. ¶ 59 (two male MDs who witnessed a male employee pull down his pants in front of a female analyst and grab her buttocks and did nothing); id. ¶¶ 83, 84 (MD dismissing junior woman's complaints concerning male mentor asking about her personal life, commenting that she is skinny and tall, and encouraging her to show off her figure to bait men, and about men ranking the "hottest" analysts).

complaints; that HR exposed those who made complaints using a purportedly anonymous hotline; and that HR helped brand as troublemakers women employees who complained. (AC ¶¶ 58, 94, 185) Citi's complete failure to prevent or punish sexual harassment, assaults, and abuse not only allowed the blatant discrimination to continue throughout Lindsey's employment, but was part of the toxic environment that Citi forced Lindsey to endure.

Contrary to Citi's assertions (Def. Br. 4), this flagrant sexual harassment spans Lindsey's tenure from the assault in 2007 until she began her leave in 2022. In multiple instances, the AC specifically identifies dates of unlawful conduct[5] and, in others, the AC states that the misconduct happened on a regular basis throughout her employment and too frequently for her to specify a precise timeframe.[6] Even though the harassment varied in form, women were the target of discrimination and abuse and throughout Lindsey's tenure, the same problems have persisted in Equities that existed when she first arrived at the Bank in 2007. (See, e.g., AC ¶¶ 186-89)

B.    The Evans Sexual Assault Is Part of the Hostile Environment

There is no dispute that Evans sexually assaulted Lindsey. After a Citi event in December 2007, when Lindsey woke up, Evans was on top of her and kissing her without her consent. (AC ¶¶ 6, 105-09) Even though Lindsey prevented Evans from further attacking her at the time, he continued his sexual advances, including later running his hand up Lindsey's leg and up her skirt,

---

[5] See, e.g., AC ¶¶ 48, 51, 57, 63, 64, 66, 70, 71, 75-76, 79-80, 82, 86, 88, 91-92, 135, 145-48, 151-52, 166, 184, 191-92.

[6] Among many examples, see, e.g., AC ¶ 49 (male employees "frequently stated that they targeted female employees for sexual conquest"); ¶ 76 (manager Greg Sutton "frequently made demeaning comments about Lindsey's work and appearance"); ¶ 80 (Singh "frequently commented on the appearance of other women"); ¶ 85 ("male executives regularly denigrated the competence and successes of women employees"); ¶ 86 ("male executives repeatedly insulted and diminished women who managed to assume significant responsibility"); ¶ 87 (male managers "regularly suggested that Lindsey had secured client relationships [] because those clients were sexually attracted to her"); ¶ 89 (Singh "regularly asked [] junior women personal sexually inappropriate questions"); ¶ 90 (male executives "regularly" joked about Citi's sexual harassment policies); ¶ 103 (women employees treated "as sexual objections" "[i]n many instances").

asking her out on a date, and ogling her throughout a meeting.  (AC ¶¶ 109-11)

While Citi acknowledges the assault, as it must, it distorts the facts concerning the attack, including omitting key allegations to try to minimize its severity and its direct connection with other harassment.  Citi falsely identifies Lindsey and Evans as "fellow employee[s]." (Def. Br. 3) They were not.  As was the case in many other incidents of unlawful conduct, the perpetrator was a senior male executive in Equities and the victim was a junior employee.  At the time of the assault, Evans was Global and Europe, Middle East, and Africa  Head of Program Trading and Electronic Execution.  (AC ¶¶ 6, 105)  The article Citi cites about Evans's departure from the Bank describes him as a "star" and "highly regarded" and states that as of 2008 he had worked there for 10 years.  (Def. Br. 4 n.2)  Evans specifically targeted Lindsey, who had joined the Bank just a few weeks earlier, was three levels below Evans, and was 24 years old.  (AC ¶¶ 6, 25-26, 106-07, 113) In addition, seeking to distance itself from the horrific incident, Citi claims that the assault happened after Lindsey joined Evans and other employees for drinks.  (Def. Br. 3)  Citi omits, however, that the problems began at a Citi sponsored holiday party.  (AC ¶¶ 106-07)

Also, consistent with the pattern of sexual harassment that Lindsey and other women experienced at Citi, Evans used his senior position to pressure Lindsey to act in ways she did not want, including threatening to fire her in the midst of widespread layoffs at Citi if she did not stay out late and drink with him; demanding that Lindsey not go home after other Citi executives had left her alone with him; insisting that he walk her home; and demanding to use her restroom to get inside her apartment as there was none in the lobby.  (AC ¶¶ 106-08)  Even after Evans began his sexual assault against Lindsey, out of fear, "she felt that she had no choice but to allow him to kiss her because of his authority over her job and previous threats that evening to fire her." (AC ¶ 109)

As was the case for many women who experienced harassment in Equities, Citi did nothing

in response to egregious and criminal conduct.  Lindsey reported the Evans assault to Keegan, her supervisor at the time, who held senior leadership roles in Equities, and who worked closely with the Bank's highest levels, including Citi's CEO Jane Fraser and Board of Directors.  (AC ¶¶ 29-30, 112)  Not only did Keegan fail to act, but he also caused Lindsey additional humiliation by subsequently "jok[ing]" about the Evans attack.  (AC ¶ 113)[7]  Evans attacked Lindsey "in th[e] environment" where Citi allowed men, "especially powerful executives," to engage in outrageous sexual harassment.  (AC ¶ 104)  Lindsey's experience surrounding the Evans sexual assault sent a clear message that Citi protects senior men, even those who brazenly break the law.  (AC ¶ 113)

C.     Singh's Prolonged and Devastating Abuse Is Part of the Hostile Environment

Singh, who was one of the most senior executives in Equities and one of Lindsey's supervisors, subjected her to unrelenting abuse and unlawful conduct for many years.  (AC ¶¶ 7, 114)  Singh persistently targeted Lindsey for sexual advances (AC ¶¶ 116-17); coerced her into a prolonged abusive dynamic (AC ¶¶ 7, 118); demanded that she engage in sexual acts (AC ¶ 119); punished her at work when his sexual demands were not met (AC ¶ 119); used physical force when she protested having sex with him (AC ¶ 121); and verbally abused her (AC ¶¶ 122-24).  Lindsey tried repeatedly to end the abusive situation, but she was terrified that Singh, who often reminded her of his significant authority and influence at the Bank (AC ¶¶ 130-42), would physically harm her, terrorize her family, and destroy her career (AC ¶¶ 125-29).

After Lindsey finally summoned the courage to end the abusive dynamic, her worst fears were confirmed.  (AC ¶¶ 7, 151)  In November 2022, Singh subjected Lindsey to an onslaught of shocking abuse via hundreds of harassing text messages, incessant calls, and disparaging

---

[7] Lindsey expects that discovery will substantiate that Evans was known for his volatile and hard-partying behavior that involved women; that there were other incidents in which he targeted junior female employees for sexual assault; and that Keegan, shortly after learning about the Evans attack, sent another young woman to the United Kingdom to work with Evans.  (See AC ¶ 106)

communications with Lindsey's colleagues. (AC ¶¶ 152-64) Singh's messages included threatening to kill Lindsey and harm her children; ruining her career and reputation; and making demeaning and sexualized comments about her appearance and body. (AC ¶¶ 7, 153-61)[8]

While Citi asserts that it "unequivocally condemns" Singh's sexual exploitation of Lindsey (Def. Br. 1), the Bank improperly disclaims any responsibility even though it empowered and protected him. (AC ¶ 150) Singh's pervasive and egregious harassment against Lindsey is part of the broader hostile work environment Citi forced her to face throughout her tenure. (AC ¶ 179)

First, Singh was a Citi executive within Equities when he targeted Lindsey; he ascended the ranks faster than any other employee in Equities; and had close relationships with the male leaders of Equities, especially Keegan. (AC ¶¶ 30, 32-33, 179) At the time Singh resigned, he had become the Bank's most senior client-facing executive in Sales within Equities, had approximately 100 employees reporting to him, and had oversight responsibilities for numerous areas. (AC ¶¶ 32-35, 179) At all times, Singh was senior to Lindsey and, by 2022, she indirectly reported to him. (AC ¶¶ 36, 114) In many respects, Singh was the Bank for Lindsey.

Second, Citi's effort to revictimize Lindsey by blaming her for Singh's egregious behavior (Def. Br. 6), should be rejected. Lindsey did not consent to Singh's misconduct and did not violate Citi's policies by failing to disclose it sooner.[9] Singh, who terrorized Lindsey for years, wielded the authority that Citi gave him by repeatedly punishing Lindsey when she sought to distance

---

[8] Those text messages include: "I am going to set you on fire"; "[H]ug [your children] tight" because your "world will be over [tomorrow]";"Gon[n]a fuck your life and kids with it too"; and "Your kids['] life will be ruined from here on in"; "Kids no kids I don't give a fuck [I] plan to burn it all down."; "Taking you down in comp[ensation]. Hard. Like a bitch you are"; and "Obv[iously] I plan to use . . . [m]y power. Obv[iously] comp[ensation] is just st[a]rt of where I take it all out."

[9] Citi's criticism of Lindsey (Def. Br. 6) for not disclosing earlier Singh's abusive misconduct rings hollow for other reasons. The AC recounts many examples of senior men involved in sexual relationships with their direct reports or more junior women. (AC ¶ 60) Even though Citi has policies purported to prohibit those relationships, which by definition cannot be consensual given the power that the senior men have over the women, the Bank allowed them. (Id.)

herself from him and threatening her life, her career, and her family if she disclosed his abuse. (AC ¶¶ 116, 118, 119, 125-42, 155, 159-64)  The text messages cited in the AC alone demonstrate not consent, but rather a gross misuse of power. (AC ¶¶ 152-61) Moreover, Citi repeatedly made clear that it had not, and would not, remedy sexual harassment and gender discrimination and that it, in fact, punished women who objected to the misconduct. (AC ¶¶ 4, 56, 57, 58, 71, 94, 97, 185)

Third, while Citi asserts that it purportedly did not know about Singh's abuse until November 10, 2022 (Def. Br. 6), the Bank ignores numerous allegations that senior executives, such as Keegan and Gately, and HR, were well-aware of Singh's erratic behavior and obvious violations of Bank policy, including his mistreatment of women, throughout his employment.  (AC ¶ 143)  The AC catalogues Singh's well-known and unstable behaviors, including his excessive alcohol consumption at work events; his rampant drug use at the office; and his misuse of the corporate credit card including at strip clubs.  (AC ¶¶ 144-50) There were multiple gender discrimination complaints against Singh.  (AC ¶¶ 147-48)  Despite knowing about the misconduct, the Bank took no action.  (AC ¶¶ 35, 37, 149, 179)  To the contrary, as it had with numerous other men who sexually harassed women, Citi rewarded Singh with increased responsibilities and expanded oversight; promotions; and large bonuses and pay increases.  (AC ¶¶ 32-35, 37, 149-50)

Fourth, even after Citi was undisputedly aware of Singh's shocking and abusive conduct, the Bank protected him. Citi claims that it took "immediate action" (Def. Br. 6) when Lindsey notified the Bank on November 10, 2022 of Singh's threating her life and her children. (AC ¶¶ 8, 66-67) To the contrary, Citi allowed Singh to resign quietly and publicly lauded him on November 22, 2022, thanking him for his "contributions," stating that Citi was "very sorry to see him go," and "wish[ing] him well." (AC ¶¶ 8, 172–73) Gately delivered that scripted announcement, which management, including Belbachir, and HR approved even after they had received more than 30

8

pages of messages that Singh had sent to Lindsey, threatening her and her family and even after Citi's investigator, a former prosecutor, described Singh's conduct as criminal. (AC ¶¶ 7-8, 166-73) Alarmingly, Citi is still protecting Singh by failing to report his egregious conduct to regulators. (AC ¶¶ 9, 174-77) Despite overwhelming evidence of Singh's deplorable behavior, well-known during his employment, a boys' club of current and former Citi male executives, including Gately and Keegan, continues to embrace Singh. (AC ¶ 178) Also, while Citi claims that it addressed the widespread misconduct that plagued Lindsey and other women, the Bank took those steps nearly a year after Singh's resignation only when Lindsey's filing was public. The purported efforts, including leaking a memo from Andy Morton, Head of Markets, were a slick public relations campaign designed to distract from the pervasive problems. (AC ¶¶ 180-83)

D.    <u>Citi Has Seriously Damaged Lindsey</u>

Lindsey has been on a medical leave from Citi since 2022 due to the pervasive gender discrimination and sexual assaults that she experienced at Citi for more than a decade, including the Evans attack and Singh's abuse, and Citi's years-long failure to act. (AC ¶¶ 193, 197) Citi's unlawful conduct has traumatized Lindsey. (AC ¶ 193) Due to the shocking mistreatment, she struggles to sleep; suffers from nightmares and paranoia; has experienced significant negative neurological effects, including a 24-point drop in her Intelligence Quotient; and has been diagnosed, for the first time, with Post Traumatic Stress Disorder, Major Depressive Disorder, Generalized Anxiety Disorder, and Major Neurocognitive Disorder. (AC ¶¶ 194-96) Almost two years later, Lindsey's team of medical professionals have determined that she remains incapable of returning to work and requires intensive treatment to manage her symptoms. (AC ¶ 197)

<u>ARGUMENT</u>

I.    <u>APPLICABLE LEGAL STANDARDS</u>

A court considering a motion to dismiss must accept all facts alleged as true and draw all inferences in the plaintiff's favor. <u>Littlejohn v. City of New York</u>, 795 F.3d 297, 306 (2d Cir. 2015). "The Second Circuit has counseled that, at the pleading stage, a plaintiff faces only a minimal burden." <u>Bandyopadhyay v. State Univ. of New York</u>, 2021 WL 1209420, at *3 (E.D.N.Y. Mar. 30, 2021) (citations and internal quotations omitted).

Under Title VII, an employer is liable for creating a hostile work environment where its "workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Moll v. Telesector Res. Grp., Inc.</u>, 760 F.3d 198, 203 (2d Cir. 2014); <u>Deprey v. FedEx Freight, Inc.</u>, 2020 WL 1702335, at *3 (D. Conn. Apr. 8, 2020) (same). To survive a motion to dismiss a plaintiff need only allege "facts to support the conclusion that she was faced with harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." <u>Krul v. Brennan</u>, 501 F. Supp. 3d 87, 99 (N.D.N.Y. Nov. 17, 2020).

The GMVPL creates a cause of action for "any person claiming to be injured by a party who commits [or] . . . enables . . . the commission of a crime of violence motivated by gender." <u>Baldwin v. TMPL Lexington LLC</u>, 2024 WL 3862150, at *11 (S.D.N.Y. Aug. 19, 2024). A plaintiff prevails on a motion to dismiss her GMVPL claims where she pleads that a covered party enabled a "gender-motivated crime of violence" against her. <u>Id.</u>

II.    <u>THE TITLE VII CLAIM BASED ON THE EVANS ATTACK SHOULD PROCEED</u>

Citi erroneously contends that the Evans attack is an untimely discrete act that is not part

of a continuing violation under Title VII. It is well established, however, that the statutes of limitation for all of plaintiff's hostile environment claims begin to run on the date of the last incident of sexual harassment. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002). "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Id. at 118; see also Campo v. City of New York, 2022 WL 970730, at *23 (E.D.N.Y. Mar. 31, 2022) ("An employer's creation of a hostile work environment is a quintessential 'continuing violation'").[10]

A.    It is Premature to Determine Whether Lindsey's Claims Are Timely

Determining the applicability of the continuing violation doctrine is a "fact-intensive" inquiry that is generally improper on a motion to dismiss.[11] In a harassment case, an employee meets the low bar to plead a continuing violation where she "allege[s] a pattern of discrimination that continued over a period of years with some incidents occurring within the appropriate filing period." Anderson v. Nassau Cnty. Dep't of Corr., 558 F. Supp. 2d 283, 298 (E.D.N.Y. 2008); Drees, 2007 WL 1875623, at *9 ("dismissal is appropriate only if a complaint clearly shows the claim is

_____

[10] Citi's argument that Lindsey did not plead a Title VII hostile work environment claim (Def. Br. 22) cannot be squared with the AC's plain language. Not only is Lindsey's Complaint replete with allegations concerning the hostile work environment, but Lindsey also explicitly alleges that Citi subjected her to "a hostile work environment, in violation of Title VII . . . ." (AC ¶ 12) Even in the absence of such explicit language, courts do not require that a plaintiff use the term "hostile work environment" to consider such a claim, which is merely a subset of a discrimination claim. See Murillo-Roman v. Pension Boards - United Church of Christ, 2024 WL 246018, at *7 (S.D.N.Y. Jan. 23, 2024); Deravin v. Kerik, 335 F.3d 195, 202 (2d Cir. 2003) (citations omitted) (noting that "precise pleading is not required for Title VII exhaustion purposes"; "it is the substance of the charge and not its label that controls.").

[11] Arazi v. Cohen Bros. Realty Corp., 2022 WL 912940, at *14 (S.D.N.Y. Mar. 28, 2022) (quoting Drees v. County of Suffolk, 2007 WL 1875623, at *9 (E.D.N.Y. June 27, 2007)); Walker v. Accenture PLC, 511 F. Supp. 3d 169, 192 (D. Conn. 2020) (whether continuing violation doctrine applies is a question better addressed on a summary judgment motion after discovery); cf. McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 77 (2d Cir. 2010) (continuing violation analysis requires "flexibility . . . in a context as fact-specific and sensitive as employment discrimination and as amorphous as hostile work environment.").

out of time") (quoting <u>Harris v. City of New York</u>,186 F.3d 243, 250 (2d Cir.1999)).  As Lindsey

easily meets the pleading standard, Citi's motion to dismiss her Title VII claim should be denied.

     B.    <u>Lindsey Has Alleged a Continuing Violation</u>

In determining if acts outside the limitations period constitute part of an actionable hostile

environment, courts consider the nature and frequency of the misconduct, the individuals involved,

and any intervening remedial action by the employer. <u>McGullam</u>, 609 F.3d at 83-86 (Calabresi, J.,

concurring);[12] <u>Klymn v. Monroe Cnty. Sup. Ct.</u>, 641 F. Supp. 3d 6, 21-22 (W.D.N.Y. 2022). Each

factor links Evans's shocking attack to the biased environment that Lindsey constantly endured.

     1.    <u>Nature and Frequency of the Conduct</u>

The AC describes the vile harassment that Lindsey faced as constant and unending. (AC

¶¶ 48-51, 62-79, 87, 91-92, 118-41) The Evans sexual attack against Lindsey, which happened

when she was 24 and shortly after she joined the Bank (<u>Id.</u> ¶¶ 103-10),[13] and Singh's relentless

harassment, including sending Lindsey hundreds of messages threatening to kill her and harm her

children (<u>Id.</u> ¶¶ 151-64), while serious and harmful on their own, were part of a much broader

pattern within Equities of mistreating women.  For Lindsey's entire employment, Citi subjected

her and numerous other women to an onslaught of harassing conduct, including jokes objectifying

---

[12] The unrelated non-timely incidents described in <u>McGullam</u> – which otherwise found a continuing violation – occurred in a different department from the non-trivial timely incident. In contrast, the Evans attack and dozens of harassing incidents here all occurred in Equities.

[13] Citi mistakenly claims (Def. Br. 21), contrary to longstanding Supreme Court precedent, that Lindsey is required to assert a "tangible employment action" to prevail on claims related to the Evans attack. <u>See Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 6 (1986) (holding that sexual harassment – without more – is prohibited by the antidiscrimination laws); <u>Brown v. Fat Dough Incorp.</u>, 2024 WL 1345360, at *9 (N.D.N.Y. Mar. 29, 2024) (under hostile work environment theory, a plaintiff may "recover even in the absence of a tangible job action . . . ."). Defendant's citations to the contrary are inapplicable. <u>See Figueroa v. Johnson</u>, 109 F. Supp. 3d 532, 554 (E.D.N.Y. 2015), <u>aff'd</u>, 648 F. App'x 130 (2d Cir. 2016) (reciting that a tangible employment action must be alleged under the standard for <u>quid pro quo</u> harassment and not, as here, for hostile work environment); <u>Sosa v. New York City Dep't of Educ.</u>, 368 F. Supp. 3d 489, 494-95 (E.D.N.Y. 2019) (discussing disparate treatment claim and not a hostile work environment claim).

women and "rating" their bodies, denigrating their accomplishments, and pressuring Lindsey to attend events at strip clubs. (Id. ¶¶ 48-51, 62-79, 87, 91-92, 118-41)[14]    Repeatedly senior management and HR within Equities let the egregious and flagrant misconduct fester.  (Id. ¶¶ 151-64) Taken as a whole, including the Evans attack, the Singh abuse, the many other instances of sexual harassment and senior management's participation and tolerance of the unlawful conduct, Lindsey plausibly alleges a single hostile environment within Equities. Far from a series of discrete acts, the numerous instances of misconduct are plainly "sufficiently similar" to demonstrate a "course of mistreatment" targeted against women within Equities. Herman v. City of New York, 2023 WL 6386887, at *5 (S.D.N.Y. Sept. 29, 2023) (finding claims related to hostile work environment claim timely as a continuing violation; employee alleged he was subjected to antisemitic comments and treated differently than non-Jewish peers).[15]

Citi incorrectly asserts that sexual assaults outside of the statute of limitations are always considered untimely "discrete acts." (Def. Br. 20) Citi's argument is plainly wrong: "[W]hile a sexual overture is a discrete act, a sexual harassment claim could proceed where it did not depend exclusively on the unwanted sexual advance but, rather," as here, "starting with that incident, the

---

[14] Citi suggests that allegations concerning misconduct directed at other women need not be considered in determining whether the continuing violation doctrine applies. (Def. Br. 5) This argument is baseless. Of course, "evidence of discrimination against other employees is relevant to establishing a generally hostile work environment. . . ." Crawford v. ExlService.com, LLC, 2019 WL 6284228, at *1 (S.D.N.Y. Nov. 25, 2019) (quoting Abdus-Sabur v. Port Auth. of N.Y. and N.J., 2001 WL 1111984, at *2 (S.D.N.Y. Sept. 20, 2001)); see Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 387–88 (2008) (holding that evidence of discrimination against other employees may be admissible even when the actor had no role in the adverse employment action); Doe v. Univ. of Connecticut, 2013 WL 4504299, at *11 (D. Conn. Aug. 22, 2013) ("[I]t is well established in the Second Circuit that one way to establish [an unlawful motive] is to demonstrate [discrimination against others in plaintiff's protected class].").

[15] In many of Citi's cases (Def. Br. 23-24), the pre-limitations conduct involved actions against the employee that, in contrast to those here, were not of the same nature and not alleged to be sexually harassing.  See Newton v. LVMH Moet Hennessy Louis Vuitton Inc., 2024 WL 3925757, at *9 (S.D.N.Y. Aug. 23, 2024) (discharge, reasonable accommodation denial, and promotion denial not part of hostile environment); Ruiz v. New Avon LLC, 2019 WL 4601847 at *16 (S.D.N.Y. Sept. 22, 2019) (promotion denial and constructive discharge were not connected to harassment about plaintiff's affair with supervisor years earlier).

defendant made the work environment hostile over a multi-year period as part of an ongoing practice of harassment [which is] 'by its very nature' a 'continuing violation.'" Klymn, 641 F. Supp. 3d 6, 23 (finding allegations related to a sexual assault outside of statute of limitations timely under continuing violations doctrine); see also Lane v. City of N.Y., 18 N.Y.S.3d 579 (N.Y. Sup. Ct. 2015) (denying motion to dismiss where, "[c]ontrary to defendants' contentions, plaintiffs' theory of recovery is not predicated on each individual incident of assault but rather is based on defendants' continuous failure to provide adequate supervision during that time period which ultimately allowed inter alia the subject sexual assaults to occur.").[16]

Citi's assertion that years separated Evans's attack from other deplorable sexist and abusive misconduct Lindsey suffered (Def. Br. 24) deliberately ignores much of the AC in blatant violation of the applicable standards. In addition to the dozens of dated instances of unlawful conduct between 2007 and 2022 that the AC describes in detail, Lindsey raises numerous allegations concerning harassment that occurred repeatedly or, in some cases, so regularly that they are incapable of dating precisely.[17]  These allegations "imply[] that the alleged conduct occurred

---

[16] Citi's citations on this point (Def. Br. 19-23) involve facts of a kind not at issue here.  Tassy v. Buttigieg, 51 F.4th 521, 532 (2d Cir. 2022) (hostile work environment claim did not involve a sexual assault); Roches-Bowman v. City of Mount Vernon, 2022 WL 3648394 (S.D.N.Y. Aug. 24, 2022) (assault was sole harassment act); Irrera v. Humpherys, 695 F. App'x 626, 629 (2d Cir. 2017) (unwanted sexual touching "separated by multiple years of inactivity"); Roberts v. Sage Corp., 2021 WL 3617670, at *4 (N.D.N.Y. Aug. 16, 2021) (dismissing hostile work environment claims because there were "no timely allegations to which [plaintiff] may attach his untimely allegations"); Morris v. NYS Dep't of Corr. & Cmty. Supervision, 2024 WL 4252049, at *5 (N.D.N.Y. Sept. 20, 2024) (finding untimely two comments that were more than a decade old, involved, other forms of discrimination, and were different in nature than plaintiff's timely promotion claim); Ruggerio v. Dynamic Elec. Sys. Inc., 2012 WL 3043102, at *7 (E.D.N.Y. July 25, 2012) (finding that harassment that occurred "after the employment relationship ended [could not] be considered a continuation of a hostile work environment"); Stevens v. City of Oneonta, 2020 WL 5909071, at *4 (N.D.N.Y. Oct. 6, 2020), aff'd sub nom. Matthew M. Stevens, Plaintiff-Appellant, v. City of Oneonta, Steve Kruh, Greg Mattice, Defendants-Appellees., 2021 WL 4472494 (2d Cir. Sept. 30, 2021) (plaintiff cannot make use of continuing violations doctrine where he was denied opportunity to take promotional examination before limitations period and only purportedly timely event within limitations period was that plaintiff "continue[d] to suffer consequences in the future" as a result).

[17] See, e.g., AC ¶¶ 48, 51, 57, 74, 79, 80, 82, 86, 88 91, 92, 105-113, 121, 135, 136, 145-48, 151, 152, 155,

throughout her employment" and must be considered, alongside the dated incidents, in evaluating the frequency of defendant's conduct. E.E.O.C. v. Rotary Corp., 297 F. Supp. 2d 643, 659 (N.D.N.Y. 2003) (undated allegations "all introduced or accompanied by" phrases like "on certain occasions," "constantly," "on numerous occasions," and "on several occasions" supported finding of continuing violation); Banks v. Gen. Motors, LLC, 2020 WL 6827707, at *13 (W.D.N.Y. Nov. 20, 2020), vacated and remanded on other grounds, 81 F.4th 242 (2d Cir. 2023) (undated incidents "alleged to have been continuing" supported finding of continuing violation); see also Parrott v. Krasicky, 2013 WL 3338570, at *4 n.5 (D. Conn. July 2, 2013) ("A plaintiff does not need to recount each and every instance in order to establish pervasiveness at summary judgment, much less to survive a motion to dismiss.").[18]

Also, Citi's contention (Def. Br. 24-25) that a two-year gap is dispositive of the continuing violations issue is misguided. "The [pleading] standard [to allege a continuing violation] requires the plaintiff to state a plausible claim that the defendant had an ongoing unlawful policy" and alleging "discrete acts, close together in time" is only one way of doing so. Best v. Bell, 2014 WL 1316773, at *6 (S.D.N.Y. Mar. 28, 2014) (reasoning that where a plaintiff alleges that misconduct occurred pursuant to a policy or practice, the continuing violation doctrine may apply even with extended breaks in defendants' misconduct).[19] Even if a gap in time were dispositive, which it is

---

157; see also, e.g., AC ¶¶ 49, 76, 80, 86, 87, 89, 90, 103.

[18] Citi's cases (Def. Br. 20, 22-23) involve misconduct with substantial gaps between the harassment incidents and are otherwise inapposite. See Annunziata v. Int'l Bhd. of Elec. Workers Loc. Union # 363, 2018 WL 2416568, at *14 (S.D.N.Y. May 29, 2018) (finding no continuing violation where timely conduct took place "decades after" pre-limitations period conduct and involved entirely different people); Gonzalez v. Hasty, 802 F.3d 212, 222 (2d Cir. 2015) (claim for retaliation not continuing violation where no actionable retaliation occurred within limitations period); Bowen-Hooks v. City of New York, 13 F. Supp. 3d 179, 206 (E.D.N.Y. 2014) (four-year gap with "qualitatively different" allegations in each of the two time periods and "with no allegations of harassing conduct in between").

[19] Further, Citi's citations (Def. Br. 24-25), unlike the allegations here, do not involve just temporal gaps, but also wholly unrelated types of incidents. Ruiz, 2019 WL 4601847, at *16 (temporary transfer and

not, as set forth above, Lindsey alleges a continuous period of harassment.

> 2.  Individuals Involved

In addition, the alleged misconduct occurred in the same department – Equities – under the leadership of Citi's top executives. In particular, Keegan, a male executive and one of Lindsey's supervisors, oversaw, turned his back on, and, in many cases, participated in the harassment that gave rise to Lindsey's claim.  After Evans sexually assaulted Lindsey, she immediately reported the attack to Keegan, her then-supervisor. (AC ¶ 112) Keegan not only took no action, but he also later joked about the incident to Lindsey. (Id.  ¶¶ 112, 113) Nor was the Evans attack the only time that Keegan ignored Lindsey's complaints of sexual harassment. For example, when Lindsey later reported to Keegan that she was forced to go to a strip club for a work meeting, Keegan once again did nothing. (AC ¶ 65) Ultimately, after Singh subjected Lindsey to horrifying abuse, Keegan encouraged Lindsey to bury the issue and not file her claim. Inexplicably, he told Lindsey that notwithstanding Singh's appalling conduct, Keegan would "always love" Singh. (AC ¶ 178)

Keegan's misogyny was also evident when he repeatedly engaged in harassing conduct toward women employees, including boasting that he wanted to "take [] down" women with whom he wanted to have sex and graphically joking about a gay employee's sexuality. (AC ¶¶ 49, 54, 55) Keegan's "decisive role" in the sexual harassment against Lindsey further connects Evans's attack to the pattern of sexual harassment that continued throughout her employment. King v. Aramark Servs. Inc., 96 F.4th 546, 562 (2d Cir. 2024) (finding continuing violation where one individual

---

constructive discharge which were not alleged to be "part of the same unlawful employment action"); Castillo v. Altice USA, Inc., 2023 WL 8650270, at *7 (S.D.N.Y. Dec. 14, 2023) (finding two year gap between incidents as well as different nature of the alleged conduct – sharing an intimate picture of plaintiff in the pre-limitations period versus phoning plaintiff once during limitations period—broke continuity between actions); see also Green v. N.Y.C. Transit Auth., 2020 WL 5632743, at *1, *5 (S.D.N.Y. Sept. 21, 2020) (while untimely allegations about supervisor who did not engage in harassment were not part of continuing violation, timely allegation that co-worker swung an ax at plaintiff could create hostile environment that included harassment over prior "several years" about her affair with different supervisor).

participated in misconduct throughout the "long-running enterprise of subjecting [employee] to a pervasive, hostile work environment").

    3.  <u>Absence of Remedial Action</u>

Nor can Citi prevail in showing any intervening remedial act. To the contrary, that Citi's misconduct "continue[d] unremedied for so long" shows that its inaction "amount[ed] to a discriminatory policy or practice" and underscores the applicability of the continuing violation doctrine here. <u>King</u>, 96 F.4th at 559 (quoting <u>Cornwell v. Robinson.</u> 23 F.3d 694, 704 (2d Cir.1994)); <u>Collier v. Boymelgreen Devs.</u>, 2008 WL 835706, at *4 (E.D.N.Y. Mar. 28, 2008) (denying motion to dismiss and finding continuing violation where employee complained repeatedly to her supervisor and "no steps were taken to alleviate her concern").[20]

As described above, time and time again, Lindsey raised concerns about sexual harassment to male leadership, including Keegan. Each time Citi's policy was made clear: it would do nothing to address the rampant biased mistreatment of women in its workforce.[21]

    C.  <u>It is Premature to Determine Whether the Continuing Violations Doctrine Applies</u>

Even if Citi's motion were granted, that ruling would not change the contours of this case. First, Citi does not move to dismiss Lindsey's identical claims related to the Evans attack under the New York State Adult Survivors' Act and the State and City Laws. (AC ¶¶ 202-06, 211-14)

---

[20] In arguing that Lindsey cannot base a "continuing violation" on its failure to discipline Evans (Def. Br. 20) (citing <u>DeFranco v. New York Power Auth.</u>, 2024 WL 1621533, at *5 (W.D.N.Y. Apr. 15, 2024)), Citi misconstrues the allegations. She does not allege merely that Citi failed to act in response to that incident, but rather repeatedly ignored and enabled such biased misconduct. (AC ¶¶ 65, 83, 88, 103, 146-48)

[21] In contrast, Citi relies on decisions that do not involve discriminatory conduct taken pursuant to a broader policy and that are thus inapposite. <u>Murillo-Roman v. Pension Boards - United Church of Christ</u>, 2024 WL 246018, at *8 (S.D.N.Y. Jan. 23, 2024) (plaintiff did not "connect her treatment by the Pension Boards to any alleged company policy or practice"); <u>Little v. Nat'l Broad. Co.</u>, 210 F. Supp. 2d 330, 370 (S.D.N.Y. 2002) ("failures to promote do not constitute a continuing violation if, as here, there is no evidence that they are premised on a practice or policy of discrimination" particularly where timely and untimely employment decisions were made by different people in different departments).

Moreover, even if the Evans attack were not a part of a continuing violation under Title VII (which it is), the assault would still be relevant "background evidence" for Lindsey's timely claims. Morgan, 536 U.S. at 102; Anderson v. Nassau Cnty. Dep't of Corr., 558 F. Supp. 2d 283, 299 (E.D.N.Y. 2008) (same).  Thus, as the Title VII claims related to that attack "closely track" Lindsey's other claims and "are not likely to expand the scope of discovery, it makes sense to allow all of [her] claims to proceed at this stage and revisit them after discovery via a summary judgment motion." Speedmark Transp., Inc. v. Mui, 778 F. Supp. 2d 439, 444 (S.D.N.Y. 2011).

III.    PLAINTIFF PLAUSIBLY ALLEGES A CLAIM UNDER THE GMVPL

In 2022, the New York City Council (the "City Council") amended the GMVPL, to make clear that the legislation was always intended to sanction "a party who commits, directs, enables, participates in, or conspires in the commission of a crime of violence motivated by gender." N.Y.C. Admin. Code § 10-1104 ("the "Amendment"). The Amendment specified that even where the GMVPL statute of limitations had expired, the claim could be revived during a two-and-a-half-year period. Id. § 1105.

Contrary to well-established principles of statutory construction and the legislative history of the Amendment, Citi contends that it must be viewed as prospective only (Def. Br. 11) so that Citi can avoid liability for its role in enabling a vicious sexual attack. Citi makes this disingenuous argument even though the highest levels of its management not only ignored Lindsey's complaint about the violent criminal misconduct, but even joked about it. (AC ¶¶ 105-12) The remedial purpose, explicit language, and urgency of the City Council in enacting the Amendment make clear that the legislation was always intended to include liability for such entities whose misconduct made possible criminal sexual violence.

A.    The Clear Expression of the City Council's Purpose Mandates Retroactivity

1.    The Amendment Clarifies What the GMVPL Was Always Meant to Say

Extensive authority recognizes that certain legislative statements reflect an intent that statutory provisions be applied retroactively. Among such indications are the City Council's repeated declaration that the Amendment was designed to "clarify" how the original version of the GMVPL should have been interpreted and the City Council's urgency in correcting the erroneous interpretation that had been applied previously. See Brothers v. Florence, 95 N.Y.2d 290, 299 (N.Y. 2000); In re OnBank & Tr. Co., 90 N.Y.2d 725, 731(1997); New York v. Pennsylvania Higher Educ. Assistance Agency, 2022 WL 951048 at *4 (S.D.N.Y. Mar. 30, 2022).

Citi argues erroneously that retroactivity can be found only where mandated by the statutory language or its necessary implication. (Def. Br. 13-14) To the contrary, Court of Appeals authority make clear that in determining retroactivity, courts must also weigh the history expressing legislative purpose. As the Court of Appeals has repeatedly stated, "'In an analysis of retroactive application, we have found it relevant when the legislative history reveals that the purpose of new legislation is to clarify what the law was always meant to say and do.'" Brothers, 95 N.Y.2d at 299 (emphasis in original; citation omitted); In re OnBank, 90 N.Y.2d at 731; see People v Forshey, 75 A.D.3d 1100, 1101 (4th Dept. 2010); Pennsylvania Higher Educ., 2022 WL 951048, at *4. Thus, in Gottwald v. Sebert, 40 N.Y. 3d 240, 260 (N.Y. 2023) (Def. Br. 10), the Court in assessing retroactivity, echoed this focus on the legislature's purpose (citing Majewski v. Broadalbin-Perth Cent. Sch. Dist., 91 N.Y.2d 577, 585 (N.Y. 1998)).[22]

---

[22] In Majewski, the Court also underscored that "[i]mportantly," a provision requiring retroactivity had been deleted prior to enactment. 91 N.Y.2d at 587.   The Court of Appeals decision in Gottwald did not consider the GMVPL but only the so-called anti-Strategic Lawsuits against Public Participation ("SLAPP") amendments, Civ. Rts. Law §§70(a) & 76(a) and determined that the statutory "language chosen here makes clear that the intended application is prospective." 40 N.Y.3d at 258.

The City Council expressed such an unambiguous intention with respect to the 2022 Amendment. The City Council's Committee on Women and Gender Equality (the "Committee") stated that the Amendment was designed to "<u>clarify</u> that the [GMVPL] applies to such acts committed by parties who direct, enable, participate in, or conspire in a gender-motivated act of violence."[23] (emphasis supplied). The same language is used to describe the reach of the Amendment in the Plain Language Summary of its provisions,[24] a publication the City Council mandates to "increase[] public access to information."[25] That repeated declared intent to clarify prior legislation supports retroactive application of the Amendment.[26]

Citi argues that the Committee's report cannot function as a clear statement of legislative intent because the language specifying clarification was not included in the statute itself. (Def. Br. 15) Citi is wrong. In interpreting legislation, New York courts repeatedly rely on committee reports and other legislative history that discuss language not included in the statutory enactment.  See In Re Gleason (Michael Vee, Ltd.), 96 N.Y. 117, 122 (N.Y. 2001) (sponsor's memo); Hernandez v. Barrios-Paoli, 93 N.Y.2d 781, 789 (1999); Spiegel v. 226 Realty LLC, 2024 WL 4486892, at *1 (1st Dept.  Oct. 15, 2024); People v. Dyshawn B., 196 A.D.3d 638, 640 (2d Dept. 2021) (citing

---

[23] Report of the Council of the City of New York Committee on Women and Gender Equality, dated December 9, 2021, available at  https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=  5072017+ &GUID =BA4C2A62-23E0-4AB2-B3A1-+AC18F53C9993.

[24] Plain Language Summary of Int. No. 2372-B, dated November 30, 2021, available at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=5072017+&GUID=BA4C2A62-23E0-4AB2-B3A1-+AC18F53C9993.

[25] https://council.nyc.gov/reports/speakers-2014-2015-midterm-progress-report/increasing-transparency/

[26] Citi's citation (Def. Br. 10 n.7) to Morrison v. Shalach, 67 Misc. 3d 451 (N.Y Sup. Westchester Cty. 2020) is inapposite. That decision concerns N.Y. Civ. Rts. Law §79-n which requires proof that defendant "intentionally selects a person . . . for harm . . . because of a belief or a perception regarding the race . . ." of the plaintiff. The Court found that an institution could not formulate a belief or perception as required for liability; the GMVPL contains no such requirement. See Morren v. New York Univ., 2022 WL 1666918 , at *23 (S.D.N.Y. Apr. 29, 2022) (citing Morrison without discussion and finding that plaintiff "does not assert that NYU intentionally threatened Plaintiff because of his protected characteristics").

committee report in finding legislation retroactive); <u>Morse v. Fidessa Corp.</u>, 165 A.D.3d 61, 65-66 (1st Dept. 2018) (same).[27]

Citi also cites inapposite cases (Def. Br. 11)[28] concerning criminal sexual misconduct prior to the enactment of the original version of the GMVPL in December 2000 (the "Original Version"). In passing that law, the City Council could not have had any intention to clarify its pre-existing legislation on the subject because no such legislation existed. Instead, the intention, <u>see</u> N.Y.C. Admin. Code § 8-902, was to replace the F***ederal Violence Against Women Act, 42 U.S.C. §1398 ("VAWA") which had prohibited such gender-motivated violence until the U.S. Supreme Court held the enactment exceeded Congressional authority.[29] The legislative history of the Original Version of the GMVPL thus does not suggest that the City Council intended it to be retroactive, that is, that there was any intention that the Original Version apply to the pre-enactment period when federal law prohibited such gender-motivated violence. Given these different circumstances, decisions concerning whether in 2000, the City Council intended the law to apply retroactively to conduct that happened when there was no New York City statute at all, have no bearing on how the GMVPL should have been interpreted as to conduct that occurred after its passage.[30]

---

[27] The cases Citi cites (Def. Br. 15) are not to the contrary because they describe the limited significance of floor statements by individual legislators. <u>See</u> <u>Woollcott v. Shubert</u>, 217 N.Y. 212, 221 (N.Y. 2016); <u>People v. Arana</u>, 32 A.D.3d 305, 307 (1st Dept. 2007). In contrast, more than half the members of the City Council, <u>https://www.nyc.gov/nyc-resources/about-the-city-of-new-york.page#:~:text=The%20City%20Council%20is%20NYC's,the%20activities%20of%20City%20agencies</u>, served as sponsors of the Amendment and are listed on the Committee's report clarifying how the GMVPL always should have been applied. (<u>See</u> Committee Report, <u>supra</u> n. 23)

[28] <u>See</u> <u>Adams v. Jenkins</u>, 2005 WL 6584554 (N.Y. Cty. Apr. 22, 2005) (alleged misconduct from 1994 to June 2000).

[29] <u>United States v. Morrison</u>, 529 U.S. 598 (2000).

[30] Citi's extensive reliance (Def. Br. 10, 13) on the motion court decision in <u>Gottwald v. Sebert</u>, 2016 WL 1365969 (N.Y. Cty. Apr. 6, 2016) therefore is misplaced. Not only did the decision pre-date the Amendment; its one-sentence discussion of the Original Version is dicta because the Court found the plaintiff had failed

Similarly, and not surprisingly, the Amendment can only be read as designed to clarify that the law enacted in 2000 extended to conduct <u>after</u> and not before the Original Version. Citi therefore improperly relies on post-Amendment decisions concerning alleged sexual violence committed <u>before</u> the Original Version was passed. <u>See</u> <u>Louis v. Niederhoffer</u>, 2023 WL 8777015 (S.D.N.Y. Dec. 19, 2023) (alleged misconduct from 1974 through 1979); <u>Stein v. Rockefeller Univ.</u> <u>Hospital</u>, 2024 LEXIS 1662, at *8 (N.Y. Cty. May 23, 2024) (alleged misconduct between 1966 and 1992; "the 2022 [GMVPL] amendments do not revive claims that <u>pre-date</u> the law's 2000 enactment"). Lindsey, in contrast, suffered horrific sexual assault in 2007, well after the enactment of the Original Version that the City Council has clarified was applicable to responsible entities.

2. <u>Statements in the Legislative History Must Be Read as a Whole</u>

Citi improperly urges the Court to view in isolation each aspect of the Amendment's legislative history clarifying the statutory intent. (Def. Br. 16) On the contrary, the courts have mandated that indicia of retroactive application be viewed as a whole. <u>See</u> <u>In re Gleason</u>, 96 N.Y.2d at 123 ("These factors <u>together</u> persuade us that the remedial purpose of the amendment should be effectuated through retroactive application.") (emphasis supplied). This Court in <u>Bensky v. Indyke</u>, 2024 WL 3676819, at *10 n.5 (S.D.N.Y. Aug. 5, 2024) (Def Br. 11, 12), underscored the importance of considering together all the indicators of retroactivity. In arguing for retroactivity, plaintiff Jane Doe relied only on the Amendment's extension of the limitations period; the Court emphasized that she had not "offered any other explanation or support for reading the pre-[A]mendment law this way. This is not to foreclose a future plaintiff from making the case . . . that the 2022 amendments are retroactive. It's just to say that Jane Doe hasn't done so here."

The City Council also acted with another key marker supporting retroactivity: a sense of

---

to allege sexually motivated violence and the purported misconduct occurred outside the territorial reach of the GMVPL.

urgency in making the Amendment effective immediately. As the Court of Appeals stated in Brothers, 95 N.Y.2d at 299, "[T]he law states that it is to 'take effect immediately. . . . While this language is not alone determinative, it does 'evince [] a sense of urgency" that can require retroactive application. (emphasis added; citation omitted); see In re NYP Holdings, Inc. v. New York City Police Dep't., 220 A.D.3d 487, 489 (1st Dept. 2023); Genovese v. Nationstar Mortgage LLC, 223 A.D.3d 37, 45 (1st Dept. 2023). Together with the other indicia of legislative intent, the specification of an immediate effective date requires the Amendment's retroactive application.[31]

    B.   The Amendment is a Remedial Enactment Entitled to Retroactive Application

In addition to legislative history plainly supporting retroactivity, the Amendment is part of a remedial statute where such construction is favored. Applying an "axiom" of statutory construction, New York courts have repeatedly interpreted remedial legislation as applicable retroactively. In re Gleason, 96 N.Y. at 122.[32] "Remedial statutes are those designed to correct imperfections in the law by generally giving relief to the aggrieved party." Posillico, 195 N.Y.S.3d at 700. For example, in Spiegel, 2024 WL 4486892, at *1, this Court held that the amendment enlarging employee whistleblower protection in New York was retroactive as it was intended to ameliorate the restrictive language of the statute's earlier version.

There can be little doubt that the purpose of the Amendment was to accord avenues of relief to the victim of sexual violence enabled by other parties. See Mackoff, 222 A.D. 3d at 73 (finding retroactivity given clear legislative intent "to provide equal treatment under the law"). Indeed, in

---

[31] Citi's citations (Def. Br. 16-17) concerning the significance of the statute's effectiveness date are not to the contrary. See Lagano v. Chrysler Corp., 957 F. Supp. 36 (E.D.N.Y. 1997) (immediately effective provision, without more, did not support retroactivity where amendment's other provisions specifically required prospective application); Gottwald, 40 N.Y.3d at 258 (statutory "language chosen here makes clear that the intended application is prospective").

[32] See also Mackoff v. Bluemke-Mackoff, 222 A.D.3d 67 (2d Dept. 2023); Posillico v. Southhold Town Zoning Bd. of Appeals, 219 A.D.3d 885 (2d Dept. 2023); Matter of Mia S., 212 A.D.3d 17 (2d Dept. 2022); Nelson v. HSBC Bank USA, 87 A.D.3d 995 (1st Dept. 2011).

finding an amendment retroactive, the Court of Appeals in <u>Becker v. Huss</u>, 43 N.Y. 527, 537 (N.Y. 1978) (Def. Br. 14) stated, "[I]it is appropriate, if not required, that the [amendment's] reach be determined in accord with the flexibility and social goals of" the statutory system at issue.[33] The GMVPL Amendment effectuates the City Council's plain intent that the GMVPL was always meant to sanction entities responsible for gender-motivated sexual violence.

Citi claims that the Amendment cannot be considered remedial because it creates new rights. (Def. Br. 14)[34] Citi is wrong. For example, in <u>Mia S.</u>, 212 A.D.3d at 21, the Court found the amendment at issue remedial and retroactive even though it "did not merely alter a jurisdictional or procedural provision. Rather, the amendment affects the substantive rights of parents. . . ." <u>See</u> <u>Duell v. Condon</u>, 84 N.Y.2d 773, 783 (N.Y. 1995) (applying retroactively law affording tenants counsel fees under prior leases; "[t]he remedial nature of the Legislature's action to equalize the power of landlords and tenants is evident from both the language of the statute as well as historical documents").

"[T]the practical consequences of retroactivity" in this case do not "produce inordinate, unusual or unanticipatable harm" to defendant. <u>Becker</u>, 43 N.Y.2d at 537. Indeed, New York City corporate entities have long been held responsible in many instances for the biased acts of their executives. See <u>Zakrewska v. The New School</u>, 14 N.Y.3d 469, 479-80 (2010) ("[S]ubdivision (13) of section 8-107 of the [NYC Human Rights Law] creates an interrelated set of provisions to

---

[33] Although it claims that the Court in <u>Becker</u> "declin[ed] to characterize an amendment to insurance statute as remedial" (Def. Br. 14 n.11), Citi omits the first part of the sentence it quotes: "Although, obviously, one might characterize the amendment as remedial. . . ." The Court eschewed a determination on that issue and premised its finding of retroactivity on the overall structure and goals of the statute. 43 N.Y.2d at 541.

[34] The decades-old cases that Citi cites (Def. Br. 14 n.11) in support of this argument are inapposite. <u>See</u> <u>McGee v. Int'l Life Ins. Co.</u>, 355 U.S. 220 (1957) (statute permitting service of process on out-of-state insurer that contracted with state resident did not violate due process); <u>Jacobus v. Colgate</u>, 217 N.Y. 235 (N.Y. 1916) (amendment allowing New York resident to claim damages for injury to property outside the state was remedial; it created remedy where none existed before).

govern an employer's liability for an employee's unlawful discriminatory conduct. . . . The New York City Council adopted section 8-107(13) [defining employer liability] in 1991. . . ."). Citi accordingly could not have relied on pre-Amendment language of the Original Version as allowing it to evade responsibility for enabling executives to commit sexual violence. See Pennsylvania Higher Educ., 2022 WL 951048, at * 4 (finding that reliance interests did not preclude retroactivity even though conduct at issue was not actionable during a prior period).[35]

The Amendment's extension of the statute of limitations and its look-back period further reflect the GMVPL's remedial nature. In analyzing such statutes, courts in New York have described claim-revival legislation as "enacted as a reasonable response in order to remedy" an injustice. In re World Trade Ctr. Lower Manhattan Disaster Site Litig., 30 N.Y.3d 377, 399 (N.Y. 2017) (permitting actions previously barred by failure to file notices of claim); see Carroll v. Trump, 650 F. Supp. 3d 213, 221 (S.D.N.Y. 2023) ("[T]he creation of a revival period for otherwise time-barred claims based on sexual assaults . . . was aimed at what New York reasonably and permissibly regarded as an injustice."). The City Council's inclusion of a lengthy look-back period thus further demonstrates that the Amendment was designed to correct an injustice – that is, that it is remedial legislation applicable retroactively.

Retroactive application is appropriate here because "[t]he remedial purpose of the amendment would be undermined if it were applied only prospectively." In re OnBank, 90 N.Y.2d at 731; see Nelson, 87 A.D.3d at 999. Absent such application, entities like Citi would be rewarded for years of facilitating and condoning the most serious and violent expressions of sexual bias. The City Council's unmistakable intention in enacting the Amendment was to preclude such a result.

---

[35] The Court in Pennsylvania Higher Educ. distinguishes Regina Metro. Co. v. New York State Div. of Housing & Comty. Renewal, 35 N.Y.3d 332, 369 (N.Y. 2020) (Def.  Br. 12 n.8) which found that retroactively extending period for calculating overcharges unfairly prejudiced rent-regulated landlords who had previously permissibly destroyed documents.

CONCLUSION

For the foregoing reason, Citi's partial motion to dismiss should be denied.

Dated: New York, New York
       November 15, 2024

                              VLADECK, RASKIN & CLARK, P.C.

                         By: _____/s_____
                              Jeremiah Iadevaia
                              Emily Bass
                              Debra Raskin
                              Attorneys for Plaintiff Ardith Lindsey
                              111 Broadway, Suite 1505
                              New York, New York 10006
                              (212) 403-7300