# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SABRINA ROLDAN,

                    Plaintiff,

      v.

ADOLFO LEWIS *et al.*,

                    Defendants.

**MEMORANDUM & ORDER**
20-CV-03580 (HG) (MMH)

**HECTOR GONZALEZ**, United States District Judge:

      Plaintiff Sabrina Roldan sued Defendants the City of New York, Mark Casner, Gloria Antonsanti, Valerie Russo ("individually and as deputy Commissioner"), Maribel Cruz, (together, the "City Defendants"); Concord Family Services ("Concord"),[1] Lelar Floyd, Jacqueline Moseley,[2] Theodora Diggs ("individually and as program director"), Claire Haynes, and Charmaine Frank (together and without Concord, the "Concord Defendants"); and HeartShare Human Services of New York, HeartShare St. Vincent's Services,[3] Adolfo Lewis, Natalie Barnwell ("individually and as director"), and Cecilia Ellis (together, the "HeartShare Defendants").[4] City Defendants, Concord Defendants, and HeartShare Defendants have all

---

[1]     Concord has not appeared in this action and is in default with respect to the Second Amended Complaint. *See* ECF No. 206.

[2]     Defendant Moseley appears as "Jacqueline Harris" on the docket. Because her counsel refers to her as Jacqueline Moseley, the Clerk of Court is respectfully directed to update the docket with this name.

[3]     The two HeartShare entities are collectively referred to as "HeartShare," as in the operative Third Amended Complaint. *See* ECF No. 209 ¶ 21.

[4]     Plaintiff previously filed a notice of voluntary dismissal with respect to Defendant Luz Liburd, *see* ECF No. 205, whom the Court subsequently dismissed, *see* June 10, 2024, Text Order.

moved to dismiss the entire Third Amended Complaint.  *See* ECF No. 209 ("TAC").  As explained in detail below, their motions are GRANTED IN PART AND DENIED IN PART.

## BACKGROUND

### A.  Factual Background

Plaintiff was born in 1992 and the City took her and her two siblings into its custody in 1997 because Plaintiff's mother abandoned them and her father could not care for them.  TAC ¶¶ 12, 70.  During Plaintiff's time in foster care, Defendant Antonsanti was employed by the City's Administration for Children's Services ("ACS") as a caseworker.  *Id.* ¶ 52.  She was responsible for "supervis[ing] and monitor[ing] [P]laintiff's case during part of [P]laintiff's time in foster care."  *Id.* ¶ 53.  The same is alleged with respect to Defendant Cruz, another caseworker, and Defendant Casner, a supervisor, was also a caseworker with the same responsibilities.  *Id.* ¶¶ 50–51, 54–55.  Defendant Russo was the Deputy Commissioner of ACS during Plaintiff's time in foster care.  *Id.* ¶ 56.

The City placed Plaintiff into the custody of Defendant Concord, which the City contracted with to provide foster care services.  *Id.* ¶¶ 33h, 71.  Defendant Floyd was Concord's Executive Director "responsible for making, implementing, and supervising the foster care policies and practices of . . . Concord."  *Id.* ¶¶ 58–59.  Defendant Moseley was Concord's Program Director "responsible for managing the foster care program" there, which "includ[ed] making, implementing, and supervising the foster care policies and practices of . . . Concord" together with Defendants Floyd and Diggs.  *Id.* ¶¶ 60–61.  Defendant Diggs was also a Program Director with the same responsibilities, and she worked together with Defendants Floyd and Moseley.  *Id.* ¶¶ 62–63.

In October 1997, Concord, with the consent of the City, moved Plaintiff and her siblings into the foster home of Juan and Maria Rodriguez.[5]  *Id.* ¶ 72.  Concord had "investigated and certified" the Rodriguezes.  *Id.* ¶ 73.  Plaintiff alleges that she experienced severe sexual and physical abuse and neglect at the hands of the Rodriguezes.  *Id.* ¶¶ 74–87.  These acts included Juan Rodriguez performing oral sex on, fondling, and simulating sex with Plaintiff, as well as forcing Plaintiff to manually stimulate him.  *See id.* ¶¶ 76–79.  In addition, in an attempt to coerce Plaintiff into concealing Juan Rodriguez's sexual abuse, Maria Rodriguez, on a nearly daily basis, physically abused Plaintiff, beating her with objects like metal rods and baseball bats.  *Id.* ¶¶ 81, 83.  These left scar marks on Plaintiff's body which were visible to Defendant Frank.  *Id.* ¶ 81.  Maria Rodriguez also forced Plaintiff to kneel in a bed of raw rice until her knees bled, tied Plaintiff and her siblings to chairs and left them alone for hours, locked Plaintiff in a windowless basement for hours, failed to bathe Plaintiff, and sent Plaintiff to school wearing "filthy" clothes.  *Id.* ¶¶ 82–86.  Plaintiff contracted ringworm due to these poor hygienic conditions.  *Id.* ¶ 87.

In early 1998, Plaintiff's brother "disclosed the Rodriguezes' abuse to a mental health professional," and that mental health professional or his or her coworker told Defendants City and Concord about the disclosure.  *Id.* ¶ 88.  "Upon receiving that notice," neither Concord, the City, Casner, Antonsanti, Cruz, nor Floyd reported the suspected abuse to the New York State

---

[5]  The Court "recite[s] the substance of the allegations as if they represent[] true facts, with the understanding that these are not findings of the [C]ourt, as [I] have no way of knowing at this stage what are the true facts."  *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 133 (2d Cir. 2021).  In this regard, the Court includes the names of specific foster parents only for convenience and consistency with the TAC.  To be clear, none of these individuals is a defendant, and the Court expresses no view as to any potential liability on their part.  In addition, the TAC does not follow a clear chronology at all times, but this recitation of the facts generally tracks the order of Plaintiff's allegations.

Central Register of Child Abuse and Maltreatment ("SCR"). *Id.* ¶¶ 90–92, 259.  Shortly after Plaintiff's brother disclosed the abuse, an eyewitness to Maria Rodriguez's physical abuse of Plaintiff provided those same Defendants with "actual notice" of that abuse, but no Defendant made a report to the SCR. *Id.* ¶¶ 93–94.

During visits with Plaintiff and her siblings at Concord, Plaintiff's father "repeatedly observed" signs that the children were abused and maltreated. *Id.* ¶ 96.  He "repeatedly complained" about it to Concord employees, but Concord neither filed a report with the SCR nor took any other action. *Id.* ¶¶ 97–98.  After that, Plaintiff's father spoke to employees at Plaintiff's school "to seek their help in protecting [P]laintiff," but the City and Concord then obtained a court order to prevent him from going to the school and continued to prevent him from visiting the school during the rest of Plaintiff's time with Concord. *Id.* ¶¶ 99–101.

Additionally, after Juan Rodriguez began sexually abusing Plaintiff, employees at Plaintiff's school reported to the City and Concord that Plaintiff was abused and neglected, but neither the City, Concord, nor any of their employees filed a report with the SCR. *Id.* ¶¶ 103–05. Employees of Defendant Concord also learned that the Rodriguezes were leaving Plaintiff and her siblings "unattended for extended periods of time," but again, neither the City, Concord, nor their employees filed an SCR report. *Id.* ¶¶ 106–08.  Maria Rodriguez eventually learned that Juan Rodriguez had abused Plaintiff, but instead of taking action to protect Plaintiff, Maria Rodriguez threatened to kill her if she reported the abuse and told Plaintiff to lie if asked about it. *Id.* ¶¶ 109–10.

Again, when Plaintiff's father visited Plaintiff at Concord's offices, Plaintiff's father "repeatedly showed" Defendants Frank, Barnwell,[6] and "other employees" of Concord the bruises on the bodies of Plaintiff and her siblings and demanded that Concord investigate. *Id.* ¶ 111. In response, Concord and its employees took no action. *Id.* ¶ 112. The abuse in the Rodriguez home continued for years. *Id.* ¶ 113. Eventually, the Rodriguezes requested that Plaintiff and her siblings leave their home, and Concord and its employees, including Defendant Frank, moved them out in 2002. *Id.* ¶ 113.

When Plaintiff was ten years old, the City, Concord, and their employees moved her and her siblings into the home of Debra Shields. *Id.* ¶ 115. Concord had "investigated and licensed" Shields. *Id.* ¶ 116. The City "knew and had confirmed" that Shields had previously abused or maltreated other children in her home. *Id.* ¶ 117.[7] At the time Plaintiff and her siblings were placed into the Shields home, Concord, with the City's consent, had already placed two other adolescent boys there. *Id.* ¶ 118. Shields required Plaintiff to change bedsheets, and while she was once doing this, one of the boys entered Plaintiff's room and pinned her down on the bed. *Id.* ¶ 121. Plaintiff got out from under the boy but could not exit the room; in response, the boy grabbed her and threw her against a dresser. *Id.* ¶ 122. Shields "pushed and physically assaulted" Plaintiff as punishment for this incident. *Id.* ¶ 124. "[S]ome time later," after Shields hit Plaintiff's younger sister in the head with a frying pan, Plaintiff was removed from the home. *Id.* ¶ 125.

---

[6]  This appears to be an error. As discussed further below, Defendant Barnwell was not associated with Concord.

[7]  Plaintiff claims that this made Shields "legally ineligible to continue to be licensed as a foster mother." TAC ¶ 117.

In November 2003, Plaintiff was separated from her brother and placed in a fourth foster home. *Id.* ¶ 126.[8]  Between May 1997 and December 2008, Concord and its employees placed Plaintiff in more than ten different foster homes with the consent of the City. *Id.* ¶ 127.  In late 2008, the City terminated its relationship with Concord due to Concord's "gross mismanagement, fiscal impropriety[,] including the misuse of government funds, and criminal activity." *Id.* ¶¶ 128–29.  After that, the City placed Plaintiff in HeartShare's care, even though HeartShare "was one of the most dangerous foster care agencies in the City" because "a high percentage of HeartShare foster children were abused and neglected." *Id.* ¶¶ 130–31.

Defendant Lewis was a HeartShare supervisor responsible for "supervis[ing] the foster care placement of [P]laintiff and . . . supervis[ing] the caseworkers who were assigned to [P]laintiff's foster care case. *Id.* ¶¶ 43–44.  Defendant Ellis was a HeartShare caseworker responsible for supervising Plaintiff's foster care. *Id.* ¶¶ 45–46.  Defendant Barnwell was HeartShare's "director of foster care" during the time when Plaintiff was supervised by HeartShare, a role in which she was "assigned . . . to supervise the children in its foster care placement program, including [P]laintiff." *Id.* ¶¶ 48–49.[9]

In December 2008, HeartShare, with the City's consent, placed Plaintiff in the home of Kiesha Bell, whom HeartShare had "investigated and certified." *Id.* ¶ 133.  The Bell home was "filthy and malodorous" and "overcrowded and dangerous." *Id.* ¶¶ 134, 136.  Bell left the door open at night, when adult men would enter and leave. *Id.* ¶ 135.  And Bell failed to provide Plaintiff with food. *Id.* ¶ 134.  Plaintiff told HeartShare employees about Bell's "dangerous and neglectful behavior," but HeartShare failed to respond. *Id.* ¶ 137.

---

[8]      It is unclear what the third foster home was or when Plaintiff was there.

[9]      The TAC also alleges that Defendant Barnwell was a *Concord* "supervisor or manager." TAC ¶ 47.  That appears to be a mistake.

Plaintiff "fled" the Bell home and went to stay with her brother in the foster home of Gary Hoyte. *Id.* ¶ 138. First, Concord had "investigated and licensed" Hoyte as a foster parent; later, HeartShare did the same. *Id.* ¶ 140. The home was "filthy" and "overrun by vermin and insects." *Id.* ¶ 150. The plumbing did not work properly, causing leaks, dampness, and mold. *Id.* According to Plaintiff, Hoyte was a "sexual predator" and Defendants HeartShare, Barnwell, Lewis, and Ellis knew that, with Hoyte even sexually harassing Ellis when she came to visit the foster children for whom she was responsible. *Id.* ¶¶ 141–42. Hoyte "subjected [P]laintiff to sexual abuse and sexual harassment for a period of at least six months," including by repeatedly sexually touching and groping her. *Id.* ¶¶ 143–44. On one occasion, Hoyte came up behind Plaintiff and rubbed his body against hers. *Id.* ¶ 145. He repeatedly attempted to pull Plaintiff into his bedroom. *Id.* ¶ 147. He made sexual comments toward Plaintiff and at least one other female foster child in the home. *Id.* ¶ 148. And he also "regularly propositioned" Plaintiff by suggesting that the two go away together for the weekend. *Id.* ¶ 146. Plaintiff and Plaintiff's brother informed Lewis of Hoyte's "behavior," but neither Lewis nor any other HeartShare employee acted. *Id.* ¶¶ 151–52.

In 2009, the City and HeartShare placed Plaintiff in the home of Dolores Shore, where she lived between the ages of seventeen and nineteen. *Id.* ¶ 153. The City and HeartShare knew that Dolores Shore's adopted adult son Max Shore resided in her home when they placed Plaintiff there because the City had placed Max Shore there as a foster child years earlier. *Id.* ¶ 154. In the Shore home, Max repeatedly rubbed his body against Plaintiff's and tried to pull off her shirt. *Id.* ¶ 155. Max Shore's girlfriend also subjected Plaintiff to sexual harassment and sexual threats. *Id.* ¶ 157. Some of those incidents of sexual assault took place before Plaintiff turned eighteen. *Id.* On one occasion, Max Shore entered a room where Plaintiff was, closed the

door, threw her down, and climbed onto her. *Id.* ¶ 156.  He began kissing Plaintiff, pinned down her arms, and attempted to rape her. *Id.*  His attempt was thwarted because another adult entered the room after hearing Plaintiff's screams. *Id.*  Plaintiff does not recall if she was eighteen years old at this time. *Id.*  Plaintiff ran away from the Shore home in January 2012 at age nineteen. *Id.* ¶ 159.  When Plaintiff ran away, she informed HeartShare employees that the home was "not safe," and HeartShare "belatedly" moved her out of that home. *Id.* ¶ 160.  When HeartShare and the City moved her out, they left behind all her possessions and documents, including her birth certificate. *Id.* ¶ 161.

After that, the City and HeartShare moved Plaintiff back into the Bell home, where Plaintiff claims to again have been subjected to "mistreatment and endangerment." *Id.* ¶ 162. The City and HeartShare then moved Plaintiff to numerous other foster homes before placing her in Helen Lacy's home. *Id.* ¶¶ 163–64.  The Lacy home was "extremely overcrowded" as up to ten children lived there. *Id.* ¶ 165.  Lacy "had many male guests," kept guns in her home, and her former boyfriend, "who had lived with her," was criminally charged with "murder, drugs, and gun possession." *Id.* ¶ 166.  Plaintiff was terrified of the Lacy home and begged Ellis and Lewis to remove her, but HeartShare and the City took no action. *Id.* ¶¶ 167–68.  Eventually, HeartShare moved Plaintiff out of the Lacy home and "into many other foster homes"; in total, HeartShare placed Plaintiff in more than ten different foster homes. *Id.* ¶¶ 169–70.  Plaintiff says that she could not continue with her education because of the frequency of moves and abuse she experienced, causing her to drop out of school. *Id.* ¶ 171.  Before turning twenty-one, Plaintiff "signed herself out of foster care." *Id.* ¶ 172.

Based on the above conduct, Plaintiff alleges that she "suffered severe sexual, physical[,] and emotional abuse, in gross disregard of her constitutional, statutory, and common law rights."

*Id.* ¶ 1.  Plaintiff alleges numerous injuries, including "irreversible and permanent" "extraordinary physical and mental injuries, pain and suffering, anguish, terror, confusion, and helplessness," but also "loss of funds" and the lost opportunity to continue her education.  *Id.* ¶¶ 171, 247, 251, 294.

### B.  Procedural History

Plaintiff filed the initial complaint on August 9, 2020.  *See* ECF No. 1.  On May 23, 2022, the case was reassigned to me.  *See* May 23, 2022, Text Order.  Plaintiff filed her First Amended Complaint on November 22, 2023.  *See* ECF No. 145 ("FAC").  The City filed a motion to strike the FAC, *see* ECF No. 146, and the Court ordered Plaintiff to file a letter explaining, *inter alia*, why the FAC was procedurally proper under Rule 15 and "why she ha[d] not unduly delayed in bringing her new claims pursuant to New York's Adult Survivors Act," *see* Dec. 7, 2023, Text Order.  Plaintiff filed that response on December 14, 2023.  *See* ECF No. 150.  On December 14, 2023, the Court ordered Plaintiff to, *inter alia*, explain why her Section 1983 claims should not be dismissed on statute of limitations grounds and to explain this Court's basis for exercising diversity jurisdiction over Plaintiff's state law claims.  *See* ECF No. 151.  Plaintiff filed her response to that Order on January 4, 2024.  *See* ECF No. 174.  On March 18, 2024, the Court denied the City's motion to strike, finding the FAC proper under Rule 15, and directing Plaintiff to file a Second Amended Complaint ("SAC") "for the sole purpose of amending allegations related to diversity of citizenship."  *See* Mar. 18, 2024, Text Order.

On March 20, 2024, Plaintiff filed the SAC.  *See* ECF No. 186.[10]  On April 3, 2024, City, Concord, and HeartShare Defendants (together, the "Moving Defendants") filed a pre-motion

---

[10]     On May 31, 2024, the Court resolved a third-party dispute between the City and third-party defendants Lexington Insurance Co. and Philadelphia Indemnity Insurance Co.  *See Roldan*

letter in anticipation of filing a motion to dismiss the SAC.  *See* ECF No. 188.  Plaintiff filed her

response on April 11, 2024.  *See* ECF No. 193.  In that response, Plaintiff sought leave to amend

the SAC, which the Court granted pursuant to Rule 15(a)(2).  *See* May 31, 2024, Text Order.  On

June 17, 2024, Plaintiff filed the TAC.  *See* ECF No. 209.  On June 28, 2024, Moving

Defendants filed another pre-motion letter in anticipation of filing a motion to dismiss the TAC.

*See* ECF No. 213.  Plaintiff filed her response on July 8, 2024.  *See* ECF No. 216.  The Court

then denied the motion for a pre-motion conference as unnecessary and directed the parties to

brief the motion to dismiss.  *See* July 9, 2024, Text Order.

On August 7, 2024, HeartShare Defendants filed their motion to dismiss.  *See* ECF

No. 226 (Motion); ECF No. 227 (Declaration); ECF No. 228 (Memorandum).  On August 8,

2024, Concord Defendants did the same, *see* ECF No. 231, as did City Defendants, *see* ECF

No. 232.  The Court directed Plaintiff to file one consolidated oversized opposition on September

24, 2024, which Plaintiff filed the next day.  *See* ECF No. 240.  On October 14, 2024, the

Moving Defendants filed their Replies.  *See* ECF No. 245 (HeartShare Defendants); ECF

No. 246 (City Defendants); ECF No. 247 (Concord Defendants).

## LEGAL STANDARD

"In order to survive a motion to dismiss, a plaintiff must plead 'enough facts to state a

claim to relief that is plausible on its face.'"  *Emilee Carpenter, LLC v. James*, 107 F.4th 92, 99

(2d Cir. 2024) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[11]  "A claim is

plausibly alleged 'when the plaintiff pleads factual content that allows the court to draw the

---

*v. Lewis*, 735 F. Supp. 3d 163 (E.D.N.Y. 2024), *as amended*, 2024 WL 4389281 (E.D.N.Y. Oct. 3, 2024).

[11]     Unless otherwise indicated, when quoting cases, all internal quotation marks, alteration marks, emphases, footnotes, and citations are omitted.  The Court refers to the pages assigned by the Electronic Case Files system ("ECF").

reasonable inference that the defendant is liable for the misconduct alleged.'" *Matzell v. Annucci*, 64 F.4th 425, 433 (2d Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "In making this assessment, the court must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *VR Glob. Partners, L.P. v. Petróleos de Venezuela, S.A.*, No. 24-1176-cv, 2024 WL 4891271, at *2 (2d Cir. Nov. 26, 2024).

## DISCUSSION

Plaintiff advances eight causes of action against the sixteen remaining Defendants: (i) "[n]egligence, in violation of the Child Victims Act"; (ii) "[n]egligence, in violation of the Adult Survivors Act"; (iii) "[f]ailure to report child abuse"; (iv) breach of contract; (v) "[v]iolation of the Victims of Gender-Motivated Violence Protection Law," N.Y.C. Admin. Code §§ 10-1101 *et seq.*; (vi) "violations of the Fourteenth Amendment and Sections 1, 6, and 11 of Article I of the New York Constitution"; (vii) "[u]nconstitutional training in [v]iolation of the Fourteenth Amendment and Sections 1, 6, and 11 of Article I of the New York Constitution; and (viii) "[e]xcessive [f]orce under the Fourth and Fourteenth Amendments and Section 12 of Article I of the New York Constitution."  TAC at 32–53.

Although not clearly articulated in the TAC, and as discussed in greater detail below, the Child Victims Act ("CVA") and Adult Survivors Act ("ASA") "create[] no cause of action" but are just a "means to an end" by reviving certain claims.  *See Giuffre v. Dershowitz*, No. 19-cv-3377, 2020 WL 2123214, at *2 (S.D.N.Y. Apr. 8, 2020) (discussing the CVA).  Accordingly, the Court groups Counts I and II alleging negligence.  Similarly, Counts VI, VII, and VIII allege violations of the federal and New York State constitutions.  Also as discussed in greater detail below, the vehicle for the federal constitutional claims is 42 U.S.C. § 1983.  The Court groups

those claims under "Section 1983" and the related state claims under "State Constitutional

Claims."  Because Section 1983 provides a logical starting point for a discussion of the various

statute of limitations issues at play in this action, the Court begins there.

## I.   Child Victims Act, Adult Survivors Act, and Relevant Allegations

### A.   *Statutory Framework*

Because the current motions to dismiss revolve largely around timeliness, the Court

begins with an overview of the relevant statutory framework.  New York's CVA provides:

> Notwithstanding any provision of law which imposes a period of limitation to the
> contrary . . . every civil claim or cause of action brought against any party alleging
> intentional or negligent acts . . . which would constitute a sexual offense as defined
> in [Article 130] of the penal law committed against a child less than eighteen years
> of age . . . is hereby revived, and action thereon may be commenced not earlier than
> six months after, and not later than two years and six months after the effective date
> of this section.

N.Y. C.P.L.R. § 214-g.  Accordingly, the two-year filing window for claims revived by Section

214-g was August 14, 2019, to August 14, 2021.  *Jones v. Cattaraugus-Little Valley Cent. Sch.

Dist.*, 96 F.4th 539, 541 (2d Cir. 2024).[12]

Also relevant to this case is New York's ASA.  Like its CVA counterpart, "[t]he ASA

provided adult victims of sexual abuse with a new one-year window in which to sue their

abusers, even if an otherwise applicable statute of limitations had previously expired."  *Carroll v.

Trump*, 124 F.4th 140, 152 (2d Cir. 2024) (interpreting N.Y. C.P.L.R. § 214-j).  Its relevant

language is "identical" to the CVA's.  *Levin v. Sarah Lawrence Coll.*, No. 23-cv-10236, 2024

---

[12]      On February 20, 2025, the New York Court of Appeals, in responding to a certified
question from the Second Circuit, clarified that claims filed between the enactment of the statute
on February 14, 2019, and the effective date on August 14, 2019, were nevertheless timely
because the "six-month waiting period preceding August 14, 2019, the date on which previously
brought claims could be brought, is neither a statute of limitations nor a condition precedent."
*See Jones v. Cattaraugus-Little Valley Cent. Sch. Dist.*, No. 107, 2025 WL 554454, at *1 (N.Y.
Feb. 20, 2025).

WL 4026966, at *7 (S.D.N.Y. Sept. 3, 2024).  The ASA's period for reviving claims ran from

November 24, 2022, to November 24, 2023.  *Marciniak v. Mass. Inst. of Tech.*, No. 23-cv-10305,

2024 WL 4350872, at *12 n.8 (S.D.N.Y. Sept. 29, 2024).

        B.    *Timely Allegations*

        With that background, the Court begins with a threshold issue.  As discussed above, the

TAC includes several allegations related to physical abuse that Plaintiff experienced as a child.

*See, e.g.*, TAC ¶ 82.  However, City Defendants argue that Plaintiff may not "seek redress under

the CVA for alleged physical or emotional abuse."  ECF No. 232-1 at 19.  Concord Defendants,

*see* ECF No. 231-1 at 15, and HeartShare Defendants, *see* ECF No. 228 at 12–13, make similar

arguments.  Their position is rooted in the CVA itself, which limits claim revival to conduct, as

relevant here, "which would constitute a sexual offense" as defined in New York's Penal Law.

N.Y. C.P.L.R. § 214-g; *accord id.* § 214-j (ASA).  Unsurprisingly, this position also finds

support in the case law.  *See, e.g.*, *Perez v. Archdiocese of New York*, No. 950236/2019, 2021

WL 4895306, at *4 (N.Y. Sup. Ct. Oct. 19, 2021) ("[G]eneral claims of physical and emotional

abuse that are not sexual in nature . . . are not revived."); *Rivera v. Archdiocese of New York*,

No. 950001/2019, 2022 N.Y. Misc. LEXIS 37598, at *10–11 (N.Y. Sup. Ct. Mar. 7, 2022)

(same); *Brienza v. New York*, No. 950185/2019, 2021 N.Y. Misc. LEXIS 55171, at *16–17 (N.Y.

Sup. Ct. Oct. 28, 2021) (same).  In Opposition, Plaintiff concedes that claims based on non-

sexual abuse are unrevived by the CVA and ASA, stating that she is not "seeking damages for

physical abuse and neglect" pursuant to those revival statutes, and that she included these

allegations "to provide context and support for her overall claims regarding the sexual abuse she

suffered while in . . . homes in a foster care system that systemically failed her."  *See* ECF

No. 240 at 25.  Accordingly, although the Court mentions these other allegations as appropriate, the Court makes clear that the non-sexual abuse claims are untimely and must be dismissed.[13]

## II.    Section 1983

Plaintiff's Counts VI, VII, and VIII implicate federal constitutional rights.  In Count VI, Plaintiff alleges a violation of the Fourteenth Amendment by all Defendants for "fail[ure] to supervise" during her time in foster care.  *See* TAC ¶¶ 309–29.  Count VII also alleges a violation of the Fourteenth Amendment, but is packaged as an "unconstitutional training" claim against Defendants City, Concord, and HeartShare.  *See id.* ¶¶ 330–37.  Count VIII similarly alleges a Fourteenth Amendment violation in the form of "excessive force" and is brought against Defendants City, Concord, and HeartShare.  *See id.* ¶¶ 338–42.  Although not explicitly referenced within each count, Plaintiff brings these claims pursuant to Section 1983.  *See Fenner v. City of New York*, 392 F. App'x 892, 893 (2d Cir. 2010) ("We have long held that when 42 U.S.C. § 1983 provides a remedy, an implied cause of action grounded on the Constitution is not available."); *see also* ECF No. 240 at 33–34 (Plaintiff framing these claims under Section 1983).

### A.    Timeliness

Moving Defendants argue that Plaintiff's claims brought under Section 1983 are time-barred.  *See* ECF No. 228 at 23–24; ECF No. 231-1 at 11–12; ECF No. 232-1 at 11–18.  "[I]n New York, the statute of limitations for Section 1983 claims is New York's general statute of limitations for personal injury actions, which is three years."  *Kane v. Mount Pleasant Cent. Sch. Dist.*, 80 F.4th 101, 108 (2d Cir. 2023) (citing N.Y. C.P.L.R. § 214(5)).  In addition, New York

---

[13]    Concord Defendants argue that these allegations are "scandalous and prejudicial" and should be stricken.  ECF No. 247 at 4.  That request, made for the first time in Reply, is denied as procedurally improper.  *See United States v. Fayton*, 704 F. Supp. 3d 449, 453 (S.D.N.Y. 2023).

law automatically tolls statutes of limitations for the period in which the plaintiff is a minor, meaning that the limitations period starts to run when the plaintiff turns eighteen. *See McCoy v. ACS*, No. 23-cv-03019, 2024 WL 4379584, at *9 (E.D.N.Y. Aug. 9, 2024) (citing N.Y. C.P.L.R. § 208(a)), *report and recommendation adopted as modified*, 2024 WL 4344791 (E.D.N.Y. Sept. 30, 2024). This infant tolling provision applies to Section 1983 claims. *See id.* Accordingly, as explained by City Defendants, because Plaintiff was born in 1992, the limitations period for her Section 1983 claims began to run when she turned eighteen in 2010, and expired three years later in 2013. *See* ECF No. 232-1 at 13.

Plaintiff does not dispute that basic timeliness analysis, but instead argues that the limitations period was tolled pursuant to New York's CVA. *See* ECF No. 240 at 34. In *Kane*, the Second Circuit confronted whether Section 214-g of the CVA revived federal Section 1983 claims. 80 F.4th at 108. It concluded that the CVA, as a "specialized statute for sexual abuse claims," was not "closely related" to the borrowed general three-year statute of limitations under state law because it was not a "generally applicable tolling provision," in contrast to, for example, the infant tolling mechanism. *Id.* at 108–09. Accordingly, plaintiffs were not able to rely on the CVA to revive otherwise time-barred Section 1983 claims. *Id.* at 111. Confronted with *Kane*, Plaintiff has two responses. First, she argues that "*Kane* should not apply to her or other foster children" who are "in government custody" and "completely dependent upon [their] governmental custodians." ECF No. 240 at 34. However, *Kane*, which expressly spoke to the vehicle of Section 1983, provided for no such plaintiff-based carveout. 80 F.4th at 111. Second, Plaintiff argues that *Kane* was wrongly decided and that the Second Circuit or Supreme Court will come to a different conclusion in the future. *See* ECF No. 240 at 34. On this point, she presses numerous arguments for revisiting *Kane*'s holding. *See id.* at 34–38. But that reasoning

invites the Court to depart from binding Second Circuit precedent and thus to exceed its limited authority. As the Second Circuit has recently emphasized, the Court may not do so. *See Packer ex rel. 1-800-Flowers.com, Inc. v. Raging Cap. Mgmt., LLC*, 105 F.4th 46, 54 (2d Cir. 2024) ("District Courts . . . are obliged to follow [Second Circuit] precedent, even if that precedent might be overturned in the near future.").[14]

### B.    Equitable Tolling

New York's equitable tolling provision can also toll the limitations period for a Section 1983 claim. *Kane*, 80 F.4th at 109. However, Plaintiff does not explicitly argue for the application of equitable tolling to her claims; rather, she abstractly refers to the doctrine to attack the line of argument in *Kane* that not applying "tort-specific revival or tolling provisions" like the CVA is consistent with Supreme Court precedent seeking "to avoid time consuming litigation and uncertainty caused by 'an analysis of the particular facts' for each claim to determine the applicable statute of limitations.'" *Id.* (quoting *Wilson v. Garcia*, 471 U.S. 261, 272 (1985)). For instance, she argues that "contrary to the Second Circuit, rejection of a state tolling provision will not avoid time-consuming litigation. On the contrary, laws tolling statutes of limitations are frequently dependent upon analyses of the particular facts for each claim. This is especially true when an individual civil rights plaintiff claims equitable tolling . . . ." ECF No. 240 at 36–37. She later argues that "[i]f a civil rights plaintiff raises a claim of equitable tolling[,] . . . the [C]ourt must make an individualized factual determination as to whether the statute of limitations has been tolled for that particular plaintiff." *Id.* at 37. For the reasons

---

[14]    Plaintiff does not articulate how the ASA would revive any Section 1983 claims based on injuries she alleges to have experienced after becoming an adult in 2010. *See* TAC ¶ 179 (alleging that Plaintiff was in foster care through February 2012). Nor could she because *Kane*'s rationale applies with equal force to the ASA, another specialized tolling statute. *See Doe v. Columbia Univ.*, No. 23-cv-10393, 2024 WL 4149252, at *11 n.6 (S.D.N.Y. Sept. 11, 2024).

already explained, those are arguments for the Court of Appeals to revisit *Kane*'s doctrinal foundations, not arguments this Court can endorse.

In any event, even if the Court reads Plaintiff's argument to suggest that equitable tolling does apply to her case, the Court disagrees. "Under New York law, the doctrine[] of equitable tolling . . . may be invoked to defeat a statute of limitations defense when the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007). And it is an "essential element" of a claim of equitable tolling that a plaintiff has exercised "[d]ue diligence . . . in bringing an action." *Id.* However, the Court agrees with Concord Defendants, *see* ECF No. 247 at 8, that this case does not implicate the "rare and exceptional circumstances" in which equitable tolling applies, *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005).

On this point, the Court takes seriously Plaintiff's argument that "[s]ome victims of sexual and physical assault, like Plaintiff, are so traumatized by their experiences that they remain unable to file lawsuits for redress until after the period of limitations has expired." ECF No. 240 at 37. Recent Second Circuit authority buttresses that point. *See Doe v. United States*, 76 F.4th 64, 72 (2d Cir. 2023) ("[S]everal courts have recognized that the psychological impact of long-term or extreme sexual abuse can constitute an extraordinary circumstance that prevents a victim from coming forward even for some time after the abuse has ceased."); *see also Clark v. Hanley*, 89 F.4th 78, 102–03 (2d Cir. 2023) (in assessing applicability of equitable tolling, district court appropriately considered effect of abuse on plaintiff's delay in filing suit). And the TAC also alleges that the abuse Plaintiff alleges to have experienced at the hands of Maria Rodriguez prior to 2002 was intended to "conceal" Juan Rodriguez's alleged sexual abuse, and that Maria Rodriguez "threatened to kill [P]laintiff" if Plaintiff reported the abuse. *See* TAC

¶¶ 83, 110, 113.  However, this allegation, which does not relate to filing *this* suit, coupled with Plaintiff's generalized reference to the effect of trauma, "fail to describe her impairment with particularity and also fail to demonstrate a causal connection between how she felt and her ability to pursue her rights," leading the Court to decline to exercise its discretion to toll the statute of limitations.  *Levin*, 2024 WL 4026966, at *19; *see also Doe 1 v. Congregation of the Sacred Hearts of Jesus & Mary*, No. 23-cv-5294, 2024 WL 4276174, at *6 n.2 (E.D.N.Y. Sept. 24, 2024) (declining to apply equitable tolling where the complaint "d[id] not allege any specific actions . . . that somehow kept plaintiffs from timely bringing suit").  Therefore, the Court dismisses without prejudice Plaintiff's federal constitutional claims as time-barred.[15]

### III.    State Constitutional Claims[16]

In addition to each of her federal constitutional claims, Plaintiff asserts parallel claims under the New York State Constitution in Counts VI, VII, and VIII.  *See* TAC ¶¶ 309–42.  City and HeartShare Defendants say that these claims must be dismissed because Plaintiff has alternative common law remedies.  *See* ECF No. 232-1 at 19–20; ECF No. 228 at 24–26.  It is well established that "[t]he New York State Constitution provides a private right of action where remedies are otherwise unavailable at common law or under § 1983."  *Allen v. Antal*, 665 F. App'x 9, 13 (2d Cir. 2016) (citing *Brown v. New York*, 674 N.E.2d 1129, 1141 (N.Y. 1996)).

---

[15]    As described further below, the Court will grant Plaintiff leave to replead these Counts, including, if possible, so that she can assert facts needed to support a request for equitable relief. *See Ellis v. Kelly*, No. 17-cv-6656, 2019 WL 1243760, at *1 (E.D.N.Y. Mar. 18, 2019) (describing grant of leave to amend, "in an abundance of caution," to allow plaintiff to plead facts related to equitable tolling).

[16]    Even though the Court has dismissed Plaintiff's sole federal claim under Section 1983, Plaintiff's remaining claims, all brought under New York law, come within the Court's limited subject-matter jurisdiction because Plaintiff has adequately pled complete diversity of citizenship and damages in excess of $75,000 pursuant to 28 U.S.C. § 1332.  *See* TAC ¶¶ 2–7.

In Opposition, Plaintiff concedes that she has alternative remedies for these state constitutional tort claims and reframes them as brought in the alternative:  "Even if the Court finds that Plaintiff's federal constitutional claims and/or common law claims *are time-barred or otherwise fail*, Plaintiff's causes of action under the New York State Constitution would still come into play."  *See* ECF No. 240 at 38 (emphasis added) (citing Fed. R. Civ. P. 8(d)(2)–(3)). She goes on to argue that City and HeartShare Defendants, who argue for dismissal of her common law and Section 1983 claims elsewhere, "cannot have it both ways" because the failure of those other claims would mean she has no alternative but to resort to state constitutional tort law.  *Id.* at 39.  The Court rejects that argument, which misunderstands the "narrow remedy" provided by the New York State Constitution.  *Brown*, 674 N.E. at 1141.  "[I]t is the *availability* of remedies under Section 1983, and not their *success*, that precludes a New York State Constitution claim."  *Sullivan v. Metro. Transit Auth. Police Dep't*, No. 13-cv-7677, 2017 WL 4326058, at *10 (S.D.N.Y. Sept. 13, 2017) (emphasis added), *reconsideration denied*, 2017 WL 5202951 (S.D.N.Y. Oct. 18, 2017).  Because, by her own concession, those alternative remedies are available to her, the Court dismisses the state constitutional claims with prejudice.

## IV.    Breach of Contract

Plaintiff's Count IV is for breach of contract, in which she alleges that there were contractual agreements between the City and Concord and the City and HeartShare.  *See* TAC ¶¶ 285, 290.  Concord's contract required it "to provide safe, competent[,] and professional supervision of children in foster care and to protect children in [its] care from abuse and maltreatment."  *Id.* ¶ 287.  HeartShare's contract required it to "provide safe, competent[,] and professional supervision of children in foster care and to protect children in [its] care from sexual, physical, and emotional abuse."  *Id.* ¶ 291.  Plaintiff alleges that she was a beneficiary of

these agreements, *id.* ¶¶ 288, 292, and that they were breached while she was in the care of the

respective agencies, *id.* ¶¶ 289, 293.  The TAC does not make clear which Defendants Plaintiff

seeks to hold liable for this breach, although Plaintiff states in opposition that the claim applies

to the City, Concord, and HeartShare.  ECF No. 240 at 29.

> A.    Timeliness

Moving Defendants argue that the breach of contract claim is time-barred.  *See* ECF

No. 228 at 21–22; ECF No. 231-1 at 11; ECF No. 232-1 at 10–11.  HeartShare Defendants

additionally argue that the breach of contract allegations are insufficiently specific.  *See* ECF

No. 228 at 22.  All parties agree that New York's general six-year statute of limitations for

breach of contract actions applies here.  *See Bainbridge Fund Ltd. v. Republic of Argentina*, 37

F.4th 847, 850 (2d Cir. 2022) (citing N.Y. C.P.L.R. § 213(2)).  As previously explained,

Plaintiff's claims from childhood began to run in 2010 when she turned eighteen, meaning that a

breach of contract claim arising from that time period needed to be brought no later than 2016.

For claims that may have accrued after she reached the age of eighteen in 2010, the limitations

period started to run no later than February 2012, when she left foster care.  *See* TAC ¶ 179.

Accordingly, those claims needed to be filed no later than 2018.

Plaintiff again does not disagree with this basic timeliness analysis, but instead argues

that her breach of contract claims were tolled pursuant to the CVA and ASA.  However, Moving

Defendants point to *Kaul v. Brooklyn Friends School*, 198 N.Y.S.3d 380 (N.Y. App. Div. 2023),

for the proposition that the CVA did not revive expired breach of contract claims.  In that case,

plaintiff alleged that a school "breached its harassment policy," which injured her.  *Id.* at 382.

The Appellate Division concluded that the complaint should have been dismissed because

"plaintiff failed to establish . . . that [her] cause of action was revived by the [CVA]."  *Id.*

Plaintiff retorts that *Kaul* does not govern here because in that case, "plaintiff failed to allege that her cause of action was revived by the [CVA]," nor was *Kaul* based on qualifying sex crimes under the CVA and ASA. ECF No. 240 at 29–30. The Court agrees with Plaintiff that *Kaul* provides no escape hatch out of this claim.

The question of whether the CVA and ASA can revive expired breach of contract claims has not been squarely addressed by the New York Court of Appeals. Therefore, this Court, sitting in diversity, "must predict, if reasonably possible, how the New York Court of Appeals would rule on the question." *Sutton v. Tapscott*, 120 F.4th 1115, 1119 (2d Cir. 2024). In this instance, the Court concludes that the statutory text provides the answer. *See Anonymous v. Molik*, 109 N.E.3d 563, 568 (N.Y. 2018) ("Where the language of a statute is clear and unambiguous, courts must give effect to its plain meaning."). The CVA and ASA apply to "every civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense as defined in" the Penal Law. N.Y. C.P.L.R. §§ 214-g, 214-j. "The term 'every,' modifies the statutory phrase 'civil claim or cause of action' and means all without limitation." *Levin*, 2024 WL 4026966, at *9. This capacious phrasing "definitively encompasses" a "civil claim or cause of action" brought for breach of contract, so long as it "arise[s] out of conduct that constitutes a sexual offense," a predicate uncontested by Moving Defendants here. *See Doe v. N.Y.C. Dep't of Educ.*, 669 F. Supp. 3d 160, 165–66 (E.D.N.Y. 2023) (collecting cases and concluding that the CVA revived claims under the New York State Human Rights Law and New York City Human Rights Law).

Moving Defendants' responses are unpersuasive. First, they overread *Kaul*, which, contrary to their suggestion, did not hold that the CVA cannot revive a breach of contract claim

as a matter of law; rather, the Appellate Division merely determined that plaintiff "failed to

establish" as much in that case.  198 N.Y.S.3d at 382.  Concord Defendants confusingly argue in

Reply that "[s]ince the [*Doe*] [c]ourt has held sexual harassment allegations are actionable under

the CVA, Plaintiff cannot distinguish *Kaul* from this case."  ECF No. 247 at 5.  But the

conclusion that *Kaul* is therefore like this case is a *non sequitur*.  It just does not follow from the

*Doe* court's conclusion that the gender discrimination claims arose from "conduct which would

constitute a sexual offense," as required under the CVA and ASA.  669 F. Supp. 3d at 166.

Second, City Defendants argue that Plaintiff's construction of the revival statutes are "blatantly

false and [P]laintiff cites to no case law to support this argument."  ECF No. 246 at 5.  That is

hyperbole.  And Plaintiff has something even better than on-point case law; she has the statutory

text on her side.  *See Anonymous*, 109 N.E.3d at 568 ("The literal language of the statute is

generally controlling . . . .").  Third, HeartShare Defendants claim that "[a] breach of contract

action is not a sexual offense."  ECF No. 245 at 9.  However, that view ignores the statutes'

bifurcation of "every civil claim or cause of action" and the underlying conduct animating the

claim or cause of action.  *See Doe*, 669 F. Supp. 3d at 166 ("[A] narrow reading of the CVA

requiring the civil claim to be synonymous with the Penal Code would produce an absurd result

by excluding claims at the very heart of the statute.").  Accordingly, because Moving Defendants

do not claim that the breach of contract claim is otherwise untimely, the Court finds no time bar.

> B.    *Pleading Adequacy*

The Court also easily disposes of HeartShare Defendants' remaining arguments that the

breach of contract cause of action "is conclusory and lacks specifics."  ECF No. 228 at 22.  To be

sure, the TAC is no model of clarity when it comes to the breach of contract claim.  But

HeartShare Defendants' perfunctory argument, which does not even describe the elements of the

cause of action, does not compel dismissal.  Although they contend that "Plaintiff fails to point to a specific . . . contract provision that was not adhered to in this case," *id.*, the TAC does identify specific contracts with the City and the provisions contained therein requiring Concord and HeartShare to provide, *inter alia*, "safe, competent[,] and professional supervision" of the children, like Plaintiff, in their care, TAC ¶¶ 287, 291.  Accordingly, and contrary to their contention, this is not a case in which the allegation of a "specific breached promise or obligation" is so lacking as to warrant dismissal.  *See* ECF No. 228 at 22 (quoting *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 207 (S.D.N.Y. 1998)).  Moving Defendants' motions to dismiss Count IV are denied.

## V.     Gender-Motivated Violence Act

### A.     Statutory Framework

Plaintiff's Count V alleges that Defendants City, Concord, Floyd, Moseley, Barnwell,[17] HeartShare, Lewis, and Ellis violated New York City's Gender-Motivated Violence Act ("GMVA").  *See* TAC ¶¶ 298, 301, 304.  The current version of the GMVA ("Amended GMVA"), N.Y.C. Admin. Code §§ 10-1101 *et seq.*, provides, in relevant part, that "any person claiming to be injured by a party who commits, directs, enables, participates in, or conspires in the commission of a crime of violence motivated by gender has a cause of action against such party," *id.* § 10-1104.  With respect to the statute of limitations, it provides:

> A civil action under this chapter shall be commenced within seven years after the alleged crime of violence motivated by gender occurred.  If, however, due to injury or disability resulting from an act or acts giving rise to a cause of action under this chapter, or due to infancy as defined in the civil procedure law and rules, a person entitled to commence an action under this chapter is unable to do so at the time such cause of action accrues, then the time within which the action must be commenced shall be extended to nine years after the inability to commence the action ceases.

---

[17]     Barnwell's inclusion in connection with a Concord foster care placement appears to be an error.  *See* TAC ¶¶ 298, 301.

> Notwithstanding any provision of law that imposes a period of limitation to the contrary, any civil claim or cause of action brought under this chapter that is barred because the applicable period of limitation has expired is hereby revived and may be commenced not earlier than six months after, and not later than two years and six months after, September 1, 2022.

*Id.* § 10-1105(a). The window for filing otherwise time-barred claims ran from March 1, 2023, to March 1, 2025. *Dixon v. Reid*, 744 F. Supp. 3d 323, 327 n.4 (S.D.N.Y. 2024). Prior to amendment in 2022 ("Unamended GMVA"), the GMVA's substantive provisions were narrower, making liable exclusively "an individual who commits a crime of violence motivated by gender." *See* N.Y.C. Admin. Code § 10-1104 (2021), *amended by* N.Y.C. Admin. Code § 10-1104 (2022). It also had a shorter limitations period of seven (rather than nine) years for a plaintiff to commence an action and had no revival mechanism. *See* N.Y.C. Admin. Code § 10-1105(a) (2021), *amended by* N.Y.C. Admin. Code § 10-1105(a) (2022).

### B. Retroactivity

Moving Defendants raise different arguments in favor of dismissal, but all posit that any claim brought pursuant to the Amended GMVA is untimely. *See* ECF No. 228 at 26–29; ECF No. 231-1 at 12–14; ECF No. 232-1 at 20–21. They pick up on Plaintiff's allegations that the Defendants she now seeks to hold liable "enabled the commission of crimes of violence" in the Rodriguez, Shields, Hoyte, and Shore homes. *See* TAC ¶¶ 298, 301, 304, 307. Because she does not allege that any Defendant "commit[ted]" a gender-motivated crime of violence against her, she must rely on the Amended GMVA's broadened "enabl[ing]" language. In her Opposition, Plaintiff concedes that liability for this claim hinges on the availability of the amendment. *See* ECF No. 240 at 30. But Moving Defendants contend that the Amended GMVA "does not provide for retroactive liability against one who 'enabled' a crime of violence." *See* ECF No. 231-1 at 12. They are correct.

24

Unlike the CVA and the ASA, the GMVA is not just "a means to an end" of reviving certain otherwise-expired claims. *Giuffre*, 2020 WL 2123214, at *2. Rather, in addition to creating a revival period, the "GMVA [also] establishes a standalone claim." *Dixon*, 744 F. Supp. 3d at 327 n.4. Under the Amended GMVA in effect today, a plaintiff may ground such a standalone claim in the "enabling" liability previously discussed. The relevant question, then, is whether that liability reaches pre-GMVA amendment conduct. Under New York Law, "[i]t is a fundamental canon of statutory construction that retroactive operation is not favored by courts and statutes will not be given such construction unless the language expressly or by necessary implication requires it." *Jeter v. Poole*, No. 82, 2024 WL 4874353, at *4 (N.Y. Nov. 25, 2024). The New York Court of Appeals' major decision in *Regina Metropolitan Co. v. New York State Division of Housing & Community Renewal*, 154 N.E.3d 972 (N.Y. 2020), guides this Court's analysis. In that case, the state legislature amended the Rent Stabilization Law through the Housing Stability and Tenant Protection Act of 2019 ("HSTPA"). *Id.* at 976. Part F of the HSTPA "include[d] amendments that, among other things, extend[ed] the statute of limitations, alter[ed] the method for determining legal regulated rent for overcharge purposes and substantially expand[ed] the nature and scope of owner liability in rent overcharge cases." *Id.* Although certain overcharges took place "well before" enaction of the HSTPA, tenants asked the Court of Appeals to "apply certain [Part F] amendments . . . with respect to [their] overcharge claims." *Id.* at 986. They pointed to the language of Part F, which provided that it "shall take effect immediately and shall apply to any claims pending or filed on and after such date," while the property owners argued that language did not "evince a clear legislative intent to apply the new overcharge calculation provisions retroactively." *Id.* at 987.

In assessing whether Part F had retroactive effect, the Court of Appeals considered whether "'it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed,' thus impacting 'substantive' rights." *Id.* at 988 (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 278–80 (1994)). The court concluded that "[r]etroactive application of the overcharge calculation provisions in Part F implicates all three *Landgraf* retroactivity criteria." *Id.* at 991. That "triggered" "the presumption against retroactivity." *Id.* Noting that "[r]etroactive legislation is viewed with great suspicion" because of the "elementary considerations of fairness" involved, the court explained that "it takes a clear expression of the legislative purpose to justify a retroactive application of a statute." *Id.* at 991–92. Although no "particular words" are required, "the expression of intent must be sufficient to show that the Legislature contemplated the retroactive impact on substantive rights and intended that extraordinary result." *Id.* at 992. And "an even clearer expression of legislative intent" is necessary "[i]f retroactive application would not only impose new liability on past conduct but also revive claims that were time-barred at the time of the new legislation." *Id.* at 992.

As applied to the facts of that case, the Court of Appeals concluded that Part F's "generic reference to 'any claims pending' upon enactment d[id] not provide the requisite textual assurance" to revive time-barred claims. *Id.* at 994. The absence of that language notwithstanding, the Court went on to conclude that "read in the specific context of this legislation, the 'claims pending' language [was] sufficiently clear to evince legislative intent to apply the amendments to at least some timely overcharge claims that were commenced prior to enactment." *Id.* The court pointed to the fact that of the HSPTA's fifteen parts, only Part F referred to prior claims, and that Part F also "relate[d] almost entirely to the calculation of

26

overcharge claims, and any such claim that was pending at the time the HSTPA was enacted necessarily involved conduct that occurred prior to the statute's enactment." *Id.* Thus, Part F did not revive time-barred claims, but it did apply to pending claims. *Id.* at 995.

      In Opposition, Plaintiff contends that the Amended GMVA's lookback window— reviving "any civil claim or cause of action brought under this chapter that is barred because the applicable period of limitation has expired"—"expressly" demands retroactive application of the entire Amended GMVA. *See* ECF No. 240 at 30–31. That position, however, confuses the Amended GMVA's provision expanding substantive liability with its provision reviving certain claims. *Cf. Regina*, 154 N.E.3d at 992 ("Even within the same legislation, language may be sufficiently clear to effectuate application of some amendments to cases arising from past conduct but not others with more severe retroactive effect."). To be sure, unlike in *Regina*, the Amended GMVA expressly provides for claim revival, but only as to "any . . . claim . . . that is barred because the applicable period of limitation *has* expired." N.Y.C. Admin. Code §§ 10-1105(a) (emphasis added). Critically, though, at the time of the Amended GMVA's enactment, Plaintiff's claim "ha[d]" not "expired"; rather, it did not, and never had, existed. *See Expire*, Merriam-Webster, https://www.merriam-webster.com/dictionary/expire [https://perma.cc/PT9A-SKS3] (last visited Mar. 3, 2025) ("to come to an end"). Accordingly, the Amended GMVA's claim revival language not only fails to "unequivocally convey the aim of reviving" enabling claims, but by its own wording and structure, actually points in the opposite direction: claims that never existed cannot be "revived." *See Regina*, 154 N.E.3d at 992. Nor can the Amended GMVA's separate provision expanding substantive liability help because it identifies no specific class of claims whatsoever, in contrast to, for example, the "claims pending" identified by the statute in *Regina*. *Id.* at 994. Therefore, it is "presumed to apply only prospectively." *Id.* at 991.

The Court further notes that this outcome is consistent with Chief Judge Swain's decision in *Louis v. Niederhoffer*, No. 23-cv-6470, 2023 WL 8777015 (S.D.N.Y. Dec. 19, 2023). In that case, plaintiff sued defendant for conduct that took place between 1974 and 1979. *Id.* at *1. Observing that the Unamended GMVA was not passed until 2000, the court found that the presumption against retroactivity described in *Regina* controlled. *Id.* (citing *Adams v. Jenkins*, No. 115745/03, 2005 WL 6584554 (N.Y. Sup. Ct. Apr. 22, 2005)). The court further explained that the claim-revival provisions of the Amended GMVA did not change this outcome, reasoning that there is a difference between a *timely* claim under a newly enacted law and whether that newly enacted law reaches the past conduct in the first place. *Id.* (citing *Adams*, in which the court declined to give retroactive effect to the Unamended GMVA even though plaintiff's claim would have been timely). Plaintiff attempts to distinguish *Louis* by arguing that plaintiff in that case sought to bring claims for conduct that took place "prior to the passage of the law," referring to the "initial version" of the GMVA (the Unamended GMVA). *See* ECF No. 240 at 31. But that is not a principled distinction. In *Louis*, plaintiff sought to hold defendant liable for conduct not prohibited by the GMVA at the time it took place. *Louis*, 2023 WL 8777015, at *1. The same is true here. The Amended GMVA "create[d] a new substantive cause of action"— enabling liability—which did not exist at the time Plaintiff alleged the violative conduct took place in the foster homes. *Adams*, 2005 WL 6584554, slip op. at 7. And for the reasons already explained, that new strand of liability does not reach back to retroactively make such conduct illegal with respect to these Defendants. Thus, the Court dismisses the GMVA claim with prejudice.[18]

---

[18]    The Court therefore does not reach Moving Defendants' alternative bases for dismissing this claim.

## VI. Failure to Report Child Abuse

Plaintiff's Count III, brought against all Defendants, alleges failure to report child abuse. TAC ¶¶ 252–83. Plaintiff asserts this as both a statutory, *see id.* ¶ 254, and as a common law, *see id.* ¶ 255, claim. On the statutory side, New York law requires "mandated reporter[s]," including "foster care worker[s]," to

> report or cause a report to be made in accordance with this title when they have reasonable cause to suspect that a child coming before them in their professional or official capacity is an abused or maltreated child, or when they have reasonable cause to suspect that a child is an abused or maltreated child where the parent, guardian, custodian or other person legally responsible for such child comes before them in their professional or official capacity and states from personal knowledge facts, conditions or circumstances which, if correct, would render the child an abused or maltreated child . . . .

N.Y. Soc. Serv. Law § 413(1)(a). It further provides that "[a]ny person, official or institution required by this title to report a case of suspected child abuse or maltreatment who knowingly and willfully fails to do so shall be civilly liable for the damages proximately caused by such failure." *Id.* § 420(2).

### A. Distinguishing Statutory from Common Law Duty

As mentioned, Plaintiff also argues that Defendants breached a common law duty to report. *See* ECF No. 240 at 27. She primarily relies on *BL Doe 3 v. Female Academy of the Sacred Heart*, in which the Appellate Division explained that "a school owes a common-law duty to adequately supervise its students, which requires that the school exercise such care of them as a parent of ordinary prudence would observe in comparable circumstances." 158 N.Y.S.3d 474, 478–79 (N.Y. App. Div. 2021). The Appellate Division agreed with the New York Supreme Court that plaintiff could state a claim for breach of that duty where she alleged that her former school "fail[ed] to notify law enforcement or another appropriate governmental agency" about alleged sexual abuse by a teacher. *Id.* And it rejected defendants' argument that

Section 420, the statute providing for civil liability by mandated reporters, "subsumed" plaintiff's common law cause of action.  *Id.* at 479–80.[19]  Although Plaintiff provides no precedent standing for the proposition that this common law duty extends to Defendants here, including foster care agencies, at least one Appellate Division has held as much.  *See Matarazzo v. CHARLEE Fam. Care, Inc.*, 192 N.Y.S.3d 755, 760 (N.Y. App. Div. 2023) (explaining that a "negligent failure to report claim" brought by a former foster child is "recognized under New York law").  No Moving Defendant contends otherwise.  Therefore, the Court concludes that Plaintiff may seek to advance both claims independently.  That said, the common law strand of this argument sounds in negligence.  *See id.*; *see also Doe ex rel. Hickey v. Jefferson Cnty.*, 985 F. Supp. 66, 70 (N.D.N.Y. 1997).  The Court therefore discusses it in the context of its broader negligence analysis below.

### B.   Statutory Analysis

#### i.   Timeliness

As a threshold defense to the Section 420(2) claim, City Defendants argue this count is untimely.  *See* ECF No. 232-1 at 18–19.  They observe that Plaintiff did not bring this count until she filed the FAC on November 22, 2023, but the window for bringing claims under the CVA closed on August 14, 2021.  *See id.*  In Opposition, Plaintiff concedes that she must rely on the

---

[19]   The Court recognizes that the court in *Zubko-Valva v. County of Suffolk*, No. 20-cv-2663, 2022 WL 2197136, at *6–7 (E.D.N.Y. June 17, 2022), reached the opposite conclusion. Nevertheless, the underlying case motivating that court's view, *Kimberly S.M. ex rel. Mariann D.M. v. Bradford Central School*, 649 N.Y.S.2d 588, 589–92 (N.Y. App. Div. 1996), involved the dismissal of the negligent failure to report claim based on the elements of that claim and not because it was preempted by the statutory reporting obligation under Section 413.  As such, it does not undermine the *BL Doe 3* court's view of the interplay between the causes of action.

CVA for her Section 420(2) claim to be timely.  *See* ECF No. 240 at 27.[20]  She goes on to argue, however, that under Rule 15(c)(1)(B), the Section 420(2) claim relates back to the original complaint filed on August 9, 2020, which was within the CVA revival window.  *See id.*  That Rule provides that "[a]n amendment to a pleading relates back to the date of the original pleading when the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."  For their part, City Defendants concede that if the Section 420(2) claim relates back to the original complaint, it was timely pursuant to the CVA.  *See* ECF No. 246 at 4–5; *see Doe 1*, 2024 WL 4276174, at *5–6 (analyzing how a claim brought after the close of the revival window could relate back to a timely complaint filed within that window).  On this point, the Court agrees with Plaintiff that her Section 420(2) claim plainly "arose out of the conduct" described in the original complaint, which is largely unchanged in the TAC.  *See* ECF No. 240 at 27–28.  Indeed, the original complaint even alleged that "foster care agency staff are required to report to the government when they have reason to believe that a foster child has been abused, neglected, or endangered" and that they must "defer to the City to investigate the reports."  *See* ECF No. 1 ¶¶ 9jj–9kk. Accordingly, the Court concludes that Plaintiff's allegations relate back to the original complaint and are timely under the CVA.

---

[20]     Notably, neither Plaintiff nor City Defendants identify when the statute of limitations actually ran on the Section 420(2) claim, and there is a dearth of case law on the applicable statute of limitations for such claims  *See, e.g.*, *Matarazzo*, 192 N.Y.S.3d at 758–60 (finding that the CVA revived Section 420(2) and negligent failure to report claims without stating when the statute of limitations ran on the claims).  Because the parties agree as to the material issues here, it is unnecessary for the Court to reach the question of the relevant statute of limitations, especially where no state court appears to have spoken directly on it.  *See Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 510 (1985) (O'Connor, J., concurring) (warning against "[s]peculation by a federal court about the meaning of a state statute in the absence of prior state court adjudication").

ii.     <u>Pleading Adequacy</u>

On the merits, Plaintiff must adequately plead that a Defendant (1) was a mandated reporter, (2) the child or person legally responsible for the child "c[a]me before [the mandated reporter] in [that person's] professional or official capacity"; and (3) the mandated reporter had "reasonable cause" to suspect that Plaintiff was an "abused or maltreated child" or that a person legally responsible for her "state[d] from personal knowledge facts, conditions or circumstances which, if correct, would [have] render[ed] [her] an abused or maltreated child." N.Y. Soc. Serv. Law § 413(1)(a). Plaintiff must also adequately plead (4) that a Defendant's failure to report was "knowing[] and willful." *Diana G-D ex rel. Ann D. v. Bedford Cent. Sch. Dist.*, 932 N.Y.S.2d 316, 329 (N.Y. Sup. Ct. 2011) (citing N.Y. Soc. Serv. § 420), *aff'd*, 961 N.Y.S.2d 305 (N.Y. App. Div. 2013).

Concord Defendants also argue that "[e]stablishing 'reasonable cause' . . . requires proof that the defendant had notice of the alleged abuse." ECF No. 231-1 at 16. For that proposition, they rely on *Easterbrooks v. Schenectady County*, 194 N.Y.S.3d 173 (N.Y. App. Div. 2023). But to the extent that Concord Defendants are arguing that actual notice of the abuse is required to state a claim under Section 420(2), that overreads *Easterbrooks*. To be sure, actual notice is *sufficient*. *See id.* at 177; *see also Brave v. City of New York*, 188 N.Y.S.3d 179, 181–82 (N.Y. App. Div. 2023) (under state law, plaintiff stated a claim where he allegedly told defendants' employees about sexual abuse). But *Easterbrooks* does not go as far as to state that actual notice is *necessary*; at most, it suggests that, in a way similar to a negligence claim, a complaint must have "allegations of fact that would have provided the . . . defendants with notice that the [alleged abuser] presented a foreseeable harm." 194 N.Y.S.3d at 177. That reading is also more consistent with the statute, which requires a mandated reporter to have "reasonable cause," and

not, for example, "knowledge."  *Cf. Diana G-D*, 932 N.Y.S.2d at 328–29.  ("Defendants could

not rely on the third-hand hearsay statements of [another student's mother] or the general

concern of [plaintiff's mother] regarding [plaintiff]'s behavior at home to support 'reasonable

cause' to believe she was being abused.").

    Moving Defendants all advance similar arguments in favor of dismissal.  City Defendants

contend that "Plaintiff fails to adequately allege any Defendant's reasonable suspicion of abuse

or their willful or knowing failure to file a report of such abuse."  ECF No. 232-1 at 19.[21]

Concord Defendants state that "[t]he TAC is devoid of factual allegations to establish that

Defendants had *any* notice that either Mr. Rodriguez or Ms. Shields' foster son had an alleged

propensity to abuse Plaintiff sexually, yet placed Plaintiff in those homes regardless."  ECF

No. 231-1 at 16.  And HeartShare Defendants argue that, in relation to the alleged abuse in the

Hoyte and Shore homes, "Plaintiff fails to provide any specificity regarding when she revealed

her alleged abuse to [HeartShare] Defendants' employees" and "fails to allege that she revealed

her alleged abuse to [HeartShare] Defendants' employees while the sexual abuse and assaults

were occurring."  ECF No. 228 at 21.  Plaintiff's response is thin, merely stating that she states a

claim under Section 420(2) because "agents and employees of Defendants City, Concord, and

HeartShare, including the individually named Defendants, failed on numerous occasions to

report that Plaintiff may have been abused" and citing disparate provisions of the TAC without

further explication.  *See* ECF No. 240 at 27 (citing TAC ¶¶ 88–94, 96–98, 103–08, 111–12, 134–

37, 141–52, 155–60, 165–68, 257–76).  The Court now assesses their sufficiency.

---

[21]     They also argue, without citation, that "[i]n several instances, the [TAC] fails to plead
that [City] Defendants placed Plaintiff in the care of the alleged abuser."  ECF No. 232-1 at 19.
But that argument is unlinked to the elements of the statutory cause of action.  Without such
articulation, the Court cannot conclude that the allegations fail as a matter of law.

With respect to Plaintiff's allegations concerning the Rodriguezes, Plaintiff alleges that "[u]pon information and belief, in early 1998, [P]laintiff's brother disclosed the Rodriguezes' abuse to a mental health professional.  Upon information and belief, said professional, or a coworker, advised [D]efendants City and Concord of said disclosure."  TAC ¶ 88.  She also alleges that "after Juan Rodriguez began sexually abusing [her], staff at [her] elementary school reported to [D]efendants City and Concord that [she] was abused and neglected."  *Id.* ¶ 103.  Although those factual allegations are somewhat vague, the Court, accepting them as true and construing them in the light most favorable to Plaintiff, finds that she has adequately pled that the City received actual notice of Juan Rodriguez's alleged sexual abuse.  *See id.*[22]  This conclusion is primarily driven, due to Plaintiff's unclear timing allegations, by the alleged disclosure by school personnel, since the first disclosure took place in 1998, prior to the time period in which Plaintiff alleges that Juan Rodriguez began to sexually abuse her.[23]  It is a closer call with respect to whether the City's failure to report was willful and knowing.  However, the City's single sentence on this point—merely asserting that Plaintiff fails to "adequately" allege as much, without citation to authority—is unpersuasive.  *See* ECF No. 232-1 at 19.  Where, as here, Plaintiff has adequately alleged that the City received actual notice of Juan Rodriguez's sexual abuse, the Court can draw the inference in her favor that the subsequent failure to report was knowing and willful.  *See Bartels v. Westchester Cnty.*, 429 N.Y.S.2d 906, 909 (N.Y. App. Div. 1980) (suggesting that "actual notice of conduct by the foster parents" by defendants is

---

[22]    The Court does not directly address Defendant Concord here or elsewhere, as it is a non-movant and is in default.

[23]    Plaintiff alleges that the sexual abuse began when she "was approximately eight years old," TAC ¶ 74, or around the year 2000 based on Plaintiff's 1992 birth year, *id.* ¶ 12.

sufficient to trigger liability under Section 420(2)). The City is of course free to test this allegation in discovery, but the claim against it survives for now, even if just barely.

At the same time, Plaintiff fails to state a claim with respect to Defendants Casner, Antonsanti, Cruz, and Floyd with these allegations. As to these individual Defendants, she merely suggests in the passive voice that they were required to file reports "[u]pon receiving notice," without actually alleging that they received notice. *See id.* ¶ 90.[24] Even setting notice aside, Plaintiff points to no other allegations that any of these individual Defendants had "reasonable cause to suspect" that Plaintiff was the victim of Juan Rodriguez's alleged sexual abuse, much less that any "knowingly and willfully" failed to report it, as just discussed. *See* N.Y. Soc. Serv. Law §§ 413(1)(a), 420(2). On a motion to dismiss, it is insufficient for Plaintiff merely to group all these Defendants together under the City or Concord banner, as it is a basic requirement that she "must plead enough facts *with respect to each defendant* to state a claim." *Stora v. Don't Ask Why Outfitters*, No. 15-cv-7106, 2016 WL 10571885, at *7 (E.D.N.Y. Dec. 7, 2016) (emphasis added), *report and recommendation adopted*, 2017 WL 1034637 (E.D.N.Y. Mar. 17, 2017); *see also Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) ("By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, [plaintiff]'s complaint failed to satisfy th[e] minimum standard [under Rule 8]."). Plaintiff therefore fails to state a claim against the individual Defendants based on the allegations concerning Juan Rodriguez.

---

[24] And to the extent that she alleges that they received "actual notice of Maria Rodriguez's physical abuse of plaintiff by an eyewitness to said abuse," TAC ¶ 93, the claim is time-barred for the reasons already explained. *See supra* § I. The same is true with respect to Plaintiff's allegation that Plaintiff's father "showed [D]efendants Frank and Barnwell . . . the bruises on the bodies of [P]laintiff and her siblings, complaining that the bruises had been caused by child abuse and demanding that [D]efendant Concord investigate. TAC ¶ 111.

With respect to the allegations related to the Shields home, City Defendants' and Concord Defendants' motions are granted as to the Section 420(2) claim. *See* ECF No. 231-1 at 16; ECF No. 232-1 at 19. Unlike with the Juan Rodriguez allegations, Plaintiff just asserts that "City, Concord, Floyd, Barnwell, Moseley-Harris, Diggs, Haynes, and Frank had actual notice or knowledge that [P]laintiff was being abused . . . in the Shields foster home." TAC ¶¶ 261–64. That claim is entirely conclusory and the lack of "factual content" makes it impossible for the Court "to draw the reasonable inference that the defendant[s] [are] liable" for statutory failure to report. *Matzell*, 64 F.4th at 433.

City and HeartShare Defendants, *see* ECF No. 228 at 21; ECF No. 232-1 at 19, argue that the same analysis applies with respect to Plaintiff's allegations concerning her time in the Hoyte home, and the Court mostly agrees. *See* TAC ¶ 269 ("Upon information and belief, [D]efendants City, HeartShare, Barnwell, Ellis, and Lewis had actual notice or knowledge that [P]laintiff was being abused in the Hoyte foster home."). However, Plaintiff points to her allegation that "Plaintiff and [her] brother informed [D]efendant Lewis of . . . Hoyte's behavior on numerous occasions." *Id.* ¶ 151. To be sure, that allegation is factually flimsy, but it is not inappropriately conclusory. At this juncture, the straightforward allegation that Lewis (and HeartShare) received notice of Hoyte's "behavior" from Plaintiff herself allows the Court to draw the inference that he had reasonable suspicion of Hoyte's sexual abuse, which, as previously explained, is sufficient to state a claim. *See Twombly*, 550 U.S. at 555 (on a motion to dismiss, "detailed factual allegations" are not required). Similar analysis applies to Defendant Ellis (and HeartShare), insofar as Plaintiff alleges that "Hoyte even sexually harassed [D]efendant Ellis when she came to the Hoyte home to visit the foster children on her caseload, including [P]laintiff." TAC ¶ 142. Based on that alleged fact, taken as true, the Court can also draw the reasonable inference that

Ellis (and HeartShare) had reasonable suspicion that Hoyte was sexually abusing Plaintiff, a minor he was obligated to care for.

There is little factual content pled with respect to the Shore home. There, Plaintiff alleges that "[w]hen [P]laintiff ran away from the Shore home, [p]laintiff advised employees of [D]efendant HeartShare that the Shore home was not safe." TAC ¶ 160. Nevertheless, even accepting as true that Plaintiff told HeartShare employees that the home was "not safe," the Court cannot reasonably infer, without further factual allegations, that HeartShare employees should have had "reasonable cause to suspect" that Plaintiff was being subjected to sexual abuse within the CVA's scope. This allegation stands in notable contrast to, for example, Plaintiff's allegations with respect to the Rodriguezes, in which she alleges specific disclosures of "abuse" to certain Defendants. *See* TAC ¶¶ 88, 103.

The Court also agrees with City Defendants that any Section 420(2) claim based on the conduct in the Bell home must be dismissed. *See* ECF No. 232-1 at 19. The allegations related to that conduct, *see* TAC ¶¶ 134–37, lack a predicate sex crime as contemplated by the CVA; thus, they are time-barred as to all Defendants, as previously discussed. *See supra* § I & 35 n.24. The same is true with respect to the later allegations concerning the Lacy home. *See* TAC ¶¶ 165–67. Plaintiff's mere allegation that "Helen Lacy had many male guests" does not allege a predicate sex crime. *See id.* ¶ 166.

Summing up on the Section 420(2) claim, Moving Defendants' motions to dismiss are granted, except as to Plaintiff's claim against Defendant City based on Plaintiff's allegations concerning Juan Rodriguez and Plaintiff's claim against Defendants Lewis, Ellis, and HeartShare based on Plaintiff's allegations concerning Hoyte.

## VII.  Negligence

### A.  Introduction

Plaintiff's Counts I and II assert negligence against all Defendants.  *See id.* ¶¶ 195–251.
Although Plaintiff asserts that these Counts are brought pursuant to the CVA and ASA,
respectively, those references to the revival vehicles are relevant only as to whether the alleged
conduct took place before or after Plaintiff turned eighteen, and the underlying theories of
negligence are the same.  *See id.* ¶ 235 (alleging that Plaintiff remained in the custody of the City
and HeartShare after she turned eighteen).  All Moving Defendants seek the dismissal of all
negligence claims.  *See* ECF No. 228 at 13–19; ECF No. 231-1 at 15–17; ECF No. 232-1 at 10.
As is well-established, "[t]o establish a prima facie case of negligence, a plaintiff must establish
the existence of a duty owed by a defendant to the plaintiff, a breach of that duty, and that such
breach was a proximate cause of injury to the plaintiff."  *S.W. ex rel. Marquis-Abrams v. City of
New York*, 46 F. Supp. 3d 176, 205 (E.D.N.Y. 2014).

At the threshold, the Court must identify the relevant universe of conduct.  As explained
in detail in the prior Section, Plaintiff alleges predicate sex crimes only with respect to the
conduct in four homes.  *See* TAC ¶ 114 (Juan Rodriguez); *id.* ¶ 123 (boy in the Shields home);
*id.* ¶ 149 (Hoyte); *id.* ¶ 158 (Max Shore).  The negligence claims brought with respect to the
Bell, *id.* ¶ 212, and Lacey, *id.* ¶ 225, homes are time-barred and have already been dismissed.
*See* ECF No. 228 at 12–13.

### i.  Governmental Function Immunity and General Negligence Claims

City Defendants argue that the negligence claims "must fail because Plaintiff fails to
plead the existence of a special duty."  ECF No. 232-1 at 23.  Curiously, they advance an
immunity argument without using the word "immunity," but the idea under state law is that when
a municipality exercises a "governmental function, the municipality is immune from suit if the

conduct was discretionary, and if the conduct was ministerial, the municipality is immune unless it owed a special duty to the injured party." *Q.G. v. City of New York*, 199 N.Y.S.3d 62, 62 (N.Y. App. Div. 2023) (cited by City Defendants, ECF No. 232-1 at 22).[25]  City Defendants then place themselves into the latter ministerial bucket by referring to their "oversight and management of the foster care system," ECF No. 232-1 at 22, like in *Q.G.*, where it was undisputed that the City's "management of the foster care system" was ministerial in nature, 199 N.Y.S.3d at 62–63.  Further, as explained in *Q.G.*, such "[a] special duty exists where either (1) the plaintiff belonged to a class for whose benefit a statute was enacted; (2) the government entity voluntarily assumed a duty to the plaintiff beyond what was owed to the public generally; or (3) the municipality took positive control of a known and dangerous safety condition." *Id.* at 62.  At bottom, City Defendants say this case is like *Q.G.*, in which the Appellate Division, First Department, analyzing the first criterion for establishing a special duty, concluded that the Social Services Law ("SSL") did not create a special duty for the municipality vis-à-vis a foster child, 199 N.Y.S.3d at 63.  The Appellate Division, Fourth Department, also reached the same conclusion because, following the New York Court of Appeals' decision in *Mark G. v. Sabol*, 717 N.E.2d 1067 (N.Y. 1999), there is no private right of action under the SSL, as needed to form a "special duty," and thus, "plaintiff c[ould not] establish a special duty based upon the County's alleged violation of its duties under the [SSL]." *Weisbrod-Moore v. Cayuga Cnty.*, 189

---

[25]    City Defendants suggest that this immunity applies to "any common-law claim," as well as the GMVA. ECF No. 232-1 at 22.  It is unclear the authority from which that argument emerges.  For the reasons already explained, the Court need not reach it with respect to any GMVA claim.  To the extent City Defendants intended to assert this immunity with respect to the breach of contract claim, that argument is never made, and their Reply does not even discuss it, ECF No. 246 at 4.  So the Court's analysis of immunity is confined, like City Defendants' own analysis, to the negligence claims in Counts I and II, which is consistent with New York precedent.  *See Ferreira v. City of Binghamton*, 194 N.E.3d 239, 245–46 (N.Y. 2022) (discussing the special duty rule in the context of "any common-law *negligence* case" (emphasis added)).

N.Y.S.3d 345, 349 (N.Y. App. Div. 2023) ("*Weisbrod-Moore I*").  The court further rejected the argument that the defendant county voluntarily assumed "a duty that generated justifiable reliance on [plaintiff's] part," in part because the county's alleged failure to follow the SSL, a "statutory duty," "c[ould] not be equated with the breach of a duty voluntarily assumed."  *Id.*

Plaintiff resists this defense, pointing to authority from the Appellate Division, Second Department, concluding that plaintiff, a former child in foster care, stated a claim for negligence against the county.  *See Grabowski v. Orange Cnty.*, 196 N.Y.S.3d 113, 114–15 (N.Y. App. Div. 2023) (cited by Plaintiff, ECF No. 240 at 24); *see also Keizer v. SCO Fam. of Servs.*, 991 N.Y.S.2d 103, 104 (N.Y. App. Div 2014) ("[C]ounties and foster care agencies may be sued to recover damages for negligence in the selection of foster parents and in supervision of the foster home.").  She also identifies consistent authority from the Third Department.  *See* ECF No. 240 at 24.  *See, e.g.*, *Grant v. Temple*, 189 N.Y.S.3d 806, 809 (N.Y. App. Div. 2023).[26]

On February 18, 2025, the New York Court of Appeals reversed the Appellate Division in *Weisbrod-Moore I*, holding that "municipalities owe a duty of care to the children the municipalities place in foster homes because the municipalities have assumed custody of those children."  *See Weisbrod-Moore v. Cayuga Cnty.*, No. 7, 2025 WL 515393, at *1 (N.Y. Feb. 18, 2025) ("*Weisbrod-Moore II*").  The Court of Appeals explained that the special categories

---

[26]    Plaintiff contends that this Court is bound to *Grabowski*'s holding because it is "located completely within the Second Department of the New York Appellate Division."  ECF No. 240 at 24.  Although the issue is no longer relevant, the Court observes for future motion practice in this case that she is incorrect.  As previously mentioned, it is the federal district court's duty to "predict, if reasonably possible, how the New York *Court of Appeals* would rule on the question."  *Sutton*, 120 F.4th at 1119 (emphasis added).  As to the decisions of intermediate courts like the Appellate Division, they are "a basis for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."  *Id.* at 1119–20.  It follows that this Court is "not bound" to a decision of the Appellate Division, Second Department.  *See, e.g.*, *Reply All Corp. v. Gimlet Media, Inc.*, No. 15-cv-4950, 2024 WL 3855907, at *3 (E.D.N.Y. May 23, 2024).

identified in *Q.G.* do not apply in this context, where the foster child was in "governmental custody," and the government "effectively t[ook] the place of parents and guardians." *Id.* at *3–4. Thus, in light of the New York Court of Appeals' pronouncement, the Court must reject the City's immunity argument, at least as formulated in its papers, and proceed to the merits.[27]

>    ii.    <u>Governmental Function Immunity and Negligent Failure to Report</u>

The Court must first close the loop on the negligent failure to report theory discussed above. Recall that this is the common law variety of the statutory failure to report claim. *See supra* at 29–30. City Defendants do not explain how their governmental function immunity would apply specifically to this strand of Plaintiff's failure to report claim. In any event, it does not matter for this motion, as the Court has rejected that argument. Because the Court has found that Plaintiff stated a claim as to the statutory violation, *see supra* at 34–35, it also finds that she states a common law negligence claim against the City for failure to report. As previously discussed, state precedent makes clear that the two causes of action are cumulative. *See BL Doe 3*, 158 N.Y.S.3d at 479–80; *Matarazzo*, 192 N.Y.S.3d at 760. And because the statutory requirement is more demanding than the negligence counterpart, requiring "willfulness," it follows that, for the purposes of a motion to dismiss, adequately pleading the former should satisfy the latter. *See BL Doe 3*, 158 N.Y.S.3d at 480 (framing the statutory claim as subsumed by the common law claim and applying the same factual analysis to both in concluding that plaintiff stated a claim under state law). Accordingly, for the reasons previously provided, the negligent failure to report claim survives against the City. The same is true with respect to Lewis, Ellis, and HeartShare concerning the alleged failure to report Hoyte's conduct. *See supra*

---

[27]    On February 25, 2025, Plaintiff filed a notice of supplemental authority alerting the Court to *Weisbrod-Moore II*. *See* ECF No. 253. Although the Court gave Moving Defendants the opportunity to file responses to Plaintiff's notice, they did not do so. *See* Feb. 25, 2025, Text Order.

at 36–37.  However, the negligent failure to report claim is dismissed as to the remaining Moving Defendants, as Plaintiff neither provides nor tries to identify additional allegations related to her reporting theory of liability so as to distinguish the statutory claim from the negligence-based claim.

###### iii.        Supervisory Negligence

Moving Defendants principally argue that Counts I and II must be dismissed because the actions of third-party foster parents were not foreseeable.  *See* ECF No. 228 at 14–15; ECF No. 231-1 at 15–16; ECF No. 232-1 at 22.  Under New York law, "[i]n order to find that a child care agency breached its duty to adequately supervise the children entrusted to its care," as Plaintiff alleges here, "[she] must establish that the agency had sufficiently specific knowledge or notice of the dangerous conduct which caused injury; that is, that the third-party acts could reasonably have been anticipated."  *Lopez v. City of New York*, 99 N.Y.S.3d 381, 383–84 (N.Y. App. Div. 2019); *accord Adams v. Suffolk Cnty.*, 222 N.Y.S.3d 501, 515–16 (N.Y. App Div. 2024) (applying the same standard to a municipal defendant).  Plaintiff agrees that the "sufficiently specific" notice requirement applies to a case like this one.  *See* ECF No. 240 at 16.[28]  As previously, the Court proceeds in chronological order.

With respect to Juan Rodriguez and the boy in the Shields home, Concord Defendants raise two main arguments.  First, they state that the TAC lacks allegations that they had any notice that either Rodriguez or the boy had a "propensity to abuse Plaintiff sexually, yet placed Plaintiff in those homes regardless."  ECF No. 231-1 at 16.  Specifically with respect to Juan

---

[28]     Plaintiff relies extensively on state pleading standards.  *See* ECF No. 240 at 16–18.  For the avoidance of doubt, "New York pleading requirements do not apply to a case in federal court," regardless of the federal or state nature of the underlying claim.  *See Thorsen v. Sons of Norway*, 996 F. Supp. 2d 143, 163–64 (E.D.N.Y. 2014).

Rodriguez, they claim that "[t]he TAC contains no allegations to suggest Defendants knew [he] was 'regularly' abusing Plaintiff sexually." *Id.* Second, they argue that "[t]he TAC does not even allege that [Juan] Rodriguez or [the boy in the Shields home] engaged in or were even accused of sexual abuse before Plaintiff's alleged abuse." *Id.* As an initial matter, the Court agrees with Plaintiff that the second prong of that argument goes too far. *See* ECF No. 240 at 18. Concord Defendants' own authority does not support the proposition that knowledge of prior accusations of abuse, or actual abuse, are necessary in order for a plaintiff to demonstrate a third-party's propensity to engage in sexual abuse, even if the *absence* of such allegations may support an argument that Plaintiff fails to state a claim. *See Fuller v. Fam. Servs. of Westchester, Inc.*, 177 N.Y.S.3d 141, 143 (N.Y. App. Div. 2022) (referring only to propensity); *A.M. v. Holy Resurrection Greek Orthodox Church of Brookville*, 135 N.Y.S.3d 823, 824 (N.Y. App. Div. 2021) (same). For their part, City Defendants largely echo the arguments concerning a lack of foreseeability. *See* ECF No. 232-1 at 22.[29]

With respect to the foreseeability of Juan Rodriguez's sexual abuse, Plaintiff highlights two allegations previously discussed. She points to the allegation that "[P]laintiff's brother disclosed the Rodriguezes' abuse to a mental health professional," who in turn (either directly or through a coworker) "advised [D]efendants City and Concord of said disclosure." TAC ¶ 88. She also highlights the claim that "after Juan Rodriguez began sexually abusing [P]laintiff, staff

---

[29]     In her notice of supplemental authority, Plaintiff also argues that *Weisbrod-Moore II* stands for the proposition that Plaintiff is not "required to plead that her abuser had sexually assaulted another child before sexually assaulting her." *See* ECF No. 253 at 1. Although the Court ultimately agrees with Plaintiff's view on this issue, as the foregoing analysis makes clear, its rationale is not based on *Weisbrod-Moore II*, which Plaintiff relies upon without any reference to the text of the decision. *See id.* To be sure, that decision discussed foreseeability as an element of a negligence claim, but it did not speak with nearly as much specificity as Plaintiff suggests. *See Weisbrod-Moore II*, 2025 WL 515393, at *3.

at [P]laintiff's elementary school reported to [D]efendants City and Concord that [P]laintiff was abused and neglected." *Id.* ¶ 103.  The problem with those allegations, though, is that they say nothing at all about what Concord Defendants—as opposed to Concord—knew about Juan Rodriguez, contrary to Plaintiff's assertion.  *See* ECF No. 240 at 19.  No authority supports her attempt to reverse-impute the organization's alleged knowledge to its individual employees.  *See Doe (G.N.C.) v. Uniquest Hosp., LLC*, No. 23-cv-7980, 2024 WL 4149251, at *5 (S.D.N.Y. Sept. 11, 2024) (under Rule 8, knowledge not imputable to all defendants "lump[ed]" together into a defendant group without any "descri[ption] [of] their roles").  Plaintiff also now claims, with respect to her brother's disclosure, that the mental health professional "informed Concord and its employees, including Defendant Floyd."  ECF No. 240 at 19 (citing TAC ¶¶ 88–89).  But that citation to the TAC is misleading because the allegation about Defendant Floyd is not in there.  *See Soules v. Connecticut*, 882 F.3d 52, 56 (2d Cir. 2018) ("Ordinarily, parties may not amend the pleadings through motion papers.").  Plaintiff intimates that Defendant Floyd was on notice because, as Concord's Executive Director, he "should have been particularly attuned to reports of abuse," ECF No. 240 at 19, but that paints with too broad of a brush.  *See Moss v. Bd. of Educ. of Sachem Cent. Sch. Dist.*, No. 22-cv-6212, 2024 WL 3328637, at *12 (E.D.N.Y. July 8, 2024) ("A bald allegation that a defendant served as a superintendent is insufficient to allege personal involvement; instead, one needs to include plausible factual allegations detailing the defendant's role . . . .").  And, as already discussed, *see supra* at 34 & n.23, Plaintiff's brother's disclosure predated the onset of the alleged sexual abuse by Rodriguez by some time, rendering it implausible that that disclosure, absent any factual enhancement, was enough to put Floyd on notice of Rodriguez's propensity for sexual abuse.

Separately, Plaintiff suggests that Defendant Frank (and Barnwell) acted negligently by failing to take "any action" after "Plaintiff's father directly showed [them], along with other Concord employees, the physical evidence of abuse—bruises on the children's bodies—while demanding an investigation."  ECF No. 240 at 20 (citing TAC ¶ 111).  Although undoubtedly disturbing, that allegation is also too imprecise to overcome dismissal as it relates to this specific cause of action.  As has been discussed numerous times, these claims are untimely under the CVA because they lack a sex abuse predicate.  *See supra* § 1.  Nor, as just discussed, does this allegation demonstrate Juan Rodriguez's propensity to commit sexual abuse prior to the infliction of such injury.

A different outcome is required with respect to the City.  Even if Plaintiff stated a claim against the City for negligent failure to report, a claim for negligent supervision of the sort asserted by Plaintiff here specifically requires that the City knew of Rodriguez's propensity for sexual abuse "*prior* to [any] injury's occurrence."  *PC-41 Doe v. Poly Prep Country Day Sch.*, 590 F. Supp. 3d 551, 566 (E.D.N.Y. 2021) (emphasis added).  The TAC does not explicitly allege any discrete acts of sexual abuse by Rodriguez following either of the alleged disclosures to the City.  TAC ¶¶ 88, 103.  Nevertheless, Plaintiff alleges that Juan Rodriguez's sexual abuse "continued regularly, sometimes every day, until [P]laintiff left the Rodriguez home."  *Id.* ¶ 74.  Accepting that factual assertion as true, the Court can draw the reasonable inference that at least some act of sexual abuse by Juan Rodriguez took place after the City received notice of his abuse.  Although the timing allegations with respect to Rodriguez are generally vague, Plaintiff has provided just enough factual matter to "nudge[] [her] claim" for negligence "across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.

That said, the TAC remains deficient when it comes to the individual City Defendants
because, as previously discussed, there are no such allegations of their notice.  Plaintiff's retort
that her allegations that such sexual abuse was "foreseeable," *see* ECF No. 240 at 22 (citing TAC
¶ 207), is just a "threadbare recital[]" of an element of the negligence and is thus insufficient to
state a claim, *see Iqbal*, 566 U.S. at 678.

Similar problems require dismissal of Plaintiff's claims against Concord Defendants and
City Defendants as they relate to the boy in the Shields home.  *See* ECF No. 231-1 at 16.  This
claim is subject to dismissal on the sole basis that Plaintiff effectively abandoned it in
Opposition.  *See Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a
counseled party, a court may, when appropriate, infer from a party's partial opposition that
relevant claims . . . that are not defended have been abandoned.").  In any event, the claim is
subject to dismissal because Plaintiff pleads no facts suggestive of the boy's propensity to
sexually abuse Plaintiff.  All Plaintiff alleges is that "[p]rior to placing [P]laintiff in the Shields
home, [D]efendants City and Concord and its employees knew or should have known that the
boys posed a danger to [P]laintiff."  TAC ¶ 119.[30]  However, that allegation, which does not even
relate to the conduct of Concord Defendants, is another "threadbare recital[]" of negligence and
must fail.  *Iqbal*, 566 U.S. at 678.  Thus far, Count I survives against the City based on negligent
failure to report and negligent supervision with respect to the Rodriguez home only.  With
respect to the Rodriguez and Shields homes, Count I is otherwise dismissed and Count II[31] is
also dismissed.

---

[30]     Although Plaintiff refers to two boys in the Shields' home, she alleges only that the
conduct of one boy constituted a sex crime within the scope of the CVA.  *See* TAC ¶ 123.

[31]     Plaintiff does not bring claims under the ASA against Concord or the Concord
Defendants, presumably because she was released from Concord's custody before she turned

Moving on to HeartShare Defendants' motion, they argue for the dismissal of negligence claims based on Gary Hoyte's alleged conduct. *See* ECF No. 228 at 15. The argument on this front is somewhat more complex. First, they argue that because Plaintiff fled to the Hoyte home and because they never selected him as a foster parent, they "owed her no duty as respects the Hoyte home." *Id.* at 14–15. With respect to the duty of care, foster care agencies like HeartShare have a "duty to adequately supervise the children entrusted to [their] care." *Liang*, 799 N.Y.S.2d at 71. In Opposition, Plaintiff makes a fact-based response to HeartShare Defendants' legal contention, arguing that a duty existed because Plaintiff alleges that HeartShare Defendants "ratified" her placement in Hoyte's home when she "continued to stay" there. *See* ECF No. 240 at 21 (citing TAC ¶ 139). That is not really relevant because HeartShare Defendants provide no authority for the proposition that a foster agency's duty of care vis-à-vis the children in its care, which they accept as a matter of first principles, dissipates when those children do not act in accordance with the dictates of the agency by, for example, running away from their assigned foster home. After all, foster agencies are required to "adequately supervise the children entrusted to [their] care." *Liang*, 799 N.Y.S.2d at 71. Here, the problem for HeartShare Defendants is that the crux of their argument—that they cannot be held liable because they "never selected" Hoyte, ECF No. 228 at 14—more logically sounds in foreseeability than in duty. As the New York Court of Appeals has explained in a related context, although "[s]chools are under a duty to adequately supervise the students in their charge," they "are not insurers of safety . . . for they cannot reasonably be expected to continuously supervise and control all movements and activities of students" and are therefore

---

eighteen, the point at which the claim revival mechanism shifts from the CVA to the ASA. TAC ¶¶ 133, 153.

only liable "for foreseeable injuries proximately related to the absence of adequate supervision." *Mirand v. City of New York*, 637 N.E.2d 263, 266 (N.Y. 1994); *see also Weisbrod-Moore II*, 2025 WL 515393, at \*3. In other words, the relevant limitation on liability is couched in the element of foreseeability, not duty, which persists. *See Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232 (N.Y. 2001) ("Foreseeability, alone, does not define duty—it merely determines the scope of the duty once it is determined to exist.").

The Court therefore proceeds to foreseeability. HeartShare Defendants argue that the "TAC does not contain any allegation that [they] were aware of prior specific instances of sexual and physical abuse in the Hoyte foster home." ECF No. 228 at 15. City Defendants advance the same argument. ECF No. 232-1 at 22. As an initial mater, the Court again reiterates that a defendant need not be "aware of prior specific instances of sexual . . . abuse" in order for Hoyte's acts to have been foreseeable to Defendants. *See* ECF No. 228 at 22. On this point, Plaintiff isolates three key allegations. First, Plaintiff alleges that "Hoyte was a sexual predator, and [D]efendants HeartShare, Barnwell, Lewis, and Ellis knew that he was a sexual predator." TAC ¶ 141. However, that is just a bald assertion without factual support. *See Read v. Corning Inc.*, 371 F. Supp. 3d 87, 92 (W.D.N.Y. 2019) ("[W]here a defendant's knowledge of some fact or circumstance is an element of a tort claim, a bare assertion that a defendant 'knew or should have known' of that fact or circumstance is insufficient to state a claim.").

Second, Plaintiff alleges that she and her brother "informed [D]efendant Lewis of . . . Hoyte's behavior on numerous occasions." TAC ¶ 151. Even though Plaintiff stated a claim against Lewis and HeartShare for statutory failure to report based in part on this allegation, the Court cannot conclude that Plaintiff has pled enough to establish foreseeability with respect to Hoyte's conduct. *See supra* at 36–37. Unlike the allegations concerning Juan Rodriguez, in

which Plaintiff alleges that he abused her "sometimes every day" for years, *see* TAC ¶ 74, the Court can only speculate here as to whether Lewis and HeartShare received notice of Hoyte's conduct prior to any acts of sex abuse by Hoyte. That is insufficient to state a claim for supervisory negligence. *See Twombly*, 550 U.S. at 555.[32]

Third, Plaintiff alleges that "Hoyte even sexually harassed [D]efendant Ellis when she came to the Hoyte home to visit the foster children on her caseload, including [P]laintiff." TAC ¶ 142. In the TAC, Plaintiff makes that allegation before alleging that Hoyte sexually abused and harassed Plaintiff "for a period of at least six months" and detailing the sex abuse. *See id.* ¶¶ 143–48. Drawing all inferences in Plaintiff's favor, as the Court must at this stage, that allegation contains sufficient factual specificity, if just barely, for Plaintiff to state a claim against Ellis and her employer HeartShare. Although Plaintiff's factual allegation is thin, accepting as true that Hoyte sexually harassed Ellis during Ellis's home visits, the Court can draw the reasonable inference that Ellis and HeartShare were "on notice" of Hoyte's "propensity" for sexual abuse with respect to the children he was responsible for caring for in his own home before some act of sex abuse toward Plaintiff took place. *PC-41 Doe*, 590 F. Supp. 3d at 566–67; *see also Curtis v. Gates Cmty. Chapel of Rochester, Inc.*, No. 20-cv-06208, 2023 WL 1070650, at *4–5 (W.D.N.Y. Jan. 27, 2023) (although allegation that "students and others had complained about sexual abuse committed by [the alleged perpetrator] prior to his abuse of [P]laintiff" presented a "close call," concluding that plaintiff sufficiently stated a negligent supervision claim). Because there are no other allegations related to other Moving Defendants, only Plaintiff's claim against Ellis and HeartShare based on Hoyte's conduct survives.

---

[32]     If Plaintiff chooses to replead this claim, the allegations concerning Hoyte should, if possible, more clearly state when notice was provided, the nature of that notice, and when the alleged sex crimes within the scope of the CVA took place.

The next set of relevant allegations concerns Max Shore.  HeartShare Defendants and City Defendants raise the familiar argument regarding foreseeability.  *See* ECF No. 228 at 15–16; ECF No. 232-1 at 22.  Although the allegations concerning Shore's conduct are heinous, Plaintiff fails to state a claim for negligence for reasons already described; namely, with respect to foreseeability, she alleges only that *after* she ran away from the Shore home, "[s]he advised employees of [D]efendant HeartShare that the Shore home was not safe."  TAC ¶ 160.  Plaintiff reiterates that chronology in her Opposition, *see* ECF No. 240 at 21, meaning that she fails to allege the necessary notice or knowledge "prior" to any injury's occurrence.  *PC-41 Doe*, 590 F. Supp. 3d at 566–67.  The negligence claims based on Max Shore's conduct are thus dismissed.

Summing up, Plaintiff has stated a claim for negligence against the City with respect to its alleged failure to report Juan Rodriguez's abuse and for failure to supervise with respect to that abuse.  Plaintiff has also stated negligent failure to report claims against Lewis, Ellis, and HeartShare as well as a supervisory negligence claim against Ellis and HeartShare based on the conduct of Hoyte.  Because those claims relate to conduct that took place when Plaintiff was a child, they can be revived only pursuant to the CVA (Count I) and not the ASA (Count II).[33] Count I is therefore dismissed without prejudice, except as to those four specific groups of claims, which survive.  Count II is dismissed entirely and without prejudice.

### VIII.   Leave to Amend

Only Concord Defendants discuss leave to amend in their motion.  *See* ECF No. 231-1 at 17–18.  They argue that "[p]ermitting [P]laintiff to replead her time-barred or preempted claims would be futile since she cannot cure such deficiencies."  *Id.* at 17.  They further argue that, with

---

[33]      The ASA would only potentially revive claims only arising from the Shore home and later, where Plaintiff alleges that Max Shore may have committed sexual offenses against her after she turned eighteen.  *See* TAC ¶ 156.

respect to Count I (negligence pursuant to the CVA) and Count III (failure to report child abuse), Plaintiff "cannot rectify" her failure to plead adequate notice. *Id.* at 18. Plaintiff seeks leave to replead, arguing primarily that "the state of the law in New York regarding negligence claims by abused foster children is very much in flux." ECF No. 240 at 40.

The Second Circuit "strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6)." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 107 (2d Cir. 2022). Under Rule 15, "[a] court should freely give leave when justice so requires, but it may, in its discretion, deny leave to amend for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 90 (2d Cir. 2023). "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6)." *In re Tribune Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 175 (2d Cir. 2021). Amendment is futile where the issues with the causes of action are "substantive." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

The Court denies Plaintiff leave to amend as to Count V alleging violations of the GMVA. As discussed in detail above, the provision of that law Plaintiff relies on does not function retroactively and, as such, does not and cannot reach the conduct she seeks to hold Defendants liable for. Repleading such a claim would be futile. *Cf. Jordan v. Chase Manhattan Bank*, 91 F. Supp. 3d 491, 510 (S.D.N.Y. 2015) (denying leave to amend as futile where relevant statutes did not provide plaintiff with a private right of action). The Court also denies Plaintiff leave to amend her claims in Counts VI, VII, and VIII brought pursuant to the New York State Constitution because, for the reasons explained above, she has an adequate alternative remedy under Section 1983. *See Chan v. City of New York*, No. 19-cv-7239, 2024 WL 1452381, at *10

(E.D.N.Y. Feb. 15, 2024) (denying motion to amend New York State Constitution claim where plaintiff "d[id] not dispute the adequacy of § 1983 as a remedy"), *report and recommendation adopted*, Mar. 25, 2024, Text Order.

It is a closer call with respect to whether granting leave to amend the remaining claims would be futile.  The Court will not grant leave to amend solely on the basis that New York law is "in flux" on issues relevant to this case, both because the principal issue she identifies in *Weisbrod-Moore I* has now been resolved by the Court of Appeals, and because allowing Plaintiff to repeatedly amend in the face of shifting state law would risk running afoul of other factors relevant to the Rule 15 analysis like undue delay and undue prejudice.  *MSP*, 66 F.4th at 90.  And the Court is hesitant to grant leave to amend where Plaintiff has already amended three times.  *See Sung v. DeJoy*, No. 22-cv-07682, 2024 WL 4107212, at *14 (E.D.N.Y. Sept. 5, 2024).  That is especially so here, where Plaintiff "requested leave to amend without specifying what additional facts, if any, [she] might assert in a new pleading."  *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 188 (2d Cir. 2011).

At the same time, the Court is cognizant that this is the first time Plaintiff has "the benefit of a ruling," thereby putting her "in a position to weigh the practicality and possible means of curing [the] specific deficiencies" outlined in detail in this Order.  *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015).  In addition, at least some of the problems with the TAC's pleading appear to arise from imprecise drafting and insufficient focus on the elements of her claims in favor of developing a broad narrative about systemic problems in the foster care system.  *See Redfern-Wallace v. Buffalo News*, No. 12-cv-471, 2013 WL 3777139, at *11 (W.D.N.Y. July 17, 2013) (granting plaintiff leave to amend to, *inter alia*, provide an "organized chronology of alleged events").  Additionally, the Court credits Plaintiff's

argument, made elsewhere, that it may be difficult for child victims of sexual abuse which took place long in the past to recall facts about that abuse.  *See* ECF No. 240 at 18.  Against this backdrop, justice favors granting her the opportunity to try to cure the defects she may not have previously been aware of.  Fed. R. Civ. P. 15(a)(2).  In conclusion, the Court cannot conclude that such amendment would be futile, and grants her leave to file a Fourth Amended Complaint. *See Levin*, 2024 WL 4026966, at *26.[34]

## <u>CONCLUSION</u>

To sum up:

- Count I, alleging negligence and brought pursuant to the CVA, based on negligent failure to report child abuse and failure to supervise with respect to the allegations concerning Juan Rodriguez only, survives against Defendant City.  Count I also survives against Defendants Lewis, Ellis, and HeartShare for negligent reporting, and Ellis and HeartShare (but not Lewis) for negligent supervision, with respect to the allegations concerning Gary Hoyte only.  Count I is otherwise dismissed without prejudice and with leave to amend.

- Count II, alleging negligence and brought pursuant to the ASA, is dismissed without prejudice and with leave to amend.

- Count III, alleging statutory failure to report child abuse based on the allegations concerning Juan Rodriguez only, survives as to Defendant City.  Count III also survives against Defendants Lewis, Ellis, and HeartShare based on the allegations concerning Hoyte only.  Count III is otherwise dismissed without prejudice and with leave to amend.

- Count IV, alleging breach of contract, survives as to the City, Concord, and HeartShare (the only Defendants Plaintiff brings this claim against).

- Count V, alleging violations of the GMVA, is dismissed with prejudice and without leave to amend, as to all Moving Defendants.

- Counts VI, VII, and VIII, alleging violations of federal constitutional rights pursuant to Section 1983, are dismissed without prejudice as to all Moving Defendants.  Plaintiff is granted leave to amend to assert allegations needed to support a request for equitable relief, among any other amendments she may have to these Counts.

---

[34]     If Plaintiff chooses to file a Fourth Amended Complaint, the Counts must remain ordered in the same way as in the TAC for the ease of all parties and the Court in resolving any future motion to dismiss.

- Counts VI, VII, and VII, alleging violations of the New York State Constitution, are dismissed with prejudice and without leave to amend, as to all Moving Defendants.

If Plaintiff intends to file a Fourth Amended Complaint, she must do so on or before April 2, 2025. If Plaintiff chooses not to amend the TAC, then Defendants shall answer the non-dismissed portions of the TAC on or before April 16, 2025. If Plaintiff does file a Fourth Amended Complaint, any Defendant who then seeks to dismiss it shall file a pre-motion letter in accordance with Section IV.A of the Court's Individual Practices, or answer, on or before April 16, 2025.

Given the age and complexity of this case, and the likelihood of additional protracted motion practice, the Court encourages the parties to consider attempting to resolve this action by participating in the Court-Annexed Mediation Program. The Court reminds the parties that Plaintiff and some or all Defendants may seek referral to that program at any time by filing a letter on the docket.

SO ORDERED.

 _/s/ Hector Gonzalez_____
HECTOR GONZALEZ
United States District Judge

Dated: Brooklyn, New York
           March 3, 2025