# EXHIBIT 1

PCAELINC

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    ARDITH LINDSEY,

 4                    Plaintiff,

 5            v.                         23 Civ. 10166 (ALC)(SN)

 6    CITIGROUP GLOBAL MARKETS,
      INC.,
 7                                       Conference

 8                    Defendant.

 9    ------------------------------x
                                         New York, N.Y.
10                                       December 10, 2025
                                         3:00 p.m.
11
      Before:
12
                          HON. SARAH NETBURN,
13
                                         U.S. Magistrate Judge
14
                              APPEARANCES
15
      VLADECK, RASKIN & CLARK P.C.
16         Attorneys for Plaintiff
      BY:  DEBRA L. RASKIN
17         EMILY BASS
           JEREMIAH J. IADEVAIA
18
      PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
19         Attorneys for Defendant
      BY:  LIZA M. VELAZQUEZ
20         TIHITINA M. DAGNEW

21

22

23

24

25
```

PCAELINC

```
 1              (Case called)
 2              MR. IADEVAIA:  Good afternoon, your Honor.
 3              Jeremiah Iadevaia of Vladeck, Raskin & Clark, on
 4   behalf of the plaintiff.
 5              MS. BASS:  Good afternoon, your Honor.
 6              Emily Bass, also of Vladeck, Raskin & Clark, on behalf
 7   of the plaintiff.
 8              THE COURT:  Thank you.
 9              MS. RASKIN:  And Debra Raskin for the plaintiff,
10   Vladeck, Raskin & Clark.
11              Thank you.
12              THE COURT:  Thank you.
13              And for the defendant.
14              MS. VELAZQUEZ:  Good afternoon, your Honor.
15              Liza Velazquez from the Paul, Weiss law firm, on
16   behalf of Citigroup Global Markets.
17              THE COURT:  Thank you.
18              MS. DAGNEW:  Good afternoon, your Honor.
19              Tihitina Dagnew from Paul, Weiss, on behalf of Citi.
20              THE COURT:  Thank you.
21              All right.  So we're here today on a series of
22   discovery disputes.  I have letters from the parties.  Each
23   side filed a letter on November 26, and each side responded to
24   the other's letter on December 4.  I know that you all had been
25   asking for a delay in filing these letters because you were
```

PCAELINC

1   working to reach resolution.  I don't know if this is the

2   product of failed efforts or the product of significant

3   success, but it seems like there still is a lot to be resolved.

4           It also seems like, with respect at least to certain

5   areas of discovery, there is not necessarily a dispute as much

6   as sort of a failure to finalize a compromised position, and so

7   I think some of the discovery disputes might need to be

8   adjourned so that the discovery that the parties have agreed to

9   can start being produced, because it appears that there still

10  is very little discovery that's been exchanged between the

11  parties.

12          I think the most efficient way for us to proceed is to

13  start by talking about the scope of discovery that Citigroup is

14  going to produce, and by that I mean I want to focus on the

15  unit that we're looking at and the dates, and then we can drill

16  down on some of these issues.  I think that is the most

17  efficient way to proceed.

18          So let me begin by just getting a sense.

19          Mr. Iadevaia, are you going to be primarily speaking?

20          MR. IADEVAIA:  No.  Actually my colleagues will be.

21          THE COURT:  Okay.  Who is taking the lead here?

22          MS. RASKIN:  Your Honor, I'll be speaking on the issue

23  of the scope, by which I assume the Court is talking about the

24  scope of Global Markets.

25          THE COURT:  Yes.  So my understanding is that your

PCAELINC

```
1    client worked in New York with the -- sorry.  I'm just pulling
2    up -- I'm looking specifically at the Shari Funk -- F-U-N-K,
3    and that's Shari with an "I" -- declaration just to understand
4    the business.  And so my understanding is that your client
5    worked in New York exclusively and worked in the equities
6    division within Markets.
7              So far, Ms. Raskin, am I correct?
8              MS. RASKIN:  That's correct.  The equities division.
9              THE COURT:  And within equites, did she work -- I know
10   there's the North American NAM, N-A-M, equity sales.  Did she
11   work within that unit as well?
12             MS. RASKIN:  That's where she was formally placed, but
13   the significance here for the case is that there are biased
14   events with individuals, executives, from many other
15   geographical areas and other areas besides the equity sales.
16   And I can give the Court a few examples from the amended
17   complaint, but the point is that she was aware of all of these
18   incidents, either by knowing it firsthand or by being told
19   about it.  And the Second Circuit has certainly held that all
20   of those kinds of incidents can influence and create a hostile
21   environment.
22             And just to give a few examples from the complaint,
23   one of the most serious ones was a sexual assault of hers -- on
24   her by an individual who was responsible for Europe, the Middle
25   East, and Africa, and that's Mr. Evans.  Paragraph 50 of the
```

PCAELINC

1   amended complaint, the global head of derivatives engaged in

2   talking publicly or in the office about his sexual prowess.

3   Paragraph --

4           THE COURT:  That person worked in New York?

5           MS. RASKIN:  That was within New York that that

6   happened, that she was aware of it.  But the point is that the

7   executive who did that was global head of derivatives and not

8   in this limited area of equity sales that defendant would have

9   the discovery limited to.

10          THE COURT:  Sorry.  I thought you said global head of

11  equity.  It is global head of derivatives?

12          MS. RASKIN:  Global head of derivatives.

13          THE COURT:  And that person talked about his sexual

14  prowess --

15          MS. RASKIN:  In the office.

16          THE COURT:  -- in the office.  In the New York office.

17          MS. RASKIN:  Yes.

18          THE COURT:  And your client heard that or heard about

19  it.

20          MS. RASKIN:  Either heard it or heard about it.

21          THE COURT:  And when was that?

22          MS. RASKIN:  The date in that?  I don't know the exact

23  date, your Honor.

24          THE COURT:  Do you have a year?

25          MS. RASKIN:  I don't.

PCAELINC

| | |
|---|---|
| 1 | THE COURT:  Okay. |
| 2 | MS. RASKIN:  Number 60, paragraph 60, the global head |
| 3 | of commodities engaged in a widely known relationship with a |
| 4 | younger female subordinate, supposedly against Citi policy. |
| 5 | Paragraph -- |
| 6 | THE COURT:  Sorry.  So the global head of commodities. |
| 7 | MS. RASKIN:  Commodities. |
| 8 | THE COURT:  That was somebody who was in the New York |
| 9 | office? |
| 10 | MS. RASKIN:  With global responsibilities.  I mean, |
| 11 | that's the point. |
| 12 | THE COURT:  I understand.  But he's in the New York |
| 13 | office? |
| 14 | MS. RASKIN:  My understanding was that this affair was |
| 15 | known within the New York office.  Where he was actually |
| 16 | located at the time of the affair, I don't know the answer to |
| 17 | that. |
| 18 | THE COURT:  Okay.  So people in the New York office |
| 19 | knew that this person, global head of commodities, was in a |
| 20 | relationship with a subordinate. |
| 21 | MS. RASKIN:  Yes. |
| 22 | THE COURT:  Which was known to be consensual or |
| 23 | nonconsensual? |
| 24 | MS. RASKIN:  It is presumed -- I mean, Citi's policies |
| 25 | prohibit such relationships because there's an implicit |

PCAELINC

1    presumption that they're not consensual when you're dealing

2    with junior women and senior executive men.

3            My point is that there are many such examples of this,

4    and these are by executives and higher-level individuals with

5    global responsibilities.  And if the discovery is cut to this

6    small area of sales, equities, North America, that discovery is

7    going to go untouched, even though it was a part of the

8    day-to-day environment that the plaintiff and other women had

9    to endure.

10           THE COURT:  But, I mean, the notion that all of Citi,

11   in the 80 countries that it is present, should have to search

12   through all of those files and go through all of the data

13   privacy to find potentially discriminatory conduct that your

14   client has never once heard of seems unreasonable.

15           MS. RASKIN:  Well --

16           THE COURT:  And so why are we just opening the door to

17   all of this hugely burdensome discovery if your client maybe

18   never even heard about it?

19           MS. RASKIN:  Well, your Honor, first of all, let me

20   talk about the issue of burdensome, which appears to be the

21   chief objection on Citi's part.

22           We have reduced the number of persons whose emails and

23   information should be searched from 65 to 30, and are prepared

24   to reduce that even further by careful tailoring of search

25   terms.  And each of those 30 individuals was either a person

PCAELINC

1    who committed acts of discrimination that are alleged in the

2    complaint or was involved in the inadequate response of Citi,

3    or was a female victim.

4          So we're not just picking these custodians at random,

5    it's very tailored, and we're prepared to tailor even further

6    by means of the search terms.

7          One other point that goes to the burden, which is

8    after this lawsuit was filed, Citi undertook a survey of female

9    employees globally, throughout Markets, to find out about

10   instances of harassment or discrimination that they had

11   experienced, either current employees or past employees.  So

12   they have a lot of these data.  And unless we get a broader

13   scope of discovery, that information, which is readily

14   compiled, is not going to see the light of day.  So that the

15   burden, I think, is something -- as your Honor was saying,

16   these are things that we're still working on, have the

17   potential to narrow it but not in the artificial way because

18   this was a global business where the plaintiff also worked in a

19   global-wide women's group that got information about what was

20   going on at Citi.  So the argument for cutting this back is

21   really a false one.

22         THE COURT:  And so the 30 custodians that you have

23   identified at this point are -- it sounds like they break into

24   three categories:  People who are alleged to have engaged in

25   inappropriate sexual discrimination or sexual harassment, they

PCAELINC

 1   are people who failed to respond appropriately to Ms. Lindsay's

 2   complaints --

 3            MS. RASKIN:  And to the complaints of other women,

 4   your Honor.  That's part of the case.  That things went on,

 5   went on directly at Ms. Lindsey, but went on because other

 6   women experienced it and it went unremedied.  So that the

 7   totality of the circumstances, which, of course, is what the

 8   courts tell us to look at in a hostile environment case, the

 9   totally of the circumstances become relevant and not just what

10   happened physically to her.

11            THE COURT:  And then the third category are people who

12   experienced sexual harassment who were so-called victims.

13            MS. RASKIN:  That's correct.

14            THE COURT:  And of the list of those 30 individuals,

15   where were their offices?  Predominantly in New York, or were

16   they global?

17            MS. RASKIN:  Well --

18            THE COURT:  I know their titles may have been global,

19   but I want to ask where they physically went to work.

20            MS. RASKIN:  Well, to give an example, Mr. Evans was

21   in London.  So it's not unusual that these -- the men -- the

22   male executives with the global titles worked in different

23   places in the world but also would have an office in New York.

24            THE COURT:  Okay.  Do you know the answer to my

25   question about the 30 custodians?

PCAELINC

1          MS. RASKIN:  No, I don't.

2          THE COURT:  Okay.  So they may be all over the place.

3          MS. RASKIN:  The men who engaged in the sexual

4     misconduct that we're talking about may well have primary

5     offices in other places, but offices in New York as well.

6          The women that we're talking about, who we describe as

7     victims, would have worked pretty much in New York, but again,

8     not just in equity sales but in other areas within the New York

9     office of Markets.

10         And just to point out, Mr. Singh, who was one of the

11    chief malfeasors here, he was based both in London and in New

12    York, and he's really central to this.

13         THE COURT:  And so it sounds like the electronic

14    discovery that you are seeking is custodian-centered and not

15    file-centered, which is to say you are looking for Citi to run

16    searches, you're proposing these 30 -- it sounds like you're

17    willing to continue the conversation, but to propose search

18    terms for these 30 custodians, seeking those three categories

19    of information; is that correct?

20         MS. RASKIN:  That's correct, your Honor.

21         THE COURT:  All right.  Thank you.

22         And, sorry, before I turn to defendants, let's talk

23    about timeframe.  It's my understanding that your client was

24    assaulted by Mr. Evans in 2007 and that very soon thereafter he

25    resigned; is that correct?

PCAELINC

1          MS. RASKIN:  Well, depends, your Honor.  That was

2     2007.  He was in London again in 2008, so that's the timeframe

3     for him.  But we go back to the fact that Judge Carter

4     concluded on the motion to dismiss that we had enough evidence

5     to establish a hostile environment, dating back to 2007 until

6     the time of her leaving the work for health reasons in 2022.

7          THE COURT:  And it's my understanding that there was

8     this assault in 2007, and then I glean from your letters that

9     there were inappropriate comments that were made to her in 2013

10    or thereabouts, I think in connection with her pregnancy.

11          Is that correct?

12          MS. RASKIN:  Yes, your Honor.  But the point is that

13    throughout her tenure, these kinds of behaviors went on and

14    were unchecked.  And so it's not as if Judge Carter said, well,

15    okay, let's separate out 2007 and 2008 because then Mr. Evans

16    left and, you know, skip the period to 2013.  That's not what

17    the decision says.  It says you will have the opportunity to

18    prove that the hostile environment continued throughout that

19    period.

20          THE COURT:  And when did the relationship, however

21    it's defined, with Mr. Singh begin?

22          MS. RASKIN:  That's hard to say, your Honor, because

23    our position is that, in a certain sense, it's not really a

24    relationship.  It was a product of coercion, and --

25          THE COURT:  When did the coercion -- I mean, I

PCAELINC

```
1    understand.  I'm not trying to put words in your mouth or to

2    reframe your claims.  I understand the nature of your claims.

3    But I assume there was a moment in time where it went from a

4    work relationship to a different kind of relationship that's

5    not a work relationship.

6              MS. RASKIN:  That's very hard to say, your Honor.

7              THE COURT:  How are you going to prove this case?  I

8    don't understand why that's hard to say.

9              MS. RASKIN:  I think because she's going to talk about

10   how, leading up to any kind of sexual interchange, there was

11   really efforts to be super friendly to her, efforts to

12   intimidate her.  The --

13             THE COURT:  When did they first have sex?

14             MS. RASKIN:  -- process went on.

15             I can't give you that answer, your Honor.

16             THE COURT:  All right.  Let me talk to defense

17   counsel.

18             So it sounds like from what Ms. Raskin is saying,

19   which is, I think, helpful and different than what I

20   understood, was that the e-discovery that they are seeking

21   right now is limited to these proposed 30 custodians, with

22   potentially the possibility for further narrowing, and then

23   search terms in an effort to identify these three categories

24   that we've identified.  So let's just talk about that thus far.

25             What's your objection to that?
```

PCAELINC

```
1              MS. VELAZQUEZ:  Sure, your Honor.

2              Just to level set, Citi has already agreed to provide

3    discovery concerning the incidents that plaintiff herself

4    allegedly experienced and the individuals she accuses of

5    mistreating her.  We are still conferring about ESI searches

6    and custodians.  We just got plaintiff's proposal on Monday,

7    after having sent them our initial proposal in mid October.

8              In one of our interrogatories that is the subject of

9    our motion, we've been asking plaintiff to answer our

10   interrogatory and identify the alleged incidents in the

11   complaint that she witnessed or had contemporaneous knowledge

12   of, but she hasn't answered.  So beyond that, plaintiff is

13   asking for a fishing expedition to search for incidents

14   involving other people with whom she had no relevant personal

15   contact, and the burden and cost of that is not justified, and

16   it's not the law.

17             As you pointed out, your Honor, and as she alleges in

18   her complaint, throughout her tenure she worked within the

19   North American markets equity sales division, sitting in the

20   New York office.  Plaintiff hasn't identified a single

21   plaintiff harassment case anywhere where a court has permitted

22   a global fishing expedition untethered to the facts of these

23   claims.  And courts in this circuit have made clear that

24   discovery in a hostile work environment case is properly

25   focused on what the plaintiff personally experienced and the
```

PCAELINC

```
1    individuals who the plaintiff accuses of mistreating her.  That
2    is the discovery that Citi has agreed to provide.  And --
3              THE COURT:  So --
4              MS. VELAZQUEZ:  Sorry to interrupt you.  Yes.
5              THE COURT:  I think we're getting there, I guess is
6    the point.  And maybe that speaks to my first comments that it
7    seems like there is still more work that the parties could do.
8    But it sounds like -- I realize you got this list two days ago,
9    but so long as we're focusing on custodians, there may be a
10   fight about whether or not Custodian One should be in or
11   Custodian Four should be in, but if we're focusing on
12   custodians and that there's at least a basis for each person,
13   and the lawyers can have a conversation about that, then I
14   don't know that we need to have a conversation about whether or
15   not we should be looking at the mainframe for Citi and
16   searching Berlin offices and Sydney offices and the like if
17   we're focusing now on custodians that have at least a direct
18   relevance to the claims.
19             MS. VELAZQUEZ:  Understood, your Honor.
20             But just to level set, you know, again, we haven't had
21   an opportunity to really look at plaintiff's proposal from
22   Monday and assess the burden, but there's a high-level
23   executive on that list who is only alleged to have sent out a
24   memo after plaintiff left Citi.  So, unfortunately, the way in
25   which that list is being characterized is not accurate.  Again,
```

PCAELINC

1    it's beyond the scope of discovery.

2          If you just consider, for example, your Honor, other

3    complaints about other people will have no bearing on whether

4    the individuals who plaintiff accuses of mistreating her

5    actually did any of those things, or whether Citi was on notice

6    of misconduct by those individuals.  And incidents that

7    plaintiff had no contemporaneous knowledge of -- and, again,

8    she won't answer our interrogatory four -- cannot possibly have

9    impacted her experience in the workplace.

10         And so with respect to the timeframe, your Honor, just

11   again to level set, we've already agreed to search an

12   eight-year time period, we've agreed to search for documents

13   from multiple custodians from 2007 to 2008, so that surrounds

14   the period of the alleged assault by Mr. Evans in plaintiff's

15   apartment.  Evans left Citi in 2008.  And we've also agreed to

16   search for documents across a six-year time period, 2017 to

17   2022, and we've agreed to conduct even broader searches with

18   respect to the individuals who she actually accuses of

19   mistreating her.  The needs of this single-plaintiff case don't

20   justify the burden of requiring Citi to collect and search

21   hundreds and thousands of documents that go back to 2015.

22         With respect to --

23         THE COURT:  Sorry, you said eight-year.  You said 2007

24   to 2008.

25         MS. VELAZQUEZ:  Yes.

PCAELINC

1             THE COURT:  Are those searching those full calendar

2    years?

3             MS. VELAZQUEZ:  Yes.  Yes, your Honor.  And --

4             THE COURT:  So that's two years.  And then --

5             MS. VELAZQUEZ:  And then 2017 to 2022.

6             So when Citi investigated the texts that plaintiff

7    brought to our attention in November 2022, this was the first

8    time she ever came forward to us about Mr. Singh.  She told us

9    at that time that the relationship began in 2017 and that it

10   was consensual.  So we don't understand why plaintiff can't

11   answer our interrogatory asking her to actually identify when

12   that relationship began, but our understanding is it's 2017.

13            You noted three incidents of misconduct directed at

14   her prior to 2017:  The alleged assault in her apartment in

15   2007, a 2013 comment by a coworker before her maternity leave

16   telling her to enjoy her vacation, and Singh's comments about

17   her ankles.  Citi is searching for documents regarding all of

18   those alleged incidents.  So additional discovery is of

19   marginal utility at best and not proportional to the needs of

20   this case.

21            Again, an eight-year period is more than sufficient to

22   determine whether there was a hostile work environment which

23   impacted plaintiff, and Citi's knowledge of such.  And again,

24   the burden of adding another decade of discovery would be

25   substantial.  Applying plaintiff's initial search terms in a

PCAELINC

1    20-year timeframe to just five custodians yields over two

2    million de-duplicated documents.  Our search proposal applied

3    to just seven custodians were already at 300,000 documents.

4    So, again, the burden is substantial.

5         And with respect to documents after she left Citi, the

6    case law is very clear on that.  Discovery beyond the period in

7    which the alleged discrimination occurred is not relevant, it's

8    not proportional to the needs of the case.  She can't bring a

9    claim based on incidents that occurred after she left the

10   workplace.  Mr. Singh left the workplace.  He left Citi in

11   November of 2022.  Nor would documents concerning any

12   subsequent remedial measures even be admissible.

13        So for all of those reasons, we don't agree with

14   plaintiff's scope, we don't agree with plaintiff's timeframe.

15   She is getting discovery concerning the incidents that she

16   alleges happened to her and all of the individuals who she

17   accuses of mistreating her over an eight-year time period, plus

18   all of the incidents that she alleges happened in the

19   intervening decade between the Evans alleged assault and the

20   beginning of her relationship with Mani Singh, which she kept

21   secret from us for five, six years.

22        THE COURT:  Thank you.

23        MS. RASKIN:  Your Honor, if I may just make one

24   remark, which is that the law in the Second Circuit is

25   perfectly clear that it's not just about what actually happened

PCAELINC

1    to the plaintiff in a hostile environment case, that her

2    knowledge at the time of the harassment and the discrimination

3    that went on around her is relevant, and so I can't understand

4    how these allegations can be limited just to her.

5         THE COURT:  I don't think that's what's being

6    proposed, though.  As I understand it, what's being proposed is

7    the categories that you have identified, which are certainly

8    not just to her, there are people alleged to have been engaged

9    in sexual discrimination, misconduct, harassment, et cetera,

10   people who were the victims of it, so not your client, and

11   people who failed to respond reasonably to those allegations.

12   So you're getting well beyond -- or at least you're asking for

13   well beyond your client's incidents.  And the proposal from

14   Citi is eight years of discovery, plus some additional

15   timeframe for the things that your client has specifically

16   identified.  Why is that not adequate and consistent with

17   Second Circuit law?

18        MS. RASKIN:  Well, my client is going to respond on

19   the timing issue, but that is not at all what I heard, because

20   I have heard it as being limited to five particular malfeasors,

21   five particular men, and then two individuals who were involved

22   in the investigation in November of 2022.  That --

23        THE COURT:  Well, I think they just received your --

24   I'm getting a nod so I think I understand clearly.  They just

25   received your list of 30 custodians, they will go through it.

PCAELINC

1          I mean, I have these types of conferences all the time

2     where we have a list of 30 from the plaintiff, the defendants

3     agree to 25, and then we have a conference over the five, and I

4     say this one is in and this one is out.  But it sounds like

5     that only just happened -- well, you've only just identified

6     those folks, they're going to look at it and have a

7     conversation about whether or not all 30 should be in or

8     whether or not they don't think a certain person should be

9     there.

10          I think those conversations need to be had about the

11    custodians in connection with the search terms, because it may

12    affect whether or not a person is appropriate or not, but I

13    think those conversations need to be had, and I hear Citi

14    saying they're open to having them.  I just think we need to

15    move forward with this, because I assume -- I know the parties

16    are keen on having depositions begin, but if we don't have the

17    documents, I don't think those depositions can begin.  So I do

18    want to push the issue.

19          I know it's the 10th of December.  I assume people

20    take a day or two off in December.  And maybe when we're done

21    with today's conference, we can talk about when to report back

22    to me.  But I think for a lot of these disputes that have been

23    presented in the various letters, I think just trying to get a

24    sense of what the volume is that we're talking about I think

25    would be appropriate.  And I don't know whether your 30

PCAELINC

1  custodians are the ones that they should be, but that seems

2  like the reasonable place to be.  And maybe there'll be a

3  reason why one or two should be taken out, or four or five, I

4  don't know.  But I appreciate that you did the work of

5  identifying those people.  And identifying these three

6  categorize, I think, is useful as well.  And so to the extent

7  you can provide search terms that will, you think, identify

8  those and the defendants can run hit reports so we can have a

9  conversation about whether we're in the right world, I think

10  all of that makes a lot of sense.

11         On the timeframe, obviously I'm familiar with the

12  Second Circuit case law and understand Judge Carter's decision.

13  You know, I see this all the time.  You have to balance what

14  you really want.  I mean, you know, 20 years of discovery

15  really seems too substantial, and what I'm hearing here is a

16  pretty good hit.  I see you standing so I'm happy to hear you

17  out, but I guess that's my initial reactions.

18         But please, Ms. Bass.

19         MS. BASS:  Yes, your Honor.

20         And apologies.  I didn't mean to interrupt.

21         I want to address a couple of things that the

22  defendants have said about the timing.  The defendant argues

23  that aside from these three instances, there is nothing -- the

24  comments that were in 2013 and the assault in 2007, there's

25  nothing alleged prior to 2017, which is just not an accurate

1    reflection of what's in the complaint.  So, for example, in the

2    complaint there is a dated incident where a junior trader was

3    encouraged to show the underwear of a woman he had recently had

4    sex with in 2016 or 2017.

5         There is a timeframe that's alleged of a 10-year

6    period where a woman named Jackie Moran was subjected to sexual

7    harassment.  That's in paragraphs 55 and 56 of the complaint.

8    My understanding is that Ms. Moran left in 2017.  That

9    timeframe would cover most of the time period that we're

10   talking about.  And, again, that's conduct of which our client

11   was aware.

12        And in addition, there are many, many undated

13   allegations in the complaint, either because this type of

14   conduct was happening so regularly that it's incapable of

15   putting precise dates to it, or because there was so much of it

16   that we don't have precise dates without further discovery.

17        THE COURT:  But do you have the incidents?  Like

18   Jackie Moran.  Okay, that's helpful.  So maybe one conversation

19   is, can we look and see whether or not Jackie Moran raised a

20   complaint, brought it to Citi's attention, whether or not there

21   was an investigation, figure out what Citi knows about that

22   incident.  So that might be an exception to the general date

23   restriction.

24        MS. BASS:  So I think as to certain of the incidents,

25   including the one with Jackie Moran, based on Citi's objections

PCAELINC

1    -- we're not entirely clear on this, but it seems like their

2    position is because it's happening in this timeframe, which

3    they say is outside of the scope of the case, that they won't

4    produce documents.  If I'm wrong about that, we'd be happy to

5    have that discussion with them.

6          But in addition to the incidents that are specifically

7    alleged, in the case of some of the actors who we know to have

8    engaged in some misconduct, we're looking for some broader

9    searches about their behavior during this longer period based

10   on our client's knowledge of the harassment that was happening

11   during that time.

12         THE COURT:  And have you identified anything other

13   than these guys were bad?  Like, is there an incident, is there

14   a victim, is there anything beyond just a culture that was, you

15   know, full of sexual innuendo and sexual harassment?

16         MS. BASS:  Yes, your Honor.  As I said, there's a

17   number of allegations in our complaint, some dated, some not,

18   that talk about various instances of harassment that our client

19   was aware of.

20         What I'm getting at here is that, for some of these,

21   we can ask for documents related to a specific incident.  So,

22   for example, for specific comments that were directed at

23   Ms. Moran, for some of these, we're aware of some instances of

24   misconduct by particular men, and what we're looking for are

25   broader searches over the whole time period that would cover

PCAELINC

1    their misconduct.

2            THE COURT:  So I think I'm not going to allow just

3    full open files for a 20-year period.  I think that's

4    inappropriate and unwarranted.

5            What I will allow is more targeted discovery.  I don't

6    know if the people that you're mentioning are part of those 30

7    custodians.  If they are, you might be getting some of that

8    discovery potentially already, assuming everybody reaches

9    agreement here.  But I think what I'm not going to allow is a

10   20-year window where you're searching for the word "sex" in

11   emails at Citi.  I'm just not going to allow that, because it

12   does have to be tied to your client's experience, and so I

13   think that is unfair.  We're talking already about an

14   eight-year period where you might get "sex" for eight years, so

15   to speak, but beyond that I think it needs to be narrowed to

16   specific events that your client is aware of that affected her.

17           MS. BASS:  Understood, your Honor.

18           I just want to be clear that if the events happened

19   during a time period that's before 2017, because we're not

20   completely clear on what Citi's objection is here, that those

21   documents aren't going to be withheld on the basis that they're

22   outside of the timeframe that they deem relevant.

23           THE COURT:  I mean, I hear defense counsel saying that

24   they're open to discussions of individual incidents outside of

25   this eight-year period.  I don't know if I'm reading that

PCAELINC

1    correctly.

2              Ms. Velazquez?

3              MS. VELAZQUEZ:  That's right, your Honor.

4              With respect to instances of misconduct directed at

5    plaintiff that she was aware of, we are providing that

6    discovery.  Again, plaintiff --

7              THE COURT:  Just to make sure I'm hearing you

8    correctly, you said directed at plaintiff or that she was aware

9    of, so --

10             MS. VELAZQUEZ:  Contemporaneously.

11             THE COURT:  -- it could be something --

12             MS. VELAZQUEZ:  Yes.

13             THE COURT:  -- that she knows that her colleague is

14   experiencing.

15             MS. VELAZQUEZ:  That's correct, your Honor.

16             Again, I don't want to belabor this point, but the

17   plaintiff has refused to answer our interrogatory asking her to

18   identify the incidents in her complaint, which she had

19   contemporaneous personal knowledge of.

20             But yes, your Honor.  For example, with respect to

21   Jackie Moran, we are already providing discovery with respect

22   to the person who allegedly engaged in misconduct toward

23   Ms. Moran, and that's Mr. Keegan, so we're already providing

24   that discovery.

25             THE COURT:  Okay.  All right.

PCAELINC

1           MS. BASS:  Your Honor, if --

2           THE COURT:  Yes.

3           MS. BASS:  -- I could just address the period after

4    2022 before we move on from this point?

5           THE COURT:  Sure.

6           MS. BASS:  The reason that we've sought some documents

7    after the period of time where plaintiff went on leave is that

8    it still has relevance to the case, including because one of

9    the claims here is that Citi failed to take any action against

10   Mr. Singh after becoming aware of his text messages harassing

11   and threatening plaintiff and her family.

12          I know Citi's argument here is that it could not have

13   disciplined Mr. Singh because he left in 2022 after this

14   incident, but there are continued actions which are alleged to

15   have happened after Mr. Singh purportedly resigned, including

16   that he was not reported to FINRA, that his conduct was not

17   reported to FINRA, and that we're seeking discovery on, among

18   other things, his compensation and the effect that these

19   incidents had on his compensation.

20          We also believe that some of these documents going

21   beyond 2022 are relevant to Citi's reactions to Ms. Lindsey's

22   complaint.  So, for example, as alleged in paragraph 185 of the

23   amended complaint, an executive named Connor Davis spoke

24   publicly about and disparaged Ms. Lindsey and her claims after

25   she was already on leave.  That's, I think, obvious that it's

PCAELINC

1    relevant to plaintiff's retaliation claims, and also to her

2    discrimination claims and the culture at Citi.

3         And as my colleague mentioned, Citi did a survey

4    concerning women's experiences with sexual harassment,

5    apparently in reaction to Ms. Lindsey's complaint, which is

6    discussed in paragraph 182 of the amended complaint.

7         To respond briefly to the argument that this survey or

8    any subsequent actions would be inadmissible as a subsequent

9    remedial measure, I don't think that's on objection to

10    discovery, but in any event, it goes to the feasibility of Citi

11    being able to address these types of actions at a global level,

12    which is what it appears it attempted to do.

13         So to the extent that defendant is seeking a discovery

14    cutoff as of the time that plaintiff went on leave, we believe

15    that would be inappropriate.

16         THE COURT:  Okay.  Thank you.

17         Yes.

18         MS. VELAZQUEZ:  Your Honor, if I may, again, just to

19    level set, to address the allegation that we failed to protect

20    Ms. Lindsey when she finally came forward and disclosed the

21    relationship in November of 2022, within hours we began an

22    investigation.  Mr. Singh did resign within days.  We have

23    already agreed to produce his FINRA, U5, and any effect on his

24    compensation with respect to his resignation.

25         We also offered to support plaintiff if she wanted to

1    seek retraining order, to go to the police, and she did not

2    take us up on that offer.

3            The case law is pretty clear on this, your Honor, as I

4    mentioned earlier.  Discovery beyond the period during which

5    the alleged discrimination occurred is simply not relevant to

6    plaintiff's claim.  Plaintiffs left the workplace in

7    November 2022, she has not come back.  Mr. Singh resigned in

8    November of 2022.  This discovery is not proportional to the

9    needs of the case.  She can't bring a claim based on incidents

10   in the workplace after she left.  And again, documents

11   concerning subsequent remedial measures are not even

12   admissible.

13           Moreover, many documents postdating November 2022 that

14   discuss these claims in any substance are going to be

15   privileged.  Plaintiff filed her first claim against us in

16   2023, so the burden is substantial, there is no basis for it,

17   it won't have any probative value or shed light on what she

18   actually experienced in the workplace.

19           THE COURT:  So let me go through these, I think, three

20   categories that were identified.

21           It sounds like with respect to Mr. Singh, you are

22   producing all of the relevant documents, you will not object on

23   the basis that the decision not to report to FINRA, if that's

24   in fact true, happened after November of 2022.

25           Is that correct?

PCAELINC

1            MS. VELAZQUEZ:  That's correct, your Honor.

2            THE COURT:  Okay.  So that, I think, we're taking care

3       of.

4            Let's talk about this survey.  When was this survey

5       conducted, roughly?

6            MS. VELAZQUEZ:  I think --

7            THE COURT:  2023?

8            MS. VELAZQUEZ:  I believe it was 2023, 2024.  You

9       know, it was --

10           THE COURT:  And were the --

11           MS. VELAZQUEZ:  -- conducted by a law firm, Citi's

12      council.

13           THE COURT:  Okay.  And were the results of that survey

14      made available publicly?

15           MS. VELAZQUEZ:  I don't believe so, your Honor.

16           THE COURT:  And so Citi retained a law firm to look

17      into what was happening at its practice?  Is that --

18           MS. VELAZQUEZ:  I don't think the issues that were

19      looked at in that survey were limited to this case.  I think it

20      was sort of a broader survey of the workplace environment.

21      Again, really that discovery won't shed any light on what

22      actually happened to Ms. Lindsey, who left the workplace in

23      November of 2022 and has not come back.

24           THE COURT:  So I'm not sure I have a full grasp on

25      what this survey was.  Certainly, communications with outside

PCAELINC

1    counsel would be privileged and that would not be subject to

2    disclosure.

3        To the extent the survey was like a Gallup poll and it

4    revealed that 30 percent of respondents reported that they had

5    been sexually harassed at the workplace or something like that,

6    I think that might be relevant to a claim that there was a

7    hostile work environment.  There might be an argument to

8    exclude it, but I think on the sort of basic discovery and

9    relevance, I think that probably would be subject to

10   disclosure.

11       Again, I don't know exactly what this survey looked

12   like.  So I think it would be helpful, if there's not going to

13   be on agreement between the parties, when we meet again, which

14   is going to happen probably sooner than you want, that we talk

15   about sort of what that survey looks like.  But I can envision

16   a scenario in which there was a questionnaire sent out, just

17   like some sort of a Gallup poll, and Citi received information

18   from its own employees about what people were experiencing.

19   And I'm not saying that comes in at trial, but that might be

20   something that I think would be appropriate.

21       On the third category, it sounds like someone made

22   public statement disparaging Ms. Lindsey at some event.

23       Is that correct, Ms. Velazquez?

24       MS. VELAZQUEZ:  Your Honor, plaintiffs are referring

25   to Connor Davis who allegedly made a comment over a year after

PCAELINC

```
 1    plaintiff's alleged retaliation.  So again, you know, I don't

 2    know if he made this comment.  It's entirely irrelevant to the

 3    claims in this case.  She is not bringing the claim against

 4    Connor Davis or based on anything that he said or did.

 5              THE COURT:  Is there a retaliation claim?

 6              MS. VELAZQUEZ:  There's a retaliation claim based on a

 7    performance evaluation for 2022, based on her performance

 8    evaluation in 2022, which Mr. Davis had no involvement in.

 9              So I do think that discovery beyond the period in

10    which plaintiff left the office is really far afield, and it

11    won't have any bearing on what happened when she was in the

12    office.

13              THE COURT:  So, again, I feel like the parties can

14    probably get to where they need to be on their own, but I'm not

15    going to authorize broad discovery of all these search terms

16    about whether there's sexual misconduct happening in 2023, so

17    that is not going to be permissible, for the reasons stated by

18    defense counsel.  But I'm not going to use the plaintiff's

19    leave date to preclude discovery into what happened to

20    Mr. Singh, including compensation and reporting and all of

21    that.  It sounds like we have agreement on that.

22              And on the survey, again, I don't have enough

23    information, but I can see a scenario in which the results of

24    that survey, which would tend to reveal whether there was a

25    perception -- and it may be that it's global and so it's not
```

PCAELINC

1    helpful and maybe it's specific to offices, I don't know

2    exactly how this survey was run -- but depending on the results

3    of that survey, I might require production of that, but

4    certainly not communications with counsel.

5            On the disparaging remark, this does seem like a

6    one-off.  I don't know what information you have about it or

7    how it plays out, but it sounds like it's a thing that you

8    believe happened, and you can sort of ask about it at

9    depositions or have your client testify about it, but I don't

10    really know what sort of discovery that would entitle you to.

11           MS. BASS:  Your Honor, as to the remark by Mr. Davis,

12    the remark is relevant to plaintiff's claims because it reveals

13    Citi's attitude about her, including because she has a

14    retaliation claim that's at issue.  This is a comment by a top

15    global executive about her.

16           The other thing that I want to point out is that

17    Ms. Lindsey is still an employee of Citi.  She's on leave.  I

18    think counsel said that she's not coming back or there was not

19    a possibility of her coming back.  That's not accurate.  She's

20    still an employee who is on leave.  In addition to what I've

21    already said, whether there are top executives making negative

22    comments about her and her bringing discrimination claims is,

23    at some point, going to be relevant to her ability to go back.

24           THE COURT:  All right.

25           MS. BASS:  And, your Honor, for that matter, so is the

PCAELINC

1    ongoing environment of discrimination and harassment.  If she

2    has knowledge of incidents that happened after 2022 and is

3    still an employee there, that's going to affect her ability to

4    return to that work environment.

5        THE COURT:  Okay.  At this point I'm not going to

6    allow additional discovery beyond if you want to have her

7    explore at some deposition what Mr. Davis may have said.  And

8    you could ask questions about this at depositions if you wish,

9    I'm not going to preclude that, but I'm not going to require

10   additional discovery.

11       It's been an hour.  I have a number of calls that I

12   have to take, so I want to see if we can hit a couple of

13   big-bucket items here.  I think we've actually made some

14   progress already.

15       So let me ask, maybe I'll turn to plaintiff's counsel.

16   Is there a category that you want me to focus on right now, or

17   do you want to look and see what your search terms and these

18   three custodians looks like and we can reevaluate at that

19   point?  Because, again, I think some of this stuff, you know,

20   things about retaliation and things about Mr. Singh's favorable

21   treatment, some of this stuff, I think, is going to be produced

22   in light of the progress we're making.

23       MS. BASS:  Your Honor, one issue that I think would be

24   helpful to have some resolution on going into our discussions

25   about the search terms is for what type of discrimination and

1  retaliation issues need to be searched for and produced.  So

2  even though this case has a retaliation claim, and even though

3  plaintiff's fear of reporting misconduct is central to her

4  harassment claims, our understanding is that Citi is refusing

5  to produce evidence concerning retaliation except for a narrow

6  subset of retaliation that it seems to be sufficiently similar

7  to that experienced by plaintiff.  And by that I mean it's

8  narrowed the type of retaliation concerns that it'll produce

9  documents on to retaliation for reporting sexual harassment.

10 Because there is a retaliation claim in this case, we don't see

11 a basis for limiting it that way.  So in other words, if there

12 are other concerns that are being raised -- for example,

13 discrimination on the basis of other protected categories --

14 that's going to go to plaintiff's understanding of how Citi

15 deals with such claims and her ability to report the concerns

16 that she was experiencing at the time.  So we don't think that

17 that is an appropriate way to limit it.

18      THE COURT:  Has she said in either her pleadings or

19 otherwise in response to the defendant's discovery, I know that

20 this person wanted an ADA accommodation and was denied it, they

21 complained about that, and then they were fired?  Does she have

22 any basis for that knowledge?

23      MS. BASS:  She has, I believe in the pleadings,

24 alleged that she's aware of other people who complained about

25 other issues that were not sexual harassment-related issues,

PCAELINC

1    whose issues were not adequately addressed.

2            She also does have a basis --

3            THE COURT:  Discrimination issues or I want a bigger

4    office?

5            MS. BASS:  Yes, your Honor.  Yes, your Honor.

6            And beyond even what's in the complaint, my

7    understanding is that she has a basis to believe that people

8    who reported issues about discrimination but outside of the

9    context of sexual harassment specifically, were mistreated in

10   response to those complaints.

11           THE COURT:  So, just so I'm clear on what you're

12   seeking, you're seeking documents related to allegations of

13   sexual harassment and sort of gender-based harassment, and then

14   separately all forms of retaliation?

15           MS. BASS:  That's correct, your Honor.

16           THE COURT:  Okay.  I'll hear from the defendants.

17           MS. VELAZQUEZ:  Your Honor, if I may, Citi has already

18   agreed to produce documents about sex discrimination,

19   harassment, and retaliation complaints based on sex

20   discrimination and sexual harassments.  Those are the types of

21   claims that this plaintiff is bringing in this case.

22           The case law is very clear on this point:  Demand for

23   documents concerning other types of complaints is beyond the

24   scope of permissible discovery.  That's consistent with the

25   *Delancey* decision that was recently issued by Judge Parker.

PCAELINC

```
 1   We've cited to other cases:  Lively, Mia Coleman, and Rona,
 2   where courts have been very clear that to meet the relevance
 3   requirements, the complaints must be limited to the same form
 4   of discrimination.
 5          Again, this is far afield.  She's already going to be
 6   getting multiple years' worth of discovery concerning any
 7   sexual harassment, retaliation, sex discrimination complaints
 8   with respect to the individuals who she is accusing.  And with
 9   all due respect, discovery regarding a retaliation claim based
10   on a disability or a racial claim, she has no such claim, and
11   so we do not think that's an appropriate expansion of discovery
12   in this case, and it's not proportional to the needs of this
13   case.
14          THE COURT:  Okay.  I'm not going to authorize
15   retaliation discovery, broadly speaking.  I think we're going
16   to end up, if we do that, with having sort of mini trials on
17   all of these claims, trying to then peel back what happened.  I
18   know you said you were limiting your request for the sort of
19   offensive conduct to sex discrimination and sexual harassment,
20   but if we're then opening up the retaliation component more
21   broadly, it's necessarily going to require us to look and see
22   what was the underlying issue in the first place and what was
23   going on there, and I just think we're going to end up down a
24   million tentacles.  So I'm going to limit the discovery to
25   sexual harassment, sexual misconduct, et cetera.
```

PCAELINC

1          MS. BASS:  Your Honor, if I may?

2          THE COURT:  Sure.

3          MS. BASS:  Does that apply as well to instances of

4    retaliation that plaintiff was aware of?  Because, for us, the

5    relevance there is not so much to get into what was the

6    underlying conduct, what was the ADA accommodation being

7    denied, for example, but to the culture that was created by

8    having these incidents of retaliation that our client was aware

9    of.  Defendant's counsel has said that Ms. Lindsey didn't make

10   them aware of the harassment that she was facing by Mr. Singh

11   for many years.  Part of the reason for that is because she's

12   aware that when people speak up at Citi, they are punished.  So

13   to the extent that she's aware of it, I think that that's

14   relevant to that part of the claim, even if we're not getting

15   into the underlying facts and circumstances.

16         THE COURT:  Thank you.  I was heading in that

17   direction, so --

18         MS. BASS:  I apologize.

19         THE COURT:  If your client can identify that, yes, I

20   remember when Steve asked for a wheelchair and they said no,

21   and then when he complained he was retaliated against, if she

22   has a narrative, I think that's something that could be more

23   appropriate.  But broadly searching for all acts that had the

24   word "retaliation" in it is not permissible.  So if there's

25   specific instances where she is aware that someone made a

PCAELINC

1    complaint based on a charge of discrimination and they were

2    subsequently retaliated against and she can raise that, then

3    I'll ask that the defendants look into that.  I don't know

4    exactly what the volume is going to be or how sort of

5    attenuated, but the burden is on the plaintiff to say I

6    experienced this, and so if she can put it forward, then I

7    think it's relevant, but I'm not going to require Citi to do

8    the work and produce the information broadly.

9              MS. BASS:  Yes, your Honor.

10             THE COURT:  Can we talk about this loan issue?  I'm

11    not quite sure I follow exactly what --

12             So it's my understanding that plaintiff's mother

13    received a loan from Citi that she might not otherwise have

14    been entitled to as a result of assistance from Mr. Singh; is

15    that correct?

16             MS. VELAZQUEZ:  Yes, your Honor.  I can speak to this.

17             THE COURT:  Okay.

18             MS. VELAZQUEZ:  So in 2018 after Citi detected unusual

19    money transfers, Citi conducted an investigation and discovered

20    that Singh had loaned plaintiff --

21             THE COURT:  Personally or that Citi had loaned --

22             MS. VELAZQUEZ:  That Citi conducted an investigation.

23             THE COURT:  No, no.  Who made the loan?

24             MS. VELAZQUEZ:  Oh.  Singh had loaned plaintiff

25    $220,000 by transferring money to plaintiff's mother, and that

PCAELINC

 1  plaintiff had intended to misrepresent that money as a gift

 2  from her mother on a mortgage application.  That was never

 3  finalized.

 4          Citi interviewed plaintiff as part of that

 5  investigation, and she expressly denied being in a relationship

 6  with Singh and refers to him as her good friend.  She,

 7  similarly, described Singh as a colleague and friend of many

 8  years in a statement that she provided to FINRA about the

 9  incident at that time.

10          THE COURT:  So, the transfer of money was Singh's

11  personally.  He --

12          MS. VELAZQUEZ:  To her mother.

13          THE COURT:  To her mother.

14          MS. VELAZQUEZ:  Correct.

15          THE COURT:  And Citi learned about it in the mortgage

16  application?

17          MS. VELAZQUEZ:  Citi learned about it because they

18  detected unusual transfers between Singh and plaintiff.

19  Plaintiff paid Singh back.  And so Citi looked into it and

20  discovered that what happened is that Singh had given $220,000

21  to plaintiff's mother so that plaintiff could misrepresent the

22  source of those funds on a mortgage application that was never

23  finalized.  In other words, as a gift from her mother instead

24  of as a loan from someone who she characterized to Citi at the

25  time, and to FINRA, as a good friend.

PCAELINC

1       THE COURT:  And was the plaintiff penalized or

2  reprimanded or retaliated against in any way?

3       MS. VELAZQUEZ:  Your Honor, both Singh and plaintiff

4  were given warnings, given their violation of Citi policies

5  and, frankly, plaintiff's attempted mortgage fraud.  But

6  actually two years later, plaintiff was promoted to managing

7  director, and that was a year before she came forward and

8  reported Mr. Singh's abusive texts, at which point we

9  immediately took action.

10       THE COURT:  And so from the plaintiff's side, I see

11  that you're asking for comparator information.  I don't

12  understand this request.

13       MS. BASS:  Yes, your Honor.

14       As we've just heard and as we saw in the motion to

15  dismiss that was filed and in Citi's answer, Citi makes a lot

16  of this 2018 loan between Mr. Singh and Ms. Lindsey.  What

17  we're looking for are documents that show comparable

18  transactions under comparable circumstances and how Citi

19  reacted to them.

20       So the reason that that's relevant is, first, to the

21  extent that Citi is accusing Ms. Lindsey of engaging in

22  misconduct for her participation in this transaction, she's

23  entitled to evidence about how Citi has reacted in other

24  circumstances like these.

25       THE COURT:  Was she damaged?  Does any part of her

PCAELINC

1    damages have to do with this incident?

2           MS. BASS:  She's not seeking damages in connection

3    with this incident.

4           THE COURT:  And so why is it relevant?  I don't

5    understand.  I mean, I think Citi's argument is it's relevant

6    because of what she said, presumably under oath, about the

7    nature of her relationship, so I understand that argument, but

8    why is it relevant to you?  If she wasn't disciplined in any

9    way, it wasn't like there was some targeted retaliation against

10   her, she wasn't demoted, I don't understand why you want to

11   spend any time at all on this.  It seems like a bad set of

12   facts for you.

13          MS. BASS:  Well, the reason that it's relevant is

14   because Citi has chosen to make it a centerpiece of their case.

15          I think in addition to that, we don't believe that

16   Citi can credibly argue that it was unaware of the dynamic

17   between Ms. Lindsey and Mr. Singh, given its knowledge of this

18   sizable loan between them.  Citi was aware that there was a

19   significant transaction between a male executive and female

20   more-junior-level employee.  Shortly thereafter, Citi put

21   Ms. Lindsey into Mr. Singh's reporting line.

22          Comparator evidence could shed light on, for example,

23   how Citi reacted to other such transactions and whether, as

24   Ms. Lindsey has claimed in the context of other instances of

25   misconduct, Citi was really willing to turn a blind eye to this

PCAELINC

1  transaction because Mr. Singh was a very powerful male

2  executive who generated a lot of revenue.  So for them to say

3  at the time that the transaction was so meaningless to them

4  that they would be fine having Ms. Lindsey report into

5  Mr. Singh, and for them now to say that the transaction was,

6  according to defense counsel, attempted mortgage fraud, I think

7  that we're entitled to explore the basis for those allegations

8  at this time.

9          MS. VELAZQUEZ:  Your Honor, if I may.

10         There really is no factual basis for this fishing

11  expedition.  When Citi investigated the transfer of $220,000

12  from Singh to plaintiff's mother in 2018, we asked plaintiff

13  directly about the nature of her relationship with Singh, and

14  she didn't disclose any romantic or sexual relationship, and

15  she repeated those denials to FINRA.  Two years later, Singh

16  became her matrix supervisor when Citi was unaware of the

17  nature of their relationship.

18         And the burden is not proportional to the needs of

19  this case.  Your Honor, you mentioned mini trials earlier.

20  This would require mini trials.  Plaintiff is proposing that

21  she take discovery on whether other employees who engaged in

22  financial transactions were, in fact, in personal

23  relationships, and if so, whether Citi did enough to uncover

24  that.  Documents concerning our investigation of other

25  employees' transactions and relationship status would have no

PCAELINC

1    bearing on whether Citi was on notice of plaintiff and Singh's

2    relationship in 2018, despite plaintiff's express denials of a

3    relationship at that time, both to us and to FINRA.

4           And on the other side of the ledger, she is refusing

5    to produce documents in her possession about the transfer of

6    money to her mother and about the loan.  Those documents go

7    directly to the veracity of what she told us in 2018 and what

8    we relied on at that time.

9           THE COURT:  Thank you.

10          All right.  I don't see how other loans could possibly

11   be relevant here.  I tend to agree with the defendants that to

12   have any relevance would require figuring out all of these

13   other nuanced relationships.  That seems like an enormous

14   amount of work for something that I think really would not be

15   relevant.  It would be one thing if the argument was that your

16   client was retaliated against, but as I understand it, your

17   argument was it was so obvious at that time that my client,

18   Ms. Lindsey, was being abused by this person because he was

19   using money in a way that was inappropriate.  You're free to

20   pursue that line of argument, but I don't think looking into

21   other acts of loans that individuals may have made that caught

22   Citi's eye and caused them to have an investigation, I don't

23   see how that would possibly be relevant.

24          So what happened here, I think, is relevant.  I think

25   it's relevant to your argument, from the plaintiff's side, that

PCAELINC

         1   they should have known better.  Even though I said I wasn't in

         2   a relationship, they should have known that I was, because who

         3   else would have this sort of strange disparity.  So I think you

         4   can pursue that.

         5            I think it's also relevant whether your client lied

         6   when asked a direct question, and so I do think information

         7   about her responses and whether or not she conspired with

         8   Mr. Singh to both give false information I think is also

         9   relevant, certainly to her veracity and trustworthiness, so

        10   that should be turned over.  But I don't think there should be

        11   comparator evidence here.

        12            MS. BASS:  Your Honor, if I could ask about just the

        13   scope of that ruling.

        14            So in terms of what Citi is seeking from Ms. Lindsey,

        15   they have sought Ms. Lindsey's communications with Mr. Singh

        16   about that issue, we've agreed to produce all communications

        17   with Mr. Singh, so those are not --

        18            THE COURT:  When will that happen?

        19            MS. BASS:  At this point we've produced the text

        20   messages that were exchanged and discussed in the amended

        21   complaint.  We are working to produce the remainder of the

        22   messages as quickly as we can.  There's just a lot of

        23   electronic discovery at issue here that we need to parse

        24   through.

        25            THE COURT:  Do you have a timeframe you can give me?

PCAELINC

```
 1              MS. BASS:  I think we can do it by probably late
 2    January.
 3              THE COURT:  Late January?  You filed this case in
 4    2023.  Shouldn't you have these documents already?  I thought
 5    you were going to say late December.
 6              MS. BASS:  Your Honor, in an effort to be as inclusive
 7    and cautious as possible, we forensically imaged Ms. Lindsey's
 8    electronic devices, which has resulted in tens of thousands of
 9    documents, which are hundreds of thousands of pages, including
10    many, many, many documents that reflect exchanges with
11    Mr. Singh.  Those documents just need to be reviewed.  We are
12    working to do it as quickly as we can.
13              THE COURT:  What are you reviewing them for?  I mean,
14    there's no privileged communication, presumably, there.
15              MS. BASS:  So, for example, to search for all of the
16    communications involving Mr. Singh, we need to search for, you
17    know, his name and various --
18              THE COURT:  Sure.  Communications with somebody else
19    about him, yes.
20              MS. BASS:  Yes.  Exactly.  And then --
21              THE COURT:  But why not the communications between --
22    like, why is that not just being produced, the text exchange
23    between the two of them?
24              MS. BASS:  Yeah.  Your Honor, it's not a matter of
25    just a single sort of long text exchange, there's many texts
```

PCAELINC

1    with Mr. Singh, there are group messages between plaintiff,

2    Mr. Singh, and others who are at Citi, so those documents are

3    being reviewed.  I just don't want to overpromise our ability

4    to produce all of those before we've had a chance to go through

5    them.

6          THE COURT:  Okay.  Sorry, I interrupted you.

7          So you were saying what you're going to produce with

8    respect to the loan incident.

9          MS. BASS:  Yes.  We've agreed to produce the

10   communications with Mr. Singh, we agree that everything that

11   was communicated to Citi and to FINRA in connection with this

12   is relevant, we've agreed to produce that.

13         Citi is also, though, seeking the underlying documents

14   -- for example, bank statements of Ms. Lindsey's mother --

15   which we just don't think go what was being represented to Citi

16   at the time.  So to the extent that Citi did not have

17   possession of any of those documents at the time it was looking

18   into these purported issues, we don't think it's relevant.

19         THE COURT:  So the mother's bank statements you don't

20   think is relevant.

21         MS. BASS:  That's correct.  Or any of the --

22         THE COURT:  I assume there's no disputed fact that

23   Mr. Singh did, in fact, transfer this money to her.  That's not

24   up for dispute.

25         MS. BASS:  That's not in dispute.

PCAELINC

1    THE COURT:  Okay.  And it's not in dispute that it was

2    used for a mortgage application.

3    MS. BASS:  I don't -- the only reason I hesitate is

4    that I don't know to what extent -- the mortgage didn't

5    actually happen, but there's no --

6    THE COURT:  Right, the application.

7    MS. BASS:  -- but the sort of broad contours of that

8    are correct, your Honor.

9    THE COURT:  All right.

10    Anything on this front?

11    MS. VELAZQUEZ:  Yes.

12    THE COURT:  Yes.

13    MS. VELAZQUEZ:  Yes, your Honor.  Thank you.

14    Again, plaintiff's communications with Mr. Singh are

15    the most important communications in the case, given that she's

16    seeking to hold Citi responsible for the abuse that she

17    experienced in the course of that secret relationship.

18    We agree that she can simply turn over the full set of

19    texts and emails with his phone number and email address.  We

20    have noticed plaintiff's deposition, we noticed it for

21    December 15, at plaintiff's request we have moved it to

22    January.  These communications are critical.

23    Again, with respect to her communications with her

24    mother regarding her relationship with Singh, particularly

25    around the time of the loan, we believe we're entitled to that

PCAELINC

 1  because those communications will go directly to, one, the

 2  nature of that relationship in 2018 when she lied to us and

 3  FINRA, and, two, to the veracity of what she told us and what

 4  we relied on after that investigation.  So we do want the

 5  communications between her and her mother regarding Mr. Singh,

 6  especially concerning the loan.

 7         We do want all of her communications with Mr. Singh in

 8  the course of their relationship.  We don't understand that

 9  there's any conceivable burden or legitimate basis to withhold

10  those documents.  We would like to take her deposition in

11  January.

12         THE COURT:  Okay.  So plaintiff's counsel said the

13  objection was as to the mother's bank statements or bank

14  records.  I think that objection is well founded, and so to the

15  extent Citi is seeking those documents or the underlying

16  mortgage file, I don't think that is appropriate, but I do

17  think communications between the plaintiff and her mother

18  explaining how this loan is happening or why it's happening are

19  relevant and will need to be produced.

20         MS. VELAZQUEZ:  Your Honor, if I can add.

21         You know, we are also seeking her communications with

22  the prospective lender.  Again, those go to credibility and the

23  veracity of what she told us.  So if she's telling --

24         THE COURT:  With the mother to the lender?

25         MS. VELAZQUEZ:  No.  Plaintiff's communications with

PCAELINC

1    the lender about the source of the funds.  Again, it goes

2    directly to what she told us and to her credibility.

3           THE COURT:  Okay.  I'm not going to allow that.  This

4    is not a mortgage fraud case.

5           Okay.  We've been going for a really long time and I'm

6    going to have to adjourn.  I think a lot of the defendant's

7    objections are really about identification of witnesses, which

8    absolutely has to happen.  There's no reason why those have not

9    been identified.  I don't agree with the plaintiff's objections

10   that those requests are somehow inappropriate procedurally for

11   the reasons you stated, so you do need to identify the

12   individuals in the various interrogatories.

13          I'm not going to rule on the length of the deposition

14   question because I have a feeling I'm going to see you before

15   that deposition happens.  As a general matter, you know,

16   14 hours is a really long time for somebody to sit for a

17   deposition.  I appreciate that plaintiff is arguing that this

18   case has a nearly-two-decade life cycle and so that may justify

19   exceeding the seven-hour rule, but I want to see what sort of

20   documents we're talking about here, to see what ends up being

21   the scope.  I think part of that will also depend on the

22   production that we're waiting on for the plaintiff.

23          So I think what I want to do is have you all file a

24   status letter with me this year with respect to custodians and

25   search terms, and then we can have a conference in the

PCAELINC

1    beginning of next year and see where things stand, certainly

2    with respect to the plaintiff's communications.  I mean, with

3    Mr. Singh, again, I don't quite understand why, here at the end

4    of 2025 for a case that was filed in 2023, those are not

5    already fully searched and ready to go.  I would assume that

6    you've done all of that as part of your obligations under the

7    rules to validate your case, so I'm surprised that you're not

8    ready to turn those over.  Certainly they should be produced on

9    a rolling basis.

10           So today is December 10.  Why don't you file a status

11    letter with me on December 20, so that is next Friday.  That

12    gives you about ten days.  Let me know where you are on the

13    issue of custodians and where you are on the issue of search

14    terms, and I will address going forward from there.

15           I think I'd like to see what the outcome is in that

16    letter.  Please be as detailed as possible.  To the extent

17    you've reached agreement, that's great; to the extent you

18    haven't, explain to me what the dispute is, and I'll either

19    have a conference right away or I'll ask for a follow-up status

20    letter in early January, and then I'll probably have a

21    conference with the parties probably the week of January 6, I'm

22    guessing towards the end of that week.  So plus or minus

23    January 10 I'll probably have another conference with the

24    parties and we'll see where things stand.

25           I'm going to assume that this noticed deposition for

PCAELINC

1    sometime in January is probably not going forward.  The good

2    news is fact discovery doesn't close until mid April, at least

3    as of now, and so we've still got plenty of time for those

4    depositions to happen.  Let's make sure we get all the

5    documents squared away first.

6        All right.  I'm going to leave you with that.  I know

7    that there are still lots of other issues that have not been

8    addressed.  To the extent this conference leaves you wondering

9    about other issues, you're welcome to also file a separate

10   letter on the 20th identifying issues that you'd like me to

11   address immediately.  If you can wait on that, then I'm happy

12   to get that second substantive issue teed up in advance of what

13   will probably be a plus or minus January 10 in-person status

14   conference.  So I'm happy if you feel like we really need an

15   answer and we didn't get it at the conference, you can put in

16   the December 20th answer, otherwise I'll give you an

17   opportunity to file something again in early January, when

18   hopefully you've done some more production.

19       All right.  With that, I think we're done, and we will

20   revisit again in a couple of weeks.

21       All right, everybody.  Thank you.

22       We're adjourned.

23       (Adjourned)

24

25