# EXHIBIT 1

Q1FRLINc

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    ARDITH LINDSEY, et al.,

 4                  Plaintiff,

 5          v.                            23 Civ. 10166 (ALC)(SN)

 6    CITIGROUP GLOBAL MARKETS,
      INC.,
 7                                        Conference

 8                  Defendant.

 9    ------------------------------x
                                          New York, N.Y.
10                                        January 15, 2026
                                          2:00 p.m.
11
      Before:
12
                          HON. SARAH NETBURN,
13
                                          U.S. Magistrate Judge
14
                             APPEARANCES
15
      VLADECK, RASKIN & CLARK P.C.
16         Attorney for Plaintiff
      BY:  EMILY BASS
17         JEREMIAH IADEVAIA

18    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
           Attorney for Defendant
19    BY:  TIHITINA M. DAGNEW
           LIZA M. VELAZQUEZ
20

21    ALSO PRESENT:  Kerissa Brown

22

23

24

25
```

Q1FRLINc

1          THE COURT:  Good afternoon, everybody.

2          Good afternoon, Madam Court Reporter.

3          Please be seated.

4          (Case called)

5          MS. BASS:  Good afternoon, your Honor.  Emily Bass for

6     the plaintiff, Ms. Lindsey.  With me is my colleague Jeremiah

7     Iadevaia.

8          THE COURT:  Thank you.

9          MS. DAGNEW:  Good afternoon, Tihitina Dagnew from Paul

10    Weiss for Citi --

11         THE COURT:  I'm sorry.  What was your name?

12         MS. DAGNEW:  Tihitina Dagnew, and I'm joined by my

13    partner Liza Velazquez.

14         THE COURT:  Thank you.

15         MS. VELAZQUEZ:  Good afternoon, your Honor.

16         THE COURT:  Good afternoon.  We are here on the joint

17    letter that the parties submitted on December 22, which I have

18    studied.  I also reviewed the plaintiff's table, that I know

19    there was a dispute over, that I said I would consider, so I've

20    looked at that at least to help orient me.

21         It's my understanding that the outstanding disputes at

22    this point, though I appreciate that time has passed, so maybe

23    some disputes have been resolved, are:

24         Whether or not ten custodians should be included

25    generally in the group of people who are to be searched;

1    whether or not there should be broader date ranges than what we

2    had discussed at our last conference; and whether there were

3    specific and targeted searches that would justify that type of

4    modification; and then lastly, whether or not the defendant

5    should be producing additional documents beyond what it is

6    already producing for conduct that post-dates the plaintiff's

7    leave of absence.

8         I believe those are the three outstanding issues.

9    Ms. Bass, is that correct?

10         MS. BASS:  That is correct, your Honor.  There is one

11   additional issue relating to the source of the material to be

12   searched that we wanted to raise to your Honor's attention.

13   I'm happy to speak about that now or after we have discussed

14   the issues in the letter.

15         THE COURT:  Sure.  What do you mean by "source?"

16         MS. BASS:  We wanted to raise that we believe Citi

17   should be searching not only the work devices of the custodians

18   at issue but also the personal devices.  There are a couple of

19   reasons for that.  First, based on our review and the

20   production that we've made to date of our client's text

21   messages, we understand there were many messages sent on

22   personal devices that relate to the matters in this lawsuit.

23   And in addition, based on your Honor's order on the other

24   discovery issues that were raised before this conference, we

25   agree with your Honor's finding that information stored on

Q1FRLINc

1  personal devices, if it relates to the lawsuit, it is more

2  likely to be relevant than on other devices.  So we wanted to

3  raise that issue to your Honor's attention because it's our

4  understanding that Citi does not intend to search the personal

5  devices.

6          THE COURT:  So you are referring to all of the 22

7  agreed-upon custodians as well as whatever else I would

8  authorize?

9          MS. BASS:  That's correct, your Honor, to the extent

10  those are current employees of Citi, which I understand that

11  many of them will not be.

12          THE COURT:  OK.  All right.  Let's table that issue

13  for now.

14          MS. BASS:  Yes, your Honor.

15          THE COURT:  Any movement on the open issues that I

16  just addressed or are they all still in dispute?

17          MS. BASS:  Those are all still in dispute, your Honor.

18          THE COURT:  OK.  So then let's roll up our sleeves and

19  get started.

20          Let's talk about custodians first.  So the first three

21  custodians are what I think everybody is describing as the

22  high-level Citi executives.  It's the CEO Jane Fraser,

23  F-r-a-s-e-r; it's the market's head, whose name is Andy Morton;

24  and then global HR head Sara —— unfortunately spelled without

25  the H —— Wechter, W-e-c-h-t-e-r.  So those are three

Q1FRLINc

1    senior-level people.  Let me hear your arguments with respect

2    to those people, Ms. Bass.

3            MS. BASS:  Yes, your Honor.

4            We're really looking into, with respect to these three

5    people, what they knew about what we are alleging is

6    long-standing, widely known misconduct including by Mr. Singh,

7    as well as their knowledge of and reaction to the November 2022

8    complaint by the plaintiff.  I'll take those one at a time.

9            So in terms of the searches that relate to plaintiff's

10   complaint, we believe that these are very unlikely to be

11   burdensome.  We're searching for whether these three

12   individuals, which, as you said, everyone agrees are high-level

13   executives, were discussing plaintiff following her

14   November 2022 complaint or her lawsuit.  And to the extent -- I

15   know Citi has argued they are unlikely to have any responsive

16   communications.  They have not provided hit counts

17   substantiating that.  To the extent Citi is right, the burden

18   should be minimal.  But on the other hand, to the extent that

19   there are any communications involving these individuals where

20   plaintiff is being referred to, we think we're entitled to that

21   information, including because it's relevant to defendant's

22   Faragher-Ellerth defense; meaning, what defendants did to react

23   to and to prevent and/or correct the issues that plaintiff

24   raised.

25           In terms of the second category, their knowledge of

Q1FRLINc

1    the widely known misconduct, we have really tried to narrow our

2    search terms for these specific individuals to search only

3    information that we believe that they may have known about.

4    And their knowledge of misconduct, including especially by

5    Mr. Singh, given that he's a very high-level employee of Citi,

6    we think would be certainly relevant, including, as I said, to

7    the Faragher-Ellerth defense.

8          In addition, as to Ms. Wechter, the HR head, I think

9    that these searches can be even further narrowed given the fact

10   she has only been in the HR head role in recent years.  I

11   believe she started in 2018 or sometime around then, and that

12   falls squarely within the time period that defendant has agreed

13   is the core, relevant time period here.  So we think that to

14   the extent that this information could be sought through

15   narrowly-tailored searches, which we believe we provided, we

16   don't see that there would be a significant burden, and I think

17   the relevance is significant.

18         THE COURT:  Thank you.  All right.  Let me hear

19   from -- it's pronounced Dagnew?

20         MS. DAGNEW:  Danyou (ph.).

21         THE COURT:  Thank you.  Ms. Dagnew.

22         MS. DAGNEW:  Thank you, your Honor.

23         We disagree, and I'm happy to explain.  Let me just

24   start by highlighting that the searches that have been proposed

25   for these three senior executives are not at all targeted.  I

Q1FRLINc

1    can give you an example.  There's a search for Ms. Wechter that

2    basically asked Citi to run the term "complaint" or "suspicion"

3    within 25 of "women" or "bias" over an eight-year time period,

4    and this is just one of those search strings.  There are other

5    search strings that they've asked to run across those

6    custodians for a 20-year time period even when Ms. Wechter was

7    not in HR and for a 15-year time period for Ms. Fraser as well.

8    So we completely dispute that the searches that have been

9    proposed are narrowly tailored or targeted in any way, both in

10    terms of actual search and also the time period that has been

11    requested.

12          Let me speak about each of these proposed custodians.

13    With respect to Fraser, she is not even the CEO of CGMI, which

14    is the entity that employed the plaintiff.  She has never

15    worked in the division where Lindsey -- apologies -- where the

16    plaintiff or where Singh worked, and at all times she was many

17    reporting lines removed from either Singh or Lindsey.  There

18    are absolutely no allegations that Fraser engaged in or had any

19    involvement in any wrongdoing that was either directed at

20    Lindsey or otherwise.

21          So taking a step back, none of these three custodians

22    actually fit into the three categories that the Court had

23    assessed and had indicated might be relevant.  So they have not

24    experienced sex discrimination or misconduct.  They have not

25    witnessed it and failed to take action.  And so as a starting

Q1FRLINc

point, none of these three custodians fall within these three

categories, so we're already outside of that, and then they're

even further removed, given some of the facts that I've just

relaid, in terms of how they're several reporting layers above

the plaintiff, or Lindsey, and how there are no allegations

that they are actually aware of any of the underlying

misconduct.

One of the arguments I heard from opposing counsel is

that this goes to one of Citi's defenses.  And with respect to

that, I want to highlight that we have already agreed to

provide all the investigation reports following the plaintiff's

November 20, 2022, complaint.  We're already running searches

about our alleged awareness of Mr. Singh's conduct over several

custodians, including his supervisor, various higher-up

managers, personnel assigned to his division, and other senior

executives who plaintiff has claimed had some specific

knowledge of his misconduct.

We have also agreed to search for documents regarding

the plaintiff's 2022 complaints and our responses from six

other custodians, including plaintiff's supervisor, higher-up

managers, human resources executives who actually received her

complaint, and several other custodians.

In addition, we're doing go get searches from

databases, including CSIS, the subgroup of Citi that actually

investigated the complaint.  We've already produced that

investigative report to plaintiff.  So not only have we agreed

to conduct numerous and multiple and extensive searches related

to the November 20, 2022, complaint, but there are also no

allegations that Fraser actually had any awareness or knowledge

of it.

And the best case that plaintiff has cited in the

joint letter, that I'm sure your Honor has seen, is with

respect to a CEO that actually received the complaint from the

plaintiff and had conversations with the plaintiff about that

complaint.  Discovery allowed in the context of that scenario.

There are no comparable scenarios or allegations with respect

to the CEO here.

Let me move on to Mr. Andy Morton, the global head of

markets.  He was at all times, again, several levels removed

from plaintiff and from Singh, was never in their division, and

for the entire relevant time period, he sat in the UK office of

Citi.  Like Ms. Fraser, the CEO, Andy Morton does not fall into

any of the three categories that the Court had considered and

assessed when we were before you last time.  So he was not

involved in any wrongdoing in connection with sexual

misconduct.  He was not -- he's not alleged to have been

someone who was aware of misconduct and failed to act on it,

nor did he experience any sexual misconduct or discrimination.

Again, to the extent plaintiff's basis for this is that she

needs documents concerning Citi's awareness of and reaction to

Q1FRLINc

1    her complaint, as I just stated, we have agreed to several

2    searches that actually provide that information.

3              With respect to Sara Wechter, plaintiff is right that

4    she started in the HR role in 2018.  Again, the searches that

5    they proposed actually request that we run various terms for a

6    20-year time period so until today it was not limited to 2018

7    onwards.  But she was also, number one, not part of the three

8    categories that have been discussed by this Court at the last

9    hearing.  She was several reporting levels above the HR

10   personnel that were actually covering the equities division, so

11   at least three or four reporting lines removed from the HR

12   personnel that we're covering the equities division, from the

13   personnel that received the plaintiff's complaint and took

14   action, and were already providing both targeted searches and

15   ESI searches with respect to the HR personnel that were

16   involved in receiving and handling the plaintiff's complaint.

17             THE COURT:  Thank you.

18             MS. DAGNEW:  Plaintiff has not alleged that

19   Ms. Wechter was aware of or was involved in any complaints of

20   which plaintiff was aware prior to going on leave.  So for all

21   of these reasons, we believe that the addition of these three

22   top executives is inappropriate and not at all warranted by the

23   facts.

24             THE COURT:  Thank you.

25             Ms. Bass, any response?

1              MS. BASS:  Yes.  A couple of points, your Honor.

2              First, I just want to underscore the reason that we're

3      seeking discovery from these folks who are high-level

4      executives.  This is not a case involving a run of the mill

5      employee complaint.  It's a case involving a very, very senior

6      employee making threats to the life and the children of an MD.

7      This type of conduct is so severe that we have more reason in

8      this case than perhaps in others to believe that perhaps the

9      leadership would have, or at least should have, been informed

10     of the conduct, and their reaction goes to the culture of the

11     firm, and, as I said before, to the Faragher-Ellerth defense.

12             Now, defendant, I understand, is trying to limit the

13     Faragher-Ellerth defense, which they raised, to information

14     only relating to its specific investigation into the conduct

15     that Ms. Lindsey complained about in November of 2022.  But I

16     think this limitation is artificial.  Faragher-Ellerth requires

17     that Citi both correct and prevent the conduct.  And to the

18     extent that the conduct was enabled by the environment at Citi,

19     including where senior men were allowed to engage in rampant

20     misconduct against junior women and get away with it, their

21     defense relies not just on what they did in the weeks

22     immediately following the plaintiff's complaint but what

23     they've done to remedy that culture.  And the limitation of

24     documents related to that defense to be only documents related

25     to their specific investigation, I think is artificial.

Q1FRLINc

1        THE COURT:  OK.  But is there any allegation that

2    you're aware of that any of these people had any contact with

3    Ms. Lindsey or were aware of the allegations or anything like

4    that?

5        MS. BASS:  Not that they had contact with Ms. Lindsey,

6    your Honor, but Dan Keegan, a very senior employee at the bank

7    did tell Ms. Lindsey that Ms. Fraser would have been aware of

8    her complaint.

9        THE COURT:  Would have been aware once it was made?

10       MS. BASS:  That's correct.

11       THE COURT:  OK.  Thank you.

12       I'm going to deny plaintiff's request or sustain

13   defendant's objection.  I'm not sure what the right posture is.

14   I'm not going to require the defendants to search these three

15   senior executives.  I think to the extent the plaintiff is

16   seeking and is entitled to discovery about sort of the culture

17   and environment that led to the ultimate events in this case,

18   the plaintiff is getting those documents.  She's getting

19   everything that followed the reporting of the incident.  And to

20   authorize wide and broad discovery in search of some evidence

21   that would otherwise bolster the claim, I think is unwarranted

22   and improper.  So as to those three senior people, I'm denying

23   the request to include them in the search terms.

24       Let's turn now -- I'm going to put people in boxes

25   that I think they go together, which I think is consistent with

1    the partners.  But let's talk next about Sanders, S-a-n-d-e-r-s

2    and Lambrakis, L-a-m-b-r-a-k-i-s.  My understanding from

3    plaintiff's portion of the letter is that these two individuals

4    were close with Singh, had a lot of contact with him and

5    communication with him, and likely could report or were aware

6    of his inappropriate behavior.

7            Is that correct, Ms. Bass?

8            MS. BASS:  That's exactly, right, your Honor.

9    Lambrakis was the global head of trading based in New York.

10   Ms. Lindsey reported through Mr. Sirlin and then through

11   Mr. Singh up to Mr. Lambrakis.  Mr. Singh, I understand,

12   reported directly to Lambrakis.  As your Honor noted, Mr. Singh

13   was very close with Mr. Lambrakis.  They spoke on the phone

14   every night for approximately an hour.  And based on that

15   relationship and based on her discussions with Mr. Singh,

16   plaintiff has reason to believe that Mr. Lambrakis would have

17   been aware of Mr. Singh's misconduct.

18           For example, Mr. Singh told plaintiff that he had

19   discussed with Mr. Lambrakis employees who he targeted for

20   termination.  That is an issue that's raised in paragraph 147

21   of the amended complaint.  Essentially the relevance there is

22   that Mr. Singh acted to get rid of people he didn't like or who

23   turned against him, which led in part to why plaintiff feared

24   Mr. Singh and felt that she could not end their dynamic or

25   report it.

Q1FRLINc

1          And Mr. Lambrakis was involved in those discussions

2     about the employees who were targeted.  I think Mr. Lambrakis,

3     in fact, was the one who ultimately carried out many of the

4     termination decisions that were initiated by Mr. Singh.

5     Mr. Lambrakis, also because plaintiff reported indirectly up to

6     him, has knowledge of plaintiff's performance.

7          Similarly, Mr. Sanders is someone who knew Mr. Singh

8     very well and was friends with him.  Mr. Sanders was the head

9     of execution based in New York.  For years, he was one of

10    Mr. Singh's direct bosses.  Mr. Singh told plaintiff that he

11    used cocaine in the office with Mr. Sanders.  That's referenced

12    in paragraph 146 of the amended complaint.  And Mr. Sanders

13    himself engaged in rampant misconduct, including alcohol and

14    drug use in the workplace.  At some point, Ms. Lindsey even

15    raised to Mr. Keegan her concerns about Mr. Sanders' behavior

16    and drug use, and Keegan did nothing.  And Sanders likewise was

17    involved in covering for other men who engaged in misconduct,

18    including drug use in the workplace.

19         That's just another example, as we say again and again

20    in the complaint, of the bank turning a blind eye to widely

21    known misconduct.  So Mr. Sanders is someone who we believe was

22    very aware of Mr. Singh's misconduct and who also engaged in

23    misconduct himself and was a high-level employee at Citi.

24         THE COURT:  Thank you.

25         Ms. Dagnew.

Q1FRLINc

1          MS. DAGNEW:  Thank you, your Honor.  Let me start by

2     saying that a lot of information that was shared by Ms. Bass

3     right now is brand new information that we're learning about.

4     We were not -- prior to today, we had no information from

5     plaintiff that Lambrakis was related to the allegation about

6     potentially firing -- Singh's influence in terms of firing or

7     letting go of certain employees.  We, likewise, did not have

8     any information about the complaint that was submitted to

9     Keegan in connection with Sanders.  That said, let me explain

10    why we had objected to these two proposed custodians.

11         THE COURT:  Hearing that information, are you still

12    objecting?

13         MS. DAGNEW:  I think we are objecting.  We are

14    objecting, and let me explain why.  But I would like to

15    reassess, given some of the ties to these specific allegations

16    about the complaint to Mr. Keegan and the targeted -- the

17    effect that Mr. Singh had in terms of letting go of some

18    custodians.

19         THE COURT:  I'm inclined to grant plaintiff's request

20    with respect to these two people.  And so the fact that hearing

21    new information makes you want to at least reassess your

22    position, may be a good reason to just move on to the next

23    person, unless you've got sort of a really strong view as to

24    why my instinct should be reconsidered.

25         MS. DAGNEW:  Let me --

Q1FRLINc

        THE COURT:  Sorry to put you on the spot.

        MS. DAGNEW:  No, no.  That's fine.

        Let me provide a couple of facts that may or may not
influence your Honor.  One is that Mr. Sanders has not been at
Citi since 2016.

        THE COURT:  That I know, yes.

        MS. DAGNEW:  The second is we have already agreed to
search documents of several of Mr. Singh's supervisors,
including Mr. Gately, Mr. Keegan and others.  We've already
agreed to search many other executives' ESI for awareness of
Mr. Singh's misconduct more generally, which is what these
allegations relate to.  It's not sex discrimination or sex;
it's about general misconduct.  We've already agreed to search
several custodians for that.  So even if he is deemed to be
relevant with respect to Mr. Sanders, it is actually unlikely
that he has any unique documents that are probative to the
case.

        THE COURT:  Well, it seems like, at least according to
the plaintiff, these were two people that Mr. Singh was very
close with and likely would have insight into Mr. Singh's
behavior, and may even be aware of some of the conduct that led
us to this lawsuit.  So I'm going to grant plaintiff's request
with respect to these people.  We'll circle back and talk about
dates, given that Mr. Sanders left in 2016, but otherwise I'm
going to allow searches into these two folks.

1            Let's turn to Bandeen, B-a-h-d-e-e-n, and Harford,

2    H-a-r-f-o-r-d.  My understanding is that plaintiff is seeking

3    discovery from these people because they had been either

4    witnesses to or at least received information from others about

5    misconduct, about the type of sort of sexism that plaintiff

6    alleges was rampant at Citi.

7            MS. BASS:  That's correct, your Honor.  Both

8    Mr. Bandeen and Ms. Harford were senior employees who were

9    aware of some of the misconduct that's been alleged in the

10   complaint.  For example, both Mr. Bandeen and Ms. Harford were

11   aware of employees inviting junior attractive women, who did

12   not have a business reason to be there, to dinners with clients

13   as essentially entertainment, and to our knowledge, did nothing

14   about that.

15           Ms. Harford also was someone who women from time to

16   time at Citi turned to with their complaints about sexual

17   harassment and discrimination and again did nothing.  For

18   example, in the complaint -- the amended complaint at paragraph

19   48, we allege that there was a situation where male employees

20   were ranking the appearance of female employees.  That's

21   something that was brought to Ms. Harford's attention, and she

22   did nothing about it.  There was also a woman who complained to

23   Ms. Harford about gender discrimination and our understanding

24   is that she said essentially, well, what do you expect?

25           THE COURT:  Do you not think you are getting that

Q1FRLINc

1    information through other searches?  I understand Citi said

2    they've agreed to search custodians, and they've listed a

3    number of them, for those specific types of allegations.  Why

4    isn't that sufficient?

5        MS. BASS:  Because we have specific reason to believe

6    that these individuals not only were aware of the conduct, but

7    at least with respect to Ms. Harford was a direct recipient of

8    the complaint.  So what was said to her and what her reaction

9    was, I think, is relevant even if that information comes from

10   other people, which I don't know that it will because these two

11   folks are two of the people who were -- at the high level that

12   they were had the best view of some of this behavior.  And we

13   have specific reasons to believe that it was brought to their

14   attention.

15       THE COURT:  Do you want to respond to Citi's

16   allegation not only did Bandeen leave in 2016, but he worked in

17   the UK office?

18       MS. BASS:  Sure.  Sure.  So in terms of him leaving in

19   2016, we would obviously be happy to tailor the searches to

20   search only for the period of time when he was there.

21       THE COURT:  I think that's giving away snow in winter.

22       MS. BASS:  Sure, your Honor.

23       It does mitigate some of the burden though of

24   searching his material because he overlapped with Ms. Lindsey

25   for a more limited time period.  In terms of him being based in

Q1FRLINc

1    the UK, he did have a global remit to his position where he was

2    overseeing employees that -- or had overlap with employees who

3    were in New York and had employees who were reporting up to him

4    that were in the same orbit that plaintiff was in.

5            THE COURT:  When you say "orbit," was plaintiff's

6    division within his remit?

7            MS. BASS:  Yes.  Yes, your Honor.

8            THE COURT:  OK.  Thank you.

9            Ms. Dagnew.

10           MS. DAGNEW:  Yes, your Honor.

11           Both of these individuals, as your Honor noted, they

12   left Citi about nine or ten years ago.  They are not mentioned

13   in the complaint as having had any awareness of misconduct.

14   Mr. Bandeen is actually not mentioned at all in the complaint

15   or in the anonymized allegations that plaintiff named or

16   un-anonymized just last month.  And Ms. Harford is only

17   mentioned in the complaint only in the context of having been a

18   colleague of Mr. Keegan's.

19           With respect to Ms. Harford, while plaintiff now

20   claims that women complained of sex bias to her that she was

21   not responsive, plaintiff has not provided any details in terms

22   of what time period, who complained, what were the nature of

23   those complaints, and if plaintiff was actually aware of that

24   at the time.  As to plaintiff's other allegation that

25   Ms. Harford did not address a report that male employees were

Q1FRLINc

using -- were purportedly using headshots to rank

attractiveness of those employees, we are already searching for

about ten custodians for this information, including HR, as

well as the individual identified in plaintiff's complaint as

having been involved in this event, and we think that is more

than adequate for this.

With respect to Mr. Bandeen, who, as your Honor noted,

was based in the UK, plaintiff has actually provided even less

to go on.  They now say that he was aware of senior employees

inviting junior attractive women to client dinners that had no

business purpose, but that is not what was alleged.  He is not

in the complaint.  He is not part of even the anonymized

allegations amended last month.  There were no search terms

proposed with respect to this specific issue.  The only search

terms proposed with respect to Mr. Bandeen were the plaintiff's

career trajectory, so we're a little bit puzzled by this.

But we could also note that in order to craft such a

search would require us to locate dinner invitations from ten

to 20 years, and then determine whether females that were

invited or attended had a business purpose and whether or not

Mr. Bandeen was aware of whether or not they had a business

purpose.  If there are any specific dinners that plaintiff can

point to that she had contemporaneous awareness of, we're

willing to consider that and search for it.

We are searching for all the dinners that plaintiff

1    mentioned in her complaint that she purportedly attended, so

2    we're already aware of that.  She has never alleged Mr. Bandeen

3    had anything to do with respect to those.  But the broad search

4    that they are requesting we do not think is appropriate or

5    narrowly tailored.

6         THE COURT:  I'm going to deny plaintiff's request as

7    to Bandeen.  I think he is too far removed.  Again, the

8    plaintiff is getting a lot of information from a lot of

9    custodians to support the sort of general culture arguments

10   that she's developing.  And this individual doesn't appear in

11   the complaint and apparently is not part of any anonymized,

12   unmasked, formerly anonymized complaints, and even plaintiff's

13   submission in the letter, doesn't say much to be specific.

14        By contrast, I think Ms. Harford, there's at least

15   some allegation here that plaintiff has put forward that she

16   received complaints and failed to act on them.  I think that

17   that is a much closer nexus and more directly relevant to

18   plaintiff's claim.  So I'm going to authorize or direct that

19   Citi search Harford's files but not Bandeen's.

20        All right.  That leaves us with the final group, which

21   are people who are alleged to have engaged in misconduct.

22   There's somebody named Pauwels, P-a-u-w-e-l-s; and then

23   somebody named Patel, P-a-t-e-l; and somebody named Caperonis,

24   C-a-p-e-r-o-n-i-s.  It's my understanding that Pauwels is named

25   because he allegedly failed to support the plaintiff in her

1    promotion efforts and that that is why that person is relevant;

2    and that Patel and Caperonis both were involved in open and

3    notorious sexual relationships with other employees, which

4    would have been in violation of Citi's policies.

5         Ms. Bass, do I correctly understand why you are

6    seeking these people?

7         MS. BASS:  That's correct, your Honor.

8         Just to provide a little bit more detail with respect

9    to Mr. Pauwels, the nature of that allegation is that

10   Mr. Pauwels refused to support Ms. Lindsey for promotion

11   following the loan transaction between Ms. Lindsey and

12   Mr. Singh that we discussed at the last conference.  And

13   Mr. Pauwels was explicit about not supporting Ms. Lindsey,

14   telling her essentially, how can I trust you after what

15   happened with the loan.  By contrast, he did not similarly hold

16   Mr. Singh accountable and continued to professionally support

17   him.

18        With respect to Mr. Patel, as your Honor referred to,

19   it was widely known that he was involved with a subordinate who

20   ultimately left the firm.  Mr. Singh told Ms. Lindsey about

21   Mr. Patel's affair.  He also told Ms. Lindsey that Mr. Patel's

22   boss was aware of it and did nothing, which, of course, goes to

23   Citi's enforcement of its own policies, and again sent a

24   message that senior men could get away with misconduct.  I will

25   note that Mr. Patel was based in London although he did travel

1    frequently to New York, including with the woman he was having

2    an affair with.

3         In terms of Mr. Caperonis, who was based in New York,

4    it's our understanding that he had sexual and romantic

5    relationships with multiple subordinates as well as someone in

6    HR that were widely discussed in the firm.  It's also our

7    understanding that Mr. Keegan, who is really at the center of a

8    lot of this, was aware of Mr. Caperonis' misconduct, and he at

9    one point told the plaintiff that he had met with Mr. Caperonis

10   not to discipline him or to tell him that this was in violation

11   of policy but essentially to tell him he needed to be more

12   discreet because people were talking about these relationships.

13        THE COURT:  Keegan, you are getting a lot of discovery

14   from him; am I right about that?  He's a primary custodian.

15        MS. BASS:  That's correct.  We have agreed on searches

16   for Keegan as a custodian.

17        THE COURT:  OK.  Do you want to respond to Citi's

18   comment that you are not arguing in this case -- sorry.  I'm

19   just trying to pull it up here.

20        On page 5 of the joint letter, Citi points out that

21   you were asked whether that was part of your claim, the

22   incident involving the loan, the loan incident, and you

23   indicated that it was not part of your case.

24        MS. BASS:  It's not part of the amended complaint,

25   your Honor.  Of course, discovery is not limited by which

Q1FRLINc

1    allegations -- whether every single instance of discrimination,

2    which I think in this case would be frankly very difficult to

3    all list out in the complaint, but discovery isn't as limited

4    as just what is in the complaint.  And this is a discrete

5    instance of discrimination against plaintiff which we intend to

6    seek discovery on as evidence of sexual harassment.

7            THE COURT:  When you say "a discrete incident," what

8    are you referring to?

9            MS. BASS:  Yes, your Honor.  Gender discrimination,

10   discrete instances of gender discrimination, for example,

11   failing to pay a woman equally compared to male counterpart can

12   support a claim of sexual harassment because it goes to the

13   view of the leadership at the firm of women in the workplace.

14           THE COURT:  I obviously understand that proposition.

15   My understanding is that Citi is providing you all the

16   documents related to your client's candidacy for promotion from

17   everyone that was involved in that process, which could

18   potentially include emails from Pauwels if that person decided

19   to weigh in to the people who were actually making the

20   decision.  I don't think there's an allegation that he was a

21   decision-maker on that issue.  So you are going to get the

22   evidence surrounding the promotion decision and see what was

23   being considered.

24           What you are seeking, I think, is to search this

25   person's entire file for broad, broad terms, and it seems like

Q1FRLINc

1    the only issue that you've raised is whether or not he used the

2    loan incident against you in a discriminatory way, that he did

3    not use against Mr. Singh, which is not directly a part of the

4    case.  I understand why it's part of a culture.  But beyond

5    that, since you are already getting documents related to the

6    promotion decision, why should I authorize the full scope of

7    Pauwels' —— I'm not sure I'm saying that name correctly —— that

8    person's folder.

9            MS. BASS:  First, your Honor, I am not sure we're

10    getting documents related to the promotion decision because

11    Citi has not agreed to do any searches for Mr. Pauwels.  So to

12    the extent that he's weighing in by email or text messages, I

13    don't know that we would be able to get that without them

14    running at least limited ESI searches.

15            THE COURT:  Wouldn't you get it if they are searching

16    the person who was making the decision, and that person would

17    have all the information that went into the decision, including

18    potentially an email from Pauwels.

19            MS. BASS:  If one of those people were one of the

20    agreed-upon custodians.  But we would also not be entitled to

21    emails, for example, from Pauwels to others discussing

22    Ms. Lindsey's candidacy, which, again, goes to the

23    discriminatory mindset.

24            THE COURT:  Thank you.

25            Ms. Dagnew, let me start with where we just left off.

Q1FRLINc

1    You indicate that you are producing documents regarding

2    plaintiff's candidacy for promotion to MD for many custodians

3    who were actually involved in the process.  Can you just

4    describe that in more detail for me?

5            MS. DAGNEW:  Sure.  We have agreed to produce

6    documents for plaintiff's consideration for promotion to MD in

7    2020 and 2021 from about ten custodians.  We have also agreed

8    to run plaintiff's proposed search terms about the fraudulent

9    loan incident across five custodians, including relevant HR

10   personnel.

11           THE COURT:  Thank you.

12           Do you want to speak about Mr. Pauwels more generally?

13           MS. DAGNEW:  I do, your Honor.  Thank you.

14           I will say, as an aside, that even if Mr. Pauwels

15   said, how can I trust you, in response to the fraudulent loan

16   incident, that is not discrimination.  With respect to what

17   plaintiff's counsel just stated about Mr. Pauwels' role, that

18   is actually inconsistent with the complaint in paragraphs 140

19   and 141 of the amended complaint.  Plaintiff states that "it

20   was Singh that pitted women against each other to remind

21   plaintiff of the power he had at the firm over her career."

22   And "this destructive conduct was most evident when Citi did

23   not promote Lindsey to managing director the first time she was

24   considered."  And then at the end of paragraph 140, plaintiff

25   states, "Singh who played a role in the promotion process, made

Q1FRLINc

```
 1   Lindsey believe that he had orchestrated the decision not to
 2   elevate her and to select the other women as a way to punish
 3   Lindsey."
 4            So the allegation in the complaint was actually that
 5   it was Singh who orchestrated or made Lindsey feel like he
 6   weighed in on her promotion considerations.  In any case, we're
 7   producing -- as I just stated, we're producing documents
 8   regarding her consideration for promotion from ten custodians
 9   for her consideration in 2020 and 2021.
10            Let me just say briefly about Mr. Pauwels, he is a
11   UK-based senior executive.  He is not named in the complaint.
12   Plaintiff claims that he refused to support her promotion to
13   managing director, which, as I just explained, is actually
14   contradicted by the actual allegations in the complaint.  But
15   also, your Honor, we do want to emphasize that just last month,
16   they were squarely asked if the fraudulent loan incident is
17   relevant to their claims or their damages, and they said that
18   it was not.  The only relevance was for Citi's defenses.
19            For all of these reasons, we do not believe that
20   Mr. Pauwels should be added as a custodian, in particular
21   because we've already agreed to ten custodians on this same
22   issue.
23            With respect to Mr. Patel and Caperonis, the only
24   allegations here are that there were alleged romantic
25   relationships here.  Mr. Caperonis left Citi in 2016.
```

Q1FRLINc

1    Mr. Patel would have been based in the UK, so any romantic

2    relationship would have been in the UK or in the UK office.

3    These alleged relationships are so far attenuated to the claims

4    here.  The alleged relationship of Caperonis is not even within

5    the past decade, given that he left in 2016, nor has plaintiff

6    identified really how she became aware of these relationships.

7        Based on the complaint, it suggests that it was

8    through maybe second- or third-hand rumors because the

9    complaint states that it is on information or belief.  So we

10   don't know what the source of that information is or if she was

11   contemporaneously aware of it.

12       That said, we've agreed to produce documents about

13   several other inappropriate relationships plaintiff has alleged

14   occurred.  We're running these searches across seven

15   custodians.  We're also producing any documents on disclosures

16   of such relationships with the now equities and sales group.

17   So if there's some pattern of senior to junior relationships

18   that is relevant or that needs to be evaluated, the extensive

19   searches we've agreed to will do that, and nothing else is

20   warranted.

21       THE COURT:  Thank you.

22       Ms. Bass I know we spoke mostly about Mr. Pauwels.  Do

23   you want to speak about Patel and Caperonis?

24       MS. BASS:  Yes, your Honor.

25       I think that the way that Mr. Patel's and

1      Mr. Caperonis' relationships were handled by Citi is really

2      relevant here to specifically to how Citi was treating men who

3      violated their policy that they've touted as being so important

4      here.  By contrast, the treatment that Mr. Pauwels suggested

5      Ms. Lindsey to in denigrating her for promotion, and, of

6      course, I don't think the language in the complaint is

7      inconsistent with that.  We don't say that Mr. Singh is the

8      only person who made the decision.  But I think that the

9      contrast here is really what is important.

10             When Ms. Lindsey is alleged to have engaged in some

11     sort of misconduct, she's punished by being held back at Citi

12     and being told that she can't be trusted anymore.  Meanwhile,

13     there are men with widely discussed, widely known

14     relationships, which senior employees including Dan Keegan are

15     aware of, and nothing is being done.  And this pattern is

16     really central to the claims here, including as to why

17     Ms. Lindsey and others didn't feel that they could speak up

18     about misconduct at Citi.

19             THE COURT:  Thank you.

20             All right.  Again, just to reset, the inquiry is

21     whether or not these people should be custodians, and I think

22     with respect to Patel and Caperonis, the fact that they were in

23     an inappropriate relationship that apparently was open and

24     notorious is not a reason to go rummaging through their files.

25     Plaintiff can make whatever argument is appropriate that these

Q1FRLINc

```
 1    relationships were allowed to happen.  Maybe there were no
 2    consequences.  Maybe it's proof that nobody reported consistent
 3    with the policy.  But I don't think there needs to be any more
 4    inquiry into Patel and Caperonis.
 5            With respect to Pauwels, I'm inclined to -- so I'm
 6    denying the request for Patel and Caperonis if that wasn't
 7    clear.
 8            With respect to Pauwels, I'm also denying that
 9    request.  It appears to be extremely narrow and limited in
10    what's being sought.  That being said, I will allow plaintiff
11    to craft a more narrow in search terms and in date search of
12    Pauwels' communications regarding the promotion decision.  And
13    so if there is communications by Pauwels about the plaintiff's
14    promotion and opportunities that are not otherwise captured by
15    the emails that are being searched for related to that, I'll
16    authorize that.  But it's going to have to be quite narrow both
17    in timing and in search terms.  So I'll allow a limited inquiry
18    into Pauwels focused on the loan incident and plaintiff's view
19    that he then went out of his way to prevent her from getting
20    promoted.
21            OK.  That was the big lift, I think.  Let's move on
22    now.  Madam Court Reporter, how are you doing?
23            (Court reporter responded)
24            Good.  That's the only person I care about.  Hopefully
25    you guys are OK.
```

Q1FRLINc

1           Let's move on to date ranges.  I'm not quite sure I

2      understand the dispute.  It's my understanding, what I think is

3      happening is that the defendant has generally agreed that the

4      search terms are going to be 2007 and 2008 and then pick up

5      again from 2017 to 2022, that that was going to be the sort of

6      general default date range, and that I had indicated that if

7      there was a specific incident that fell outside or I should say

8      maybe within that range, that is the 2009 to 2016 period, that

9      that specific event could be requested and searched for.

10          So hypothetically, for example, if the plaintiff has a

11     particular dinner that would go to this issue of bringing

12     armchair candy to business meetings that happened in 2012, that

13     plaintiff could identify that dinner and seek documents related

14     to that event during that particular period.  That's what I

15     understood the parties had either agreed on or I had ordered

16     you to agree on.  And it's unclear to me from the letters where

17     things stand, or whether or not it's plaintiff's view that more

18     should be searched for generally in the 2009-2016 period.

19          So Ms. Bass, why don't you tell me what it is that you

20     are seeking.

21          MS. BASS:  Yes, your Honor.

22          I believe that your Honor correctly summed it up.  Our

23     understanding is that defendant has agreed to conduct searches

24     for specific incidents, to the extent that those incidents are

25     dated in the complaint.  So, for example, if there were a

Q1FRLINc

 1    dinner that happened in 2012, defendant has agreed to do

 2    searches for that time period.

 3         Where we still have a dispute is where there are

 4    specific instances of discriminatory conduct; meaning, where

 5    we've alleged something specific, a specific type of comment or

 6    behavior, that happened regularly or repeatedly and therefore

 7    are not dated in the complaint.  For those, we believe that

 8    Citi should search for the entire time period for those types

 9    of incidents which --

10         THE COURT:  What does that mean?

11         For instance, you claim that Citi had a widespread

12    culture of sexual harassment, that it was a sexualized office.

13    That would justify, I think, a pretty broad scope of searching

14    during that entire 2007 to 2022 period, which seems quite

15    significant.

16         MS. BASS:  Yes, your Honor.

17         We understand, consistent with your Honor's order at

18    the last conference, that we were not entitled to sort of broad

19    searches substantiating things like sexual harassment.  What

20    we're looking for here is really something more specific.  So

21    I'll give you a few examples.

22         One, at paragraph 49 of the amended complaint, we

23    allege that Mr. Keegan often made jokes referencing women where

24    he used the phrase "take her down," sort of this reference to

25    wanting to have sex with them.  In paragraph 82 of the amended

Q1FRLINc

1   complaint, we allege that Mr. Singh repeatedly referred to one

2   woman as "horse face."  And we allege at paragraph 53 of the

3   amended complaint that Manny -- Mr. Singh, throughout his

4   tenure, treated women as objects, for example, by calling them

5   "Manny's angels."

6            THE COURT:  Manny's angels?

7            MS. BASS:  Manny's angels.  So what we're looking for

8   here is really specific searches for those types of terms,

9   which we don't anticipate would be particularly burdensome, as

10  these are terms that are not likely to have an innocuous

11  meaning.

12           THE COURT:  These are the terms listed in footnote

13  three of your attachment?

14           MS. BASS:  That's correct, your Honor.

15           THE COURT:  So you want, so I'm clear, all custodians

16  to be searched from the 2007 to 2022 period for these ten

17  terms; is that what you are proposing?

18           MS. BASS:  Not all custodians, your Honor.  This would

19  only apply to the subset of custodians that are listed in

20  searches four and five.

21           THE COURT:  All right.  Ms. Dagnew.

22           MS. DAGNEW:  Yes, your Honor.

23           So what plaintiff had suggested to us was we had a

24  series of search strings and time periods, and it was actually

25  not a targeted ask.  It was to have Citi search about 25 search

Q1FRLINc

1    strings for up to 17 custodians for 20 years, and another 15

2    search strings for 13 custodians for 15 years.  And we believe

3    that that misconstrued your Honor's guidance from the prior

4    hearing.

5        THE COURT:  I think what they are saying now is that

6    there are 12 custodians that they'd like you to search for I'm

7    going to call it ten phrases that are in footnote three of

8    their attachment to the December 22 letter.

9        MS. DAGNEW:  So just to ask a clarifying question,

10    does that mean that what they've said in footnote seven and

11    footnote eight would not be searches we'd need to do?

12        THE COURT:  I don't think we're there yet.  I think

13    that right now, just to rely on this chart, if we're looking at

14    what's called search four, there are those targeted terms that

15    they want a broader date range for those 12 custodians only as

16    to those ten-ish search terms that are identified in

17    footnote three.  So that does appear much more narrow than what

18    I think maybe you had originally understood.

19        MS. DAGNEW:  That is correct, your Honor.  Although I

20    do want to make two-points.  One is that there are search terms

21    in here like "eleven," which we actually did run, and I think

22    it generates tens of thousands of hits because, as you might

23    imagine, "eleven" is a term that can occur in regular

24    conversation.  So these terms can generate really high hits,

25    and so it should be subject to burden of volume and further

Q1FRLINc

1    narrowing.

2            But the other point I want to make is that we are

3    already searching for these terms for the eight-year time

4    period that we have agreed to.  They've not identified anything

5    that indicates that these terms were used outside of that

6    eight-year time period, or more importantly that they were only

7    used through the 2009 to 2018 time period making a search like

8    this important or relevant.  It already will be captured in the

9    agreed-upon time period searches we are doing.

10           THE COURT:  OK.  My understanding is that they are

11   sort of bolstering their argument that the culture was

12   longstanding and well-embedded at Citi.  I hear you with

13   respect to the word "eleven."  It doesn't surprise me that that

14   term might pull up a huge number of hits.  "War stories" I

15   could also see being a term that has a huge number of hits.

16   But some of the other ones, "horse face," for instance, I'm not

17   quite sure how many hits you might have for something like

18   that, if it's a specific term that plaintiff is alleging was

19   sort of code and used all the time.

20           I think I would like you, Citi, to run -- since you've

21   already pulled these custodians files to run the hits.  Can you

22   do that?

23           MS. DAGNEW:  To be clear, your Honor, for most of the

24   custodians, we've pulled it for the agreed-upon time period, so

25   it would entail —— I'm not sure about this —— collecting for

Q1FRLINc

the 2009 to 2016 time period.  But if that's your Honor's

desire, we can, of course, do that.

THE COURT:  Can I ask you a question?  For what you

have already, can you run these terms?

MS. DAGNEW:  Yes.

THE COURT:  Why don't we do that so plaintiff can at

least see, in what we've already pulled, are you getting a lot

of these terms?  You know, it sort of cuts both ways.  I mean,

I can see why "eleven" you'd have a lot of terms.  If "horse

face" comes up once in that period, then maybe it's not

something that was so prevalent that it justifies pulling

additional files to search for.

So let's run the searches now on those 12 custodians

for the period you already have.  Let's see what the results

are.  Maybe you could even show the documents you would be

otherwise producing anyway to the plaintiffs, and the parties

can meet and confer and see whether or not it warrants getting

additional files if you don't already have them.  If you

already have them, I'd like you to run them for those dates.

But if you don't already have them, you can hold off on that to

see what we uncover.

So search five, the time frame "varies."  I assume

this is an example of where there's a particular incident of

misconduct.  You've brought it to Citi, and they are searching

for that particular incident even if it's outside of the

1   agreed-upon range; is that correct?

2              MS. BASS:  That's our understanding, your Honor.  Yes.

3              THE COURT:  All right.  Good.

4        Let's see.  We've got this issue coming up again on

5   complaints and Citi's responses, where we have a number of

6   custodians and then you are seeking broader searches for

7   targeted complaints, is that correct, footnote seven?

8              MS. BASS:  That's correct, your Honor.

9              THE COURT:  Ms. Dagnew, are you searching for, if

10  there's a specific incident of a particular man that plaintiff

11  has identified and the misconduct happened in 2012, are you

12  searching for that?  This is what is identified as search six.

13  It's on page 5 of the plaintiff's chart.

14             MS. DAGNEW:  Yes, we are, your Honor.

15        For instance, we're searching with respect to Jackie

16  Moran.  We're searching with respect to Sarkar, so yes.

17             THE COURT:  OK.  So I think that that issue has then

18  been resolved.

19        Then turning to search seven and eight, plaintiff is

20  seeking from January 1, 2011, to the present.  What is the

21  argument, Ms. Bass, of grabbing in those additional five years

22  from 2011 to 2017?

23             MS. BASS:  Yes, your Honor.

24        These are the types of instances that go sort of to

25  the heart of this case because it's misconduct -- in some

Q1FRLINc

```
 1    instances, specific instances of misconduct by Mr. Singh, and
 2    whether the bank was aware of them.
 3               THE COURT:  And so what are the search terms?  I mean,
 4    you've got two, four.  I didn't give you Wechter or Fraser, so
 5    nine custodians are being authorized.  So for these nine
 6    custodians, we've got a much larger window.  What exactly are
 7    you proposing as far as search terms?
 8               MS. BASS:  Your Honor, the search terms are for, for
 9    example, a search that's targeted at the bank's knowledge of
10    Mr. Singh's dynamic with Ms. Lindsey.  So search for their
11    names in combination with "relationship" or "sex" or "dating"
12    or "affair."  Also for --
13               THE COURT:  You weren't even able to tell me when
14    their relationship started, so how do you know January 1, 2011,
15    is the right time?
16               MS. BASS:  We've since provided that information to
17    Citi.
18               THE COURT:  Which is when?
19               MS. BASS:  I apologize.  I don't have the date off the
20    top of my head.  It was after 2011 -- 2014, your Honor.
21               THE COURT:  2014, all right.  So that's one question
22    as to why we need those additional three years.
23               Yes, Ms. Dagnew?
24               MS. DAGNEW:  Apologies for interrupting.  The
25    information we received is that it started in 2017, not 2014.
```

Q1FRLINc

1          THE COURT:  2017.  So Ms. Bass, does that refresh your

2     recollection of what you said, or do you still think it's 2014?

3          MS. BASS:  I just don't have the information in front

4     of me.  I don't have a reason to believe that that is not

5     accurate.

6          THE COURT:  Let's assume it's 2017.  So what would

7     justify searching these nine custodians for all of this

8     additional period to see what they knew about a relationship

9     that had not yet started?

10          MS. BASS:  Based on the information we have provided

11     to Citi, our understanding is that Mr. Singh moved from the

12     London office to the New York office in 2011, and thereafter

13     began soliciting or grooming Ms. Lindsey for a sexual

14     relationship.  So there were sort of entreaties to her that

15     were happening before that actually began.  So to the extent

16     that anyone suspected based on his conduct that there was such

17     a relationship between them or some sort of dynamic, that goes

18     to that question.

19          THE COURT:  That goes to what question?  Your client

20     didn't have a relationship with this person.  It's possible

21     that he was grooming her in those early years, but by your

22     client's own admission, there was no relationship.  I assume

23     you are getting all of Singh's emails, certainly all of your

24     own client's emails.  You are getting a lot of emails that

25     involve him starting in 2016 or January 1, 2017.  So right when

 1    the relationship allegedly began, you'll see if other people

 2    were talking about if somebody inappropriate was happening.

 3            I guess I just don't understand what would justify

 4    such a significant move from the presumptive date range for a

 5    relationship that by your account had not started.

 6            MS. BASS:  Because Mr. Singh at that point was a

 7    senior employee who was, for lack of a better phrase, coming on

 8    to a very junior employee at that point.  To the extent that

 9    people are discussing that, I think that's certainly relevant

10    to Ms. Lindsey's harassment claims.

11            And further, your Honor, if I could just add, in terms

12    of the burden, we don't have hit counts on these searches for

13    this particular time period.  So to the extent that there are

14    many, many hits for these searches, we would obviously be open

15    to narrowing them.  But we don't have hit counts for searches

16    beyond the period of time that Citi has already agreed to.

17            THE COURT:  Right.  And I don't even know what the

18    search terms are.

19            You write in footnote eight:  "Because the searches

20    proposed for search seven target specific misconduct that Singh

21    is alleged to have engaged in as well as the bank's knowledge

22    of Singh's dealings with Lindsey, plaintiff is requesting a

23    longer period of time."  So I mean, specific allegations of

24    misconduct, I understand that Citi has agreed to produce those

25    outside of the presumptive date range, so I assume you are

Q1FRLINc

 1    going to get that.

 2            If you can say Singh did this terrible thing in 2012,

 3    I assume you are going to get that through that mechanism.  So

 4    this is just looking generally to search nine custodians to see

 5    whether or not they had a glimmer that something was brewing

 6    that didn't even happen until 2017.  I don't even know what

 7    that search term would look like.  I'm not even sure what you

 8    are proposing.  I don't know if you have an example of a search

 9    term.  It's one thing to ask for a particular word that's very

10    clear, but it's another thing to try and glean from nine people

11    whether or not they were sort of having a whisper campaign

12    about this person potentially treating somebody in a grooming

13    fashion for a relationship that would not come to fruition

14    until 2017.

15            MS. BASS:  Yes, your Honor.

16            I'm happy to tell you what the search term is.  I want

17    to make clear that search seven is not limited to just that

18    topic.  There's also some specific instances of conduct which,

19    again, are not tied to a specific date.  So, for example,

20    there's a search that is targeted to Mr. Singh being drunk or

21    intoxicated at work using those terms.  There's a search that

22    is targeted to Mr. Singh going to strip clubs, presumably

23    because it's on work emails, to the extent that that is

24    happening, it's relevant to the harassment complaint.

25            In terms of the specific search for Mr. Singh and

1    Ms. Lindsey's relationship, the search that we've proposed is

2    "Manny" or "Singh" within 50 "Ardith" or "Lindsey."  So emails

3    where they are both identified and those terms within 50

4    "relationship" or "sex" or "dating" or "romantic" or "involved"

5    or "affair," again, your Honor, with the goal of targeting only

6    those documents that are actually discussing such a

7    relationship.

8          Again, to the extent that there are mishits or it's

9    bringing in a lot of hits that are not -- don't have anything

10   to do with the specific topic, we would obviously be having to

11   narrow them if we had hit counts to identify those issues.

12         THE COURT:  Within 50 is like a whole paragraph.  So

13   you could easily have an email that says, I'm having a meeting

14   with Singh, and then two sentences later say, by the way, when

15   is Lindsey up for promotion, and then two sentences later, I

16   had sex with my wife.  I mean, you would capture a lot of stuff

17   with a search like that.  So just on its face, I don't think

18   that a narrow search at all.  I still don't get where we are.

19         Let me hear from Ms. Dagnew on this.

20         MS. DAGNEW:  Yes, your Honor.

21         For this one, plaintiff is asking to expand the time

22   period by several years as well as run numerous searches, not

23   limited to even the search string just discussed with respect

24   to dating, but it's like Manny -- some of the searches, for

25   instance, are "Manny" within 25 of "expense."  "Manny" within

25 of "blackout."  "Manny" within 50 of "team night."  It is

basically -- and there are several of these search strings.  It

is basically running the searches that the Court said should be

specific searches that are tied to dates or specific

allegations and circumventing that.

        We have already agreed to run a lot of these searches

over Mr. Singh's and several other custodians' emails to the

extent that this conduct, whether it's related to being drunk

or drug use or inappropriate night's out, to the extent that is

occurring, they're going to see it in the eight-year time

period that we are searching for across now 22 custodians for

different searches.  And so this expands that search in an

inappropriate and really burdensome way, and we ask that your

Honor deny it.

        THE COURT:  Let me just go back to the search about

Singh and the plaintiff, Ms. Lindsey.  Is the theory, Ms. Bass,

that in the years 2011 to 2017 Citi should have seen that Singh

was being solicitous of Ms. Lindsey and should have intervened

at that point in time?  Is that the theory?

        MS. BASS:  The theory, your Honor, is that at some

point —— and we're not sure exactly when that is —— the conduct

of Mr. Singh was so obvious that Citi's claim that it was not

aware of it at all until Ms. Lindsey complained in

November 2022 becomes not credible.

        THE COURT:  Sorry to interrupt you.  It becomes so

Q1FRLINc

```
 1    obvious, but your view is nothing was happening until 2017,
 2    that there was no inappropriate relationship until 2017.  Maybe
 3    he was being particularly kind or solicitous or, in your words,
 4    grooming.  I'm not quite sure Citi -- let's just say the CEO
 5    noticed that Singh was being really nice to this person and
 6    helping her out and bringing her flowers, whatever odd things,
 7    is the argument that Citi should have at that time intervened,
 8    and that its failure to intervene back in 2015 when Mr. Singh
 9    was being nicer to Ms. Lindsey than he was to anybody else
10    should have been so obvious that an inappropriate relationship
11    was on its way that they should have done something at that
12    time?
13              MS. BASS:  I think it depends on the type of conduct.
14    It's not our contention nothing inappropriate happened until
15    2017.  There was inappropriate conduct by Mr. Singh towards
16    Ms. Lindsey that predated them being in a relationship.  In
17    response to your question, was Citi required to intervene
18    because Mr. Singh was being nicer to Ms. Lindsey?  No.  Were
19    they required to intervene when they saw that a senior man was
20    making comments about a junior woman?  Yes.  I think the answer
21    to that is yes, and we've alleged in the complaint that
22    Mr. Singh did just that.  He made comments about her appearance
23    and about her body.
24              THE COURT:  To other employees?
25              MS. BASS:  In the workplace.
```

Q1FRLINc

 1           THE COURT:  In the workplace.  And are those captured

 2      in the search terms?  Again, generally speaking, you are

 3      getting eight years of discovery, which more than oftentimes is

 4      the case.  You are also getting additional discovery based on

 5      specific incidents you that can identify.  For example, I'll

 6      also add that I've authorized discovery for Sanders who left in

 7      2016, so by example, Sanders' emails are going to have to be

 8      outside of the scope.

 9           We had this conversation last time we were together.

10      I'm not going to authorize two decades worth of discovery

11      unless there's some specific reason.  This grooming theory, I'm

12      not sure is sufficient to justify searching a dozen people for

13      an additional five or six years, which is what you are asking

14      for.

15           MS. BASS:  To give you an example, something we talk

16      about in the complaint, Citi should have been on notice about

17      Mr. Singh's conduct, including, for example, because they -- we

18      have reason to believe he was charging expenses from strip

19      clubs on his corporate card, so we have searches targeting his

20      corporate card.  And, again, the term "strip club" to seek

21      information relevant to that issue.  This is about, your Honor,

22      the bank's knowledge that Mr. Singh was engaging in rampant

23      misconduct, some of it was on its face sexually harassing, and

24      whether they did anything about it.

25           THE COURT:  Right.  We talked about strip clubs in

Q1FRLINc

1    connection with search four.  Strip club is one of the terms

2    you are searching.

3         I'm not going to authorize the sort of broad discovery

4    that is being sought here.  Ms. Bass, if you want to try to

5    give something much more narrow —— and I'll tell that you

6    "Singh" within 50 of "Lindsey" within 50 of "sex" is not narrow

7    in my opinion.  "Singh" and "Lindsey" and "sex" in a sentence,

8    that seems like it's a narrow thing, but the burden, I'm sure,

9    is going to be overwhelming and not warranted when you are

10   already getting a significant number of years of discovery.

11        So I'll invite you to make some proposals with respect

12   to Citi's notice, Citi being on notice that Singh was engaged

13   in inappropriate conduct before 2017.  If there are specific

14   things that you can identify, I'll direct you to provide them

15   to Ms. Dagnew.  And Ms. Dagnew, if you can just have a

16   meet-and-confer.  Again, these custodians, as I understand it,

17   you've only pulled through 2017, so I think you should have a

18   conversation about it.

19        MS. DAGNEW:  OK, your Honor.  We will do that.

20        I do want to say that we did ask the plaintiff in

21   2017/2018 in connection with the fraudulent loan incident about

22   whether or not she was in a relationship with the plaintiff,

23   and she said she was not.  She similarly provided a statement

24   to a regulator at FINRA stating that Mr. Singh was just her

25   friend.  So by her own words, there was -- she told us, and she

1   told a regulator that there was no relationship.  So to do a

2   search for documents prior to 2017 about some supposed

3   relationship or comment in this instance, in our view, is

4   unwarranted.

5              THE COURT:  Can you respond to that, Ms. Bass?

6              MS. BASS:  Yes, your Honor.

7              Our view —— and I think that we discussed this last

8   time —— is that by the time of the loan transaction,

9   specifically given the nature of that transaction —— Citi knew

10  that there was more to what was going on between Ms. Lindsey

11  and Mr. Singh.  Setting aside Ms. Lindsey's comments at the

12  time about the nature of that relationship, that doesn't mean

13  that other people weren't speculating, especially given that he

14  had made a large personal loan to Ms. Lindsey, about the nature

15  of their relationship and raising questions at least by that

16  time that there was something more going on.

17             THE COURT:  She answered questions presumably to FINRA

18  under oath, I assume, maybe not under oath to her employer.

19  She was asked the question specifically, and she said no.  What

20  you are now saying is that Citi needs to undergo all of this

21  discovery to look to see whether or not they should have

22  basically doubted her when she answered under oath that she

23  wasn't in a relationship.  That's essentially what you are

24  saying.

25             MS. BASS:  Based on their purported robust policy

Q1FRLINc

1    saying that there weren't such relationships in the workplace.

2              THE COURT:  Repeat that.  I lost you.

3              MS. BASS:  Citi maintains that they have a robust

4    policy, that it purportedly enforces, that senior employees are

5    not to have sexual or romantic relationships with junior

6    employees.  In order for them to enforce that policy, if it

7    there is something that so obvious that leads management to

8    believe that there is such a relationship happening --

9              THE COURT:  There was.  He gave her an inappropriate

10   loan, and so they asked her and she said no.  Should they have

11   gone through and searched her personal phone at that time?

12             MS. BASS:  I think whether they suspected there was

13   such a relationship at that time is relevant to their

14   knowledge, and what they decided to do to enforce their policy

15   or not to enforce it.

16             THE COURT:  You are getting all of that discovery,

17   right.  In your theory when they asked her, are you in an

18   inappropriate relationship, because something so obvious like

19   this inappropriate loan was uncovered, and they asked her and

20   she said no, which was false.  To the extent Citi at that point

21   in time should have said, oh, we don't believe her, we think

22   it's something inappropriate, you are going to get that

23   discovery because you are getting 2017 to 2022.

24             So the question is what is the justification for the

25   work that would go into searching nine custodians all the way

Q1FRLINc

```
 1    back to 2011 to see whether or not Citi should have been

 2    proactively monitoring all of its employees to see whether or

 3    not somebody was behaving in a way that would tee them off that

 4    something inappropriate was likely to happen.

 5            MS. BASS:  It's not just that, your Honor.  It's also

 6    that one of their senior employees was behaving inappropriately

 7    to the junior employees.  Regardless of the relationship or not

 8    relationship, if they had knowledge that there was

 9    inappropriate conduct, they should have taken action at that

10    point.

11            THE COURT:  OK.  Why don't you provide some proposed

12    search terms that are narrowly tailored, and I'll get an update

13    after the parties' meet-and-confer.

14            I have to be in Brooklyn on a panel in an hour, so I

15    think we need to quickly wrap up.  I think where we are is

16    post-leave searches.  I do feel like we addressed this the last

17    time we were here, so I'm not quite sure why we're addressing

18    it again.  I understand that Citi is producing documents

19    related to disability allegations, to the survey that was

20    performed after November 2022, but we've already discussed sort

21    of conduct and the like post-2022, so I'm not quite sure why

22    this is still an open issue.

23            Ms. Bass, tell me what remains open from your

24    perspective.

25            MS. BASS:  Yes, your Honor.
```

Q1FRLINc

1          I think that there's a disagreement between the

2     parties on the scope of your Honor's ruling for the post-2022

3     documents.  We understood from your Honor's ruling that we

4     don't get broad ESI for post-2022.  We also understood that the

5     Court did not cut off completely the ability to get documents

6     after Ms. Lindsey went on leave.  And we have understood that

7     certain harassment-related searches that are targeted may be

8     permissible, including in connection with the surveys.

9          Just as a point of clarification, it's our

10    understanding that Citi is objecting to providing any of the

11    information relating to the surveys.  Notwithstanding your

12    Honor's comments at the last conference --

13         THE COURT:  Can I interrupt you for one second with

14    apologies?  But I'm just rereading your chart, and at least

15    looking at page 7, searches nine, ten, 11 and 12, your report

16    is that other than the issues about Fraser and Morton, which

17    I've now resolved, the parties are in agreement.  So maybe

18    there isn't a live issue here?

19         MS. BASS:  I apologize, your Honor.  The live issue is

20    with respect to the surveys, which is a search term within

21    those searches.

22         THE COURT:  All right.  So those issues and the dates,

23    I guess, are no longer at issue.  So the only question is what

24    sort of survey information are you getting.

25         MS. BASS:  That's correct, your Honor.

1          THE COURT:  And what is it that you are seeking?

2          MS. BASS:  We are seeking information, including ESI,

3     about the survey that Citi distributed and got results from

4     following Ms. Lindsey's complaint.  Our understanding, based on

5     defendant's representation, is that the surveys purportedly

6     were not specifically about sexual harassment.  We've asked

7     defendant for a copy of the surveys or a bank copy of the

8     surveys, but we haven't been provided with one.  Whatever the

9     intent of surveys was, we understand that women used those

10    surveys as a place to raise concerns about sexual harassment,

11    including sexual harassment that predated Ms. Lindsey's leave.

12    So what we're looking for is information from these surveys

13    that's relevant to Ms. Lindsey's claims.

14         THE COURT:  OK.  Ms. Dagnew, what are you agreeing to

15    produce?

16         MS. DAGNEW:  First, let me clarify, your Honor, with

17    respect to plaintiff's chart, and that is the reason we

18    objected to it.  It is not accurate.  So with respect to

19    searches nine and ten, plaintiff represented that the parties

20    are in agreement.  That was not the case.  We had agreed to

21    search through -- with respect to search nine, we agreed to

22    search through December 2022, not to present, because that's

23    when the CSIS investigation concluded and the final report was

24    issued.

25         With respect to search ten, which requests Citi search

1    "Ardith" or "Lindsey" any time after 2022, we said that was

2    inconsistent with the Court's guidance, so we did not agree to

3    run search ten.

4            And with respect to search 12, we had agreed to run it

5    through December 2023, not to the present.  And this was in

6    part principally the reason why we said that the chart that

7    they had proposed was inaccurate and should not be submitted as

8    part of the joint solution.

9            THE COURT:  We're going to have to come back and have

10   another conference, I believe, because I have to leave

11   momentarily.

12           MS. DAGNEW:  I understand.  With respect to your

13   Honor's comments, our understanding was the survey itself might

14   be relevant, but there was no discussion of ESI into the survey

15   and we agreed to provide information about the survey.  The

16   survey was conducted in February 2024, but it was planned

17   before plaintiff had filed her lawsuit.  So it was not done in

18   response to her lawsuit, and it was not meant to be a sex

19   discrimination or sex misconduct related survey.

20           It was sent to over 1,500 individuals within markets

21   across four global offices, New York, London, Houston, and

22   Paris.  Less than 50 percent of the individuals who received

23   the survey completed the survey, and less than 50 percent of

24   the survey recipients and respondents were from the New York

25   office.  The respondents could identify which office they were

Q1FRLINc

```
 1    from, but they were not required to.  And, again, the survey
 2    was not specifically about gender discrimination or gender
 3    issues.  It was really around the various culture pillars that
 4    Citi had at the time, like leadership, tone, inclusion, talent
 5    performance, management, and the like.
 6            THE COURT:  Have they seen the survey, what the
 7    questions were?
 8            MS. DAGNEW:  No, they have not.
 9            THE COURT:  Can you produce that?
10            MS. DAGNEW:  The questions in the survey?
11            THE COURT:  Yes.  Let's start with that so they can
12    see what was sought, and we can have a discussion about whether
13    or not they should have the responses.
14            MS. DAGNEW:  We can share the questions.
15            The last point I want to make, your Honor — and I
16    know you have to go — it was conducted anonymously.  It was
17    not disaggregated between men and women, so there's no gender
18    information included in it.
19            THE COURT:  OK.  I have no idea what the survey looks
20    like, and if it's just like, do you agree or not agree or if
21    there's opportunity for discussion.  If there's opportunity for
22    discussion, maybe people said, this is a terrible place to work
23    because the men are pigs.  I don't know.  That would seem to be
24    relevant to the claims.  But maybe that's not the type of
25    survey it was.  So rather than have an extended back-and-forth
```

Q1FRLINc

about whether the survey and all of its underlying parts can be
produced, can you provide the survey to plaintiffs so they can
review it and assess?  And you can provide a status on that.

MS. DAGNEW:  We will provide the survey, your Honor.
I know you have to go.  One final point we really need your
Honor's help on is with respect to receiving the one-on-one
communications between Singh and Lindsey that plaintiff just
has to produce without even reviewing.  We still have not --
they've produced 1,600 texts, but they are group messages.
There are only 18 days of one-on-one communications.  These
texts clearly go to the central issues of the case.  We don't
have access to them.  We really need plaintiff to produce it,
and they have not.

THE COURT:  What's the problem?

MS. BASS:  Your Honor, consistent with your Honor's
guidance at the last conference, we searched for text messages
involving Mr. Singh, and we produced all of them.

THE COURT:  I think the agreement was you would be
producing the entire communication between the plaintiff and
Mr. Singh.  Why is that not produced?

MS. BASS:  That was produced.

THE COURT:  They only spoke for 18 days?

MS. BASS:  It's our understanding that plaintiff and
Mr. Singh primarily communicated via WhatsApp and had used a
feature where the messages disappeared after a certain number

Q1FRLINc

1    of days, so those messages are no longer accessible to

2    plaintiff.

3          THE COURT:  OK.  Can I have your client submit a sworn

4    declaration that she has produced all of her available

5    communications with Mr. Singh from any platform she has, and to

6    the extent she had communications on platforms that she's not

7    producing, that she explain why not.

8          MS. BASS:  Yes, your Honor.

9          THE COURT:  OK.  That should be done a week from

10    today.

11          OK.  I will address some of the last little bits and

12    pieces that I was not able to get to.  But I think you have a

13    lot of instructions on where to go, and I'll issue an order

14    tomorrow with a date to get me a status report.

15          Thank you, everybody.

16          (Adjourned)

17                         o0o

18

19

20

21

22

23

24

25